**No. 25-2919**

---

***In the***

# United States Court of Appeals

***for the***

# Eighth Circuit

---

UNION PACIFIC RAILROAD COMPANY,
*Petitioner*,

– v. –

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA
*Respondents;*

COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY
D/B/A METRA,
*Intervenor.*

---

**INTERVENOR COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY, D/B/A METRA'S RESPONSE OPPOSING PETITIONER'S MOTION FOR STAY PENDING REVIEW**

---


PAUL W. HUGHES
ANDREW A. LYONS-BERG
MARY H. SCHNOOR
EMMETT WITKOVSKY-ELDRED
*McDermott Will & Schulte LLP*
*500 North Capitol Street NW*
*Washington, DC 20001*
*(202) 756-8000*

*Counsel for Commuter Rail Division of the Regional Transportation Authority d/b/a Metra*

## TABLE OF CONTENTS

Introduction ........................................................................................ 1
Background ........................................................................................ 3
A. Metra's commuter rail service and the UP Lines ......................... 3
B. The STB proceeding and UP's rejection of the status quo ........... 4
C. The STB order ................................................................................ 6
D. The parties' subsequent negotiations ........................................... 7
Argument ........................................................................................ 9
I. UP's stay request violates Rule 18 and is moot .................................. 9
A. Rule 18 requires denial of UP's stay request. .............................. 9
B. UP's stay request is moot. ........................................................ 10
II. The stay factors support denying UP's motion ................................. 11
A. UP is unlikely to prevail on the merits ...................................... 11
1. The STB's action is consistent with the statute. ................. 11
2. The STB acted reasonably. ................................................ 15
B. UP will suffer no irreparable harm ........................................... 16
C. The remaining equitable factors do not favor relief. .................. 22
Conclusion ........................................................................................ 23

**TABLE OF AUTHORITIES**

**Cases**

*Beber v. NavSav Holdings, LLC*,
140 F.4th 453 (8th Cir. 2025) ........ 20

*Brady v. National Football League*,
640 F.3d 785 (8th Cir. 2011) ........ 18, 19

*Citizens Coal Council v. Babbitt*,
2002 WL 35468435 (D.C. Cir. June 5, 2002) ........ 19

*Conkright v. Frommert*,
556 U.S. 1401 (2009) ........ 17

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
772 F.2d 972 (D.C. Cir. 1985) ........ 11

*Forest Grove Sch. Dist. v. T.A.*,
557 U.S. 230 (2009) ........ 14

*Grasso Enters., LLC v. Express Scripts, Inc.*,
809 F.3d 1033 (8th Cir. 2016) ........ 16

*Hillesheim v. Holiday Stationstores, Inc.*,
903 F.3d 786 (8th Cir. 2018) ........ 10

*Iowa Utilities Bd. v. F.C.C.*,
109 F.3d 418 (8th Cir. 1996) ........ 17, 18

*Knick v. Twp. of Scott*,
588 U.S. 180 (2019) ........ 15

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011 (8th Cir. 2023) ........ 19, 20

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 23

*Packard Elevator v. I.C.C.*,
782 F.2d 112 (8th Cir. 1986) ........ 20

*PennEast Pipeline Co. v. New Jersey*,
594 U.S. 482 (2021) ........ 15

*Romag Fasteners, Inc v. Fossil, Inc.*,
590 U.S. 212 (2020) ........ 13

**Cases Continued—**

*S. Nat. Gas Co. v. FERC*, 877 F.2d 1066 (D.C. Cir. 1989) .......... 10

*S. Pac. Transp. Co. v. I.C.C.*, 736 F.2d 708 (D.C. Cir. 1984) .......... 6, 14

*In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749 (8th Cir. 2003) .......... 23

*SAS Inst., Inc. v. Iancu*, 584 U.S. 357 (2018) .......... 13

*Smith v. Berryhill*, 587 U.S. 471 (2019) .......... 9

*Watson Bros. Transp. Co. v. Jaffa*, 143 F.2d 340 (8th Cir. 1944) .......... 23

**Statutes and rules**

49 U.S.C. § 11102(a) .......... *passim*

Fed. R. App. P. 18(a)(2)(A)(ii) .......... 1, 2, 9, 10

**Other Authorities**

Henry Campbell Black, *A Law Dictionary* (2d ed. 1910) .......... 14

*Black's Law Dictionary* (12th ed. 2024) .......... 13

## INTRODUCTION

Metra provides a vital public service. On this point, Metra, Union Pacific (UP), and the Surface Transportation Board (STB) all agree. Metra transports over 100,000 people across the Chicago area every day, including tens of thousands on tracks owned by UP. Earlier this year—with UP exiting and Metra assuming the role of service operator on these tracks (the UP Lines)—Metra petitioned the STB for terminal trackage rights. *See* 49 U.S.C. § 11102(a). On September 3, 2025, the STB granted Metra's request, providing a framework for the parties to negotiate the conditions and compensation for Metra's use and securing the long-term continuity of Metra's service.

UP now requests a stay pending judicial review. The STB opposed UP's motion as moot. *See* STB Resp. Metra also opposes the motion for mootness and other reasons.

*First*, Rule 18 requires a stay applicant to first request a stay from the agency and then demonstrate in this Court that "the agency denied the motion or failed to afford the relief requested." Fed. R. App. P. 18(a)(2)(A)(ii). UP satisfied the first requirement—barely—by petitioning the STB, mere *hours* before filing the present motion, to impose an interim condition on Metra's terminal access rights addressing indemnity and liability, or, "[a]lternatively," to stay its order *either* "pending judicial review *or* until …



Appellate Case: 25-2919 Page: 5 Date Filed: 10/09/2025 Entry ID: 5566596

the Board imposes interim terms and conditions on indemnification and liability allocation." STB Resp. Ex. 1 at 2.

One day later, the STB granted all the relief UP had sought from the agency: The STB imposed an interim condition governing indemnity and liability for Metra's use of the UP Lines, thus granting UP's primary request and mooting its alternative request for a stay pending that action.

UP therefore cannot demonstrate, as it must, that "the agency denied the [stay] motion or failed to afford the relief requested." Fed. R. App. P. 18(a)(2)(A)(ii). UP's request for a stay from this Court is moot.

*Second*, UP is unlikely to succeed on the merits. It presses an interpretation—that the STB must set use conditions before access can begin—that contradicts the underlying statutory text. *See* 49 U.S.C. § 11102(a). UP's claims of arbitrary and capricious action are based on the prior lack of indemnity and liability terms, which the STB has remedied.

*Finally*, UP cannot demonstrate irreparable harm. Its claims of injury are premised almost entirely on the alleged absence of indemnity and liability terms. Those arguments vanished with the STB's interim relief. Nor do the other equitable factors favor a stay, as Metra and the public would both be harmed by reinstating the uncertain circumstances that preceded the STB's grant of terminal trackage rights.

For all of these reasons, the Court should deny UP's motion.



Appellate Case: 25-2919 Page: 6 Date Filed: 10/09/2025 Entry ID: 5566596

## BACKGROUND

### A. Metra's commuter rail service and the UP Lines

Metra[1] conducts commuter rail operations in northeast Illinois and southeast Wisconsin. Metra rail is an essential public service to over 100,000 daily passengers and the regional economy.

The UP Lines are three of the busiest in Metra's system. Passenger service on these lines predates the Civil War, and Metra and UP (or their predecessors) have contracted to provide commuter rail service since the 1970s. UP historically operated commuter rail service on the UP Lines pursuant to a purchase of service agreement (PSA) with Metra. The PSA expired on June 30, 2025.

In 2019, UP informed Metra that it intended to discontinue its operation of commuter rail service. Since then, the parties have transitioned operations and personnel to Metra, effectively completing that process as of May 16, 2025. Metra sought (unsuccessfully) to negotiate a new, commercially reasonable trackage rights agreement with UP to replace the PSA before its expiration.

---

1 Metra consists of two governmental entities: the Commuter Rail Division (CRD) and the Northeast Illinois Regional Commuter Railroad Corporation (NIRCRC). Metra is a service mark owned by CRD, which CRD uses to brand its commuter rail services.

### B. The STB proceeding and UP's rejection of the status quo

On March 7, 2025, Metra filed with the STB an application for terminal trackage rights—that is, the statutory right to use the UP Lines for its public service—pursuant to 49 U.S.C. § 11102(a). *See Commuter Rail Division of the Regional Transportation Authority d/b/a/ Metra—Terminal Trackage Rights—Union Pacific Railroad Company,* Surface Transportation Board, Finance Docket No. 36844. The same day, Metra sued UP in the U.S. District Court for the Northern District of Illinois, seeking, among other things, a declaration that Metra has a separate contractual right to continued use of the UP Lines. *See Commuter Rail Division of the Regional Transportation Authority d/b/a Metra v. Union Pacific* ("*CRD*"), No. 25-2439 (N.D. Ill.).

With litigation pending in both forums, and the PSA's term date looming, Metra sought to preserve the pre-expiration status quo until the parties resolved their dispute. *See CRD*, No. 25-2439, Dkt. 43 Ex. 1 at 1. UP had different ideas. Upon the PSA's expiration, UP attempted to unilaterally impose on Metra a non-negotiated "Condition of Entry" (COE), if Metra continued to use the UP Lines. *See* Mot. Ex. A at 3. The COE would have more than doubled the compensation paid by Metra. *CRD*, No. 25-2439, Dkt. 43-8 at 13-14. It also contained oppressive and one-sided terms, including a virtual blanket indemnification of UP's liability on the UP Lines, even for



Appellate Case: 25-2919 Page: 8 Date Filed: 10/09/2025 Entry ID: 5566596

claims from UP's own operations. *Id.* at 19. UP asserted that Metra's continued use of the UP Lines would constitute acceptance of the COE. Mot. Ex. B at 12-13.

Metra rejected the COE as invalid and unenforceable, noting that it has a separate contractual right to use the UP Lines, secured by hundreds of millions of dollars of capital improvements that it has funded in the UP Lines. *CRD*, No. 25-2439, Dkt. 43 Ex. 1 at 7-8; Ex. 7. Metra also sought emergency relief from the Northern District of Illinois and the STB. *Id.* at Dkt. 43; STB Dkt. 309715. Contrary to its argument now, UP opposed that relief, arguing there would be no irreparable harm to Metra because any uncertainty regarding the conditions governing Metra's use of the UP Lines—*including* terms related to liability and indemnification—could be remedied with damages. *CRD*, No. 25-2439, Dkt. 46 at 8-10; Dkt. 59 at 1-2; STB Dkt. 309717 at 1-2. The district court and STB denied relief (*CRD*, No. 25-2439 Dkt. 64 at 10-13; STB Dkt. 52650 at 3-4), and Metra continued to use the UP Lines under protest that the COE was invalid.[2]

---

[2] After the STB granted Metra terminal trackage rights, Metra voluntarily dismissed its district court complaint. The same day, UP sued Metra, asserting breach of the COE and requesting a declaratory judgment that the COE is enforceable. *See Union Pacific v. Commuter Rail Division of the Regional Transportation Authority*, No. 25-10785 (N.D. Ill.).



Appellate Case: 25-2919 Page: 9 Date Filed: 10/09/2025 Entry ID: 5566596

### C. The STB order

On September 3, 2025, the STB granted Metra's terminal trackage rights application. *See generally* Mot. Ex. A. The STB determined that it possessed jurisdiction (*id.* at 4-10), that the UP Lines lie within a reasonable distance of the relevant terminal (*id.* at 16-21), that terminal access is practicable (*id.* at 21-22), and that the public interest favors terminal access (*id.* at 22-30), because Metra "provides a vital public service over the UP Lines" (*id.* at 28).

To preserve that vital public service, the STB's order took immediate effect, retroactive to July 1. Mot. Ex. A at 33. The STB declined to set final conditions and compensation at the time. *Id.* at 30-33. It explained that, once terminal trackage rights are awarded, Congress expected and required the private parties to negotiate such matters in the first instance. *Id.* at 33; *see also* 49 U.S.C. § 11102(a).

The STB further explained that UP's compensation was "adequately secured," as required for Metra to exercise its terminal trackage rights, for several reasons. *First*, the STB had "pledge[d] to set compensation under condemnation principles" if necessary—a form of security courts have endorsed for decades. Mot. Ex. A at 31; *see also, e.g.*, *S. Pac. Transp. Co. v. I.C.C.*, 736 F.2d 708, 723 (D.C. Cir. 1984) (Interstate Commerce Commis-



Appellate Case: 25-2919 Page: 10 Date Filed: 10/09/2025 Entry ID: 5566596

sion's assurance that it would "apply the principles for compensation in condemnation proceedings … fulfills the requirement of the term 'adequately secured'"). *Second*, Metra testified that it could afford to pay any final compensation set, and, as a governmental entity, it is "presumed to be 'financially responsible'" under agency regulations. Mot. Ex. A at 31-32. Additionally, the STB noted that any compensation it sets will apply "retroactively (from July 1, 2025)" to make UP whole for any potential underpayment. *Id.* at 32.

Though the STB "expect[ed] and encourage[ed] Metra and UP to undertake a concerted, good faith effort to reach agreement on terms and compensation for Metra's use of the UP Lines," it stated that "the Board will establish the compensation and conditions of use in accordance with the statute" if necessary. Mot. Ex. A at 33. Specifically, if the parties cannot agree on "indemnity for accident liability," they could "seek guidance from the Board." *Id.* at 32 n.65.

**D. The parties' subsequent negotiations**

Metra and UP exchanged letters regarding interim terms for liability and indemnification after the STB's order, though UP never responded to Metra's five separate entreaties to meet for in-person, bilateral negotiations. *See* Mot. Exs. C-F. After previously refusing to extend the PSA terms,



Appellate Case: 25-2919 Page: 11 Date Filed: 10/09/2025 Entry ID: 5566596

UP reversed course, proposing to selectively reimplement the PSA's indemnity and liability provisions in the interim. Mot. Ex. C. Metra declined, because the PSA terms do not reflect current operating realities now that Metra, and not UP, operates commuter rail services directly. Mot. Exs. D, F. Instead, Metra proposed industry-standard terms that correspond with agreements that Metra maintains with other similarly situated rail carriers. Mot. Ex. D.

On September 29, 2025, UP petitioned for review of the STB's September 3 order and requested a stay pending review the same day. Concurrently, UP petitioned the STB to reinstate the PSA's indemnity and liability terms as interim conditions, or in the "alternative," to stay its order "pending judicial review or until the parties agree to or the Board imposes interim terms and conditions on indemnification and liability allocation." STB Resp. Ex. 1 at 2.

On September 30, 2025, the STB temporarily imposed the PSA terms UP requested. STB Resp. Ex. 2 at 3-4. Accordingly, it denied UP's alternative stay request as moot. *Id.* at 3 n.2.



Appellate Case: 25-2919 Page: 12 Date Filed: 10/09/2025 Entry ID: 5566596

## ARGUMENT

### I. UP'S STAY REQUEST VIOLATES RULE 18 AND IS MOOT

The STB has granted UP the relief it sought from the agency: an interim condition on indemnity and liability. This development compels denying UP's motion both under the text of the rule governing stays pending review and fundamental mootness principles.

#### A. Rule 18 requires denial of UP's stay request.

To justify a stay, Rule 18(a)(2)(A)(ii) requires the movant to show that "a motion having been made [before the agency], the agency denied the motion or failed to afford the relief requested." This requirement reflects the "fundamental principle[] of administrative law" that "a federal court generally goes astray if it decides a question that has been delegated to an agency if that agency has not first had a chance to address the question." *Smith v. Berryhill*, 587 U.S. 471, 488 (2019).

UP's motion fails that standard. The STB was clear: recognizing that indemnity and liability are "critical" issues, it encouraged the parties to negotiate but stated it would provide "guidance" if asked. Mot. Ex. A at 32 n.65. UP sought that guidance, and, sure enough, the next day the STB granted UP's proposed interim condition.

The STB thus "afford[ed] [UP] the relief [it] requested." Fed. R. App. P. 18(a)(2)(A)(ii). The relief Union Pacific requested was the precise interim condition the STB has imposed. Only in the "alternative" did UP seek a stay



Appellate Case: 25-2919 Page: 13 Date Filed: 10/09/2025 Entry ID: 5566596

pending judicial review. STB Resp. Ex. 1 at 6. *Cf. S. Nat. Gas Co. v. FERC*, 877 F.2d 1066, 1070 (D.C. Cir. 1989) ("Having received what it asked for, Southern cannot now complain that FERC acted arbitrarily in refusing to grant the relief it requested only in the alternative."). In particular, UP asked for a stay "pending judicial review *or* until the parties agree to or *the Board imposes interim terms and conditions on indemnification and liability allocation*." STB Resp. Ex. 1 at 2 (emphasis added). UP cannot now ask this Court for more—a stay that extends *beyond* the Board's imposition of indemnity and liability terms.

Because the STB provided UP all the relief it requested from the agency, Rule 18 precludes a stay.

**B. UP's stay request is moot.**

UP's request is moot. "Generally, a claim is moot when changed circumstances already provide the requested relief and eliminate the need for court action." *Hillesheim v. Holiday Stationstores, Inc.,* 903 F.3d 786, 791 (8th Cir. 2018). Just so here. The "need for court action" was obviated by the STB's interim condition.

The alleged absence of indemnity and liability terms was the impetus of UP's motion. UP emphasizes the issue throughout its merits arguments. *See, e.g.*, Mot. 13 ("This language is best read to require setting terms—including compensation and other conditions of use, like indemnification—



Appellate Case: 25-2919 Page: 14 Date Filed: 10/09/2025 Entry ID: 5566596

before access can begin."); *id.* at 19. Indemnification is the core of UP's irreparable harm contentions as well. *Id.* at 22 ("[G]iven the lack of clear indemnity protections, the risks and burdens of protracted negotiations will fall disproportionately on Union Pacific."). And so too on the public interest. *Id.* at 24-25.

These concerns resolved, what is left does not warrant the "extraordinary remedy" of a stay pending review. *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985).

## II. THE STAY FACTORS SUPPORT DENYING UP'S MOTION

### A. UP is unlikely to prevail on the merits.

#### *1. The STB's action is consistent with the statute.*

UP's statutory argument—that the statute "require[s] setting terms … before access can begin" (Mot. 13) contradicts the plain statutory text.[3]

**a.** Union Pacific notes that "Section 11102(a) describes a sequential process." Mot. 14. But it misreads the sequence. The text provides:

> The Board may require terminal facilities … to be used by another rail carrier if the Board finds that use to be practicable

[3] It also contradicts what UP told the STB a year ago in another trackage rights case. There, UP argued that "[r]etroactive compensation is common where one railroad is required to provide another railroad access to its facilities" and "[u]nder 49 U.S.C. § 11102(a), the Board allows rail carriers to begin using the terminal facilities of other rail carriers before compensation terms are established, subject to retroactive compensation." Ex. A at 16 & n.57; *id.* at n.56 (citing favorably STB order applying "terms and conditions" retroactively).



Appellate Case: 25-2919 Page: 15 Date Filed: 10/09/2025 Entry ID: 5566596

> and in the public interest … . The rail carriers are responsible for establishing the *conditions and compensation* for use of the facilities. However, if the rail carriers cannot agree, the Board may establish *conditions and compensation* for use of the facilities under the principle controlling compensation in condemnation proceedings. The *compensation* shall be paid or adequately secured before a rail carrier may begin to use the facilities of another rail carrier under this section.

49 U.S.C. § 11102(a) (emphases added). The sequence is this: *first* the STB awards trackage rights, *then* the parties negotiate over conditions and compensation, and only *then*, if negotiations fail, the STB sets conditions and compensation. But only the securing of compensation, and not the setting of conditions, must precede use of the tracks. The STB followed that sequence.

**b.** UP makes a series of interpretive errors. It first asserts that when the statute requires "compensation" to be paid or adequately secured before use, it actually means that "compensation *and other conditions of use, like indemnification*" must be established. Mot. 13 (emphasis added). But the statute does not say that; on the contrary, while the parties are responsible for negotiating—or, failing, that, the Board is empowered to set—both "conditions *and* compensation," only "*compensation* shall be paid or adequately secured before" use begins. 49 U.S.C. § 11102(a) (emphases added).

Congress knew how to apply a provision to both conditions and compensation when it wanted to—it did so twice in the preceding two sentences.



Appellate Case: 25-2919 Page: 16 Date Filed: 10/09/2025 Entry ID: 5566596

Thus, "if Congress had wanted" to encompass not just compensation but also conditions in the final sentence of Section 11102(a) "it knew exactly how to do so—it could have simply borrowed from the [sentence] next door." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018). The Court "may [not] disregard" Congress's contrary choice. *Id.*; *accord, e.g.*, *Romag Fasteners, Inc v. Fossil, Inc.*, 590 U.S. 212, 215 (2020) ("[T]his Court [does not] usually read into statutes words that aren't there," and "we are doubly careful to avoid" doing so "when Congress has (as here) included the term in question elsewhere in the very same statutory provision.").

**c.** UP defends its revisionism by asserting that "at least some conditions *must* be set together with (or before) compensation so the amount of compensation can be determined." Mot. 14. Again, however, the statute allows compensation to be "adequately secured" rather than "paid." 49 U.S.C. § 11102(a). Compensation can be adequately secured without the precise final value being known. UP admits as much, acknowledging that "final terms are not required in advance." Mot. 15.

UP also argues that to be "secured" something must be "supported or backed by security or collateral" and thus the STB's "pledge" to set future compensation is inadequate. Mot. 16 (citing *Secured*, Black's Law Dictionary (12th ed. 2024)). But the "ordinary meaning" (*id.*) of the verb "secure" at



Appellate Case: 25-2919 Page: 17 Date Filed: 10/09/2025 Entry ID: 5566596

the time of enactment[4] comfortably encompassed the general sense "to assure of payment, performance, or indemnity"; it was not limited to the giving of collateral or other specific methods. *Secure*, Henry Campbell Black, *A Law Dictionary* 1066 (2d ed. 1910).

The STB's conclusion that compensation is "adequately secured" by its pledge to set compensation finds support in four decades of judicial and agency precedent. *See S. Pac. Transp.*, 736 F.2d at 723 (holding that agency "fulfills the requirement of the term 'adequately secured,'" enabling "trackage rights [to be] made immediately effective" notwithstanding a current lack of payment terms, by pledging to "apply the principles for compensation in condemnation proceedings" if the parties cannot agree); *see also* Mot. Ex. A at 31 n.64 (citing agency examples). Congress itself is deemed to have adopted that interpretation when it "re-enact[ed]" the relevant language "without change" in 1995. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-240 (2009) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change."); *see* ICC Termination Act of 1995, Pub. L. No. 104-88, § 102(a), 109 Stat. 803, 831.

---

[4] The relevant language was added to the Interstate Commerce Act in 1920. *See* Transportation Act of 1920, ch. 91, § 405, 41 Stat. 456, 480.



Appellate Case: 25-2919 Page: 18 Date Filed: 10/09/2025 Entry ID: 5566596

Finally, UP argues that allowing Metra to use the UP Lines without setting compensation "raises constitutional problems" because terminal access is a taking. Mot. 16 (citing *Knick v. Twp. of Scott*, 588 U.S. 180, 190 (2019)). UP misconstrues *Knick*, which actually holds that while the "*right* to full compensation arises at the time of the taking"—meaning that the property owner "may bring" a takings claim "at that time"—that "*does not* as a practical matter mean that government action or regulation may not proceed in the absence of contemporaneous compensation[,] [g]iven the availability of post-taking compensation." 588 U.S. at 190, 202 (emphases added)); *see also PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 487-488 (2021) (recognizing that "[e]minent domain … can be exercised … simply by taking possession up front, with compensation to follow").

***2.*** *The STB acted reasonably.*

UP is also wrong that the STB acted arbitrarily and capriciously by not initially setting interim conditions.

*First*, UP focuses on the alleged lack of liability and indemnity conditions. Mot. 19-20 (arguing "[t]he Board's failure to adopt interim terms was especially unreasonable as to indemnity."). But again, that concern is now resolved, leaving nothing of substance to address.

*Second*, the STB was prepared at all times to address interim conditions upon request (and now has done so). This approach achieved a sensible

balance between what the statute demands (private negotiation); what the circumstances require (immediate trackage rights); and what the complexities of railroading counsel (swift STB intervention, if needed).

*Third*, UP argues the agency did not explain its approach. Mot. 20. Not so. The STB declined to set conditions for the parties because the statute requires negotiation first. Mot. Ex. A at 32-33. The STB granted Metra immediate rights because Metra provides a "vital public service," "there is a strong public interest in having this service continue," and "the record demonstrates that Board intervention is warranted to ensure that result." Mot. Ex. A at 27. Specifically, "under UP's interpretation of the law, Metra would have [had] no right to refuse unreasonable terms and conditions and no recourse if UP decided to deny access altogether." *Id.* at 29. Put differently, immediate rights were (and remain) necessary because otherwise UP could attempt to upend service at any time or impose unreasonable conditions. That conclusion, on this record, was reasonable, and UP's motion does not demonstrate otherwise.

**B. UP will suffer no irreparable harm.**

**1.** UP's irreparable harm arguments also fail. *See, e.g.*, *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) ("Failure to show irreparable harm is an independently sufficient ground upon which



Appellate Case: 25-2919 Page: 20 Date Filed: 10/09/2025 Entry ID: 5566596

to deny" equitable relief). As noted (*supra* at 9-11), UP's purported harm based on its concerns about indemnity and liability are now resolved.

As it turns out, any "harm" caused by the STB's determination to require the parties to initially negotiate indemnity and liability was not "irreparable;" it was easily redressed by simply asking the STB. UP requested an interim condition on indemnification and liability, and it quickly got its wish. If the parties were to reach future impasses that UP found intolerable, UP would have a remedy.[5] It does not need extraordinary equitable relief to resolve its concerns. *See*, *e.g.*, *Conkright v. Frommert*, 556 U.S. 1401, 1403 (2009) ("The possibility that adequate compensatory or *other corrective relief* will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (emphasis added).

**2.** None of the other bases of irreparable harm that UP advances withstand scrutiny.[6] Citing *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th

[5] For example, UP frets over future requests for service schedule adjustments. Mot. 4. But the STB already has engaged with the parties on that issue at Metra's request and can set an interim condition if necessary. *See* STB Dkt. 52650 at 4 (Served July 1, 2025) ("[T]he Board expects the parties to work together collaboratively and in good faith when Metra makes requests for additional trains to accommodate attendees for special events.").

[6] UP's arguments conflict with its prior positions before the STB and in federal district court. Then, UP was clear that neither (a) UP exploiting its bargaining power in an effort to force the COE on Metra nor (b) uncertainty about governing terms post-PSA-expiration constituted irreparable harm. Before the STB, UP argued that "potential legal uncertainty" is a "routine harm[]," not irreparable. STB Dkt. 309717 at 3 (served June 30, 2025). And



Appellate Case: 25-2919 Page: 21 Date Filed: 10/09/2025 Entry ID: 5566596

Cir. 1996), UP argues that the STB order "badly tilts … negotiations in Metra's favor." Mot. 21. If the parties' negotiating positions now seem "tilt[ed]" to UP, it is only because UP previously was "negotiating" from the (incorrect) perspective that Metra had no right to operate on the UP Lines at all, except in UP's sole discretion. A level playing field may feel disorienting to UP, but that does not establish irreparable harm.

*Iowa Utilities Board* is inapposite. There, the FCC promulgated pricing regulations that caused an industry-wide distortion on rates in local telephone markets, which forced incumbents into permanent agreements that would "be extremely difficult … to abandon" if the FCC's rules were invalidated. 109 F.3d at 425. Unlike the petitioners in *Iowa Utilities Board* (and unlike Metra in the event of a stay), UP faces no risk of being forced into a lopsided agreement. Neither party can leverage its way into getting what it wants. The STB remains a neutral arbiter and the ultimate decider, and Metra and UP are on equal footing before the agency.

UP's citation to *Brady v. National Football League*, 640 F.3d 785, 793 (8th Cir. 2011) likewise is inapposite. *Cf.* Mot. 21. There, the Court stayed

---

UP insisted that neither the need for "clarity" nor the "risk" of operating without it were irreparable because "facing uncertain … liabilities" is present in "every lawsuit." *CRD*, Dkt. 59 at 1-2, No. 25-2439 (N.D. Ill., May 25, 2025). Even uncertainty about indemnity was not irreparable, UP argued, as "indemnification is just money." *Id*. at 2.



Appellate Case: 25-2919 Page: 22 Date Filed: 10/09/2025 Entry ID: 5566596

an injunction of a player lockout instituted by the NFL amid a labor dispute. UP quotes (at 21) a portion of the opinion not relaying this *Court's* reasoning but paraphrasing what "*[t]he League* contends." 640 F.3d at 793 (emphasis added). By contrast, the Court's own reasoning was, similar to *Iowa Utilities Board*, that a stay was necessary to prevent the "harm that would be caused to the League by player transactions that would occur only with an injunction against the lockout." *Id.* In other words, the distortion in negotiation positions was significant because it would lead to real-world transactions that would be impossible to unwind. No similar risk exists here.

Lastly, UP cites *Citizens Coal Council v. Babbitt*, 2002 WL 35468435, at *1 (D.C. Cir. June 5, 2002) to argue that "uncertainty" establishes irreparable harm. Mot 23. But the movants in *Citizens Coal Council* faced a complete "regulatory vacuum" absent a stay. 2002 WL 35468435 at *1. There is no vacuum here: the STB can resolve any uncertainty, as it just showed.

This Court recently rejected the argument that "uncertainty surrounding the validity and scope" of agency action was irreparable harm. *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023). These concerns, the Court explained, were not "definite enough" to show that "any harm is 'actual and



Appellate Case: 25-2919 Page: 23 Date Filed: 10/09/2025 Entry ID: 5566596

not theoretical,'" and "[i]njunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time.'" *Id.* (quoting *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986)).

Likewise, UP's concerns are indefinite. It has received clarity on indemnity and liability, and UP's motion does not specify any other lurking risks. Beyond that, UP's concerns reduce to commercial issues related to the usage of its tracks, which can easily be remedied either by additional STB action or future damages. *See, e.g.*, *Beber v. NavSav Holdings, LLC*, 140 F.4th 453, 463 (8th Cir. 2025) ("[P]urely economic harms are not irreparable if the movants can recover their losses by money damages.").

**3.** If anything, *granting* a stay would create uncertainty. As matters stand, Metra can use the UP Lines, and UP is assured compensation. The STB can promptly resolve any impasse over conditions of use, as already demonstrated, while the parties negotiate final conditions and compensation within the statutory framework. A stay, by contrast, would remove the statutory incentive to progress toward a bilateral agreement and plunge the parties back into the uncertainty that led Metra to seek terminal trackage rights in the first place.

UP is incorrect that a stay would eliminate uncertainty by restoring the COE as the alleged "sole source of Metra's right to use the rail lines." Mot. 24. On the contrary, the source of Metra's right to use the UP Lines,



Appellate Case: 25-2919 Page: 24 Date Filed: 10/09/2025 Entry ID: 5566596

prior to obtaining trackage rights, is intensely disputed between the parties in ongoing litigation filed by UP. Metra maintains it has preexisting contractual rights to use the UP Lines separate from the statutory rights granted: In exchange for Metra spending *hundreds of millions of dollars* to improve the UP Lines, UP agreed it would keep those lines "in service and available to be used." *See CRD*, Dkt. 37 at ¶¶ 289-311. Metra contends that UP has bargained away the right to dictate usage terms and denies that the COE is enforceable. The parties' dispute over the COE, which UP is seeking to litigate elsewhere, further counsels against a stay.

Here, staying the STB's order would introduce the very uncertainty UP decries. Metra maintains that the COE's indemnity and liability provisions are in breach of contract, unconscionable, and contrary to public policy. Right now, there is no uncertainty about indemnity and liability: the STB's interim condition governs. Under a stay, it would be uncertain what liability and indemnity terms apply.

Because the COE's validity or invalidity is unsettled, has not been briefed, and UP has sought to litigate this same question elsewhere, the COE cannot justify a stay. For present purposes what bears emphasis is that UP's assertion that a stay would *resolve* uncertainty, rather than create it, is incorrect.



Appellate Case: 25-2919 Page: 25 Date Filed: 10/09/2025 Entry ID: 5566596

### C. The remaining equitable factors do not favor relief.

The remaining equitable factors also weigh against a stay, which would harm both Metra and the public interest.

**1.** UP says a stay will not harm Metra because "Metra can keep operating on Union Pacific's lines without the Board's order" under the COE. Mot. 24. But, as explained, the legal status of the COE is contested.

Further, as the STB found, UP's argument is "critically undermined" by its own conduct, especially UP's view that "its decisions about whether to allow—and, if so, on what terms to allow—Metra future access to the UP Lines would be at UP's sole discretion." Mot. Ex. A at 28. Granting Metra immediate trackage rights was necessary to preserve Metra's ability to provide a critical public service on bilaterally negotiated terms subject to regulatory oversight consistent with the statutory framework for trackage rights. A stay would harm Metra and undermine the public interest secured by the STB order.

**2.** The public interest favors maintaining Metra's trackage rights *See generally* Mot. Ex. A 26-30. Specifically, "Metra provides a critically important public service" that has "served dozens of communities for decades" and "[t]housands of area residents" who "rely on Metra for access to and from essential daily activities." *Id.* at 29. Metra "supports economic development and job growth, reduces traffic congestion, and helps protect the



Appellate Case: 25-2919 Page: 26 Date Filed: 10/09/2025 Entry ID: 5566596

environment." *Id.* As the STB recognized, "[n]o other carrier provides that service." *Id.*

Those findings are compelling. The STB—whose interests "merge" with the public's (*see Nken v. Holder*, 556 U.S. 418, 435 (2009))—has a strong interest in exercising its authority to protect the public. *See, e.g.*, *In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 760 (8th Cir. 2003) ("[W]e give great weight to the fact that Congress already declared the public's interest and created a regulatory and enforcement framework."); *Watson Bros. Transp. Co. v. Jaffa*, 143 F.2d 340, 345 (8th Cir. 1944) (The "public interest is paramount and it is for the [Interstate Commerce] Commission to identify and to protect the public interest in the first instance.").

## CONCLUSION

The Court should deny the motion.



Appellate Case: 25-2919 Page: 27 Date Filed: 10/09/2025 Entry ID: 5566596

Dated: October 9, 2025

Respectfully submitted,

/s/ Paul W. Hughes
PAUL W. HUGHES
ANDREW A. LYONS-BERG
MARY H. SCHNOOR
EMMETT WITKOVSKY-ELDRED
*McDermott Will & Schulte LLP*
*500 North Capitol Street NW*
*Washington, DC 20001*
*(202) 756-8000*

*Counsel for the Commuter Rail Division of the Regional Transportation Authority d/b/a Metra*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief:

(i) complies with the type-volume limitation of Rule 27(d) because it contains 5,196 words; and

(ii) complies with the typeface and type style requirements of Rule 27(d)(1)(E) because it has been prepared using Microsoft Word for Microsoft 365 MSO and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: October 9, 2025 /s/ *Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2025, I electronically filed the foregoing response with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: October 9, 2025 /s/ *Paul W. Hughes*

# Exhibit A

Union Pacific Railroad Company's Opening Statement and Evidence, *Atchison, Topeka & Santa Fe Railway Company—Operating Rights—Southern Pacific Transportation Company*, Surface Transportation Board Finance Docket No. 22218 (May 3, 2024)

Appellate Case: 25-2919 Page: 30 Date Filed: 10/09/2025 Entry ID: 5566596

**COVINGTON**

BEIJING BOSTON BRUSSELS DUBAI FRANKFURT
JOHANNESBURG LONDON LOS ANGELES NEW YORK
PALO ALTO SAN FRANCISCO SEOUL SHANGHAI WASHINGTON

**Michael L. Rosenthal**

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5448
mrosenthal@cov.com

308286

ENTERED
Office of Proceedings
May 3, 2024
Part of
Public Record

**By E-Filing**

May 3, 2024

Cynthia T. Brown
Chief, Section of Administration
Office of Proceedings
Surface Transportation Board
395 E Street, S.W.
Washington, DC 20423-0001

**Re: STB Finance Docket No. 22218, Atchison, Topeka & Santa Fe Railway Company-Operating Rights-Southern Pacific Transportation Company**

Dear Ms. Brown:

Enclosed for electronic filing in the referenced proceeding is the redacted, public version of Union Pacific Railroad Company's Opening Statement and Evidence. Union Pacific is filing electronic copies of its workpapers, which contain Confidential and Highly Confidential material, under seal.

Please contact me if you have any questions.

Sincerely,

Michael L. Rosenthal
*Counsel for Union Pacific Railroad Company*

Enclosures

cc: All parties of record

Appellate Case: 25-2919 Page: 31 Date Filed: 10/09/2025 Entry ID: 5566596

BEFORE THE
SURFACE TRANSPORTATION BOARD

---

Finance Docket No. 22218

ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY
—OPERATING RIGHTS—
SOUTHERN PACIFIC TRANSPORTATION CO.

---

**UNION PACIFIC RAILROAD COMPANY'S OPENING STATEMENT AND EVIDENCE**

CRAIG V. RICHARDSON
JAMES B. BOLES
TONYA W. CONLEY
TANYA L. SPRATT
Union Pacific Railroad Company
1400 Douglas Street
Omaha, NE 68179

MICHAEL L. ROSENTHAL
Covington & Burling LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
(202) 662-6000

*Attorneys for Union Pacific Railroad Company*

May 3, 2024

## TABLE OF CONTENTS

I. Introduction ..... 1

II. Background ..... 3

A. The Tehachapis Line ..... 3

B. The ICC's Prescribed Terms and Conditions ..... 4

C. SP's Petition to Reopen and the Joint Stipulation ..... 5

D. Union Pacific's Petition to Reopen ..... 6

III. Determining Interest Rental for the Tehachapis Line ..... 7

A. The Board Should Calculate Interest Rental Using CE. ..... 8

B. Interest Rental Calculations Using CE and RCNLD ..... 11

1. Application of CE ..... 11

2. Application of RCNLD ..... 14

IV. Other Issues ..... 15

A. BNSF Should Pay the New Rental as of January 3, 2023. ..... 15

B. Potential Impact ..... 17

V. Conclusion ..... 17

EXHIBIT A – Verified Statement of David W. Hughes

EXHIBIT B – Verified Statement of Dr. Divya Mathur

EXHIBIT C – Verified Statement of Harvey A. Crouch, PE

EXHIBIT D – Verified Statement of Charles W. Rex III, MAI

BEFORE THE
SURFACE TRANSPORTATION BOARD

---

Finance Docket No. 22218

ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY
—OPERATING RIGHTS—
SOUTHERN PACIFIC TRANSPORTATION CO.

---

**UNION PACIFIC RAILROAD COMPANY'S OPENING STATEMENT AND EVIDENCE**

## I. Introduction

This proceeding involves the interest rental BNSF Railway Company pays to use Union Pacific Railroad Company's 67.8-mile line between Kern Junction and Mojave, California, known as the Tehachapis Line. BNSF currently pays an amount prescribed by the Interstate Commerce Commission in 1967. The ICC's prescription has become inequitable, and Union Pacific is effectively subsidizing BNSF's operations on the Line. Union Pacific is asking the Board to revise the ICC's 1967 prescription and set a new interest rental amount using the capitalized earnings method from the Board's *SSW Compensation* methodology for computing trackage rights compensation. Application of the *SSW Compensation* methodology will substantially increase the interest rental, leveling the competitive playing field between Union Pacific and BNSF.

The only dispute in this proceeding is the amount of interest rental BNSF must pay to use the Line. On January 6, 2023, Union Pacific filed a petition asking the Board to reopen this proceeding and revise the prescribed interest rental. On January 26, 2023, BNSF acknowledged Union Pacific's right to reopen the proceeding. On May 15, 2023, the Board granted Union Pacific's petition but ordered the parties to mediate the dispute.



Appellate Case: 25-2919 Page: 34 Date Filed: 10/09/2025 Entry ID: 5566596

Mediation was unsuccessful. On December 4, 2023, the parties proposed a schedule for the submission of evidence, which the Board adopted on December 5, 2023.

This Opening Statement first describes the Tehachapis Line and the events leading to the present dispute. It then discusses the legal issues involved in determining the appropriate interest rental and summarizes the results of rental calculations based on two methods the Board has used in *SSW Compensation* cases: capitalized earnings (CE) and reproduction cost new less deprecation (RCNLD). It concludes by addressing two implementation issues: when to implement the new interest rental amount, and the potential impact of implementing the new rental.

In support of its Opening Statement, and as its Evidence, Union Pacific is submitting verified statements and supporting workpapers from three expert witnesses: Dr. Divya Mathur of Analysis Group, Inc. (Mathur VS); Harvey A. Crouch, PE, of Crouch Engineering (Crouch VS); and Charles W. Rex III, MAI, of RMI Valuation, LLC (Rex VS). Dr. Mathur determined the Line's valuation and calculated interest rental using CE. Her statement explains why CE is the economically appropriate valuation method in this proceeding. Mr. Crouch determined the Line's valuation and calculated interest rental using RCNLD. Mr. Rex's statement provides a real estate valuation that Mr. Crouch uses in his RCNLD calculation. Union Pacific's Evidence also includes a verified statement from Mr. David W. Hughes, Union Pacific's Assistant Vice President of Joint Facilities and Interline Operations (Hughes VS). Mr. Hughes provides context for the present dispute and addresses the potential impact of implementing the new rental.



Appellate Case: 25-2919 Page: 35 Date Filed: 10/09/2025 Entry ID: 5566596

## II. Background

### A. The Tehachapis Line

The Tehachapis Line runs for 67.8 miles between Kern Junction in Bakersfield, California, and Mojave, California. It crosses some of the most challenging terrain on Union Pacific's system. The Line rises from an altitude of 412 feet above sea level at Kern Junction, ascends to 4,025 feet at its highest point in Tehachapi, then descends to an altitude of 2,777 feet in Mojave. It has 55.7 route mile segments of double track and 13.1 route mile segments of single track. It also has 12 concrete-lined tunnels totaling 5,425 feet in length, as well as 140 culverts, 73 bridges, and 12 retaining walls.[1]

The Line is an exceptionally valuable asset to both Union Pacific and BNSF. Union Pacific currently routes { }[2] trains per day over the Line, including high priority intermodal trains. Union Pacific's intermodal trains use the Line for routes from Los Angeles to the Pacific Northwest and Los Angeles to Lathrop, California. Union Pacific's manifest trains use the line for traffic moving between Los Angeles and Roseville, California, and between Roseville and El Paso, Texas.[3]

BNSF is highly dependent on the Line. It currently routes { } trains per day over the Line. The Line provides a critical link in BNSF's intermodal franchise. BNSF has no alternate route it could use to move double-stack intermodal traffic from markets in Northern California to connect with its highly efficient Southern Transcon

---

[1] *See* Crouch VS at 4–7.

[2] In Union Pacific's Opening Statement and Evidence, Highly Confidential information is enclosed in double braces, and Confidential information is enclosed in single braces. Highly Confidential information and Confidential information is redacted from the public version of documents filed at the Board.

[3] *See* Hughes VS at 2.



Appellate Case: 25-2919 Page: 36 Date Filed: 10/09/2025 Entry ID: 5566596

route that runs from Los Angeles to Chicago. The line is also critical to BNSF's ability to offer competitive service for all its traffic moving in the I-5 Corridor.[4]

The Line was constructed in 1876 by a predecessor of Southern Pacific Transportation Company. Union Pacific now owns the line as successor to SP. In 1899, The Atchison, Topeka & Santa Fe Railway Company contracted with SP to use the Line, rather than construct its own line to bridge a gap in its network. BNSF now has trackage rights over the Line as successor to ATSF.

In 1912, SP and ATSF renegotiated their original trackage rights agreement. When the renegotiated agreement expired in 1961, the railroads were unable to agree on terms and conditions for renewal, so they submitted the issues to the ICC.[5]

**B. The ICC's Prescribed Terms and Conditions**

In 1967, the ICC entered an order prescribing 31 separate terms and conditions for ATSF's continued use of the Line.[6] Two conditions are relevant in this proceeding: Conditions 17 and 30.

Condition 17 sets ATSF's annual rental for use of the Line at one-half of 5-1/2 percent of the ICC's $17 million valuation of the Line.[7] The ICC made the new rental retroactive to January 1, 1962—the day after the 1912 agreement had expired.[8]

---

[4] *See id.* at 3.

[5] *See generally Atchison, Topeka & Santa Fe Ry.—Operating Agreement—S. Pac. Co.*, 331 I.C.C. 367 (1967), *modified*, 333 I.C.C. 342 (1968) (jointly referred to as the *1967 Order*).

[6] *See id.* at 387–404.

[7] *See id.* at 394.

[8] *See id.*

Condition 30 allows either party, on each succeeding fifth anniversary of the effective date of the transaction, to petition for revision of terms and conditions that may have become inequitable. It provides that the ICC will retain jurisdiction over the transaction for the purpose of revising the terms and conditions.[9]

**C. SP's Petition to Reopen and the Joint Stipulation**

In 1991, SP petitioned to reopen the proceeding to modify certain provisions of the prescribed conditions. In 1992, the ICC granted SP's petition, but only to address the condition establishing the interest rental for ATSF's use of the Line.[10] In granting SP's petition, the ICC agreed with SP that the rental prescribed in Condition 17 was "clearly inequitable."[11]

In June 1993, SP and ATSF negotiated a settlement that included changes to Condition 17. They called the settlement the "Joint Stipulation and Agreement." At the parties' request, the ICC entered an order formally incorporating the provisions of the Joint Stipulation and Agreement as a modification to the conditions prescribed in the *1967 Order*.[12]

In the Joint Stipulation and Agreement, ATSF's annual interest rental amount was initially set at $5.5 million.[13] In 2022, however, BNSF paid just $2.1 million in

---

[9] *See id.* at 403–04.

[10] *See Atchison, Topeka & Santa Fe Ry.—Operating Agreement—S. Pac. Transp. Co.* (*1992 Order*), 8 I.C.C.2d 297, 303 (1992).

[11] *Id.*

[12] *See Atchison, Topeka & Santa Fe Ry.—Operating Agreement—Southern Pac. Transp. Co.* (*July 1993 Order*), FD 22218 et al., slip op. at 1 (ICC served July 8, 1993).

[13] *See id.*, App. § 1(a).

annual interest rental, as a result of an adjustment mechanism based on yields of U.S. Treasury bonds.[14]

The Joint Stipulation and Agreement included an initial term of 17 years and provided it would continue in effect until terminated by either party, with at least six months prior written notice to the other party.[15]

### D. Union Pacific's Petition to Reopen

On June 29, 2022, Union Pacific served BNSF with notice that it was electing to terminate the Joint Stipulation and Agreement as of December 31, 2022.[16] Union Pacific terminated the Joint Stipulation and Agreement because the interest rental provision no longer provided fair compensation for BNSF's use of the Line.[17]

On January 6, 2023, Union Pacific filed a petition to reopen this proceeding pursuant to Condition 30 of the *1967 Order* for the purpose of revising Condition 17. Union Pacific explained it was seeking to reopen the proceeding because the interest rental paid by BNSF was "clearly inequitable."[18]

On January 26, 2023, BNSF filed a reply in which it asked the Board to grant Union Pacific's petition and requested that the Board order the parties to engage in Board-sponsored mediation.

---

[14] *See id.*, App. § 1(b); *see also* Hughes VS at 2.

[15] *See July 1993 Order*, App. § 3.

[16] *See* Hughes VS at 4.

[17] Union Pacific had to terminate the Joint Stipulation and Agreement to petition for reopening of the compensation terms. The Joint Stipulation suspended SP's right under Condition 30 to seek revisions of prescribed conditions that would be "inconsistent with" or that would "modify" the Joint Stipulation's provisions while the Joint Stipulation remained in effect. *See July 1993 Order*, App. §§ 4, 5.

[18] Union Pacific's petition also requested reopening to revisit Condition 16. Union Pacific is not pursuing revisions to Condition 16.

On May 15, 2023, the Board granted Union Pacific's petition to reopen and directed the parties to participate in mediation.[19] The parties participated in a virtual mediation session on October 10, 2023, and an in-person session on October 27, 2023. Mediation was unsuccessful. On December 4, 2023, the parties jointly proposed a schedule for the submission of evidence, which the Board adopted on December 5, 2023.[20]

## III. Determining Interest Rental for the Tehachapis Line

The Board should determine the appropriate interest rental for the Tehachapis Line using CE, the Board's "preferred approach for developing the rental component" in *SSW Compensation* cases.[21] CE is the Board's preferred approach because it "values the property as a going concern for railroad use, i.e., the use to which the property would actually be put."[22]

In Section III.A, Union Pacific explains how this proceeding fits into the *SSW Compensation* framework and why the Board should use CE. Although Board precedent requires use of CE, Union Pacific's expert witnesses performed valuation analyses using both CE and RCNLD, because the ICC ordered the parties to use RCNLD in the special

---

[19] *See Atchison, Topeka & Santa Fe Ry.—Operating Agreement—Southern Pac. Transp. Co.*, FD 22218 (STB served May 15, 2023).

[20] *See Atchison, Topeka & Santa Fe Ry.—Operating Agreement—Southern Pac. Transp. Co.*, FD 22218 (STB served Dec. 5, 2023).

[21] *1992 Order*, 8 I.C.C.2d at 304; *accord CSX Corp.—Control & Operating Leases/ Agreements—Conrail Inc.*, 3 S.T.B. 955, 964 n.18 (1998); *see also New England Cent. R.R.—Trackage Rights Order—Pan Am S. LLC*, FD 35842, slip op. at 18 (STB served Oct. 31, 2017) ("Case law confirms that the CE methodology is 'preferred'" . . . .").

[22] *CSX Corp.*, 3 S.T.B. at 364 n.18.



Appellate Case: 25-2919 Page: 40 Date Filed: 10/09/2025 Entry ID: 5566596

circumstances that existed when it reopened this proceeding at SP's request in the early 1990s. The results of those analyses are described and summarized in Section III.B.

### A. The Board Should Calculate Interest Rental Using CE.

The Board's established methodology for prescribing trackage rights compensation is called *SSW Compensation*.[23] "Under *SSW Compensation*, total compensation is the sum of three elements: (a) the variable cost incurred by the owning carrier due to the tenant carrier's operation over the owning carrier's track; (b) the tenant carrier's usage-proportionate share of the track's maintenance and operation expenses; and (c) an interest rental component designed to compensate the owning carrier for the tenant carrier's use of its capital dedicated to the track."[24]

In this proceeding, only *SSW Compensation*'s third element—the interest rental component—is at issue.[25] The interest rental component is determined "by multiplying (i) the value of the assets that comprise the trackage rights line by (ii) a rate of return equal to the current pre-tax nominal cost of capital."[26] In past cases, the Board and the ICC have discussed four potential methods of determining the value of the assets that

---

[23] *See generally St. Louis Southwestern Ry.—Trackage Rights Over Missouri Pacific R.R.—Kansas City to St. Louis* (*SSW I*), 1 I.C.C.2d 776 (1984); *St. Louis Southwestern Ry.—Trackage Rights Over Missouri Pacific R.R.—Kansas City to St. Louis* (*SSW II*), 4 I.C.C.2d 668 (1987); *St. Louis Southwestern Ry.—Trackage Rights Over Missouri Pacific R.R.—Kansas City to St. Louis* (*SSW III*), 5 I.C.C.2d 525 (1989); *Trackage Rights Over Missouri Pacific R.R.—Kansas City to St. Louis* (*SSW IV*), 8 I.C.C.2d 80 (1991).

[24] *New England Cent. R.R.*, slip op. at 2–3.

[25] The other elements are addressed by conditions in the *1967 Order* that are not part of Union Pacific's petition to reopen.

[26] *New England Cent. R.R.*, slip op. at 3; *CSX Corp.—Control & Operating Leases/ Agreements—Conrail Inc.*, 4 S.T.B. 75, 79 (1999).



Appellate Case: 25-2919 Page: 41 Date Filed: 10/09/2025 Entry ID: 5566596

comprise the trackage rights line, often called the investment base. In modern practice, they have used only two methods: CE and RCNLD.

Under CE, the investment base is arrived at by "multiplying the specific earnings assigned to the line by an earnings multiplier."[27] The earnings multiplier "relates corporate earnings to corporate value."[28]

Under RCNLD, the investment base is arrived at by developing the total cost of reproducing the trackage rights line in its current configuration, pricing the necessary material and labor quantities at current levels, then accounting for the current age and conditions of the assets.[29]

Use of *SSW Compensation* in this proceeding should not be controversial. When SP petitioned to reopen this proceeding in 1991, the ICC agreed that the interest rental prescribed in the *1967 Order* should be recomputed consistent with the principles adopted in *SSW Compensation*.[30]

Use of CE to determine the investment base in the proceeding also should not be controversial. Board precedent establishes CE is the "preferred approach for developing the rental component" in *SSW Compensation* cases.[31] The ICC used CE in its original line of *SSW Compensation* cases.[32] The ICC explained CE was its preferred approach

---

[27] *1992 Order*, 8 I.C.C.2d at 304.

[28] *SSW I*, 1 I.C.C.2d at 787.

[29] *See Atchison, Topeka & Santa Fe Ry.—Operating Agreement—Southern Pac. Transp. Co.* (*March 1993 Order*), FD 22218, slip op. at 2, 5–7 (ICC served Mar. 26, 1993).

[30] *See 1992 Order*, 8 I.C.C.2d at 303.

[31] *1992 Order*, 8 I.C.C.2d at 304; *accord CSX Corp.*, 3 S.T.B. at 964 n.18; *see also New England Cent. R.R.*, slip op. at 18 ("Case law confirms that the CE methodology is 'preferred'" . . . .").

[32] *See generally, SSW I*, 1 I.C.C.2d at 786.

"because, among other things, it values the property as a going concern for railroad use—*i.e.*, the use to which the property would actually be put."[33] The Board has offered the same reason to explain its preference for CE.[34]

When SP petitioned to reopen this proceeding in the 1990s, the ICC concluded the Line should be valued using RCNLD rather than CE, but its reasons for departing from its preferred method do not apply to this reopened proceeding. The ICC declined to use CE mainly because "SP had negative earnings from railroad operations," at the time, and thus "an earnings multiplier for SP's rail operations [was] not a meaningful figure."[35] As the ICC observed, "the strict application of the CE approach might well produce a meaningless, negative valuation for the line."[36]

The ICC also noted SP's concern that ATSF's proposed application of CE would have excluded ATSF earnings from using the Line or would have included only revenue from ATSF's inadequate rental payments. The ICC recognized that "line-specific earnings must include the earnings of both carriers."[37]

The circumstances that led the ICC to depart from its preferred methodology in the prior proceeding—concerns about SP's negative earnings and the exclusion of ATSF earnings—do not exist here. As Dr. Mathur shows, Union Pacific has positive earnings

---

[33] *1992 Order*, 8 I.C.C.2d at 304.

[34] *See CSX Corp.*, 3 S.T.B. at 964 n.18 ("[CE] values the property as a going concern for railroad use, *i.e.*, the use to which the property would actually be put.").

[35] *March 1993 Order*, slip op. at 4.

[36] *Id.*

[37] *Id.* In that proceeding, BNSF predecessor ATSF urged the ICC to use CE. SP argued for RCNLD because it was concerned CE would result in an inappropriately low rental due to its negative earnings and the exclusion of ATSF earnings. Both parties agreed that a third potential method, the comparable line segments approach, was unsuitable. *See id.* at 3.

from its rail operations, so the application of an earnings multiplier will not produce a meaningless valuation. Also, as Dr. Mathur shows, BNSF's line-specific earnings can be determined in the same manner as Union Pacific's line-specific earnings, so the CE calculation here can and does include the line-specific earnings of both carriers. The Board should therefore apply CE in this proceeding.

### B. Interest Rental Calculations Using CE and RCNLD

Although Board precedent supports the application of CE to determine the appropriate interest rental for the Tehachapis Line, Union Pacific's evidence addresses both CE and RCNLD. In Section III.B.1, Union Pacific describes and summarizes the CE analysis performed by Dr. Mathur. In Section III.B.2, Union Pacific describes and summarizes the alternative RCNLD analysis performed by Mr. Crouch.

As Dr. Mathur's and Mr. Crouch's statements establish, under either method of determining appropriate interest rental for the Line, the rental established by the *1967 Order* has "become inequitable" and must be revised.[38]

#### 1. Application of CE

Union Pacific's CE analysis was performed by Dr. Mathur and is fully described in her accompanying verified statement and workpapers. First, Dr. Mathur determined Union Pacific's and BNSF's line-specific earnings from the Line by using the Board's Average Total Cost method of determining the portion of revenue from through-traffic appropriately attributed to a specific segment. She used Union Pacific's and BNSF's waybill data produced in discovery to determine each railroad's revenue from each movement that traversed the Line, then allocated the revenue between the Line and the

[38] *1967 Order*, 331 I.C.C. at 404.

other segments the movements traversed on Union Pacific's and BNSF's respective networks in proportion to each movement's average total cost (*i.e.*, variable costs and fixed costs) associated with the Line and the other segments.[39] The Board accepted the same basic approach to calculating line-specific earnings in *New England Central Railroad, Inc.—Trackage Rights Order—Pan Am Southern LLC*.[40] Dr. Mathur improved on the approach the Board accepted in *New England Central* by using both railroads' actual earnings, rather than relying on the landlord railroad's earnings as a proxy for the tenant's earnings.[41]

Second, Dr. Mathur calculated the multiplier needed to convert the total earnings from the Line into a valuation of the Line—*i.e.*, the investment base. More specifically, she calculated the multiplier based on market data regarding Union Pacific's enterprise value in relation to its earnings before interest and taxes, consistent with economic literature and the evidence in this proceeding showing the Line's earnings should be expected to grow over time, rather than remain static.[42] Dr. Mathur's approach was consistent with Board precedent establishing that the "earnings multiplier ordinarily is

---

[39] *See* Mathur VS at 33–57.

[40] *See New England Cent. R.R.*, slip op. at 15.

[41] *Cf. id.* ("In response to NECR's position that a CE calculation would need to include PAS's earnings from traffic shipped over the NECR segments at issue . . ., PAS used NECR's earnings per car mile and extrapolated PAS earnings based on PAS car miles."). {{

}

[42] *See* Mathur VS at 58–61.



Appellate Case: 25-2919 Page: 45 Date Filed: 10/09/2025 Entry ID: 5566596

the ratio of the landlord railroad's total system market value to its total system earnings."[43]

Third, Dr. Mathur determined the Line's investment base by multiplying the line-specific earnings attributed to the Line by the earnings multiplier.[44] Once again, Dr. Mathur's approach was consistent with precedent.[45]

Finally, Dr. Mathur calculated BNSF's annual rental payment on a car-mile basis. She determined Union Pacific's breakeven return on investment for its investment in and ownership of the Line by multiplying the investment base by a rate of return equal to the pre-tax nominal cost of capital, derived from the railroad industry cost of capital published by the Board. She then multiplied the result by BNSF's usage factor—that is, BNSF's relative share of total traffic moving over the Line on a car-mile basis—to determine BNSF's total annual interest rental payment. She then divided BNSF's total annual interest rental payment by BNSF's total car miles for traffic moving over the Line to develop a rental charge on a per-car mile basis.[46] Yet again, Dr. Mathur's approach was consistent with precedent.[47]

Dr. Mathur's calculations produce an interest rental payment of $1.62 per car mile for 2023.[48]

---

[43] *Toledo, Peoria & W. Ry.—Trackage Rights Compensation—Peoria & Pekin Union Ry.*, FD 26476 (Sub-No. 1), slip op. at 5 n.10 (ICC served Sept. 20, 1994); *see also, e.g.*, *CSX Corp.*, 4 S.T.B. at 79; *1992 Order*, 8 I.C.C.2d at 304; *SSW II*, 4 I.C.C.2d at 680–81.

[44] *See* Mathur VS at 61–62.

[45] *See, e.g.*, *1992 Order*, 8 I.C.C.2d at 304.

[46] *See* Mathur VS at 62–65.

[47] *See, e.g.*, *New England Central*, slip op. at 3.

[48] *See* Mathur VS at 65.



Appellate Case: 25-2919 Page: 46 Date Filed: 10/09/2025 Entry ID: 5566596

### 2. Application of RCNLD

Union Pacific's RCNLD analysis was performed by Mr. Crouch and is fully described in his accompanying verified statement and workpapers. First, Mr. Crouch estimated the total cost of reproducing the Line in its current configuration, except for the acquisition of real estate. He developed quantities of necessary materials using both records and in-person observations during field visits. He developed estimates of current costs from the best available sources for the various categories of assets, including the California Department of Transportation's historical database of past construction projects and Union Pacific's records of actual spending for work performed and assets installed on the Line.[49]

Mr. Crouch also assessed the current condition of the Line to account for depreciation. He based his assessment on factors including, but not limited to, physical inspections of the Line, Union Pacific asset lists and records, Union Pacific information about past capital programs on the Line, engineering studies on lifespans of certain assets, and his extensive experience in the railroad industry. Based on his condition assessment, Mr. Crouch adjusted his estimate of the Line's reproduction cost to reflect the remaining life of the assets.[50] Mr. Crouch also adjusted the Line's reproduction cost to reflect actual investment BNSF made in the Line.[51]

Finally, Mr. Crouch calculated BNSF's annual rental payment on a per-car mile basis. To perform the calculation, he developed an RCNLD-based estimate of the Line's

---

[49] *See* Crouch VS at 2–3.

[50] *See id.* at 2–3, 7–8.

[51] *See id.* at 58–59; *see also March 1993 Order*, slip op. at 7–8.



Appellate Case: 25-2919 Page: 47 Date Filed: 10/09/2025 Entry ID: 5566596

interest rental base by combining the results of Mr. Rex's real estate appraisal with his own estimate of the Line's reproduction costs new less depreciation. He then applied the cost of capital and BNSF usage data that Dr. Mathur developed to convert the resulting RCNLD-based interest rental base to a per-car mile basis.[52]

Mr. Crouch's calculations produce an interest rental payment of $1.56 per car mile for 2023.[53]

## IV. Other Issues

### A. BNSF Should Pay the New Rental as of January 3, 2023.

The Board should require BNSF to pay the new rental calculated as a result of this proceeding as if the new rental had been in place as of January 3, 2023. The Board should thus order BNSF to compensate Union Pacific for the difference between the new rental calculated in this proceeding and any rental BNSF paid between January 3, 2023, and the effective date of the Board's order establishing the new rental amount.

Union Pacific notified BNSF on June 29, 2022, that it was electing to terminate the Joint Stipulation and Agreement as of December 31, 2022.[54] Terminating the Joint Stipulation and Agreement allowed Union Pacific to petition for revision of the *1967 Order*'s interest rental condition as of January 3, 2023, pursuant to *1967 Order*'s provision allowing either party to petition for revision of the conditions on each succeeding fifth anniversary of the effective date of the transaction.[55]

---

[52] *See* Crouch VS at 56–59.

[53] *See id.* at 59.

[54] *See* Hughes VS at 4.

[55] *See 1967 Order*, 331 I.C.C. at 404.



Appellate Case: 25-2919 Page: 48 Date Filed: 10/09/2025 Entry ID: 5566596

Applying the new rental amount as of January 3, 2023, would be consistent with the *1967 Order*. The *1967 Order* required ATSF to pay SP retroactive compensation dating back to January 1, 1962—the day after the parties' prior agreement expired.[56] Union Pacific is seeking the same treatment here—an order providing for compensation dating back to the day of its most recent opportunity to obtain a revision of the *1967 Order*'s interest rental condition. Retroactive compensation is common where one railroad is required to provide another railroad access to its facilities.[57]

Not applying the new rental amount as of January 3, 2023, would be inequitable to Union Pacific. The *1967 Order* specifically provides for "revision of such of the terms and conditions imposed on the transaction as may have become inequitable."[58] BNSF's rental payment plainly has been inequitable since at least January 3, 2023, as established by evidence in this proceeding. Failing to fully remedy inequitable rental payments resulting from application of the *1967* Order would compound the inequity.

Further, BNSF has had substantial notice that its rental payment would increase. Union Pacific formally notified BNSF on June 29, 2022, that it was electing to terminate the Joint Stipulation and Agreement as of December 31, 2022, after unsuccessful efforts

---

[56] *See id.* at 394; *see also id.* at 403–04 ("[T]he terms and conditions contained in section 17 prescribing the Santa Fe payments to Southern Pacific shall, upon final determination herein, be effective from January 1, 1962, and accounts relating to such payments shall promptly be adjusted accordingly.").

[57] For example, in *SSW Compensation*, SP was ordered to make retroactive payments for the trackage rights at issue after compensation terms were established by the ICC. *See SSW I*, 1 I.C.C.2d at 792; *St. Louis Southwestern Ry.—Trackage Rights Over Missouri Pacific R.R.—Kansas City to St. Louis*, 8 I.C.C.2d 213, 214–15 (1991) (denying reconsideration of order to pay compound interest). Also, under 49 U.S.C. § 11102(a), the Board allows rail carriers to begin using the terminal facilities of other rail carriers before compensation terms are established, subject to retroactive compensation.

[58] *1967 Order*, 331 I.C.C. at 404.



Appellate Case: 25-2919 Page: 49 Date Filed: 10/09/2025 Entry ID: 5566596

to negotiate a new rental amount.[59] BNSF knew Union Pacific would petition to reopen the *1967 Order*'s rental condition on the first available opportunity, because BNSF's rental under Condition 30 was even lower than its rental under the Joint Stipulation and Agreement. BNSF has no right to retain the windfall it has been enjoying while paying inequitably low rent in the period since Union Pacific filed its petition.

### B. Potential Impact

Union Pacific recognizes application of *SSW Compensation* principles will result in a significant increase to BNSF's rental payments for use of the Line. If BNSF desires, Union Pacific is willing to work with BNSF to address the impact of the change.[60]

## V. Conclusion

Union Pacific is currently subsidizing BNSF, a major competitor, by collecting inequitably low rental for the valuable Tehachapis Line. The Board should establish a new rental amount using *SSW Compensation*'s capitalized earnings method and order BNSF to pay rental amounts based on that method retroactively to January 1, 2023.

[59] *See* Hughes VS at 4.

[60] *See id.*

Respectfully submitted,

/s/ Michael L. Rosenthal
MICHAEL L. ROSENTHAL
Covington & Burling LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
(202) 662-6000

CRAIG V. RICHARDSON
JAMES B. BOLES
TONYA W. CONLEY
TANYA L. SPRATT
Union Pacific Railroad Company
1400 Douglas Street
Omaha, NE 68179

*Attorneys for Union Pacific Railroad Company*

May 3, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May, 2024, I caused a copy of the foregoing document to be served by email on all parties of record.

/s/ Michael L. Rosenthal