No. 25-2919

In the

# United States Court of Appeals
### for the
# Eighth Circuit

UNION PACIFIC RAILROAD COMPANY,
*Petitioner*,

— v. —

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA
*Respondents;*

COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY,
*Intervenor.*

**INTERVENOR COMMUTER RAIL DIVISION OF THE
REGIONAL TRANSPORTATION AUTHORITY'S
MOTION TO HOLD PROCEEDINGS IN ABEYANCE**

PAUL W. HUGHES
ANDREW A. LYONS-BERG
MARY H. SCHNOOR
EMMETT WITKOVSKY-ELDRED
  McDermott Will & Schulte LLP
  500 North Capitol Street NW
  Washington, DC 20001
  (202) 756-8000

*Counsel for Commuter Rail Division of the
Regional Transportation Authority*

# TABLE OF CONTENTS

Introduction ............................................................................................. 1

Background ............................................................................................. 2

    A.   Legal background ............................................................... 2

    B.   Factual background ............................................................ 4

        1.   Metra's commuter rail service and the UP Lines ................. 4

        2.   The STB proceeding and September 3 Decision ................... 5

        3.   Metra's request to set conditions and compensation. ........... 6

Argument ............................................................................................... 6

    A.   Because the underlying STB proceeding remains ongoing, an abeyance will avoid waste of judicial and party resources. ........................................................................... 7

    B.   There is no urgent need to proceed with piecemeal review. ....... 11

Conclusion ............................................................................................. 14

# TABLE OF AUTHORITIES

**Cases**

*Basardh v. Gates,*
    545 F.3d 1068 (D.C. Cir. 2008) ................................................................. 7

*Bergenland v. Nejezchleba,*
    477 F.3d 942 (8th Cir. 2007) ..................................................................... 6

*Canadian Ass'n of Petroleum Producers v. FERC,*
    308 F.3d 11 (D.C. Cir. 2002) ..................................................................... 7

*CSX Transp., Inc. v. Surface Transp. Bd.,*
    774 F.3d 25 (D.C. Cir. 2014) ................................................................... 10

*Kansas City Southern Railway Co. v. Surface Transp. Bd.,*
    No. 20-1116 (D.C. Cir. Aug. 7, 2020) ..................................................... 10

*Landis v. N. Am. Co.,*
    299 U.S. 248 (1936) ............................................................................... 6, 7

*Madjakpor v. Ashcroft,*
    97 F. App'x 72 (8th Cir. 2004) ................................................................ 10

*N. Nat. Gas Co., Div. of Enron Corp. v. FERC,*
    929 F.2d 1261 (8th Cir. 1991) ................................................................. 10

*Nat'l Treasury Emps. Union v. United States,*
    101 F.3d 1423 (D.C. Cir. 1996) ................................................................. 9

*Peters v. Union Pac. R.R. Co.,*
    80 F.3d 257 (8th Cir. 1996) ....................................................................... 9

*R.R. Salvage & Restoration, Inc. v. Surface Transp. Bd.,*
    648 F.3d 915 (8th Cir. 2011) ..................................................................... 7

*United States v. Michigan Nat'l Corp.,*
    419 U.S. 1 (1974) ....................................................................................... 7

*United States v. Rice,*
    605 F.3d 473 (8th Cir. 2010) ................................................................... 10

**Statutes**

49 U.S.C.
    § 10101 ....................................................................................................... 2
    § 10501(c)(3)(B) .......................................................................................... 3

**Statutes—continued**

49 U.S.C.

§ 11102(a)..........................................................................2, 3, 14

§ 11102(d)............................................................................3, 8

## INTRODUCTION

This case addresses a proceeding for terminal trackage rights at the Surface Transportation Board (STB). Per the governing statute—and as Union Pacific (UP) acknowledges—the proceeding entails a two-step process: *first*, the STB determines whether to award Metra terminal trackage rights and then, *second*, conditions and compensation are determined via party negotiation and, if unsuccessful, via STB adjudication. On December 1, 2025, Metra advised the STB that the parties were at an impasse and formally asked the STB to set conditions and compensation. This Court's review should wait until the STB's work is complete.

Once the STB's proceeding is completed, either the matter will be resolved because the parties will be satisfied with the outcome—or additional related issues will be ripe for judicial resolution. That is, once the STB proceeding is actually finished, either there will be *no* review or there will be review of *more* issues. Proceeding now is certain to waste judicial and party resources.

In seeking piecemeal review, UP complains of being underpaid for Metra's use of its facilities (the UP Lines), even though Metra continues to compensate UP in accordance with the STB's September 3, 2025 decision granting Metra's application for terminal trackage rights. *See* Ex. 1 (September 3 Decision). But if UP proves it is being underpaid, the STB has

guaranteed UP true-up compensation from July 1, 2025 onward—that is, from the day after the two sides' historical contract for Metra's service on the UP Lines expired. And though UP complains that the STB's decision implementing the statute enables Metra to use its property without its consent, Metra's service has operated continuously on the same lines for decades (including the entire time UP has owned them); UP previously bargained away any right to exclude Metra from its lines regardless of the STB's September 3 Decision; and, in contrast to its position before this Court, UP has stated publicly and repeatedly that it *wants* Metra to operate on the lines.

Metra respectfully moves the Court to hold this matter in abeyance until the STB has adjudicated Metra's application in full.

## BACKGROUND

### A. Legal background

The STB regulates the nation's interstate rail transportation industry, subject to the provisions of the ICC Termination Act of 1995. *See* 49 U.S.C. § 10101 *et seq.* Relevant here, among its powers, the STB has statutory authority to award a rail carrier terminal trackage rights—that is, "[t]he Board may require terminal facilities, including main-line tracks for a reasonable distance outside of a terminal, owned by a rail carrier … to be used by another rail carrier." *Id.* § 11102(a). Congress has specified that this

remedy is available to local governmental authorities, such as Metra, in specified circumstances. *Id.* § 10501(c)(3)(B).

The statute explains that the STB's adjudication of a rail carrier's terminal trackage rights application proceeds in two phases: *First*, the STB may award terminal trackage rights if it "finds that use to be practicable and in the public interest without substantially impairing the ability of the rail carrier owning the facilities or entitled to use the facilities to handle its own business." 49 U.S.C. § 11102(a). *Second*, if the agency decides to award the applicant terminal trackage rights, compensation and other terms of use must be established. The statute states that the rail carriers should privately negotiate in the first instance. *Id.* "[I]f the rail carriers cannot agree," however, "the Board may establish conditions and compensation for use of the facilities under the principle controlling compensation in condemnation proceedings." *Id.* By statute, the STB "shall complete any proceeding" under the terminal trackage rights provision within 180 days. *See* 49 U.S.C. § 11102(d).

### B. Factual background

#### 1. Metra's commuter rail service and the UP Lines

Metra[1] conducts commuter rail operations in northeast Illinois and southeast Wisconsin. Metra rail is an essential public service to over 100,000 daily passengers and the regional economy.

The UP Lines are three of the busiest on Metra's system. Passenger service on these lines predates the Civil War, and Metra and UP (or their predecessors) have contracted for the provision of commuter rail service on the lines since the 1970s. UP (or a predecessor) historically operated commuter rail service on the UP Lines pursuant to a purchase of service agreement (PSA) with Metra. The PSA expired on June 30, 2025.

In 2019, UP informed Metra that it intended to discontinue its operation of commuter rail service. Since then, the parties have transitioned operations and personnel to Metra, effectively completing that process as of May 16, 2025. Metra sought (unsuccessfully) to negotiate a new, commercially reasonable trackage rights agreement with UP to replace the PSA before its expiration.

---

[1] Metra consists of two governmental entities: the Commuter Rail Division (CRD) and the Northeast Illinois Regional Commuter Railroad Corporation (NIRCRC). Metra is a service mark owned by CRD, which CRD uses to brand its commuter rail services.

## 2. The STB proceeding and September 3 Decision

On March 7, 2025, with the expiration of the PSA looming, Metra filed with the STB an application for terminal trackage rights. *See Commuter Rail Division of the Regional Transportation Authority d/b/a Metra—Terminal Trackage Rights—Union Pacific Railroad Company,* Surface Transportation Board, Finance Docket No. 36844. The STB granted Metra's application on September 3, 2025. *See* Ex. 1. That action resolved the first phase of the statutory terminal trackage rights process. To preserve Metra's vital public service, the September 3 Decision took effect immediately, with retroactive application to July 1. *See id.* at 31-32 (determining that UP's compensation was adequately secured, retroactive to July 1, 2025).

The STB maintained its jurisdiction over the parties and directed them to submit a status report every 60 days. Ex. 1 at 33. The STB also pledged that, if negotiations did not succeed, it would set terms, including compensation. *Id.* ("If the parties cannot reach an agreement, the Board will establish the compensation and conditions of use in accordance with the statute."). And the STB said it would set interim conditions of use as necessary—a power it has already exercised on one occasion, at UP's request.[2]

---

[2] As described in more detail below (*infra* at 13), after UP requested an interim condition to govern liability and indemnity, the STB temporarily reinstated the PSA terms on those issues and finalized that relief on December 3, 2025.

### 3.    Metra's request to set conditions and compensation.

Metra and UP have engaged in negotiations as directed by the STB, but those negotiations have not produced agreement. Accordingly, on December 1, 2025, Metra asked the STB to determine the final conditions and compensation that will govern Metra's use of the UP Lines. *See* Ex. 2. This second phase is a continuation of the ongoing agency proceeding, with the filing occurring in the same, existing docket, and remains pending.

### ARGUMENT

The Court should hold this matter in abeyance. UP's petition for review encompasses only part of the dispute before the STB: whether to award Metra terminal trackage rights. Establishment of the resulting conditions and compensation governing Metra's use of the UP Lines is presently pending, and a decision will be forthcoming. The better use of judicial and party resources is to adjudicate the issues determined by the agency all at once, rather than bit by bit.

The Court has broad discretion to manage its docket. *See, e.g.*, *Kreditverein der Bank Austria Creditanstalt fur Niederosterreich und Bergenland v. Nejezchleba*, 477 F.3d 942, 945 (8th Cir. 2007) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)); *see also Landis*, 299 U.S. at 254 ("[T]he power to stay proceedings is incidental to the power inherent in

every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants").

Traditionally, courts factor into docket-management decisions—including whether to hold a matter in abeyance—considerations like the preservation of judicial resources, efficiency of dispute resolution, and hardship to the parties. *Landis*, 299 U.S. at 254-255. Courts will often hold a matter in abeyance "while awaiting the decision of another tribunal" in related proceedings. *United States v. Michigan Nat'l Corp.*, 419 U.S. 1, 4 (1974); *cf. R.R. Salvage & Restoration, Inc. v. Surface Transp. Bd.,* 648 F.3d 915, 921 (8th Cir. 2011) (holding petition for review from STB order in abeyance due to potential related federal district court litigation). That rubric includes related proceedings before a federal agency. *See, e.g.*, *Basardh v. Gates*, 545 F.3d 1068, 1069 (D.C. Cir. 2008); *Canadian Ass'n of Petroleum Producers v. FERC*, 308 F.3d 11, 14 (D.C. Cir. 2002).

Here, these principles favor an abeyance.

## A. Because the underlying STB proceeding remains ongoing, an abeyance will avoid waste of judicial and party resources.

Congress created a two-phase terminal trackage rights process, and so the STB proceeding below is only half done. The ongoing proceedings, which will almost certainly conclude before this Court would resolve UP's current petition for review, may moot this case; if not, the forthcoming STB

decision will raise another set of related issues for review in this Court. Under these circumstances, the better use of judicial and party resources is to allow the agency process to run its course and then render review—if any review is needed at all—at the end of the adjudication rather than at the intermission.

**1.** Metra's terminal trackage rights application has completed the first phase—with Metra securing terminal trackage rights—but the second phase is currently pending. *See* Ex. 2. Consistent with the underlying statutory mandate, Metra's proposed schedule calls for completion of the second phase of proceedings within 180 days—by June 1, 2026 (day 180 falls on a Saturday). *See* 49 U.S.C. § 11102(d).[3]

That is to say, a decision by the STB on conditions and compensation will almost surely issue *before* this Court even would hear argument in this matter. Absent an abeyance, the matter will not be fully briefed until likely spring of 2026, with arguments occurring months later. While UP asserts (UP Resp. to Respondents' Status Report (Resp.) at ¶ 12) that success in this current petition would obviate further STB proceedings, the timing of the STB action belies that claim. Because the STB proceeding is moving forward

---

[3] The STB met the same 180-day statutory deadline in resolving Metra's application for terminal trackage rights. Metra filed its application on March 7, 2025, and the STB issued its decision 180 days later, on September 3, 2025.

now, a decision on the merits will not obviate ongoing work at the agency level.

By contrast, an abeyance here *would* meaningfully conserve judicial and party resources. One of two outcomes is sure to result from completion of the STB proceedings: On the one hand, all parties may be satisfied with the result, and the parties' dispute may be resolved entirely. While the two sides to date have been unable—privately or with agency assistance—to reach agreement on the terms for Metra's use of the UP Lines, UP is simply incorrect that, "whatever happens, the Court will still need to resolve this appeal." Resp. ¶ 13. On the other hand, the STB's adjudication of conditions and compensation may disappoint *someone*, adding to the list of issues subject to review. Holding this matter in abeyance will either (a) eliminate the need for any judicial review, or (b) allow all issues arising from the STB proceeding to be considered at once, with a single review proceeding.

**2.** Basic notions of comity between federal courts and agencies encourage resolution of administrative proceedings *before* the court exercises review rather than proceed in parallel. *See, e.g.*, *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (recognizing that "as the governmental branch of last resort … Article III courts should not make decisions unless they have to"); *cf. Peters v. Union Pac. R.R. Co.*, 80 F.3d

257, 263 n.3 (8th Cir. 1996) (acknowledging the value of "promot[ing] judicial economy by avoiding needless repetition of administrative and judicial factfinding"); *United States v. Rice*, 605 F.3d 473, 475 (8th Cir. 2010) (recognizing the importance of "promoting proper relationships between the courts and administrative agencies").

The D.C. Circuit recently held a case in abeyance in similar circumstances. In *Kansas City Southern Railway Co. v. Surface Transportation Board*, the D.C. Circuit ordered that a petition for review of a decision of the STB awarding terminal trackage rights be held in abeyance where—as here—the STB had not yet reached the issue of final terms of use. *See* Order, No. 20-1116 (D.C. Cir. Aug. 7, 2020) (per curiam).

In another similar case, the D.C. Circuit went even further, *dismissing* the case entirely for lack of finality. *See CSX Transp., Inc. v. Surface Transp. Bd.*, 774 F.3d 25, 30 (D.C. Cir. 2014). That case—like this one—involved a petition for review challenging an STB order that resolved a threshold issue in the proceeding but left pending other related issues. *Id.*

This Court, too, has often found abeyance proper where further agency activity will bear on the issues under review, if not obviate the need for review entirely. *See, e.g.*, *Madjakpor v. Ashcroft*, 97 F. App'x 72, 73 (8th Cir. 2004) (per curiam) (holding petition for review of Board of Immigration Appeals in abeyance pending removal outcome); *N. Nat. Gas Co., Div. of Enron*

*Corp. v. FERC*, 929 F.2d 1261, 1267-1268 (8th Cir. 1991) (discussing decision to hold petition for review in abeyance "pending [the Federal Energy Regulatory Commission's] decision" of a related issue). The same approach is appropriate here.

## B. There is no urgent need to proceed with piecemeal review.

There is no compelling need for immediate review that would justify undertaking a piecemeal approach to review.

**1.** UP has suggested that an abeyance would be prejudicial to it because, per the September 3 Decision, "Metra is already operating on Union Pacific's lines without Union Pacific's agreement" and UP is presently "being dramatically underpaid for access to, and use of, its property" under Metra's current interim payments. Resp. ¶ 14. UP is incorrect for several reasons.

*First*, UP is not being underpaid and, regardless, it faces no risk of irreparable economic injury. Metra is paying UP on an interim basis at the rate (subject to annual escalation) that long governed the parties' relationship under the now-expired PSA. UP is seeking to more than double Metra's rent. Whatever rate ultimately is agreed or deemed reasonable, the STB made clear in its September 3 Decision that if UP is owed more, UP will be compensated at that rate from July 1, 2025 onward. Ex. 1 at 32.

*Second*, Metra's right to use the UP Lines already was a foregone conclusion before the September 3 Decision, as UP has acknowledged in open court. In exchange for Metra spending hundreds of millions of capital dollars to improve the UP Lines over many years, UP previously agreed—in dozens of contractual amendments—that it would keep those improvements "in service and available to be used" for commuter rail. *See* Dkt. No. 37 ¶¶ 289-311, Dkt. Nos. 37-3; 37-4; 37-5; 37-6, *Commuter Rail Div. of the Reg'l Transp. Auth. v. Union Pac. R.R. Co.,* No. 25-cv-2439 (N.D. Ill.) (describing and providing examples of these amendments).[4] To be sure, the STB's September 3 Decision provides Metra a statutory right to use the UP Lines, but UP previously had bargained away the right to exclude Metra from operating on its property altogether, provided Metra pays compensation—which already is the case, with the question of the reasonable amount of that compensation currently pending before the STB.

*Third*, UP has stated repeatedly that it has no intention of excluding Metra from the UP Lines. UP's CEO was explicit on this topic: "[W]e will not be stopping service to the millions of people who use Metra daily." Ex.

---

[4]  Though the parties dispute the amount of compensation that UP may demand Metra to pay for using the UP Lines without violating these amendments, UP's counsel agreed in court that these amendments—at least the most recent ones—provide "Metra[ a] right to keep using the lines, to keep using the facilities," which "is subject to Metra first paying UP separate compensation." Ex. 3 at 36:6-8.

4. UP has even represented in court that "we are not going to kick [Metra] off [the UP Lines] while we are litigating th[is] dispute." Ex. 3 at 31:2-3. Yes, the parties disagree over the appropriate conditions and compensation for Metra's use of the UP Lines, but those issues will be resolved privately or by the STB, and, if necessary, reviewed in this Court. There is no prejudice from Metra's operations on the UP Lines continuing in the interim.

*Fourth*, regarding the non-economic conditions, the STB retains jurisdiction over the parties, and either party may ask the agency to supply interim conditions of use, if clarity is needed. UP has already successfully requested and obtained relief from the STB to this effect. On September 29, 2025, UP requested the STB impose an interim condition related to liability and indemnity, which UP had identified as a "critical interim term." Ex. 1 at 32, n.65. The STB did so the very next day, imposing the very condition that UP requested. *See* Metra's Opp. to UP's Mot. to Stay Proceedings at 8. The STB has since determined that the same interim condition will remain in effect until final terms are established or the proceeding is otherwise resolved. Ex. 5.

**2.** UP's contention that "[a]beyance will … exacerbate the imbalance in bargaining power created by the Board's order" granting Metra terminal trackage rights (Resp. ¶ 15) is also incorrect. The STB's determination to grant Metra trackage rights in the first place was premised on the agency's

recognition that "under UP's interpretation of the law, Metra would have no right to refuse unreasonable terms and conditions and no recourse if UP decided to deny access altogether," which contradicted the public interest and congressional intent. Ex. 1 at 29-30. The fact that the parties have been unable to reach agreement since the September 3 Decision confirms the reality that neither side has been able to disadvantage the other under the statutory negotiation process envisioned by Congress and ordered by the STB. A level playing field may feel disorienting to UP, but there is no imbalance in favor of either side. A negotiated resolution or an agency determination on compensation and conditions of use is exactly what Congress provided for when it drafted the governing statute (49 U.S.C. § 11102(a)), and the parties will remain on equal footing in either event pending a final resolution of the pending issues and, as needed, judicial review.

## CONCLUSION

For these reasons, the Court should hold this matter in abeyance until the STB has fully resolved Metra's application for terminal access, including the presently pending request to set final compensation and conditions of use.

Dated: December 5, 2025

Respectfully submitted,

/s/ *Paul W. Hughes*
PAUL W. HUGHES
ANDREW A. LYONS-BERG
MARY H. SCHNOOR
EMMETT WITKOVSKY-ELDRED
  *McDermott Will & Schulte LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for the Commuter Rail Division of the*
*Regional Transportation Authority d/b/a Metra*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this motion:

(i) complies with the type-volume limitation of Rule 27(d)(2) because it contains 3,138 words; and

(ii) complies with the typeface and type style requirements of Rule 27(d)(1)(E) because it has been prepared using Microsoft Word for Microsoft 365 MSO and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: December 5, 2025          */s/ Paul W. Hughes*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2025, I electronically filed the foregoing motion with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: December 5, 2025          */s/ Paul W. Hughes*

# Exhibit 1

SERVICE DATE – SEPTEMBER 3, 2025

SURFACE TRANSPORTATION BOARD

DECISION

Docket No. FD 36844

COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY
D/B/A METRA—TERMINAL TRACKAGE RIGHTS—
UNION PACIFIC RAILROAD COMPANY

Digest:[1]  This decision grants Metra's application for terminal trackage rights
over three Union Pacific Railroad lines used to operate commuter rail service in
the Chicago area.

Decided:  September 2, 2025

On March 7, 2025, the Commuter Rail Division of the Regional Transportation Authority
d/b/a Metra (Metra) filed an application for terminal trackage rights under 49 U.S.C. § 11102(a)
to continue commuter rail service over three lines owned by Union Pacific Railroad Company
(UP) in the Chicago area (the UP Lines).  For decades, UP had been operating Metra's passenger
trains over the UP Lines under an agreement known as a "Purchase of Services Agreement"
(PSA).  The application states that the parties have been working since 2023 to transition UP's
operation of Metra's passenger trains over the UP Lines to Metra following a court ruling
permitting UP to discontinue providing the service, but that despite their efforts—including
Board-sponsored mediation in 2024[2]—Metra and UP have been unable to negotiate successor
arrangements.  (Appl. 2-3, 9-10, Mar. 7, 2025.)[3]  UP opposes Metra's application on the merits
and has also moved to dismiss the application on jurisdictional grounds.

As discussed below, the Board will deny the motion to dismiss and grant Metra's
application for terminal trackage rights.

---

[1]  The digest constitutes no part of the decision of the Board but has been prepared for the
convenience of the reader. It may not be cited to or relied upon as precedent. See Pol'y
Statement on Plain Language Digs. in Decisions, EP 696 (STB served Sept. 2, 2010).

[2]  See Appl. of Union Pac. R.R. for Mediation Under 49 U.S.C. § 28502, FD 36800, slip
op. at 1-2 (STB served Aug. 14, 2024) (ordering Board-sponsored mediation).

[3]  Although the initial term of the operative PSA had expired, the parties had agreed to a
series of short-term extensions—until recently—while they attempted to negotiate a new
agreement.  (Metra Opening, V.S. Kane, para. 10, May 5, 2025.)  As discussed below, the term
of the most recent extension expired on June 30, 2025.

BACKGROUND

Historical Background

The Regional Transportation Authority (RTA) was approved by referendum and established by the Illinois General Assembly in the early 1970s to replace and unify a complicated and patchwork passenger rail network in the Chicago metropolitan area. (Appl. 4, Mar. 7, 2025.) Created by statute, the publicly funded and managed passenger rail system administered by RTA remains in place today. (Id. at 4-5.) The RTA oversees Metra, which was formally created in 1984 and consists of two different governmental entities: the Commuter Rail Division (CRD) and the Northeast Illinois Regional Commuter Railroad Corporation (NIRCRC). (Id. at 5.)[4]

Metra is the largest regional passenger rail system by size in the United States and the fourth largest in ridership. (Id.) In 2024, Metra provided approximately 35 million passenger trips in six counties in northeastern Illinois and one county in southeastern Wisconsin. (Id.) The application includes a map depicting Metra's commuter rail system, including the three UP Lines at issue in this proceeding: the UP-North Line, the UP-Northwest Line, and the UP-West Line. (See id. at 6.)[5] Metra states that 39 percent of its total yearly ridership is on the UP Lines. (Id. at 5.) According to Metra, the three UP Lines have been used for passenger service since their inception over 170 years ago; they were eventually acquired by the Chicago and Northwestern Railway Company (CNW), which merged into UP in 1995.[6] (Id. at 7-8.) UP (and its predecessor) operated passenger trains for Metra (and its predecessor) over the UP Lines for five decades, using Metra-supplied rolling stock, under a PSA. (Id. at 2.) In 2019, UP advised Metra that it had no duty to continue operating the trains and would cease doing so, but (according to Metra) was willing to make its track and property available to Metra for continued passenger service. (Id.) The courts upheld UP's position in litigation that concluded in 2023,[7] and the parties have been engaged in negotiating successor arrangements for Metra to operate its passenger trains over the UP Lines since that time. (Id. at 2, 9-10.)

---

[4] According to the application, "Metra" technically is a service mark owned by CRD. CRD uses the "Metra" service mark to brand its passenger rail services, which NIRCRC and other railroads currently provide (or, in UP's case, provided until recently) under PSAs with CRD. (Id.; see also id. at 2.)

[5] The three UP Lines, discussed further below, originate at Metra's Ogilvie Transportation Center (OTC) in downtown Chicago. (Id. at 7.)

[6] Union Pac. Corp.—Control—Chi. & Nw. Transp. Co., FD 32133 (ICC served Mar. 7, 1995).

[7] Union Pac. R.R. v. Reg'l Transp. Auth., No. 19-C7957 (N.D. Ill. Sept. 23, 2021), 2021 WL 4318106, aff'd, 74 F.4th 884 (7th Cir. 2023).

The application states that "substantial progress" has been made,[8] and that as of May 16, 2025, Metra for the first time will be solely responsible for operating the commuter rail service on the UP Lines.[9] However, despite their efforts, including Board-sponsored mediation in Docket No. FD 36800 that concluded unsuccessfully in December 2024, the parties have been unable to reach agreement regarding an appropriate "interest rental" or access fee for the UP Lines. (Appl. 10, Mar. 7, 2025.) During the transition, until recently, Metra and UP had agreed on short-term extensions of the PSA (usually 30 to 90 days). (Id.) However, in view of the parties' impasse on the access fee and uncertainty that the short-term extensions would continue, Metra filed this application seeking terminal trackage rights over the UP Lines. (Id.)

The most recent extension of the PSA ended at midnight on June 30, 2025, and UP was not amenable to another extension. (Metra Pet. for Temporary Injunction and/or Emergency Serv. Ord. 3, June 30, 2025.) Instead, UP presented Metra with a unilateral document termed "Condition of Entry" (COE) to govern Metra's use of the UP Lines, beginning July 1, 2025, pending the conclusion of this proceeding. Metra, however, objects to the COE on multiple grounds. (Id. at 5 & n.4.)[10] Metra states that it "has informed UP that it will continue to operate on the Lines after expiration of the existing agreement at midnight on June 30, 2025" but that it "does not agree to and will not consent to the terms of the COE." (Id. at 5 n.4.)

As discussed further below, Metra contends that the circumstances provide "compelling justification" for the Board to grant terminal trackage rights relief under 49 U.S.C. § 11102(a). (Appl. 4, Mar. 7, 2025.) Metra argues, first, that it meets the eligibility criteria as a rail carrier under the Board's jurisdiction for granting terminal trackage rights; second, that the UP Lines over which Metra operates constitute terminal facilities, including mainline tracks for a reasonable distance outside of a terminal; third, that Metra's use of the facilities is practicable and in the public interest; and fourth, that Metra's use of UP's facilities will not impair UP's ability to handle its own business. (Id.)

UP disputes that Metra meets the eligibility criteria for jurisdiction. (UP Mot. to Dismiss, May 23, 2025.) On the merits, UP argues that Metra is not entitled to trackage rights over any track outside of the Chicago terminal, (UP Reply to Opening 20-21, June 3, 2025), and that Metra has not shown anticompetitive conduct by UP or otherwise established that its request for terminal trackage rights is in the public interest, (id. at 23-32).

---

[8] (See Appl. 2-3, 10 (describing Metra's hiring of former UP personnel for customer service, equipment maintenance, and train crews and support functions).) The application states that by April 30, 2025, "nearly all UP employees dedicated to the passenger service will have transferred to Metra." (Id. at 10.)

[9] (See id. at 2, V.S Derwinski at 7; accord Metra Rebuttal, Ex. C (Kane Decl.), para. 20, June 23, 2025 (stating that transition of commuter rail operations from UP to Metra was substantially concluded as of May 16, 2025).)

[10] The COE is attached as Exhibit A to Metra's June 12, 2025 Reply to UP's Motion to Dismiss.

Procedural History

Metra filed its terminal trackage rights application, thereby initiating this proceeding, on March 7, 2025. Pursuant to a procedural schedule set by the Board, UP filed its response to the application on April 18, 2025; Metra filed its opening submission on May 5, 2025; UP replied on June 3, 2025; and Metra filed its rebuttal on June 23, 2025. On July 17, 2025, UP filed a "notice of supplemental authority," to which Metra responded on July 18, 2025.

Additionally, on May 23, 2025, UP filed a motion to dismiss on jurisdictional grounds, to which Metra responded on June 12, 2025. On June 25, 2025, UP filed a motion to strike certain evidence submitted by Metra, to which Metra responded on June 26, 2025.

On June 30, 2025, Metra filed an emergency request, styled "Petition for Temporary Injunction and/or Ex Parte Application for a Section 11123(a) Service Order," to which UP responded the same day. Metra asked the Board to enter an order to maintain the status quo as it existed on June 30, 2025 (the last day of the then-operative PSA extension) until further notice,[11] arguing that, with no agreement or mechanism in place to ensure that Metra's service on the UP Lines would continue after that date, immediate interim relief was required to avoid an emergency situation or irreparable harm to Metra and the public interest. (Pet. 1- 2, June 30, 2025.) In reply, UP argued that "there is no emergency and no prospect of imminent irreparable harm," (UP Reply to Pet. 1, June 30, 2025), stating (among other things) that Metra could continue operating; that UP would not exclude Metra; and that "there is no basis to conclude that Metra will not be able to access the UP Lines once the PSA expires." (Id. at 2-3.) By decision served July 1, 2025, the Board denied Metra's emergency petition, finding that Metra had not shown the irreparable harm needed for injunctive relief or emergency circumstances permitting the Board to order service under 49 U.S.C. § 11123.

As discussed below, the Board will deny UP's motion to dismiss, grant in part UP's motion to strike, and grant Metra's application for terminal trackage rights.

PRELIMINARY MATTERS

UP's Motion to Dismiss on Jurisdictional Grounds

As a threshold matter, the Board concludes that it has jurisdiction to grant Metra's application for terminal trackage rights. The Board will therefore deny UP's motion to dismiss.

Congress explicitly provides for Board jurisdiction over transportation provided by certain local government authorities for purposes of terminal trackage rights.[12] 49 U.S.C.

---

[11] The petition stated that the interim relief sought by Metra would be subject to a retroactive adjustment in favor of either party to July 1, 2025. (Pet. 2.)

[12] Metra is "another rail carrier" within the meaning of 49 U.S.C. § 11102(a), a proposition UP does not dispute. See 49 U.S.C. § 10102(5) (defining "rail carrier" as "a person providing common carrier railroad transportation for compensation, but does not include street,

§ 10501(c)(3)(B). As a general matter, 49 U.S.C. § 10501(c)(2) excludes from the Board's jurisdiction public transportation provided by local government authorities, such as Metra, "[e]xcept as provided in paragraph (3)." The exception in paragraph (3)(B), in turn, states that the Board has jurisdiction over transportation provided by a local governmental authority for purposes of sections 11102 and 11103 of title 49 "if the Board finds that such governmental authority meets all of the standards and requirements for being a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission that were in effect immediately before January 1, 1996." 49 U.S.C. § 10501(c)(3)(B).[13]

Metra meets these criteria and therefore qualifies as "a rail carrier providing transportation subject to [ICC] jurisdiction" under pre-ICCTA standards.[14] It does so in two independent ways.

*First*, Metra provides transportation subject to the agency's jurisdiction under pre-ICCTA standards because the ICC had jurisdiction over rail transportation "between a place in a State and a place in another State." 49 U.S.C. § 10501(a)(2)(A) (1994); see, e.g., DesertXpress Enters.—Pet. for Declaratory Ord., FD 34914, slip op. at 9 (STB served May 7, 2010) ("Before ICCTA, § 10501(a)(2)(A) gave the ICC jurisdiction over transportation by rail carrier between a place in 'a State and a place in another State'—that is, over any and all rail transportation that crosses a state line."). Since well before January 1, 1996, and continuing today, Metra's commuter rail passenger system has spanned two states. Metra has had a permanent station and related facilities in Kenosha, Wis., for decades, and Metra's trains have originated in Wisconsin and travelled to Illinois, and vice versa, on a daily basis. Thus, Metra provides transportation between two states, and that transportation was subject to the ICC's jurisdiction under former § 10501(a)(2)(A). That is sufficient under the plain language of § 10501(c)(3)(B).

The Board has reached a similar conclusion regarding Boston's commuter rail system. In Massachusetts Bay Commuter Railroad—Petition for Declaratory Order, FD 34332 (STB served June 5, 2003), the Massachusetts Bay Commuter Railroad (MBCR) sought a declaratory order on various points pertaining to its proposed commuter rail service for the Massachusetts Bay Transit Authority, including a declaration that, were it not for the general exclusion of local

---

suburban, or interurban electric railways not operated as part of the general system of rail transportation"). The parties also agree that Metra is a "local government authority" as defined by 49 U.S.C. § 5302(10). (See Appl. 12, Mar. 7, 2025; UP Mot. to Dismiss 4, May 23, 2025.)

[13] The ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (ICCTA), was enacted on December 29, 1995, to modernize and streamline the economic regulation of surface transportation in the United States. Among other things, ICCTA abolished the Interstate Commerce Commission (ICC) and placed responsibility for economic regulatory oversight of rail transportation with the Surface Transportation Board (Board).

[14] Both parties assume that Metra must satisfy the criteria of § 10501(c)(3)(B) in order to avail itself of the remedies available under § 11102(a). Because the Board clearly has jurisdiction over the transportation provided by Metra under § 10501(c)(3)(B), the Board need not decide at this time whether a rail carrier not providing transportation subject to the Board's jurisdiction is nonetheless eligible to seek relief under § 11102(a).

government authorities from Board jurisdiction under § 10501(c)(2), MBCR would be a rail common carrier providing transportation subject to the Board's jurisdiction. Id. at 1. Boston's commuter rail system consisted of 13 lines, including one line used to provide commuter rail service between Boston and Providence, R.I. Id. The Board deemed a declaratory order unnecessary because there was no controversy or uncertainty. As described in the decision, "[t]he rail service would be provided across a state line between Boston and Providence. MBCR thus satisfies the definition of a rail carrier set forth in 49 U.S.C. § 10102(5) and would provide interstate transportation as specified in 49 U.S.C. § 10501(a)." Id. at 2. In other words, MBCR would provide transportation subject to the jurisdiction of the agency because it would provide transportation between one state and another (even though the vast majority of transportation it provides occurs only in the first state). The same is true of Metra here.

Moreover, the ICC issued rulings reflecting that Metra provided transportation subject to its jurisdiction under pre-ICCTA standards, including decisions asserting jurisdiction with respect to Metra's purely intrastate operations. In Regional Transportation Authority—Directed Service—Chicago, Rock Island & Pacific Railroad (Rock Island), 360 I.C.C. 777 (1980), the ICC issued a directed service order, in response to a petition filed by RTA (Metra's governing authority), authorizing RTA (or its agent) to assume provision of Rock Island's transportation between Joliet, Ill. and Chicago, Ill., following Rock Island's financial collapse. And in Commuter Rail Division of the Regional Transportation Authority of Northeast Illinois—Exemption—Tariff Filing Requirements (Tariff Filing Requirements), No. 41506 (ICC served Feb. 24, 1995), decided under former section 10505, the ICC "exempt[ed] Metra's rail commuter service within the State of Illinois and between Chicago, IL, and Kenosha, WI, from the tariff filing requirements of Subtitle IV of Title 49." Slip op. at 4.

UP argues that the directed service order in Rock Island "was issued without any analysis of whether [the ICC] had jurisdiction over such intrastate transportation, and it does not appear that the issue of jurisdiction was raised." (UP Mot. to Dismiss 11, May 23, 2025.) However, the fact remains that, in Rock Island, the ICC exercised jurisdiction and authorized the RTA to operate an intrastate line (presumably because Metra operated across state lines then as it does now). And, in Tariff Filing Requirements, even though Metra tried to argue that it was not subject to the ICC's jurisdiction because its services were intrastate in nature, the ICC found that Metra was subject to its jurisdiction. Tariff Filing Requirements, slip op. at 2, 4. The ordering clause in the decision specifically encompassed both Metra's commuter rail service within Illinois and its service between Chicago and Kenosha. Id. at 4.[15]

---

[15] UP argues that "the Tariff Filing decision cuts in favor of a lack of jurisdiction of the commuter rail transportation," noting "[t]he fact that Illinois [previously] had authority to regulate Metra's rates and tariffs is because they were in fact local and intrastate." (UP Mot. to Dismiss 12.) But that inference does not follow: Before ICCTA, states were permitted to regulate the intrastate activities of carriers that were nonetheless subject to ICC jurisdiction if the state was certified by the ICC (as Illinois was between 1983 and 1994). See 49 U.S.C. § 11501(b) (1994); Utah Power & Light Co. v. ICC, 747 F.2d 721, 724-26 (D.C. Cir. 1984) (noting that the rates charged by UP for intrastate movements were appropriately subject to the jurisdiction of the Utah Commission). Regulation by the state did not change those carriers' status as interstate carriers providing transportation subject to the ICC's jurisdiction.

UP's remaining arguments also lack merit. UP contends that jurisdiction must be assessed on a line-by-line basis, such that the Board could have jurisdiction over some of Metra's lines but not others. (UP Mot. to Dismiss 2-3, 15-16, 19, May 23, 2025.) But that is not what the statute says. The statute gives the Board jurisdiction over "transportation provided by" Metra—without qualification—if Metra "provid[es] transportation subject to [the agency's] jurisdiction" as assessed under pre-ICCTA standards. 49 U.S.C. § 10501(c)(3)(B). Metra provides such transportation on the UP-North line to Wisconsin (if not on other lines as well). So the Board has jurisdiction over "transportation provided by" Metra, including over transportation that is purely intrastate. UP's claimed limitation has no basis in the statutory text.

Nor do pre-ICCTA standards call for such line-by-line parsing. The ICC's authority generally extended to even the intrastate movements of carriers that operate in interstate commerce. See, e.g., ICC v. Texas, 479 U.S. 450, 456 (1987) ("Since all of the railroads interested in this proceeding are engaged in interstate commerce, the Commission has authority over the intrastate transportation, as well as the interstate transportation, provided by such carriers.") (construing former § 10501). The Board has continued that understanding. See, e.g., DesertXpress, FD 34914, slip op. 8 ("[T]hat [the carrier]'s project would cross a state line is enough, by itself, to bring the [200-mile] project under our jurisdiction, as it would have been prior to ICCTA."); Mass. Bay Commuter R.R., FD 34332, slip op. at 1-2 (explaining that a commuter rail carrier "provide[s] interstate transportation" bringing it within § 10501(a) because just one of that carrier's 13 lines crossed into another state).[16]

UP identifies no precedent in which a carrier providing transportation from one state to another was determined not to be a carrier providing transportation subject to the ICC's jurisdiction. (See UP Mot. to Dismiss 6-7.) Instead, UP cites three Progressive Era cases dealing with the inapposite question whether a shipper should pay the interstate rate or the intrastate rate for a freight movement that crossed state lines but also had a sizeable in-state component. Those cases looked to the movement's "essential character," see Atlantic Coast Line Railroad v. Standard Oil Co. of Kentucky, 275 U.S. 257, 268 (1927); Baltimore & Ohio Southwestern Railroad v. Settle, 260 U.S. 166, 170-71 (1922); Pennsylvania Railroad v. Clark Bros. Coal Mining Co., 238 U.S. 456, 465-66 (1915), but they nowhere suggested that daily transportation on a fixed route between permanent facilities in two different states was inadequate to make the carrier into a "carrier providing transportation subject to the ICC's jurisdiction" under the law as it existed before January 1, 1996. To the contrary, as a more modern case cited by UP suggests, (UP Mot. to Dismiss 7), the ICC could have jurisdiction over

---

[16] More recent decisions have also referred to a local governmental authority's ability to seek trackage rights under § 11102 without any suggestion that a line-by-line parsing of its commuter rail system would be needed to determine jurisdiction. See N.J. Ass'n of R.R. Passengers—Pet. for Declaratory Ord.—Princeton Branch, FD 35745, slip op. at 6 (STB served July 25, 2014); Commuter Rail Div. of the Reg'l Transp. Auth.—Pet. for Declaratory Ord.—Status of Chi. Union Station, FD 36171, slip op. at 4 (STB served Aug. 22, 2018).

"interstate carrier[s]" even when the movement in question was geographically intrastate.  Texas v. United States, 866 F.2d 1546, 1553 (5th Cir. 1989).[17]

UP also claims that the UP-North line to Wisconsin is jurisdictionally inadequate because the line's traffic is "de minimis" in that it forms a relatively small part of Metra's network.  (UP Mot. to Dismiss 7-10, May 23, 2025.)  But, as above, this argument finds no basis in the statute or agency precedent.[18]  Section 10501(c)(3)(B) says nothing about quantifying the relative inter- and intra-state volumes of operations, and UP points to no caselaw disqualifying interstate movements on that ground.  Precedent suggests the opposite.  Again, in Massachusetts Bay Commuter Railroad, FD 34332, slip op. at 1-2, the Board determined that a local governmental authority met the general standards to be considered a rail carrier providing transportation subject to the Board's jurisdiction because, even though twelve of the lines were purely intrastate, the thirteenth line crossed from Massachusetts to Rhode Island (much as Metra's UP-North provides service to Wisconsin).  The cases cited by UP, by contrast, concern neither the ICC nor the Interstate Commerce Act and fail to support UP's position.  See, e.g., Kimball v. Goodyear Tire & Rubber Co., 504 F. Supp. 544, 547 (E.D. Tex. 1980) (comparing relative volume of shipments crossing state lines for purposes of determining truckers' entitlement to overtime pay under the Fair Labor Standards Act); Interstate Towing Ass'n, 6 F.3d at 1163 (under the Dormant Commerce Clause, Cincinnati could license tow trucks moving into and out of the city without unreasonably burdening interstate commerce, even if trucks incidentally passed into other states by virtue of the city's geography).  It also bears emphasis that Metra's Kenosha traffic is not truly "de minimis;" hundreds of people rely on the Kenosha station daily.  There is no doubt that a carrier providing the UP-North service and nothing more would be providing transportation "between a place in a State and a place in another State," 49 U.S.C. § 10501(a)(2)(A) (1994), and the law does not penalize Metra for providing additional services, as well.

*Second*, Metra meets the pre-ICCTA standards for ICC jurisdiction because, under former § 11501(b)(4)(B), once the ICC denied certification to a state (as it did for Illinois when it relinquished its certification in 1994), the ICC possessed jurisdiction over "[a]ny intrastate transportation provided by a rail carrier" in that state.  The full provision states:

---

[17]  The other cited cases are similarly irrelevant.  In Magner-O'Hara Scenic Railway v. ICC, 692 F.2d 441, 444-45 (6th Cir. 1982), the ICC disclaimed jurisdiction over a proposed sightseeing excursion rail service because it would operate "entirely within the state of Michigan."  And the remaining two cases involved not the ICC's jurisdiction but the Dormant Commerce Clause:  Lehigh Valley Railroad Co. v. Pennsylvania, 145 U.S. 192, 204-05 (1892), held that a state could tax its own corporations for movements that originate and end in the same state and only incidentally cross state lines en route.  Interstate Towing Ass'n, Inc. v. City of Cincinnati, 6 F.3d 1154, 1165-66 (6th Cir. 1993), held that Cincinnati could license tow trucks moving in or out of the city without unreasonably burdening interstate commerce.

[18]  Indeed, if UP's arguments were accepted, there would be a significant question as to whether any local governmental authority could ever qualify for terminal trackage rights under § 11102.

Any intrastate transportation provided by a rail carrier in a State which may not exercise jurisdiction over an intrastate rate, classification, rule, or practice of that carrier due to a denial of certification under this subsection shall be deemed to be transportation subject to the jurisdiction of the Commission under subchapter 1 of subtitle IV of title 49.

49 U.S.C. § 11501(b)(4)(B) (1994).  In 1994, Illinois surrendered its authority to regulate Metra's intrastate rates and tariffs by requesting decertification of its authorization to exercise jurisdiction over intrastate transportation.  Tariff Filing Requirements, No. 41506, slip op. at 1; see generally former 49 U.S.C. § 11501(b) (1994) (prescribing terms under which a state authority could be certified to exercise jurisdiction over intrastate transportation).  Accordingly, under the "standards and requirements . . . that were in effect immediately before January 1, 1996," § 10501(c)(3)(B), the ICC had jurisdiction over Metra's commuter rail transportation within Illinois.

UP contends that the trackage-rights prescription sought in this case would not have fit within the grant of jurisdiction in former § 11501(b)(4)(B) because the D.C. Circuit construed that section as reaching only "ratemaking and related activities," as distinguished from "trackage abandonment and other noneconomic matters."  (UP Mot. to Dismiss 16-17, May 23, 2025 (quoting Ill. Com. Comm'n v. ICC (Illinois Commerce), 879 F.2d 917, 926 (D.C. Cir. 1989)).)  UP's position is difficult to square with the language of the statute, which gave the ICC jurisdiction over "[a]ny" intrastate transportation provided by a rail carrier in post-decertification Illinois.[19]

But even under Illinois Commerce, trackage-rights prescriptions are among the "ratemaking and related [economic] activities" over which § 11501(b)(4)(B) gave the ICC authority.  Illinois Commerce was focused specifically on abandonment of spur tracks lying entirely within one state.  Because the Interstate Commerce Act expressly withdrew such tracks from the ICC's licensing authority, see 49 U.S.C. § 10907(b)(1) (1994), the D.C. Circuit held that the more general jurisdictional grant in § 11501(b)(4)(B) could not be read to include them, 879 F.2d at 926-27.  Still, because "[t]he central concern of the Staggers Rail Act [which added § 11501(b)(4)(B)] was reformation of the economic regulation of railroads," the court acknowledged that the statute could reach not just "ratemaking" but "related activities," including other "[]economic matters."  Id. at 925.

A trackage-rights prescription of the kind Metra seeks here is such an economic matter because it deals specifically with the economic relationships among railroads and access to markets.  "An order granting terminal trackage rights . . . can also lead to direct 'rate regulation'

---

[19]  See, e.g., Ill. Com. Comm'n v. ICC, 749 F.2d 875, 878 & n.5 (D.C. Cir. 1984) ("A denial of certification vested the ICC with plenary jurisdiction to regulate the intrastate commerce of the uncertified State" (citing Staggers Rail Act § 214(b) (codified at 49 U.S.C. § 11501(b)(4))); see also Napa Valley Wine Train, Inc.—Pet. for Declaratory Ord., 7 I.C.C.2d 954, 960 & n.16 (acknowledging that "there are statements in other court cases that can be read as supporting full preemption" (citing Ill. Com. Comm'n, 749 F.2d at 884-85 and Utah Power & Light Co. v. I.C.C., 764 F.2d 865, 869 (D.C. Cir. 1985)))).

because the Commission is empowered to fix the compensation governing [those] rights if the carriers cannot reach agreement." Midtec Paper Corp. v. United States, 857 F.2d 1487, 1506 n.8 (D.C. Cir. 1988). Indeed, shortly after Illinois Commerce, another court concluded that trackage-rights prescription under statutory access provisions constitutes an economic, rate-related activity that is therefore within the scope of former § 11501(b)(4)(B), even under Illinois Commerce. Ass'n of Am. R.Rs. v. Pub. Serv. Comm'n of W. Va., 745 F. Supp. 1188, 1194-95 & n.14 (S.D. W. Va. 1989). Thus, UP's reliance on Illinois Commerce is unavailing because the holding of that case would not prohibit the Board from asserting jurisdiction over transportation provided by Metra in this matter.[20]

UP lastly argues that a decertification theory is unavailable to Metra because § 10501(c)(3)(B) is phrased in the present tense: the Board must find that Metra "*meets* all of the standards and requirements for being a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission that were in effect immediately before January 1, 1996." (emphasis added). According to UP, this language "requires that present facts be measured against past standards," (UP Mot. to Dismiss 18-19, May 23, 2025), and, with the certification program discontinued, it is no longer the case that Illinois is prohibited from regulating intrastate commerce "due to a denial of certification," pursuant to former § 11501(b)(4)(B). But the legal effect of Illinois's 1994 decertification decision is not a "fact" to be evaluated in the present tense; it is part of "the standards and requirements" governing ICC jurisdiction "that were in effect immediately before January 1, 1996." 49 U.S.C. § 10501(c)(3)(B). And, under those standards, Illinois was prohibited from regulating intrastate commerce that is within the scope of § 11501(b)(4)(B) due to the decertification decision. That regulatory authority therefore belonged to the ICC, including the authority to prescribe trackage rights for Metra's intrastate movements.

When Congress, in enacting ICCTA, repealed provisions requiring regulatory review and approval before a railroad could discontinue passenger rail operations, it established a means for local governmental authorities to mitigate the adverse effects of a railroad's decision to do so: they could seek terminal trackage rights and reciprocal switching under 49 U.S.C. § 11102 (and switch connections under 49 U.S.C. § 11103) under certain circumstances. As Metra points out, Congress intended that "local transportation authorities satisfying the jurisdictional requirements

---

[20] UP's reliance on the two ICC decisions that followed Illinois Commerce is unpersuasive. Neither case involved a dispute about involuntary trackage rights. The dispute in Napa Valley centered on the ability of state and local authorities to require an environmental assessment of a purely intrastate "wine train" that traversed Napa Valley. See Napa Valley, 7 I.C.C.2d at 955. The ICC initially ruled that such environmental regulation was preempted under former § 11501 because California had not sought certification, but later reopened the proceeding and determined that Illinois Commerce's economic interpretation of § 11501 "appeared to cast doubt" on that conclusion." Id. at 957. In Southern Pacific Transportation Co.—Abandonment Exemption—Los Angeles County, Cal., 9 I.C.C.2d 385 (1993), the ICC found that a voluntary trackage rights agreement (where there was no threat of the agency setting trackage-rights compensation) "does not appear to be related to ratemaking," and thus was not subject to the ICC's jurisdiction under the narrower view of § 11501 set forth in Illinois Commerce. Id. at 392.

of section 10501 could invoke the remedies of [section 11102 and section 11103] with respect to both freight and passenger transportation uses of railroad facilities." (Metra Opening 9, May 5, 2025 (quoting H.R. Conf. Rep. No. 104-422, at 184 (1995); see also H.R. Conf. Rep. 104-422, at 852.) UP's strained view of the Board's jurisdiction would effectively eviscerate the remedy Congress intended to provide.

In sum, the Board concludes that Metra provides transportation subject to the ICC's jurisdiction as it existed under pre-ICCTA standards, both because Metra provides transportation between one state and another, and because Illinois ceded authority to regulate even intrastate economic rail transportation matters to the ICC. The Board therefore has jurisdiction over transportation provided by Metra under § 10501(c)(3)(B). UP's motion to dismiss will be denied.

### UP's Motion to Strike

On June 25, 2025, UP filed a motion to strike what it describes as new arguments and evidence presented in Metra's rebuttal to which UP had no opportunity to respond. First, UP asserts that Metra "submitted impermissible evidence on compensation under SSW principles." (UP Mot. to Strike 1, June 25, 2025.)[21] UP states that "Metra argued on opening that [UP's] offer [of a proposed access fee] was economically unreasonable, but . . . waited to unveil an expert opinion and purported SSW calculations until after [UP] submitted its reply evidence." (Id. at 1-2, 5.) UP maintains that, while it was permissible for Metra's expert (Mr. Mulholland) to respond to the testimony of UP's expert (Professor Carey), it is "classic sandbagging for Metra to introduce SSW calculations on rebuttal" that could have been submitted earlier. (Id. at 5-6.)[22]

Second, UP argues that Metra's rebuttal impermissibly seeks what UP terms "new relief"—interim access to the UP Lines under an alternative to the proposed terms and conditions attached to UP's reply—when Metra had initially claimed it was entitled to continuing access without any form of compensation order and was not asking the Board to set compensation "at this time." (Id. at 2, 8-9.)

Metra replied to UP's motion to strike on June 26, 2025. With respect to UP's first claim, Metra argues that its rebuttal evidence regarding a reasonable access fee was appropriate because Metra "cannot be expected to have anticipated that UP would seek to insert the putative reasonableness of its own compensation demand into the public interest analysis." (Metra Reply to Mot. to Strike 1, June 26, 2025.) However, as UP points out, "Metra argued on opening that [UP's] offer was economically unreasonable, but Metra provided no evidence in support, nor did it put forward its own view of economically reasonable compensation." (UP Mot. to Strike 1,

---

[21] SSW Compensation methodology principles have long been used by the Board for setting trackage rights compensation. BNSF Ry.—Terminal Trackage Rts.—Kan. City S. Ry., FD 32760 (Sub-No. 46), slip op. at 11-12 (citations omitted) (STB served Feb. 21, 2020). The Board has concluded in prior cases that the SSW Compensation methodology satisfies the principles of compensation in condemnation proceedings. Id. at 16 (citing cases).

[22] For similar reasons, UP also objects to the SSW evidence and argument submitted in Metra's June 12, 2025 response to UP's motion to dismiss on jurisdictional grounds. (Id. at 6-7.)

June 25, 2025.) UP maintains that evidence and any related argument on what Metra believes is a reasonable rate should be stricken from the record, while recognizing that "Mr. Mulholland's statement responding to Professor Carey is permissible [ ] rebuttal evidence." (Id. at 5.)

The Board finds that Metra's submission of affirmative evidence on what Metra believes is a reasonable rate—which occurred after UP's reply submission—is improper rebuttal to which UP had no ability to respond. The Board will accordingly strike such evidence (and related argument) from the record.[23] At the same time, Metra will not be deprived of its ability to refute UP's reply submission; evidence and argument focused on discrediting UP's claims and contentions (whether made by Professor Carey or elsewhere in UP's reply submission)—rather than Metra's affirmative case—is not subject to this ruling.

With respect to UP's second claim, Metra responds that it could not have anticipated that UP "would alter its prior position that final compensation had to be decided and paid before usage could commence." (Metra Reply to Mot. to Strike 2, June 26, 2025.) Metra maintains that its proposed Interim Conditions and Compensation "are a proper rebuttal response to UP's change in position and, contrary to UP's argument, are not inconsistent with any argument or evidence Metra previously offered." (Id. at 2-3.) The Board agrees.

The interim arrangement proposed in UP's reply submission was a material change in its initial position. Initially, in response to Metra's application, UP maintained that compensation must be decided by the agency and either paid or adequately secured "by means of a bond, deposit, or pledge of other property" before trackage rights usage could commence. (UP Reply to Appl. 5-6, Apr. 18, 2025.)[24] Later, however, in its reply to Metra's opening, UP shifted to proposing an interim order that UP said it would accept—subject to the reservation of specified rights[25]—as "adequate security" to permit Metra to use the UP Lines on an interim basis pending resolution of the compensation phase of the proceeding. (UP Reply to Opening 33, June 3, 2025.) Metra submitted an alternative proposal, in rebuttal and response to the interim order presented by UP. (Metra Rebuttal 2 & Ex. A, June 23, 2025.)

---

[23] However, should the parties be unable to reach a negotiated agreement, Metra may re-submit its SSW calculations—and any other evidence or argument that Metra believes supports its position on compensation issues—in its opening submission pursuant to the procedural schedule that would be set for the second phase of this proceeding.

[24] (See also id. at 7 (stating that "Metra has not indicated that it is willing or able to secure a litigation bond to fully compensate Union Pacific for the requested fair market value of access, with interest, for the long duration of any compensation litigation"); id. at 9 (stating that UP is confident the Board will conclude "it is not appropriate to order access to Union Pacific lines in this case, which would then obligate Metra to compensate Union Pacific under condemnation principles. But in any event, Metra cannot access Union Pacific's lines pursuant to such order without compensating Union Pacific beforehand.").)

[25] As described in UP's reply to Metra's Opening, those rights include "a retained right to challenge the Board's authority to issue such an order," and "[UP's] right to advocate for compensation under condemnation principles, which may be significantly higher." (UP Reply to Opening 33, June 3, 2025.)

UP's motion to strike Metra's alternative proposal will be denied. Metra's proposal was a permissible response to a new position expressed by UP. UP's assertions that Metra's proposal is improper because it reflects a "reversal of position" in "direct conflict" with its earlier position, and that it "alter[s] the core assumptions upon which its case-in-chief is based," (UP Mot. to Strike 9-10, June 25, 2025), are not persuasive. UP relies on Metra statements about not asking the Board to set compensation "at this time," and that trackage rights usage could commence before compensation was decided, to support its claim.[26] However, reasonably construed, these statements simply reflect Metra's characterization of the sequence and process for handling terminal trackage rights requests under § 11102 in past proceedings. (See Appl. 25-26, Mar. 23, 2025 (describing sequence under § 11102 and citing cases for the proposition that there is no requirement that compensation be decided before trackage rights usage may commence).) Moreover, the statements refer to the determination of *final* compensation terms if the parties are unable to agree to terms *following* a grant of trackage rights. They do not contemplate the different scenario presented here, in which the Board has been asked by the incumbent carrier to enter an order governing the applicant's interim use of the lines.

UP also protests that Metra's interim proposal "raises a host of issues that require adversarial briefing by both parties." (UP Mot. to Strike 10, June 25, 2025.) That argument need not be addressed because the Board is not entertaining either party's interim proposal. Metra's alternative interim proposal and supporting material can remain in the record, because it is permissible rebuttal. UP will not be prejudiced (and need not file a surrebuttal) because the Board is not setting interim compensation and has not relied on the evidence referenced in UP's motion in this decision.

DISCUSSION AND CONCLUSIONS

The parties' positions on the merits of Metra's application are discussed below, along with the Board's conclusions that Metra's request for terminal trackage rights satisfies the statutory criteria of 49 U.S.C. § 11102(a).

**Terminal Area and Facilities**

Metra has filed this application under § 11102(a), which provides that "[t]he Board may require terminal facilities, including main-line tracks for a reasonable distance outside of a terminal, owned by a rail carrier . . . to be used by another rail carrier" if it finds that specified criteria are met. 49 U.S.C. § 11102(a).[27] The purpose of this section is to avoid "unnecessarily

---

[26] UP implies that Metra's earlier position was that *no* compensation would be paid for Metra's continuing use of the UP Lines pending completion of the compensation phase of this proceeding. However, Metra never stated that it would cease making interim payments pursuant to the PSA, even after it expired, until the terms of a new arrangement were negotiated by the parties or set by the Board.

[27] The full text of § 11102(a) provides that:

13

duplicated" lines, and is not limited to benefiting the rail service in the relevant terminal area. See S. Pac. Transp. Co. v. ICC, 736 F.2d 708, 723 (D.C. Cir. 1984) (citing Spokane, Portland & Seattle Ry.—Control—Peninsula Terminal Co., 348 I.C.C. 109, 142-43 (1975)). In considering the application, the Board must determine the scope of the terminal area and construe the term "terminal facilities" for purposes of this case.

The agency has long understood the concept of a terminal area in functional terms: as a commercially cohesive area in which two or more railroads engage in the local collection, classification, and distribution of rail shipments for purposes of line haul service. See Golden Cat Div. of Ralston Purina Co. v. St. Louis Sw. Ry., NOR 41550, slip op. at 7 (STB served Apr. 17, 1996); Rio Grande Indus., Inc.—Purchase & Related Trackage Rts.—Soo Line R.R. (RGI/Soo), FD 31505, slip op. at 10-11 (ICC served Nov. 15, 1989). Terminal functions include the "transfer, collection or delivery of freight," and a terminal facility is "any property of a carrier [that] assists in the performance of the functions of a terminal." Golden Cat, NOR 41550, slip op. at 7.[28] "The question[] of what is a terminal area . . . [is a] factual one[] requiring consideration of all the circumstances surrounding a particular case." Midtec Paper Corp. v. Chi. & Nw. Transp. Co., 3 I.C.C.2d 171, 179 (1986).

The Terminal Area

Metra proposes three alternatives for defining a terminal area for purposes of this proceeding. First, Metra asserts that the UP Lines that are the subject of its application "function

---

The Board may require terminal facilities, including main-line tracks for a reasonable distance outside of a terminal, owned by a rail carrier providing transportation subject to the jurisdiction of the Board under this part, to be used by another rail carrier if the Board finds that use to be practicable and in the public interest without substantially impairing the ability of the rail carrier owning the facilities or entitled to use the facilities to handle its own business. The rail carriers are responsible for establishing the conditions and compensation for use of the facilities. However, if the rail carriers cannot agree, the Board may establish conditions and compensation for use of the facilities under the principle controlling compensation in condemnation proceedings. The compensation shall be paid or adequately secured before a rail carrier may begin to use the facilities of another rail carrier under this section.

[28] Terminal functions and facilities may also encompass activities related to the transport of passengers. See, e.g., Hastings Com. Club v. Chi., Milwaukee & St. Paul Ry., 69 I.C.C. 489, 494 (1922) (explaining that, in its technical meaning as applied to railroads, the word "facility" encompasses what is "necessary for the convenience of passengers" as well as "the safety and prompt transportation of freight"). In subsequent decisions, the ICC reiterated that the term "terminal facilities" for purposes of Section 3(5) of the Interstate Commerce Act (§ 11102's predecessor) "was defined as everything necessary for the convenience of passengers and the safety and prompt transportation of freight." Erie R.R. Acquis., Etc., 275 I.C.C. 679, 687 (1950). Although terminal facilities are described by reference to "freight" in some cases, such as Golden Cat, those cases are not delimiting because they did not involve functions or facilities pertaining to the transportation of passengers.

and operate as a terminal area or as part of the larger Metra system terminal area." (Metra Opening 20-24, May 5, 2025.) Metra explains its view that Metra's commuter rail system, including the three UP Lines, "functions as and constitutes a unified terminal," (Appl. 18-19, Mar. 7, 2025), and exists within a commercially cohesive area known as Chicagoland, (Metra Opening 25-27, May 5, 2025). Metra contends that the UP Lines that exist within this terminal are not too long to be considered terminal facilities. (Id. at 28.)

Second, Metra asserts that the UP Lines are part of a larger Chicago rail terminal area overseen by the Chicago Planning Group (CPG), described as "a consortium of freight, passenger, and commuter railroads, established in 2000 to monitor freight and passenger train performance and develop solutions to daily operating problems to promote efficiency and safety." (Id. at 28, 31.) According to Metra, both UP and Metra are members and active participants in the CPG and the entities that operate under its auspices—the Chicago Transportation Coordination Office (CTCO) and the Chicago Integrated Rail Operations Center (CIROC)—to collect real-time data, review routes and schedules, identify potential operational problems, and mobilize the equipment and personnel needed to keep traffic moving through the city. (Id. at 31.) Metra states that the CTCO defines its territory as extending one crew district from the downtown Chicago freight terminal district. (Id. at 32.) It provides a map depicting that territory in relationship to Metra's system and the UP Lines at issue. (Id. at 33.)

Finally, Metra asserts that the terminal area could consist of the Chicago Freight Terminal (or CFT, identified on Metra's map as the "Chicago Terminal District") in which the three UP Lines at issue originate, and that the remainder of each of the UP Lines is within a reasonable distance of the terminal for purposes of § 11102(a). (Id. at 34-38.)

UP argues that Metra's first proposal—that Metra's system (or, alternatively, the three UP Lines) marks the parameters of an appropriate terminal area for this proceeding—has "no basis in agency precedent" and asserts that the proposal "would vastly expand the agency's authority far beyond the limits Congress enacted." (UP Reply to Opening 12, June 3, 2025.) UP maintains that the terminal area in this proceeding must be defined solely by reference to the types of terminal facilities discussed in prior cases, namely, facilities used for terminal activities related to freight. (Id. at 13-14.) UP also dismisses Metra's second proposal, noting that under a CTCO-based approach, the agency would apparently have jurisdiction to order Chicago-area terminal trackage rights "for hundreds of miles outside of Chicago—into Michigan, Ohio, Indiana, Iowa, and Wisconsin." (Id. at 16.)

According to UP, the only relevant terminal is the "Chicago terminal"—by which UP appears to mean the Chicago Freight Terminal described in Metra's third proposal. (Id. at 15.)[29] UP defines this terminal by reference to Chicago terminal switching limits, which UP describes as "generally considered to include major yards such as Proviso, Bensenville, Markham, and Clearing, as reflected in" maps attached to its reply. (Id. at 17.) UP acknowledges that, using

---

[29] The "Chicago terminal" discussed on pages 15-20 of UP's reply to Metra's Opening appears largely synonymous with the Chicago Freight Terminal described in Metra's third proposal. For clarity, it will hereafter be referred to as the Chicago Freight Terminal, or the CFT.

what it considers "the correct test," "some portions of the UP Lines are located within the Chicago terminal and therefore could be eligible for a terminal access order." (Id. at 19.)[30] However, UP argues that Metra "is not entitled to trackage rights over any track outside of the Chicago terminal." (Id. at 20.) Specifically, UP claims that such rights are available under § 11102(a) only if the carrier seeking them has no other means to access the terminal, and argues that, because "Metra has multiple lines that it uses to reach the Chicago terminal," it cannot qualify for any trackage rights outside the Chicago Freight Terminal due to this asserted limitation. (Id.) UP also maintains that lines "dozens of miles from Chicago" are not within a "reasonable distance" from the terminal. (Id. at 4; see also id. at 21 (arguing that past decisions have "only approv[ed] access for short distances of approximately 15 miles or less").)

The Board will construe the terminal area in this proceeding as the Chicago Freight Terminal (or CFT). Both parties acknowledge that the CFT qualifies as a terminal area under any definition the Board may apply.[31] As described in Metra's rebuttal, the CFT is "the downtown freight switching terminal," (Metra Rebuttal 9, June 23, 2025), and, as noted above, UP recognizes that "some portions of the UP Lines are located within the Chicago [Freight] [T]erminal and therefore could be eligible for a terminal access order." (UP Reply to Opening 19, June 3, 2025.) Because the Board finds that Metra's system either falls within the CFT or consists of mainline track for a reasonable distance outside of the terminal, as discussed below, the Board need not decide whether a more expansive definition of terminal area would be appropriate. Therefore, the CFT will be considered the terminal area for purposes of this proceeding.

<u>Trackage Rights within a Reasonable Distance of the Terminal Area</u>

Metra maintains that the portions of the UP Lines outside the limits of the CFT are nevertheless within a "reasonable distance" of the terminal area and thus eligible for trackage rights under § 11102(a). (Metra Opening 36-38, May 5, 2025; Metra Rebuttal 26-28, June 23, 2025.) UP, on the other hand, disputes Metra's entitlement to any trackage rights beyond the confines of the CFT itself. (UP Reply to Opening 17-19, June 3, 2025.) Under the facts of this

---

[30] Specifically, UP does not contest that the following portions of the UP Lines are within the Chicago Freight Terminal:

UP-North: From "OTC to Rogers Park (approximately Geneva Sub MP 0.0 to Kenosha Sub MP 9.3)";

UP-Northwest: From "OTC to Cumberland (approximately Geneva Sub MP 0.0 to Harvard Sub MP 18.2)"; and

UP-West: From "OTC to Berkeley (approximately Geneva Sub MP 0.0 to Geneva Sub MP 14.4)." (Id.)

[31] As noted above, however, UP disputes Metra's entitlement to any trackage beyond the confines of the CFT. (UP Reply to Opening 17-19, June 3, 2025.) Metra maintains that the remaining portions of the UP Lines are located within a "reasonable distance" of the terminal area, and thus eligible for trackage rights under § 11102(a) on that basis. (Metra Opening 36-38, May 5, 2025; Metra Rebuttal 26-28, June 23, 2025.) These issues are discussed below.

case—which involve the provision of commuter passenger rail service—the Board concludes that the UP Lines used by Metra outside of the CFT are within a "reasonable distance" of the CFT and thus eligible to host Metra trackage rights under § 11102(a).

First, UP argues that Metra "is not entitled to trackage rights over any track outside of the Chicago [Freight] [T]erminal because it does not need those rights to access the terminal." (UP Reply to Opening 20.) Putting aside the applicability of UP's contention in a freight rail context, in the commuter rail context, the question of whether the carrier seeking access has only one way to reach the terminal does not resolve the issue. A commuter rail system is only as useful as its proximity to the places its customers live; a Metra system that consisted of a single line from the city center to one suburb would be of limited utility. As Metra rightly points out,[32] in light of its hub-and-spoke configuration, the fact that Metra trains can reach the CFT from its southern routes—which run into downtown Chicago from points in southern Illinois (Joliet, Manhattan, and University Park, Ill.)—is irrelevant to the many thousands of commuters who rely each day on Metra's service specifically over the UP Lines, which run from northern (Kenosha, Wisc.), northwestern (Harvard, and McHenry, Ill.), and western (Elburn, Ill.) points to their terminus in the CFT. In the commuter rail context, it is appropriate for the Board to consider the hub-and-spokes approach that is inherent in many passenger rail networks.

Aside from this general distinction between passenger and freight service, the cases cited by UP do not support its reading of the statute. Indeed, the agency has never held § 11102(a) or its predecessor to require that the term "terminal facilities" be limited to the trackage within the operating limits of the terminal whenever the carrier seeking access has *some* routing into the terminal area. S. Pac. Transp. Co. v. ICC, 736 F.2d 708, 723 (D.C. Cir. 1984). Spokane, Portland & Seattle Railway—Control—Peninsula Terminal Co., 334 I.C.C. 419, 435 (1969), simply states that § 11102(a) was enacted "to provide a method of avoiding the necessity for incurring unnecessary expense in duplicating existing terminal facilities by a railroad entitled to serve a particular territory." (UP Reply to Opening 20 (quoting Spokane, Portland & Seattle Ry.).) Nor is such a limitation required by Chicago & Alton Railroad v. Toledo, Peoria & Western Railway, 146 I.C.C. 171, 179 (1928), which UP cites for the proposition that a reasonable distance from the terminal area will "depend primarily upon the extent of the terminal area to be served and the complexity of access to it." (UP Reply to Opening 20 (quoting Chi. & Alton R.R.).) That decision does not say there must be only one point of access to the terminal area; indeed, the ICC noted that the stretch of track to which the plaintiff sought access in that case "affords its only *direct* means of access from the east to the [terminal] facilities of the P. & P. U.," Chi. & Alton R.R., 146 I.C.C. at 178 (emphasis added), suggesting precisely the opposite. The two other cases cited by UP similarly do not support its contention that trackage rights for a

_____

[32] Metra notes its "hub and spoke" configuration and explains that the fact that another Metra line may reach downtown Chicago via some other route "is of no value to a commuter who wishes to use the UP Lines to travel to or from a [different] location outside the terminal district." (Metra Rebuttal 27, June 23, 2025.)

reasonable distance outside the terminal are foreclosed by § 11102(a) unless the party seeking them has no other way to access the terminal area.[33]

Nor does the statute's text or legislative history state or suggest that mainline track outside the terminal cannot be included in an order granting terminal trackage rights unless the party seeking them has no other way to access the terminal area. Accord S. Pac. Transp. Co., 736 F.2d at 723 ("The Commission has never held 49 U.S.C. § 11103(a) or its predecessor to require that the term "terminal facilities" be limited to the trackage within the operating limits of the terminal."). Such a limitation would also be at odds with the foundational precepts that the statute is "highly remedial" and the term "terminal facilities" should be liberally, not narrowly, construed.[34] UP's proposed limiting criterion would materially diminish the remedy, especially as it concerns a local governmental authority providing commuter rail service, and undermine Congress's intent that terminal trackage rights be available to support such operations. H.R. Conf. Rep. No. 104-422, at 184 (1995).

The Board also rejects UP's second contention—that the portions of the UP Lines outside the CFT are not a "reasonable distance outside" the terminal for purposes of applying that statutory criterion in this proceeding.[35] UP asserts that "there is no basis to interpret the phrase

---

[33] Neither case cited by UP discussed that issue or endorsed such a proposition. (See UP Reply to Opening 20-21 (citing CSX Corp.—Control—Chessie Sys., Inc., 363 I.C.C. 518 (1980) (CSX/Chessie) and RGI/Soo).) UP thus misconstrues the reference to track being "necessary for access" in CSX/Chessie, 363 I.C.C. at 585, and to tracks "that would be used to gain access to a terminal area" in RGI/Soo, FD 31505, slip op. at 12. These references are more properly understood as simply meaning the track in question would need to be used to gain access to the terminal area for purposes of redressing the particular issue presented in the case.

[34] See, e.g., City of Milwaukee v. Chi. & Nw. Ry., 283 I.C.C. 311, 314 (citations omitted) (1951) ("We have found that [section 3(5), now section 11102] is highly remedial and that the words 'terminal facilities' should be liberally, not narrowly, construed."); accord CSX/Chessie, 363 I.C.C. at 585, aff'd 857 F.2d 1487 (D.C. Cir.1988) ("Since [the agency's] power to make the terminal facilities of one carrier available to another is remedial in nature, the term [terminal facilities] should be construed liberally.").

[35] UP overstates the distances at issue. (See UP Reply to Opening 21, June 3, 2025 ("Ordering access to track that reaches over 50 miles beyond a terminal area into another state is not reasonable.").)

Measured from their OTC origin, the UP-North Line to Kenosha is 51.6 miles, the UP-Northwest Line is 62.8 miles to Havard and 65.8 miles to McHenry, and the UP-West Line to Elburn is 43.5 miles. (Metra Opening 28, May 5, 2025.) However, as described above, using what UP terms "the correct test," portions of those Lines "are located within the Chicago terminal," specifically:

- 9.3 miles of the UP-North Line (from OTC to Rogers Park)
- 18.2 miles of the UP-Northwest Line (from OTC to Cumberland)
- 14.4 miles of the UP-West Line (from OTC to Berkeley).

'reasonable distance' differently in the context of passenger operations than for freight operations," and suggests the Board's discretion in determining "reasonable distance" is constrained by past decisions that focused primarily on "the physical distance beyond the terminal, only approving access for short distances of approximately 15 miles or less." (UP Reply to Opening 21, June 3, 2025 (citing two decisions described by UP as involving 12-mile line segments).)[36] The Board disagrees. It is appropriate—indeed, the agency policy has discretion[37]— to consider all pertinent facts and circumstances that bear on a determination of "reasonableness" in the case before it. Neither the statute nor past decisions support UP's claim that "physical distance" is the only pertinent consideration. As Metra points out, (Metra Rebuttal 11-12, June 23, 2025), UP's approach—which is tethered to just one factor (the physical distance found reasonable in past cases)—is inconsistent with the foundational principle that the question of reasonable distance "is to be determined in light of the facts in each case." RGI/Soo, FD 31505, slip op. at 11 (citing Chi. & Alton R.R.).[38]

In this case, the Board concludes that a "reasonable distance" outside the CFT is the endpoint of Metra's existing commuter rail service over each UP Line.[39] While these line

---

(UP Reply to Opening 19.) Thus, the distance of each Line that would be subject to the "reasonableness" determination is as follows: UP-North: 42.3 miles; UP-Northwest to Harvard: 44.6 miles; UP-Northwest to McHenry: 47.6 miles; UP-West: 29.1 miles.

[36] UP's statement is erroneous. Terminal trackage rights have been authorized over mainline segments longer than 15 miles outside a terminal, as the next page of UP's reply submission reflects. (See UP Reply to Opening 22, June 3, 2025 (discussing the mainline segment in Rio Grande Industries—Purchase & Trackage Rights—Chicago, Missouri and Western Railway Line Between St. Louis, Mo. and Chicago, Ill. (RGI/CMW), 5 I.C.C.2d 952 (1989), and citing a 1987 exemption proceeding in Docket No. FD 30911 reflecting that the segment in question spanned "around 22 miles," from "Joliet MP (A0) 36.7 to Kensington MP 14.0").)

[37] See Loper Bright Enters. v. Raimondo, 603 U.S. 369, 394–95 (2024) (referencing statutes that employ terms that "'leave[] agencies with flexibility,' . . . , such as 'appropriate' or 'reasonable'") (citations omitted); Wis. Cent. Ltd. v. STB, 122 F.4th 1009, 1011 (7th Cir. 2024) (observing that the word "reasonable" is "an open-ended term that confers discretion on the Board").

[38] UP states that RGI/Soo found the request for use of "a 42-mile main line segment" in that case unreasonable. (UP Reply to Opening 21, June 3, 2025 (quoting a passage from the decision noting that it "exceeds anything we have previously ordered under [then] Section 11103").) More accurately, however, in RGI/Soo the ICC found that "[t]he record, in our view, does not presently contain sufficient justification for considering such a long stretch of main line track reasonable," and declined to grant summary dismissal. RGI/Soo, FD 31505, slip op. at 11.

[39] A "key issue" in deciding what is reasonable is the use to be made of the tracks. Union Pac.—Control—Mo. Pac., 366 I.C.C. 459, 575 (1982). Here, the purpose of the grant of trackage rights is to enable Metra (and by extension, the population of Chicago and its surrounding suburbs) to access downtown Chicago from communities extending to Kenosha (UP-North Line), Harvard and McHenry (UP-Northwest Line), and Elburn (UP-West Line), and

segments are longer than those found reasonable in past cases involving freight rail operations,[40] this case involves several factors not present or considered in those decisions.

For example, unlike prior cases, this case involves a defined commuter rail system that has been in operation for decades; Metra is not seeking to institute a new and untested service over the mainline of the incumbent carrier. Adopting a narrower cut-off point would undermine the public interest served by granting terminal trackage rights in this case. The utility of Metra's commuter rail system would be severely diminished if Metra did not have statutory access to use three of its major lines, which could foreclose access to downtown Chicago for thousands of residents in communities living outside the CFT who rely on Metra for essential transportation services. At the same time, UP makes no claim that there is any point on any of the UP Lines beyond which UP's ability to conduct its freight operations has been hindered in the past or would be impeded going forward. Metra also points out that all three UP Lines have yards located at their endpoints that assist in the performance of important functions and "should not be viewed as the distant ends of main-line track." (Metra Opening 24, May 5, 2025 (citing V.S. Cork/Godfrey, para. 10).[41]) A finding that the UP Lines to their full extent are within a reasonable distance is further supported by the fact that they are all subject to centralized monitoring and coordination provided by the CTCO and the CIROC, under the auspices of the CPG, which work to help ensure that freight and passenger traffic moves efficiently throughout the greater Chicago region.[42] Additionally, the UP-North and UP-Northwest Lines are at most lightly used by UP;[43] and Metra invested in the construction of a "third main" on the UP-West line that UP asserted was needed to relieve congestion. (Appl. 24-25, Mar. 7, 2025.) These factors further mitigate the likelihood that Metra's operations over longer distances than have been found reasonable in other cases would be problematic.

---

vice versa. Without access to the UP Lines, Metra would not be able to provide commuter service to the passengers in those communities, forcing those passengers to find alternative means of transportation. UP's reading of the statute would render a grant of access to UP's terminal facilities nearly meaningless for Metra's purposes.

[40] As noted above, the distance of each Line subject to the "reasonableness" determination is as follows: UP-North: 42.3 miles; UP-Northwest to Harvard: 44.6 miles; UP-Northwest to McHenry: 47.6 miles; UP-West: 29.1 miles.

[41] According to paragraph 10 of the Cork/Godfrey V.S., the yards support passenger car storage, light maintenance, fueling, and crew change for the commuter service. (Id.)

[42] (See Metra Opening 31-32 & V.S. Cork/Godfrey, paras. 34-51, May 5, 2025 (describing CTCO and CIROC activities overseen by the CPG, in which Metra and UP are said to be "both members and active participants").)

[43] (See, e.g., Metra Rebuttal 24, June 23, 2025 (stating that the UP-North and UP-Northwest Lines handle primarily passenger traffic); UP Reply to Opening, V.S. Carey at 2, June 3, 2025 (stating that these two lines "carry lighter freight traffic" than the UP-West Line); UP Mot. to Strike 7, June 25, 2025 (noting that on the McHenry branch "there is no freight traffic at all").)

For these reasons, on the record before the Board, a finding that the existing endpoint for commuter rail service on each UP Line is within a reasonable distance of the terminal is warranted and appropriate in this proceeding. Adopting cut-off points within Metra's service area, merely based on shorter physical distances referenced in other cases, is supported by neither the record in this case nor the public-interest considerations involved.

Accordingly, subject to the matters addressed below, the trackage rights granted in this decision include the CFT terminal area and the entirety of the UP Lines up to the last Metra station.[44]

### Practicability and Lack of Substantial Impairment

Section 11102(a) provides that the Board may require terminal facilities owned by a rail carrier to be used by another rail carrier "if the Board finds that use to be practicable and in the public interest without substantially impairing the ability of the rail carrier owning the facilities . . . to handle its own business." 49 U.S.C. § 11102(a). The "public interest" criterion is addressed below. Here, the Board considers whether Metra's use of UP's terminal facilities would be "practicable . . . without substantially impairing the ability of [UP] . . . to handle its own business."

Metra states that the parties' long experience under the PSA demonstrates that use of the UP Lines for commuter rail service is practicable and does not substantially impair UP's operations. (See generally Appl. 22-25, Mar. 7, 2025; Metra Opening 38-40, May 5, 2025.) Metra maintains that the transfer of operational responsibility from UP to Metra, and Metra's use of trackage rights to operate the service, will not reduce that practicability or impair UP's operations. (Appl. 22-24; Metra Opening 6-7, 39-40, V.S. Maertins paras. 10-22.) Metra explains that UP will continue to maintain and dispatch the UP Lines; that Metra's trains will transport the same rolling stock over the same routes using essentially the same operating personnel (who have been transferred from UP to Metra); and that the workforce that maintains equipment and provides passenger services will also include the same experienced personnel who previously performed those functions for UP and are now Metra employees. (Appl. 23-24; Metra Opening 2, 39-40, V.S. Derwinski at 7.)[45] Metra also points to capital improvements and several technologies implemented in recent decades that it contends will help ensure safe, efficient commuter operations over the UP Lines going forward. (Metra Opening 38-39 (citing V.S. Maertins, paras. 15-16).) Metra states that, to Metra's understanding, UP does not dispute that the use of the UP Lines for commuter service has been and would remain practicable, and that UP's ability to handle its own business has not been, and will not be, impaired. (Metra Opening 4-5, 39-40.)

UP does not dispute, as a substantive matter, that Metra's use of the UP Lines for commuter service has been and would remain practicable within the meaning of the statute under

---

[44] Again, in light of this determination, the Board need not consider Metra's proposed alternative definitions of a terminal area.

[45] Metra also states that these employees will continue to be represented by the same unions. (Appl. 24, Mar. 7, 2025.)

a grant of terminal trackage rights.  Nor does UP take exception to Metra's statement that Metra's ongoing use of the UP Lines for commuter rail service would not substantially impair UP's ability to handle its own business.  And nothing in the record before the Board suggests otherwise.[46]  Accordingly, the Board finds that granting Metra trackage rights would be practicable and would not substantially impair UP's ability to handle its own business.

## The Public Interest

There are several points of contention regarding the parties' positions on the "public interest" standard under § 11102(a), and whether it has been satisfied.

Metra asserts that its use of the UP Lines is "manifestly in the public interest."  (Appl. 4, 23, Mar. 7, 2025.)  Metra states that dozens of communities were planned and built along the UP Lines and rely on them for daily life and economic well-being, and that cessation of its service also would strand the productive use of substantial capital improvements in the UP Lines, including public dollars.  (Metra Opening 41, V.S. Derwinski at 7-8, May 5, 2025.)  Metra notes that UP itself has acknowledged the importance of Metra's service to the economic well-being and quality of life in the communities located along the UP Lines.[47]  Metra also highlights a statement in the ICCTA Conference Report addressing a qualifying local governmental authority's ability to obtain terminal trackage rights under § 11102(a):

> It is the Conference's intent that, subject to the foregoing limitations and the operational and compensation requirements stated in this section, a local transportation authority's request would virtually always satisfy the public interest standard.

(Appl. 23, Mar. 7, 2025 (quoting H.R. Conf. Rep. No. 104-422, at 184 (1995)).)[48]  Metra maintains that this statement in the Conference Report overrides any interpretation of "public

---

[46]  A footnote in UP's reply—in the section on UP's proposed interim terms and conditions—states that UP believes any interim order requiring access without provisions relating to indemnity and liability would not be practicable and would unduly impair UP's ability to serve its freight customers.  (UP Reply to Opening 36 n.52, June 3, 2025.)  That matter is addressed below in the section on UP's proposed interim order (see infra, page 32 n.65).

[47]  See, e.g., Complaint (ECF No. 1) at ¶¶ 1, 7, Union Pac. R.R. v. Commuter Rail Div. of the Reg'l Transp. Auth., No. 1:19-cv-07957 (N.D. Ill. filed Dec. 5, 2019) (acknowledging that "[Metra's] transportation service, which accounts for 27 million passenger trips each year, is important to the economic well-being and quality of life in the communities along these lines" and that "Union Pacific has no desire to play any role in disrupting the lives of the people and communities who have come to reply [sic] on Metra's commuter rail service on its lines") (quoted in Metra Opening 27-28).

[48]  The full text of the pertinent passage reflects that, in adopting § 10501(c), Congress acted to make remedies available to jurisdictionally-qualified local governmental authorities:

interest" that would require a showing of anticompetitive conduct to obtain terminal trackage rights under <u>Midtec Paper Corp. v. Chicago & Northwestern Transportation Co.</u>, 1 I.C.C.2d 362 (1985), <u>as superseded</u>, 3 I.C.C.2d 171 (1986), <u>aff'd sub nom.</u> <u>Midtec Paper Corp. v. United States</u>, 857 F.2d 1487 (D.C. Cir. 1988). (Appl. 23 n.10, Mar. 7, 2025; <u>see also</u> Metra Opening 41-42, May 5, 2025 (contending that <u>Midtec</u> does not apply because Metra seeks to preserve an existing use that does not involve the addition of a new competitive carrier).)

In its reply to Metra's Opening, UP maintains that Metra must show anticompetitive conduct to obtain a terminal trackage rights grant but cannot do so because "[UP] and Metra are not competitors; [UP] is not excluding Metra from its lines; and [UP's] proposed access fee is eminently reasonable." (UP Reply to Opening 4-5, June 3, 2025; <u>see also</u> <u>id.</u> at 23-29 (arguing that <u>Midtec's</u> anticompetitive conduct requirement must be applied to this proceeding and that UP's "conservative access fee proposal" is not anticompetitive).) UP also contends that, apart from not satisfying the <u>Midtec</u> standard, Metra has not shown that the terminal trackage rights requested here are in the public interest. UP contends that the public interest standard for imposing terminal access requires "some actual necessity or some compelling reason" and that this standard has not been met because UP has not threatened to exclude Metra's access to the UP Lines. (<u>Id.</u> at 30-32; <u>see also</u> <u>id.</u> at 32 ("This dispute is not about necessity . . . but about money").) Citing the Seventh Circuit's recent decision in <u>Grand Trunk Corp. v. STB</u> (<u>Grand Trunk</u>), 143 F.4th 741 (7th Cir. 2025), UP argues that actual necessity or compelling reason requires a finding of inadequate service by the incumbent carrier, and reiterates that Metra "cannot make the requisite showing under § 11102(a) that Board-ordered terminal trackage rights are in the public interest . . . [because] Union Pacific has not excluded Metra from the UP Lines." (UP Letter 2, July 17, 2025.) Metra opposes this contention and maintains that the public interest standard is met. (Metra Reply to UP Letter 1-2, July 18, 2025.)

As discussed below, the Board holds that <u>Midtec</u> does not apply and finds that Metra's request for trackage rights is in the public interest.

---

As noted in connection with section 10501, local government authorities are to be excluded from economic regulation (rates, fares, entry, and exit) under the amended statute. A specific exception is made in section 10501(c) for matters arising under sections 11102 and 11103, which deal with access to or use of railroad facilities and infrastructure. Under the amended section 11102, the agency's existing power to order access to terminal facilities, including main-line tracks a reasonable distance from the terminal, would be retained. Thus local transportation authorities satisfying the jurisdictional requirements of section 10501 could invoke the remedies of this section [11102] and section 11103 with respect to both freight and passenger transportation uses of railroad facilities, based on the existing public interest standard. It is the Conference's intent that, subject to the foregoing limitations and the operational and compensation requirements stated in this section, a local transportation authority's request would virtually always satisfy the public interest standard.

H.R. Conf. Rep. No. 104-422, at 184 (1995).

Applicability of the Midtec Anticompetitive Conduct Criterion

UP argues that "for nearly 40 years, the agency has consistently held that, in addition to meeting the other criteria set forth in § 11102(c) [sic], an applicant seeking terminal trackage rights must make a showing of anticompetitive conduct." (UP Reply to Opening 23-24.) UP contends that Metra's opposing position—that the requirement applies only where a party seeks to introduce or obtain new competition, not where a party seeks to preserve existing service— "finds no support in the Board's competitive access rules, Midtec, the decades of subsequent precedent, or the single case that Metra cites—RGI/CMW." (Id. at 24.)

In rebuttal, Metra argues that anticompetitive conduct is not a statutory requirement and that the cases cited by UP applying Midtec all involved an attempt to inject a second carrier and the related competition that would bring. (Metra Rebuttal 30, June 23, 2025 (citing cases).) Metra states that it is not seeking to introduce a competing service, but simply to preserve an existing one. (Id.)

When adopting the regulations at 49 C.F.R. part 1144, the agency narrowed its discretion to require reciprocal switching agreements under § 11102(c) to cases where "there is a reasonable fear of anticompetitive behavior." Midtec Paper, 857 F.2d at 1500. In Midtec, the Board extended this need for showing anticompetitive behavior to requests for terminal trackage rights. Id. at 1501-02. The Board concludes that the requirement of an anticompetitive showing that the agency imposed on itself does not apply to this case and that Midtec and the other decisions cited by UP are not controlling. As Metra correctly notes, Midtec and the other decisions cited by UP involved attempts to inject a competing service by a second freight carrier.[49] This case does not. As UP itself acknowledges, "Metra and [UP] do not compete in any relevant market." (UP Reply to Opening 25, June 3, 2025.) Metra is simply seeking to continue to provide a different service—in and to an entirely different market involving different consumers (passengers, not shippers) and different products (commuter rail, not freight rail, service)—after UP elected to discontinue that service. Midtec's rationale is focused on freight rail competition, as the D.C. Circuit explained in its ruling:

---

[49] UP's attempt to dismiss RGI/CMW as "merely stand[ing] for the longstanding principle that the agency's competitive access rules do not apply in 'the context of acquisition or merger proceedings,'" (UP Reply to Opening 24), is also misplaced. In RGI/CMW, the ICC did note, in the footnote cited by UP, that the competitive access rules "address the addition of another carrier to the market outside the context of acquisition or merger proceedings;" but it also commented that no party had "addressed the legal issues underlying [§ 11102] remedies in depth" and explained that the agency's findings on these issues were therefore "limited to the unique factual circumstances of this case." 5 I.C.C.2d at 980 n.30.

In a decision served just months later, the ICC commented on the distinguishing feature of RGI/CMW noted by Metra—namely, that in RGI/CMW the agency was "faced with the situation of substituting one carrier for another" in order to continue service, which it described as standing in "marked contrast" to "being asked to alter competitive relationships and add another carrier." RGI/Soo, FD 31505, slip op. at 13.

Midtec's request for terminal trackage rights . . . is predicated upon the theory that its 'captive status' 'subjects it to serious service and rate disabilities.' [citing Midtec's complaint] Under these circumstances, we cannot say it is unreasonable for the Commission to require Midtec and the Soo to demonstrate that terminal trackage rights are necessary to remedy or prevent an act on the part of the C&NW that is contrary to the competition policy of the Staggers Act or that is otherwise anticompetitive.

857 F.2d at 1503.

In enacting § 10501(c)(3)(B), Congress explicitly provided that qualifying local governmental authorities could request the statutory remedy of terminal trackage rights under § 11102(a). Relatedly, the Conference Report for § 11102 specifically expressed "the "Conference's intent" that "a local transportation authority's request would virtually always satisfy the public interest standard." H.R. Conf. Rep. No. 104-422, at 184 (1995). UP's stance would have precisely the opposite effect. Requiring a local governmental authority to satisfy "the competitive access rules" to obtain a terminal trackage rights remedy, as UP maintains must be done (UP Reply to Opening 23-24, June 3, 2025),[50] would effectively nullify its ability to secure a remedy vis-à-vis a freight rail carrier because—as UP recognizes—local governmental authorities providing commuter rail service "do not compete [with freight rail carriers] in any relevant market," (id. at 25-26).

In sum, Midtec's anticompetitive conduct criterion—which the statute itself does not mandate—has only been applied for purposes of freight-to-freight competition. The Board declines to extend Midtec to situations in which terminal trackage rights are sought to enable a rail carrier to continue to provide a non-competing passenger service over the incumbent's lines when the incumbent no longer wishes to provide that service.

---

[50] UP argues that the agency's competitive access standard for trackage rights cases "was well established" when Congress reenacted § 11102(a) in ICCTA, (UP Reply to Opening 24), and that the Board "is not now free" to change it because Congress is presumed to adopt existing administrative interpretations when it reenacts a statute without change. (Id. at 24-25.) UP overlooks that Congress added a provision in § 10501(c)(3)(B) to enable qualifying local governmental authorities to request the statutory remedy of terminal trackage rights under § 11102(a), and it expressed "the Conference's intent" that a qualifying local transportation authority's request "would virtually always satisfy the public interest standard" embodied in § 11102(a). H.R. Conf. Rep. No. 104-422, at 184 (1995). Moreover, given that the cases (both before and after ICCTA) did not involve a passenger carrier, Congress did not "endorse" any application relevant to the context of this case. See, e.g., Jama v. Immigr. & Customs Enf't, 543 U.S. 335, 349 (2005) (presumption inapplicable where "Congress did not simply reenact [the statute] without change" or where there was no "supposed judicial consensus so broad and unquestioned" that Congress must be presumed to have known of and endorsed it).

The Parties' Other Arguments and the Board's Public Interest Determination

Metra's submissions center on two primary points to support its contention that granting its request for terminal trackage rights is in the public interest: (1) the statement in the ICCTA Conference Report that: "It is the Conference's intent that a local transportation authority's request would virtually always satisfy the public interest standard;"[51] and (2) the harmful economic and social impacts on the Chicago region and its residents from the loss of Metra's service on the UP Lines, even temporarily, as described in its opening submission.[52] Metra also asserts that granting the application and preserving commuter rail service would cause no harm to UP but rather would be a net benefit to it.[53]

UP asserts that Metra has not established that trackage rights are in the public interest because UP has not refused access and is willing to provide Metra with access to the UP Lines through a private commercial agreement. (UP Reply to Opening 31, June 3, 2025.) UP argues that this dispute therefore is just "about money." (Id. at 5, 32.) According to UP, because Metra cannot "demonstrate any service inadequacy," there is no actual necessity or compelling reason for a grant of terminal trackage rights, and "Metra therefore cannot make the requisite showing under § 11102(a) that Board-ordered terminal trackage rights are in the public interest." (UP Letter 2, July 17, 2025 (citing Grand Trunk, 143 F.4th at 751); see also UP Reply to Opening 30-32, June 3, 2025.)

Metra argues in rebuttal that it is seeking statutorily available rights to operate a public service over the UP Lines for a compelling reason: so that it can provide that service to the public on transparent, reasonable, and bilateral terms and with the certainty required, as Congress understood, to run a railroad. (Metra Rebuttal 4, June 23, 2025.) Metra argues that Grand

---

[51] (See Metra Opening 41, May 5, 2025.)

[52] (See Metra Opening 41, V.S. Derwinski at 7-8, May 5, 2025.)

[53] Metra maintains that UP earned a positive return under the PSA, and that as long as UP continues to recover its costs plus any margin (which, Metra says, the SSW Compensation formula applied in other trackage rights proceedings would ensure), UP would be better off, not worse, with continued Metra service contributions. (Metra Opening 44-45, May 5, 2025.) UP does not dispute that it would receive a net economic benefit from Metra's continued service.

UP instead claims that Metra "refus[es] to acknowledge the difference between a privately negotiated, term-limited agreement and permanent government-ordered access to private property." (UP Reply to Opening 8, June 3, 2025.) Although it is premature to assess compensation because that and Metra's terms of access are to be negotiated by the parties in the first instance, the Board notes that a trackage rights proceeding may be reopened, and appropriate relief ordered, when circumstances change in a material way. Moreover, according to Metra's plan for access, UP will retain important functions such as dispatching authority, and the schedules for Metra's trains will still require UP's advance approval. (Metra Opening 40, V.S. Maertins, para. 21, May 5, 2025.) Metra also states that if capacity constraints or new service requirements emerge, it will continue to cooperate with UP to identify and implement any needed capital improvements and/or operating or scheduling changes to ensure that UP's freight operations are not impaired. (Id. at 40, V.S. Maertins, para. 22.)

Trunk's holding that a public interest determination requires a showing of inadequate service does not apply where a local transportation authority seeks the use of terminal facilities to support passenger rail operations. (Metra Reply to UP Letter 1, July 18, 2025.) And it contends that because UP has no intention to reestablish any such service, the service is, "by definition," inadequate. (Id. at 2.)

Here, there is a compelling reason to award Metra terminal trackage rights over the UP Lines and, accordingly, the public interest standard under § 11102(a) has been met. Metra provides a vital public service over the UP Lines to suburban residents north and west of Chicago and has done so for decades. According to Metra, it serves a total of 66 stations along the UP Lines, which in 2024 supported more than 13 million passenger trips and accounted for 39 percent of Metra's total annual ridership. (Metra Opening 41, V.S. Derwinski at 7, May 5, 2025.) Metra states that it has invested more than $1 billion in public funds in the UP Lines to improve UP's infrastructure and make it fully functional for combined passenger and freight use. (Id.) Metra's opening submission also describes that dozens of communities were planned and built along the UP Lines,[54] details the many public benefits its service provides,[55] and asserts that even a temporary cessation of service would have wide-ranging and harmful economic and social impacts.[56] The Board finds that there is a strong public interest in having this service continue,[57] and, as discussed below (<u>see</u> pages 28-30, <u>infra</u>), the record demonstrates that Board intervention is warranted to ensure that result.

Citing <u>Grand Trunk</u>,[58] UP asserts that "Metra cannot demonstrate any service inadequacy," and accordingly no compelling need for the trackage rights, because "[UP] has not

---

[54] (Metra Opening 41, V.S. Derwinski at 7-8, May 5, 2025 (explaining that these population centers developed because of the availability of commuter rail service and continue to rely on that service for daily life).)

[55] (Metra Opening 41, V.S. Derwinski at 7-8 (explaining that the UP Lines, along with the rest of Metra's system, support economic development and job growth; help connect the entire metropolitan Chicago region; reduce traffic congestion; reduce road and parking costs; protect the environment and public health; provide households with access to and from work, school, and essential appointments; create and facilitate housing opportunities; and provide an otherwise unavailable transportation option for low-income individuals and families).)

[56] (Metra Opening 41, V.S. Derwinski at 8 (also stating that cessation of Metra's commuter service would strand the productive use of large amounts of capital improvements in the UP Lines, including public dollars).)

[57] <u>See, e.g.</u>, <u>Seaboard Air Line R.R.—Use of Terminal Facilities of Fla. E. Coast Ry</u>, 327 I.C.C. 1, 7 (1965) ("Obviously, long-continued prior service demonstrates a public need for maintaining operations.").

[58] <u>Grand Trunk</u> is of questionable applicability. The issues there pertained to the availability of reciprocal switching to address service issues in the context of competing carriers. The court did not consider or have need to consider Congress's subsequent enactment of § 10501(c)(3)(B) and its impact on the public interest standard under § 11102(a) for qualifying local governmental authorities seeking terminal trackage rights to continue to provide a non-

excluded Metra from the UP Lines," and Metra's current operations are "pursuant to a Passenger Rail Condition of Entry ("COE") provided by Union Pacific." (UP Letter 2, July 17, 2025.)[59] In other words, in UP's view, a local governmental authority could never qualify for terminal trackage rights so long as the incumbent carrier says it is willing to permit the local authority to use its lines under conditions solely determined by the incumbent carrier. It argues that this dispute therefore is just "about money"—not "some actual necessity or some compelling reason." (UP Reply to Opening 31-32, June 3, 2025.)[60] But UP's characterization of the dispute is critically undermined by its continued insistence that Metra does not have a statutory right to seek access to operate over the UP Lines to provide commuter rail service in the Chicago area. (UP Reply to Opening 31; see also id. at 44 (asserting that "[UP] is under no obligation to provide or allow use of its lines for commuter rail service after expiration of the PSA").) And UP has included provisions in the COE that it could use to exclude Metra from the UP Lines. (Metra Reply to Mot. to Dismiss, Ex. A (COE) at 3, 11, June 12, 2025 (permitting UP to remove Metra from the UP Lines if Metra does not comply with the terms of the COE, which UP set unilaterally).) In other words, UP maintains that its decisions about whether to allow—and, if so, on what terms to allow—Metra future access to the UP Lines would be at UP's sole discretion. Accordingly, this is not a dispute "about money"—it is about access.

If UP's position were adopted, the future of commuter rail service over the three UP Lines would be dictated by UP without any access to Board intervention.[61] UP's demands

---

competing commuter rail service the incumbent no longer wished to provide. However, even if the "public interest" in this context were to require a showing of inadequate service, that showing has been made, as explained below. Further, although UP alludes to both Midtec and Grand Trunk, it provides no support for why inadequate service would have to be shown to warrant an access remedy even if anticompetitive conduct had been shown.

[59] UP appears to imply that the COE is a private consensual arrangement, (see UP Letter 1 & n.1), but that is not the case. Metra opposes and objects to the COE's terms, (see, e.g., Metra Rebuttal 4, 43-44 & Ex. C (Kane Decl.), paras. 51-55, June 23, 2025), and describes the COE as "non-negotiated," (Metra Reply to UP Letter 2, July 18, 2025). To the extent the COE is a contract, it appears to be a contract of adhesion. (See Metra Reply to Mot. to Dismiss, Ex. A (COE), at 12-13.)

[60] (See also id. at 5 ("this dispute boils down to a disagreement about money" and "[t]hat is not a compelling need").) UP appears to have abandoned its earlier position that the parties' dispute over the appropriate value of access to the UP Lines—specifically, Metra's refusal to pay what UP considers "fair market value for access"—"strikes at the heart of the public interest analysis." (UP Reply to Appl. 3, Apr. 18, 2025.)

[61] UP's suggestion that, because Metra does not agree to binding arbitration the Board should not entertain its terminal trackage rights application, (UP Reply to Opening 9, June 3, 2025), is not persuasive, and its reliance on Dakota, Minnesota & Eastern Railroad—Control— Iowa, Chicago & Eastern Railroad (DME/ICE), 6 S.T.B. 511 (2003), is misplaced. It is true that the Board's policy "has long been to encourage private sector dispute resolution whenever possible, particularly in disputes involving compensation." (UP Reply to Opening 3, 32 (quoting DME/ICE, 6 S.T.B. at 530).) But that does not mean that, where the parties attempt to reach a

and actions in its proposed "private commercial" relationship with Metra, (UP Reply to Opening 31, June 3, 2025), would effectively be insulated from review by the Board. More importantly, under UP's interpretation of the law, Metra would have no right to refuse unreasonable terms and conditions and no recourse if UP decided to deny access altogether. There is, no doubt, a compelling need to grant Metra trackage rights over the UP Lines to provide commuter rail service in the Chicago area. Metra provides a critically important public service. As described above, the UP Lines over which Metra operates have served dozens of communities for decades, and in 2024 provided more than 13 million passenger trips. Thousands of area residents rely on Metra for access to and from essential daily activities. The public service Metra provides also supports economic development and job growth, reduces traffic congestion, and helps protect the environment. No other carrier provides that service. And UP has made clear that it has no obligation to provide passenger rail service—it secured a declaration from a federal court confirming as much. Union Pac. R.R., 74 F.4th 884, 887 (7th Cir. 2023).

These circumstances are different from those in a proceeding where a freight carrier seeks access to the terminal facilities of another freight carrier. In such a situation, the incumbent railroad has a common carrier obligation to serve the freight customers to which the tenant freight carrier seeks access. 49 U.S.C. § 11101. Accordingly, if the incumbent carrier opposes access by the tenant carrier,[62] there would be different considerations regarding service inadequacy. Here, UP has no obligation to provide passenger rail service to the thousands of people who rely every day on Metra's service over the UP Lines. See Union Pac. R.R., 74 F.4th at 887. There is therefore no apparent replacement or alternate to the service that Metra provides. Moreover, while UP has stated that it does not intend to deny Metra access to the UP Lines, it also has repeatedly stated that it is under no obligation to allow Metra to continue to do so and the express terms of the COE allow UP to deny Metra access. If Metra's heavily trafficked public commuter rail service is subject to unreviewable terms and pricing set

_____

private sector resolution but do not succeed in doing so, the Board must force one by refusing to entertain a statutorily-based request for regulatory intervention.

The facts of DME/ICE are also distinguishable. Unlike Metra, DME (the party seeking the trackage rights) had expressed its clear expectation that it would reach a mutually satisfactory arrangement with UP (the incumbent carrier), and DME had another option (Board authorization to construct a new connection to the line it was acquiring) if the parties could not agree. DME/ICE, 6 S.T.B. at 529-30. In those circumstances, the Board found that granting terminal trackage rights was not "necessary or appropriate to provide the full benefits of common control," and that the price DME would pay if it elected to use UP's track rather than construct a connecting line should be established through negotiations with UP rather than by the Board. Id.

[62] The situation present in this case involving continued access sought by a commuter railroad is unlikely ever to arise in the freight rail context because before a second common-carrier freight railroad can access the lines of another freight carrier via trackage rights, the second carrier must be licensed by the Board to do so. Once the license is granted, it cannot be revoked without Board approval. This further illustrates how the current situation is unique to the passenger rail context because a passenger carrier does not need prior approval from the Board to access freight lines.

unilaterally by UP and can disappear on a whim, that is not adequate service.[63]  Under these circumstances, the public interest requires greater certainty and granting Metra terminal trackage rights is warranted to ensure the provision of adequate rail service to the public.

This conclusion is most consistent with Congress's clearly expressed intent that "a local transportation authority's request would virtually always satisfy the public interest standard," H.R. Conf. Rep. No. 104-422, at 184 (1985), and is warranted by UP's continued and repeated insistence that it has the unilateral right to set the terms and conditions under which Metra can access the UP Lines, including the ability to deny Metra access altogether, and the reality that UP does not have a statutory obligation to provide passenger rail service.  The Board finds that granting Metra's requested trackage rights meets the inadequate service standard articulated in Grand Trunk (to the extent such a showing is even necessary in these circumstances), and is otherwise in the public interest under 49 U.S.C. § 11102(a).

## Compensation and Conditions of Use

Under the terminal trackage rights statute, "[t]he rail carriers are responsible for establishing the conditions and compensation for use of the facilities."  49 U.S.C. § 11102(a).  If the rail carriers cannot agree, "the Board may establish conditions and compensation for such use under the principle controlling compensation in condemnation proceedings.  The compensation must be paid or adequately secured before a rail carrier may begin to use the facilities of another rail carrier under this section."  Id.

### Adequate Security

Stating that "compensation is required under statute to be paid or adequately secured prior to access," (UP Reply to Appl. 3, Apr. 18, 2025), UP's initial filings argues that Metra must be "willing or able to secure a litigation bond to fully compensate Union Pacific for the requested fair market value of access, with interest, for the long duration of any compensation litigation." (Id. at 7.)  UP also challenges agency precedent that the Board's pledge to set appropriate terms of compensation under condemnation principles constitutes "adequate security" under § 11102(a).  (Id. at 7-8.)  UP claims that this precedent derives from "some ill-advised language in a 1984 D.C. Circuit opinion," Southern Pacific Transportation Co. v. ICC, 736 F.2d 708 (D.C. Cir. 1984), that "is entitled to no weight in a Loper Bright era."  (Id. at 7.)

In its opening submission, Metra disagrees with UP's reading of the statute and argues that a bond is unnecessary to protect UP, but states that it would be open to discussing the issue of security with UP at an appropriate time, if it remains a concern, after the application is granted.  (Metra Opening 43-44, May 5, 2025.)

In response, UP reiterates that if the Board were to grant Metra's application, the Board "would have to deal with compensation *before* any Board-ordered access takes effect." (UP Reply to Opening 5, June 3, 2025.)  UP also argues that provisions governing service,

---

[63]  The Board notes that passenger rail service has operated over the UP Lines for more than 100 years, long before UP acquired them.  (See Appl. 7-8, Mar. 7, 2025.)

liability, indemnity, and other issues would be needed.  (Id. at 6.)  UP attaches proposed interim terms and conditions, including for compensation "at the level sought by UP in private negotiations."  (Id. at 33-34 & Ex. B.)  UP states that it "would assent to such interim terms as constituting adequate security, subject to a retained right to challenge the Board's authority to issue such an order, and subject to Union Pacific's right to advocate for higher compensation under condemnation principles in any subsequent court or agency proceeding."  (Id. at 35; accord id. at 33.)

In rebuttal, Metra objects to UP's proposed terms, stating that they were not established by agreement of the parties or by the Board, as envisioned by § 11102, and claiming that they are not reasonable.  (Metra Rebuttal 29, June 23, 2025.)  Metra proposes alternative Interim Conditions and Compensation, which would (as described by Metra) "maintain the status quo on UP's compensation and ensure Metra's operational integrity."  (Id. at 2 & Ex. A; see also id. at 41-44 (comparing and contrasting Metra's proposal to UP's).  To address UP's concerns about "adequate security," the interim compensation would be subject to retroactive adjustment in either party's favor once the issues are resolved, (id. at 2), and Metra would pay the monthly compensation in advance (id. at 42).

As an initial matter, the Board disagrees with UP's contention that agency precedent about the meaning of a statutory term—specifically, that the Board's pledge to set compensation under condemnation principles serves as "adequate security" under § 11102(a)—carries no weight.  The agency has been faithful to the D.C. Circuit's decision in Southern Pacific Transportation Co. v. ICC since it was issued in 1984.  In that decision, the D.C. Circuit plainly stated: "[w]e hold that the Commission is bound by this statement [to "apply the principles for compensation in condemnation proceedings"] and that [applying those principles] fulfills the requirement of the term 'adequately secured' under 49 U.S.C. § [then] 11103(a)."  736 F.2d at 723.  The D.C. Circuit's holding that this approach satisfies the statute remains good law and has not been questioned in any subsequent decision by that court or another appellate tribunal.  Accordingly, consistent with controlling precedent, the Board pledges that, if UP and Metra cannot reach agreement respecting compensation terms, it will set appropriate terms under condemnation principles with retroactive effect, thereby satisfying the statute's adequate security requirement.[64]

Moreover, there is no real doubt that the compensation to be paid UP is "adequately secured" as a practical matter.  Metra is a governmental entity and thus may be presumed to be

---

[64] See, e.g., Union Pac. Corp.—Control & Merger—S. Pac. Rail Corp., 1 S.T.B. 233, 426 n.185 (1996) (stating that Board's pledge to apply condemnation principles in setting compensation fulfills requirement that compensation be "adequately secured" before commencement of terminal trackage rights operations); see also id. at 449 & n.215 ("We therefore pledge that, if BNSF and KCS cannot reach agreement respecting compensation terms, we will set appropriate terms under condemnation principles." (citations omitted)); BNSF Ry.— Terminal Trackage Rights—Kan. City S. Ry., FD 32760 (Sub-No. 46), slip op. at 17 (STB served Feb. 21, 2020) (Board's pledge to set appropriate compensation under condemnation principles fulfills requirement in § 11102(a) that compensation be "adequately secured" before commencement of terminal trackage rights operations).

"financially responsible."  See generally 49 C.F.R. § 1152.27(c)(1)(iv)(B); Or. Int'l Port of Coos Bay—Feeder Line Appl.—Coos Bay Line of Cent. Or. & Pac. R.R., FD 35160, slip op. at 15 (STB served Oct. 31, 2008) (explaining that, although this presumption is located in the regulations relating to offers of financial assistance, "there is no logical basis to presume that governmental entities are financially responsible in one type of forced-sale proceeding, but not in another").  Metra has also testified that it could afford to pay UP's requested access fee. (UP Reply to Opening 37, Ex. D (Dep. Excerpt, T. Stuebner, Assistant Deputy Executive Director of Administration, Metra (May 1, 2025), Tr. 73:1–3).)  And, as Metra points out, if Metra in the future could not pay for or afford the trackage rights, Metra would not use them. (Metra Opening 48, May 5, 2025.)  Taken together, these considerations serve as additional bases for a determination that compensation is "adequately secured" in this proceeding.

While the parties have expressed support for a Board order establishing compensation to be paid on an interim basis with a true-up once final compensation terms are set, (see UP Reply to Opening 34, 38, June 3, 2025; Metra Rebuttal 30, 44, June 23, 2025 (both proposing true-up mechanisms)), the substantive terms of the parties' competing proposals are not easily reconcilable.  Therefore, the Board will not adopt either of the parties' written interim proposals.[65]  However, the Board expects Metra to continue to compensate UP for its use of the UP Lines so as to avoid any interim impairment to UP's financial interests.  If the parties cannot reach agreement, and the Board is required to set interim terms and conditions governing Metra's access, there will be an accounting and reconciliation when final terms are set.  UP will be reimbursed retroactively (from July 1, 2025) if the interim amount paid by Metra is less than the final amount set.

Compensation and Conditions

The parties' views on the issue of appropriate final compensation for use of the terminal facilities (as well as certain issues relating to conditions[66]) differ sharply.  Metra argues that UP earned a positive return under the PSA, and that so long as UP continues to recover its costs plus any margin (which, Metra maintains, the SSW Compensation formula supported by Metra would ensure), UP would be better off, not worse, with continued Metra service contributions, and would not face a cross-subsidy.  (Metra Opening 44-45, May 5, 2025.)

---

[65]  Under § 11102(a), the parties are responsible in the first instance for establishing the conditions and compensation for use of facilities after an application for terminal trackage rights is granted.  It therefore would be inappropriate for the Board to prejudge the parties' interim proposals, which have not been subject to the statutorily-required negotiating process.

UP asserts that a critical interim term relates to indemnity for accident liability, and that it does not anticipate serious disagreement from Metra on this point.  (UP Reply to Opening 35, June 3, 2023 (citing Metra discovery response reflecting Metra's expectation that any conditions and compensation for use of the facilities would include provisions addressing liability allocation and indemnification).)  In the event the parties have a material disagreement about appropriate liability and indemnity terms to apply on an interim basis that cannot be resolved through concerted good faith negotiation, they may seek guidance from the Board.

[66]  (See, e.g., Metra Opening 47, May 5, 2025.)

UP argues that it is simply seeking fair market compensation for Metra's use of the UP Lines, (UP Reply to Opening 2, June 3, 2025), and that the rate offered by UP is "not only demonstrably economically reasonable," but "conservative (i.e., low)," (id. at 3). UP states that Metra seeks even lower compensation than the PSA called for—which, according to UP, was already "demonstrably below market." (Id. at 29 (citing Carey V.S.).) Metra's rebuttal disputes the reasonableness of UP's proposed rate and discusses what Metra describes as "numerous deficiencies in UP's submission." (Metra Rebuttal 36-39, June 23, 2025.)[67]

Because § 11102(a) provides that "[t]he rail carriers are responsible for establishing compensation and conditions for the use of terminal facilities" in the first instance, the Board will not address any related issues raised by the parties at this time. The Board expects and encourages Metra and UP to undertake a concerted, good faith effort to reach agreement on terms and compensation for Metra's use of the UP Lines. If the parties cannot reach an agreement, the Board will establish the compensation and conditions of use in accordance with the statute.

Metra asks that the Board "set a reasonable and prompt deadline for the parties to establish agreed conditions and compensation for Metra's use of the facilities, or report to the Board that they cannot agree." (Metra Rebuttal 46, June 23, 2025.) The Board does not typically set a deadline by which the parties must complete the negotiation process under § 11102(a) and will not do so here. However, the parties will be directed to submit a joint status report, if possible, or separate reports by November 3, 2025, stating whether they have reached agreement, require additional time, or are unable to agree. If additional time is required, further status reports should be filed every 60 days.

If or to the extent the parties are unable to agree, either party may request the Board to establish compensation and/or conditions of use. The request must identify the disputed issue(s) and be accompanied by a proposed procedural schedule for the Board's consideration to govern the process for resolving any remaining issues pertaining to compensation or conditions of use. The other party may file a written response to the request within 20 days.

It is ordered:

1. UP's motion to dismiss is denied.

2. UP's motion to strike is granted in part and denied in part as discussed above.

3. Metra's application for terminal trackage rights is granted as discussed above.

---

[67] Metra's rebuttal presents evidence and argument regarding Metra's position on "what would be an economically reasonable rate." (See Metra Rebuttal 39-40 & cited paragraphs of Mulholland V.S., June 23, 2025.) As discussed above, UP's motion to strike this material, to which UP had no ability to reply, and which Metra could have presented on Opening, will be granted. However, Metra may re-submit that evidence and argument in support of its position on compensation in its case-in-chief during the second phase of this proceeding, if one is necessary.

4.  The parties are directed to file a status report (jointly is possible) with the information described above by November 3, 2025, with further reports due every 60 days thereafter as long as negotiations continue.

5.  A request for the Board to establish compensation or conditions of use must include the information specified above, and any response thereto must be filed within 20 days.

6.  This decision is effective on the date of service.

By the Board, Board Members Fuchs, Hedlund, and Schultz.

# Exhibit 2

310386

ENTERED
Office of Chief Counsel
December 1, 2025
Part of
Public Record

BEFORE THE
SURFACE TRANSPORTATION BOARD

_____

FINANCE DOCKET NO. 36844

COMMUTER RAIL DIVISION OF THE REGIONAL
TRANSPORTATION AUTHORITY D/B/A METRA
– TERMINAL TRACKAGE RIGHTS –
UNION PACIFIC RAILROAD COMPANY

_____

**METRA REQUEST FOR THE BOARD TO ESTABLISH CONDITIONS
AND COMPENATION FOR USE OF TERMINAL FACILITIES,
AND PROPOSED PROCEDURAL SCHEDULE**

Peter A. Pfohl
Robert D. Rosenberg
Slover & Loftus LLP
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 347-7170

*Attorneys for the Commuter Rail
Division of the Regional Transportation
Authority d/b/a Metra*

Dated: December 1, 2025

BEFORE THE
SURFACE TRANSPORTATION BOARD

———————————————

FINANCE DOCKET NO. 36844

COMMUTER RAIL DIVISION OF THE REGIONAL
TRANSPORTATION AUTHORITY D/B/A METRA
– TERMINAL TRACKAGE RIGHTS –
UNION PACIFIC RAILROAD COMPANY

———————————————

**METRA REQUEST FOR THE BOARD TO ESTABLISH CONDITIONS
AND COMPENATION FOR USE OF TERMINAL FACILITIES,
AND PROPOSED PROCEDURAL SCHEDULE**

Metra advises the Board that, despite concerted and ongoing efforts, the

parties have been and are unable to reach agreement on the conditions and

compensation for Metra's use of UP's terminal facilities pursuant to the Board's

decision, served September 3, 2025 ("September 3 Decision"). Accordingly, Metra

requests that the Board establish the conditions of use and compensation and

submits a proposed procedural schedule for the Board's consideration to govern the

process for resolving the remaining disputed issues, as described below.

**I.**
**The Parties are Unable to Reach Agreement**

As directed in the September 3 Decision, and reflected in the Parties' Joint

Status Report filed on November 13, 2025, Metra and UP have been negotiating the

conditions and compensation for Metra's use of UP's terminal facilities. The parties

have exchanged drafts of a comprehensive Trackage Rights Agreement to govern

Metra's use of the UP Lines and have exchanged multiple offers on compensation

and other terms. The parties have made progress and reached common ground on

some elements. For example, Metra anticipates that it will be able to reach agreement with UP on issues including the effective date; maintenance fee; train schedules and special trains and service change requests; dispatching protocol; a joint services committee for ongoing coordination of operational, maintenance, and capital project matters; dispute resolution; and audits. While the parties continue to confer, it is clear at this point that the parties will not reach agreement on all remaining disputed issues in a way that would remove the need for Board involvement.

## II.
## Board Establishment of Conditions of Use and Compensation is Required

The Board's September 3 Decision enables either party to request the Board to establish compensation and/or conditions of use. September 3 Decision at 33. *See also id.* at 31 ("the Board pledges that, if UP and Metra cannot reach agreement respecting compensation terms, it will set appropriate terms under condemnation principles with retroactive effect."); *id.* at 32 ("If the parties cannot reach agreement, and the Board is required to set interim terms and conditions governing Metra's access, there will be an accounting and reconciliation when final terms are set. UP will be reimbursed retroactively (from July 1, 2025) if the interim amount paid by Metra is less than the final amount set."). Metra requests the Board to so establish the conditions of use and compensation.

Compensation and the remaining disputed issues are too important and too material for Metra, the public it serves, and the taxpayers that provide critical funding for its transportation service to be left unresolved indefinitely. Both UP and

Metra have continued to operate cooperatively and safely on the UP Lines since the parties' Purchase of Service Agreement ("PSA") expired on June 30, 2025. The Board has acted, as needed, when issues have arisen, *e.g.*, *Commuter Rail Div. of the Reg'l. Transp. Authority—Terminal Trackage Rights—Union Pac. R.R.*, FD 36844 (STB served Sept. 30, 2025) (ordering the indemnity, liability allocation, and claims administration provisions of the PSA as an interim condition).

UP has asserted on review that "hosting passenger service on a freight-rail network is too important, complex, and potentially dangerous to undertake without clear terms governing dispatching, maintenance, liability, indemnity, and many other topics." *Union Pacific R.R. Co. v. STB* (8th Cir., No. 25-2919), Union Pacific Mot. for Stay Pending Appeal dated Sept. 29, 2025, at 5. Metra agrees that Board involvement, as requested here, to establish the conditions and compensation for Metra's ongoing use of the UP Lines is necessary and appropriate.

At the same time, Metra wishes to make clear that it intends to remain engaged in negotiations with UP during this second phase of the proceeding and will continue to work with UP toward narrowing the issues for final resolution by the Board.

### III.
### Major Disputed Issues to be Resolved.

The major remaining issues in dispute for the Board to resolve in establishing the compensation and conditions of use include the following:

A.       Scope of the trackage rights;

B.       Length of the term;

C.	Trackage rights fee under the *SSW Compensation* formula, how the fee is adjusted over time, and treatment of Metra's capital contributions;

D.	Performance standards; and

E.	Liability, indemnification, and claims handling.

The disputed issues identified above are not the only remaining unresolved issues, but they are the most consequential and bear on the other areas of disagreement.

## IV.
## Proposed Procedural Schedule

Metra proposes a procedural schedule that allows for a short period of discovery to address necessary elements for the calculation of the trackage rights fee under *SSW Compensation*. Metra proposes simultaneous opening and reply evidentiary filings where each party will address both calculation of the trackage rights fee under *SSW Compensation* and conditions of use for the terminal trackage rights.

Under Metra's proposed schedule, to facilitate the simultaneous opening filings the parties will exchange, on or before February 16, 2026 (two weeks prior to filing Opening Evidence), their then-current proposed draft language for the Trackage Rights Agreement, with the exception/redaction of the confidential elements of the proposed trackage rights fee (*i.e.*, interest rental and maintenance and operation expenses). As part of its evidentiary filings, each party will submit its

proposed Trackage Rights Agreement, together with justification for (1) its preferred terms resolving disputed issues and (2) the compensation elements.

Similar procedures were utilized in *New England Cent. R.R. – Trackage Rights Order – Pan Am S. LLC*, FD 35842 (STB served Oct. 31, 2017). Use of the parties' proposed Trackage Rights Agreement form(s) to establish conditions of use and compensation, will allow the parties to continue their negotiations – with the possibility that the scope of the dispute will be narrowed – while protecting confidential compensation terms addressed in those negotiations. This approach will also facilitate the Board's consideration and resolution of the matter, by enabling the Board to leave in place terms and conditions on which the parties have agreed, while resolving disputed issues that remain.

Metra proposes the following procedural dates:

| December 1, 2025 (Day 0) | Metra filing<br>Discovery period begins on elements needed to calculate the trackage rights fee under *SSW Compensation* |
|---|---|
| December 22, 2025 (Day 21, a Monday) | UP Responds to Metra's December 1 Filing |
| December __, 2025 (Day x) | Board adopts Procedural Schedule |
| January 30, 2026 (Day 60) | Close of Discovery |
| February 16, 2026 (Day 77) | Parties exchange then-current proposed Trackage Rights Agreements, including agreed upon terms and conditions (not to be filed with the Board) |
| March 2, 2026 (Day 91) | Parties submit simultaneous Opening Evidence, including calculation of the trackage rights fee under *SSW Compensation*, and submission and justification of preferred Trackage Rights Agreement terms and conditions |
| April 6, 2026 (Day 126) | Parties submit simultaneous Reply Evidence |
| June 1, 2026 (Day 182, a Monday) | Board Decision |

Metra informed UP that it was filing this request, and discussed the possibility of a joint request, which UP declined.

## VI.
## Conclusion

For these reasons, Metra requests that the Board adopt the above-proposed procedural schedule and establish the conditions and compensation for Metra's use

of UP's terminal facilities pursuant to 49 U.S.C. § 11102(a).

Respectively submitted,

/s/ Peter A. Pfohl
Robert D. Rosenberg
Slover & Loftus LLP
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
(202) 347-7170

*Attorneys for the Commuter Rail Division of the Regional Transportation Authority d/b/a Metra*

Dated: December 1, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of December, 2025, a copy of the foregoing has been served by first-class U.S. Mail, or more expeditious means, on counsel for all parties of record.

/s/ Peter A. Pfohl

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COMMUTER RAIL DIVISION OF THE    )  Case No. 25 C 2439
REGIONAL TRANSPORTATION          )
AUTHORITY,                       )
                                 )
                Plaintiff,       )
                                 )
        v.                       )
                                 )  Chicago, Illinois
UNION PACIFIC RAILROAD           )  June 23, 2025
COMPANY,                         )  1:00 p.m.
                Defendant.       )


                TRANSCRIPT OF PROCEEDINGS - MOTION
        BEFORE THE HONORABLE JOHN J. THARP, JR.


APPEARANCES:

For the Plaintiff:      McDERMOTT WILL & EMERY LLP
                        BY:  MR. PAUL W. HUGHES
                             MR. EMMETT WITKOVSKY-ELDRED
                        500 N. Capitol Street NW
                        Washington, DC 20001


                        McDERMOTT WILL & EMERY LLP
                        BY:  MR. MATTHEW MADDEN
                        444 W. Lake Street, Suite 4000
                        Chicago, Illinois 60606


For the Defendant:      SIDLEY & AUSTIN LLP
                        BY:  MR. BRUCE R. BRAUN
                             MR. CHARLES K. SCHAFER
                             MR. RODNEY F. RODHEIM
                        1 S. Dearborn Street
                        Chicago, Illinois 60603

APPEARANCES:   (Cont'd)

For the Defendant:        SIDLEY & AUSTIN LLP
                          BY:   MR. TOBIAS S. LOSS-EATON
                                MR. RAYMOND A. ATKINS
                          1501 K Street NW
                          Washington, DC 20005

Court Reporter:           Laura LaCien, CSR, RMR, F/CRR
                          Official Court Reporter
                          219 S. Dearborn Street, Room 1928
                          Chicago, Illinois 60604
                          312.408.5032
                          laura_lacien@ilnd.uscourts.gov

                      *   *   *   *   *

                PROCEEDINGS REPORTED BY STENOTYPE
      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1       MR. LOSS-EATON:  Your Honor, I'd like to start just by

2  zooming out a little bit.  What Metra is asking you for here is

3  not a status quo injunction.  Under the cases that we cited at

4  Pages 6 and 7 of our brief without contradiction extending the

5  parties' relationship past its expiration point under their

6  contract is not a preservation of the status quo but is instead

7  a transformation of it.  Beyond that, what Metra is asking you

8  for here is unprecedented as far as we're aware in terms of a

9  court ever entering an injunction requiring dictating

10  operations on a rail line so Metra has to carry an especially

11  heavy burden here.  They have to show you that they will be

12  irreparably harmed, they have show you that they are clearly

13  going to prevail on the merits, and then of course they have to

14  address the other factors.  The threshold requirement, of

15  course, for any injunction is irreparable harm so let me start

16  there.

17       You asked Mr. Hughes about the two possibilities,

18  whether the COE -- the Condition of Entry -- is enforceable or

19  unenforceable.  If it's unenforceable which, of course, is

20  Mr. Hughes's position, then Metra is not harmed at all because

21  the only thing they have to do is litigate to prove that and

22  that, as you pointed out, is not irreparable harm under the

23  case law.  On the other hand, if it is enforceable, then

24  Metra's claim challenging it will have failed and Metra will

25  have nothing to vindicate on the merits.  And you asked

1  Mr. Hughes how do you get out of that dilemma and, with

2  respect, I think his answer to you was completely circular.  He

3  said a couple of times that it's not fair to require Metra to

4  operate at risk, but at risk of what.  Putting a party to a

5  choice between two possibilities at least one of which

6  definitely is not irreparable harm is not irreparable harm.

7  All Metra has to do here to avoid the service disruption

8  problems that it has emphasized in its papers is keep

9  operating.  We will then litigate whether the conditions of

10  entry are valid or not.  If they are valid, Metra can't

11  complain about having to comply with them because those are the

12  only conditions on which its operations can continue and if

13  they're invalid Metra is even better off because then it gets

14  to keep running and it doesn't have to give up any of the

15  things that it objects to.  Either way, Metra is not going to

16  suffer a service interruption.  And I want to say this clearly

17  because Mr. Hughes said, well, why would we have put the COE

18  out there if we didn't intend to enforce it.  And certainly it

19  is true, we issued the COE because it is essential that some

20  terms and conditions govern Metra's operations after the

21  expiration of the parties' contract but we, of course,

22  recognize the public value of the service that Metra provides.

23  And so if Metra operates after June 30th and it does not pay

24  that first bill at the higher level, we do not intend to

25  terminate.  We will collect, absolutely we will try to enforce

1  the conditions of entry and we will try to collect the money

2  that Metra owes us but we are not going to kick them out off

3  while we are litigating that dispute.

4       And so ultimately, the only thing that's going to

5  happen here if you deny Metra's motion is that this litigation

6  will progress in an orderly fashion, Metra will keep running,

7  and nothing really will change.  And so that ultimately is the

8  preservation of the status quo option here whereas what Metra

9  is asking you for is a really extraordinary extension of the

10  parties' relationship as you observed beyond the point where it

11  naturally would expire under the parties' negotiated contracts.

12       I heard for the first time today Mr. Hughes point to a

13  novel aspect of Illinois common law that I'm not familiar with

14  that says that at least in the holdover tenant context, the

15  preexisting terms of a contract essentially carry on if the

16  parties carry on in some form or fashion.  There are at least a

17  couple of problems with that, the most obvious of which to my

18  mind is that that would be preempted by ICCTA.  Even on my

19  friends' view of ICCTA preemption, that's not a voluntary

20  contractual commitment.  Rather, that would be a common-law

21  duty to operate a railroad in a way that you wouldn't otherwise

22  have to.  So even if that principle might apply here on its own

23  terms, it's not available to Metra in this context and I can

24  say that without the benefit of having seen those cases.

25       Beyond that, I think it's important to actually look

1  two things.  One, it makes clear that Metra does have to

2  separately negotiate for continued access to the lines

3  notwithstanding these amendments --

4        THE COURT:  Well, let me ask you about that.  I mean,

5  it seems like you could argue that the access to those

6  particular -- I think the five most recent FFAs, that's what

7  the language says, but the absence of that language in earlier

8  FFAs might suggest that -- particularly since that language was

9  adopted in more recent ones, that it didn't pertain and wasn't

10 part of the earlier agreements.

11       MR. LOSS-EATON:  In a vacuum, your Honor, certainly

12 that contrast might suggest that.  But in context, I think,

13 that is not a plausible interpretation.  The reason being that

14 if those earlier amendments already handed Metra a right -- an

15 unqualified right to keep using the lines, there would be no

16 separate compensation.  There would be no separate entitlement

17 for access.  Metra would just have everything it needed already

18 on its own view and --

19       THE COURT:  So why was it necessary to add that

20 language?

21       MR. LOSS-EATON:  I can only assume, your Honor, that

22 each of these amendments sort of over time got more specific on

23 these points as each of the parties sort of looked at them in

24 the context of their, frankly, growing dispute and thought we

25 should be trying to make this as clear as possible as we go

1     along.  And the most recent ones, which of course Metra has

2     signed onto, I think have to reflect the parties' understanding

3     of the way that these amendments fit into their broader

4     contractual relationship.  The most recent one Metra signed

5     onto just this past February in 2025 and it says that Metra's

6     right to keep using the lines, to keep using the facilities is

7     subject to Metra first paying UP separate compensation and the

8     only thing it says about what that compensation should or

9     should not look like is that Metra's contributions to the five

10     specific projects governed by those amendments shall be

11     factored into any such compensation.

12     And I do not take Metra to have tried to show you here

13     that that is not the case and, even if they had, that is a

14     classic damages case.  We would owe them, you know, whatever

15     small amount they would be entitled to credit for based on

16     that.  But you simply cannot read this language to hand Metra

17     either an ongoing right to keep operating no matter what or

18     some sort of contractual limitations around Union Pacific's

19     bargaining positions when it comes to replacing the PSA.

20     Unless you have any further questions about that, your

21     Honor, I'd like to talk a little bit about jurisdiction and

22     ICCTA preemption.  So Mr. Hughes is right that we agree on the

23     basic legal principle that applies here.  ICCTA does not

24     preempt contract claims to the extent that a court would be

25     enforcing a railroad's voluntary agreement, its voluntary

# Exhibit 4



May 21, 2025

Jim Derwinski
CEO and Executive Director
Metra
547 W. Jackson Blvd.
Chicago, IL 60661

Dear Mr. Derwinski:

Thank you for partnering with Union Pacific Railroad for more than 30 years in service of Chicagoland commuters. I applaud Metra for embracing the transfer of approximately 800 employees and welcoming them to your team. Based on my nearly 50 years of railroading, I expect these changes will allow you to optimize your operation and deliver stronger service at a substantially lower expense. I look forward to seeing the results.

We have worked through several hurdles to make this transition smooth and not impact commuters. However, one last issue remains – an agreement on the price for Metra to access our network. Union Pacific has offered many innovative methods to find a resolution, including arbitration. But after nearly six years, we have not come to a reasonable result.

As I have indicated in several phone conversations with you, we will not be stopping service to the millions of people who use Metra daily. I personally saw how important the service is when I lived in Chicagoland and used the train to travel downtown.

Our teams need to work together toward a reasonable conclusion. Union Pacific has the benefit of having agreements with several commuter organizations across the nation, and the rate we offered Metra is competitive compared to any other service. On July 1, after the current contract extension expires, we will be posting the new rates. While we would rather have an agreement in place with Metra, after nearly six years, it is time to move forward.

I welcome the opportunity to discuss should you have any questions.


Sincerely,

V. J. Vena

**UNION PACIFIC RAILROAD**
1400 Douglas Street, 19th Floor
Omaha, Nebraska 68179

**Jim Vena**
Chief Executive Officer
Union Pacific

P 402-544-5858
E jimvena@up.com

# Exhibit 5

SURFACE TRANSPORTATION BOARD

DECISION

Docket No. FD 36844

COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY
D/B/A METRA—TERMINAL TRACKAGE RIGHTS—
UNION PACIFIC RAILROAD COMPANY

Digest:[1]  This decision confirms the imposition of interim liability and
indemnification terms, applicable to three Union Pacific Railroad lines used by
the Commuter Rail Division of the Regional Transportation Authority d/b/a Metra
to provide commuter rail service in the Chicago area, until final terms are
established or this proceeding is otherwise resolved.

Decided:  December 2, 2025

By decision served September 3, 2025, the Board granted an application for terminal
trackage rights, filed by the Commuter Rail Division of the Regional Transportation Authority
d/b/a Metra (Metra) under 49 U.S.C. § 11102(a) to continue commuter rail service over three rail
lines owned by Union Pacific Railroad Company (UP) in the Chicago area (the UP Lines), and
directed the parties to undertake negotiations on conditions and compensation for Metra's use of
the UP Lines.  Commuter Rail Div. of the Reg'l. Transp. Authority—Terminal Trackage
Rights—Union Pac. R.R. (Sept. 3 Decision), FD 36844 (STB served Sept. 3, 2025).

On September 29, 2025, UP petitioned the Board to impose an interim condition or, in
the alternative, stay the effectiveness of the September 3 Decision, and requested expedited
consideration.  By decision served September 30, 2025, the Board granted the proposed
condition on a temporary basis, pending Metra's ability to file a response, to give certainty to the
parties in the event of an anticipated lapse in appropriations later that day that would prevent the
Board from acting on the petition during a Federal government shutdown.  Commuter Rail Div.
of the Reg'l. Transp. Authority—Terminal Trackage Rights—Union Pac. R.R. (Sept. 30
Decision), FD 36844 (STB served Sept. 30, 2025).[2]

---

[1]  The digest constitutes no part of the decision of the Board but has been prepared for the
convenience of the reader.  It may not be cited to or relied upon as precedent.  See Pol'y
Statement on Plain Language Digs. in Decisions, EP 696 (STB served Sept. 2, 2010).

[2]  The September 30 Decision specified that Metra could file a response on or before
October 6, 2025.  However, by decision served in Docket No. EP 751 on October 1, 2025, all
deadlines for the submission of pleadings, filings, comments (including environmental
comments) and other material due to be submitted during the pendency of the Federal
government shutdown that began that day were tolled.

As discussed below, Metra has now filed a response stating that it does not oppose the interim condition imposed in the <u>September 30 Decision</u>. Accordingly, the condition will remain in effect until final terms are established or this proceeding is otherwise resolved.

BACKGROUND

For decades before July 1, 2025, the operation of Metra trains over the UP Lines was governed by an agreement known as a Purchase of Services Agreement (PSA). Under the PSA, UP itself operated Metra's passenger trains over the UP Lines for many years. More recently, since 2023 the parties have been working to transition UP's operation of Metra's passenger trains to Metra following a court ruling permitting UP to discontinue providing the service; however, they have been unable to agree on successor arrangements, prompting Metra to seek terminal trackage rights under § 11102(a). <u>See, e.g.</u>, (Metra Appl. 2-3, 9-10, Mar. 7, 2025); <u>Sept. 3 Decision</u>, FD 36844, slip op. at 1-3.

In its opposition to Metra's request for terminal trackage rights, UP asked the Board to set interim terms and conditions governing Metra's operation on the UP Lines that would apply in the event the Board granted Metra's application. (See UP Reply to Opening 34-35, June 3, 2025.) In its rebuttal in support of the application, Metra objected to the terms and conditions proposed by UP but agreed that interim terms and conditions would be useful. (Metra Rebuttal 29-30, 41-42, June 23, 2025.) Metra asked the Board to impose the terms and conditions established by the PSA, including those governing liability and indemnity. (See <u>id.</u> at 42 ("Metra's Interim Conditions and Compensation preserve the status quo in all material respects, including . . . liability terms already in effect addressing the risks associated with Metra's operations (<i>i.e.</i>, indemnification and insurance for UP.")), <u>id.</u> at 44 ("The parties would retain existing procedures for adding trains and the same standard for indemnification and insurance.").)[3]

In the <u>September 3 Decision</u> granting Metra's application, the Board declined at that time to set interim terms and conditions. The Board explained that, under § 11102(a), "[t]he rail carriers are responsible for establishing compensation and conditions for the use of terminal facilities" in the first instance, and that it therefore would be inappropriate to prejudge the parties' interim proposals, which had not been subject to the negotiating process required by the statute. <u>Sept. 3 Decision</u>, FD 36844, slip op. at 32-33. However, the Board stated that it expected Metra to continue to compensate UP for its use of the UP Lines to avoid any interim impairment to UP's financial interests. <u>Id.</u> at 32. The Board also indicated that, if the parties could not reach agreement on interim terms and conditions governing Metra's access, the Board

---

[3] On June 30, 2025, the eve of the expiration of the last extension of the PSA, Metra petitioned the Board to issue an emergency order or temporary injunction to similarly maintain the "status quo" (i.e., the terms and conditions of the PSA) until the parties reached agreement or the Board set the terms and conditions governing Metra's operations on the UP Lines. UP opposed the petition, and the Board denied the request because Metra failed to meet the standard for an emergency service order or temporary injunction. <u>Commuter Rail Div. of the Reg'l. Transp. Authority—Terminal Trackage Rights—Union Pac. R.R.</u>, FD 36844 (STB served July 1, 2025.)

would set such interim terms and conditions, subject to an accounting and reconciliation when final terms are set. Id. The Board further noted that UP did not anticipate "serious disagreement" from Metra on indemnity for accident liability, id. at 32 n.65 (citing UP Reply to Opening 35, June 3, 2023), but said that "[i]n the event the parties have a material disagreement about appropriate liability and indemnity terms to apply on an interim basis that cannot be resolved through concerted good faith negotiation, they may seek guidance from the Board," id.

On September 29, 2025, UP petitioned the Board to enter as an interim condition the indemnity, liability allocation, and claims administration provisions of the PSA. (UP Pet. 6, Sept. 29, 2025.) As an alternative to the relief requested in the proposed interim condition, UP requested that the Board stay the effectiveness of the September 3 Decision pending judicial review or until the parties agree on, or the Board imposed, interim indemnity and liability allocation terms. (Id. at 2, 6.) According to the petition, UP attempted to seek agreement with Metra on an interim condition pertaining to liability and indemnity but Metra rejected UP's proposal to re-adopt terms from the PSA on a temporary basis while the parties continued efforts to negotiate final terms and conditions. (Id. at 4-5; see also id. at Ex. A, Letter from John Milano to John Turner (Sept. 11, 2025).) UP represents that it is now willing to re-adopt the terms and conditions stated in the PSA regarding indemnification, liability, and claims administration on an interim basis, and asserts that its proposal is consistent with the position Metra itself previously advocated. (Id. at 2.)

The September 30 Decision granted UP's petition for an interim condition on a temporary basis, pending an opportunity for the Board to consider any response Metra might elect to file. Sept. 30 Decision, FD 36844, slip op. at 3.[4] On November 13, 2025, following the Board's issuance that day of public notice that all agency functions had resumed,[5] Metra filed its response.[6]

DISCUSSION AND CONCLUSIONS

Under 49 U.S.C. § 11102(a) the Board is authorized to set the conditions and compensation for use of the facilities if the rail carriers cannot agree. Despite attempts at negotiating since the Board's September 3 Decision, UP and Metra have been unable to date to agree on conditions and compensation for Metra's use of the UP Lines. On September 29, 2025,

---

[4] UP's alternative request for a stay was denied as moot. Id. at 3, 4.

[5] See Materials Due to Be Submitted During the Federal Government Shutdown, EP 751 (STB served Nov. 13, 2025) and related Public Advisory stating that the Board had resumed all agency functions and that filings previously due between October 1, 2025, and November 12, 2025, were now due no later than November 20, 2025, unless otherwise ordered by the Board.

[6] On November 13, 2025, the parties also reported that they had exchanged proposals regarding the conditions and compensation for Metra's use of the UP Lines but had not reached agreement. (Joint Status Report 1, Nov. 13, 2025 (stating that negotiations continued).) On December 1, 2025, Metra filed a request for the Board to establish conditions and compensation, and a proposed procedural schedule, while stating that it "will continue to work with UP toward narrowing the issues for final resolution by the Board." (Metra Request 3, Dec. 1, 2025.) The Board will address the requests in Metra's December 1, 2025 filing in a subsequent decision.

UP filed a petition seeking an interim condition imposing the indemnification, liability, and claims administration provisions from the PSA as it existed on June 30, 2025, which the Board granted, on a preliminary basis pending Metra's response, on September 30, 2025.  See Sept. 30 Decision, FD 36844, slip op. at 2-3 (describing background and reasons for granting the petition, and explaining that the condition would remain in effect until the Board had an opportunity to consider any response filed by Metra).

In its response, Metra states that it does not oppose the September 30 Decision and will comply with the ordered indemnity and liability terms until final terms are established.  (Metra Reply 2, Nov. 13, 2025.)  For purposes of "completeness" and "clarity," the response also addresses various points referenced in UP's petition.  (Id. at 1-2.)[7]  However, Metra does not contend that its assertions merit reconsideration of the September 30 Decision.  Rather, Metra expressly states that it accepts, and will comply with, the interim condition ordered by the Board. (Id.)

The Board has considered Metra's response and finds that the interim condition imposed in the September 30 Decision remains appropriate.  Metra states that it does not oppose the Board's September 30 Decision.  As noted above, Metra also previously acknowledged that interim terms would be useful.  And, although Metra's response includes various points to provide further context, Metra does not assert that these points warrant rejection or modification of the interim condition proposed by UP and ordered by the Board.  Accordingly, the indemnification, liability, and claims administration provisions from the PSA will remain in effect until final terms are established by the Board or the parties, or this proceeding is otherwise resolved.[8]

It is ordered:

1.  The indemnity, liability allocation, and claims administration provisions of the PSA as it existed on June 30, 2025, are imposed as an interim condition in this proceeding until final terms are established or this proceeding is otherwise resolved.

2.  UP's alternative request to stay the September 3 Decision, which was denied as moot in the September 30 Decision, is reconfirmed as denied as moot.

3.  This decision is effective on its service date.

By the Board, Board Members Fuchs, Hedlund, and Schultz.

---

[7]  Specifically, Metra asserts that UP failed to mention that UP "declined or disregarded five separate requests from Metra to engage in bilateral negotiations on this issue" during September 2025; explains its rationale for its counterproposal to UP's request to revert to the expired PSA's indemnity and liability terms; and clarifies Metra's position on the proper scope of liability and indemnification terms now that Metra is operating the commuter rail service. (Id.)

[8]  UP's alternative request to stay the September 3 Decision continues to be moot.