No. 25-2919

# United States Court of Appeals for the Eighth Circuit

UNION PACIFIC RAILROAD COMPANY,

*Petitioner*,

v.

SURFACE TRANSPORTATION BOARD and
UNITED STATES OF AMERICA,

*Respondents*,

COMMUTER RAIL DIVISION OF THE
REGIONAL TRANSPORTATION AUTHORITY,
d/b/a METRA,

*Intervenor-Respondent.*

On Petition for Review from
the Surface Transportation Board

## OPENING BRIEF FOR PETITIONER
## UNION PACIFIC RAILROAD COMPANY

Raymond A. Atkins
Allison C. Davis
Tobias S. Loss-Eaton
Stephen S. Laudone
Brooke B. Boyd
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
ratkins@sidley.com
(202) 736-8427

*Counsel for Petitioner*

## SUMMARY OF THE CASE

This case is about three rail lines in Illinois and Wisconsin owned by Petitioner Union Pacific Railroad Company. For many years, commuter trains operated on these lines under a written contract between Union Pacific and Intervenor-Respondent Metra (the Chicago-area commuter-rail agency). That contract expired in June 2025, and the parties have not yet negotiated a replacement. But Metra trains have kept running without interruption, and Union Pacific has committed to allow them to continue.

Even so, in the decision under review, Respondent Surface Transportation Board granted Metra "terminal trackage rights"—an indefinite, government-authorized occupation of private property for a third party's business—over the entirety of all three Union Pacific lines. *See* 49 U.S.C. § 11102(a). Union Pacific challenges that decision as unlawful, arbitrary, and capricious.

Given the importance and complexity of these issues, oral argument would assist the Court. Union Pacific submits that 20 minutes per side would be appropriate.

Appellate Case: 25-2919   Page: 2   Date Filed: 01/07/2026 Entry ID: 5594823

# DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.lA, Petitioner Union Pacific Railroad Company, a Delaware corporation, states that it is a wholly owned subsidiary of Union Pacific Corporation, a Utah corporation. Union Pacific Corporation is publicly traded on the New York Stock Exchange (NYSE: UNP).

Appellate Case: 25-2919     Page: 3     Date Filed: 01/07/2026 Entry ID: 5594823

# TABLE OF CONTENTS

Summary of the case ................................................................... i

Disclosure statement ................................................................. ii

Table of authorities .................................................................. v

Introduction ............................................................................ 1

Jurisdictional statement .......................................................... 6

Statement of the issues ........................................................... 7

Statement of the case .............................................................. 8

    A.   Legal background. ............................................... 8

    B.   Factual background. ........................................... 11

    C.   Proceedings below. ............................................ 13

Summary of argument ........................................................... 20

Argument ................................................................................ 23

I.   The Board erred by giving Metra terminal trackage rights
without a showing of inadequate service. .................................... 24

    A.   Granting terminal trackage rights requires a threshold
showing of inadequate service. ............................................ 24

    B.   The Board's public-interest reasoning lacks merit. ............. 30

II.   The Board erred by giving Metra terminal trackage rights
spanning the entirety of Metra's commuter operations. ............... 38

    A.   Terminal trackage rights extend only to terminal
facilities. ............................................................................ 38

    B.   The Board ignored the statutory test, instead working
backward from its desired result. ........................................ 42

Appellate Case: 25-2919    Page: 4    Date Filed: 01/07/2026 Entry ID: 5594823

III.   The Board erred by granting Metra immediate trackage rights without setting compensation or any conditions of use......49

     A.   The Board lacks authority to order immediate access without terms or compensation. ...........................................49

     B.   Forcing one railroad onto another railroad's tracks without setting terms is arbitrary and capricious. ..............54

Conclusion ...........................................................................................56

Certificate of compliance

Certificate of service

Addendum

Appellate Case: 25-2919      Page: 5      Date Filed: 01/07/2026 Entry ID: 5594823

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BP P.L.C. v. Mayor & City Council of Baltimore,*
141 S. Ct. 1532 (2021)............................................................... 48

*Cent. States Enters., Inc. v. ICC,*
780 F.2d 664 (7th Cir. 1985)........................................................ 9, 27

*City of Providence v. Barr,*
954 F.3d 23 (1st Cir. 2020) ........................................................ 40

*Commuter Rail Div. v. Union Pac. R.R.,*
No. 1:25-cv-2439, 2025 WL 1787514 (N.D. Ill. June 27, 2025).......... 14

*Duncan v. Walker,*
533 U.S. 167 (2001)................................................................... 45

*George v. McDonough,*
596 U.S. 740 (2022)................................................................... 26

*Grand Trunk Corp. v. STB,*
143 F.4th 741 (7th Cir. 2025) .............................8, 9, 10, 26, 28, 29, 33

*ICC v. Bhd. of Locomotive Eng'rs,*
482 U.S. 270 (1987)................................................................... 24

*Knick v. Twp. of Scott,*
588 U.S. 180 (2019)................................................................... 50, 52

*Lamar, Archer & Cofrin, LLP v. Appling,*
584 U.S. 709 (2018)................................................................... 27

*Liu v. SEC,*
591 U.S. 71 (2020).................................................................... 52

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)................................................................. 24, 47

Appellate Case: 25-2919    Page: 6    Date Filed: 01/07/2026 Entry ID: 5594823

*Midtec Paper Corp. v. United States,*
857 F.2d 1487 (D.C. Cir. 1988) ...................................................... 27

*Ohio v. EPA,*
603 U.S. 279 (2024) ...................................................................... 54

*PBGC v. LTV Corp.,*
496 U.S. 633 (1990) ...................................................................... 48

*Roberts v. Sea-Land Servs., Inc.,*
566 U.S. 93 (2012) ........................................................................ 25

*S. Pac. Transp. Co. v. ICC,*
736 F.2d 708 (D.C. Cir. 1984) ...................................................... 52

*Union Pac. R.R. v. DHS,*
738 F.3d 885 (8th Cir. 2013) ........................................................ 53

*Union Pac. R.R. v. RTA,*
74 F.4th 884 (7th Cir. 2023) ........................................................ 12

*Union Pac. R.R. v. STB,*
358 F.3d 31 (D.C. Cir. 2004) .......................................................... 6

*United States v. Rodgers,*
461 U.S. 677 (1983) ...................................................................... 26

*United States v. Bd. of Comm'rs of Sheffield,*
435 U.S. 110 (1978) ...................................................................... 27

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) ...................................................................... 48

**Agency Decisions**

*Chi. & Alton R.R. v. Toledo, Peoria & W. Ry.,*
146 I.C.C. 171 (1928) .................................................................... 42

*Golden Cat Div. of Ralston Purina Co.,* No. 41550,
1996 WL 197602 (S.T.B. served Apr. 25, 1996) .......................... 39, 40

Appellate Case: 25-2919    Page: 7    Date Filed: 01/07/2026 Entry ID: 5594823

*Mfrs. Ass'n of York v. Penn. R.R.*,
73 I.C.C. 40 (1922) .......................................................................... 29

*New Eng. Cent. R.R.—Trackage Rights Order—Pan Am S. LLC*,
No. FD 35842, 2017 WL 5639660 (S.T.B. served Oct. 31, 2017) ....... 55

*Rio Grande Indus., Inc.—Purchase & Related Trackage Rights*,
No. FD 31505, 1989 WL 246814 (I.C.C. Nov. 13, 1989).................... 41

*Spokane, Portland & Seattle Ry.—Control—Peninsula Term. Co.*,
334 I.C.C. 419 (1969) .................................................................. 8, 41

*W. Fuels Serv. Corp. v. BNSF Ry.*,
No. NOR 41987, 1997 WL 416961 (STB served July 28, 1997)......... 25

## Statutes & Regulations

5 U.S.C. § 706 ................................................................................ 24

28 U.S.C. § 2321 .............................................................................. 6

28 U.S.C. § 2342 .............................................................................. 6

28 U.S.C. § 2343 .............................................................................. 6

28 U.S.C. § 2344 .............................................................................. 6

49 U.S.C. § 10501(c)(3)(B) ......................................................... 6, 36

49 U.S.C. § 11102(a) ..................... 1, 3–6, 10, 11, 15, 22, 25, 38–40, 49, 50

ICC Termination Act,
Pub. L. No. 104-88, 109 Stat. 803 (1995)........................................ 27

Transportation Act of 1920,
ch. 91, 41 Stat. 456 (1920) ............................................................. 8

## Congressional Materials

H.R. Conf. Rep. No. 104-422 (1995) ......................................... 35, 36, 37

H.R. Rep. No. 96-1430 (1980)......................................................... 27

Appellate Case: 25-2919    Page: 8    Date Filed: 01/07/2026 Entry ID: 5594823

## Other Authorities

Metra, *Fiscal Cliff Still Looms*, https://tinyurl.com/metdxnhw
(last visited Jan. 1, 2026)................................................................53

Appellate Case: 25-2919    Page: 9    Date Filed: 01/07/2026 Entry ID: 5594823

# INTRODUCTION

Federal law has long authorized the Surface Transportation Board (or its predecessor) to grant "terminal trackage rights," allowing one railroad to use another railroad's "terminal facilities" under certain conditions. 49 U.S.C. § 11102(a). Congress adopted this limited remedy to avoid the unnecessary duplication of railroad facilities. If two railroads serve a city, and one of them already has terminal facilities downtown, it would be expensive and inefficient for the second railroad to acquire land and build its own terminal facilities alongside the existing ones. Thus, the second railroad can piggyback on the first railroad's facilities to the extent necessary to access and use the downtown terminal—*if* the statutory standards are met.

Under those standards, the agency can grant terminal trackage rights only if necessary to remedy inadequate rail service and only to facilities in and around the terminal itself. And if such rights are granted, they can become effective only after compensation and at least some governing terms are set. These limitations flow from statutory text, history, and purpose, and they have been recognized repeatedly in precedent. They also reflect that granting terminal trackage rights—an indefinite,

government-authorized occupation of private property for a third party's business—is a taking under the Fifth Amendment.

In the decision below, however, the Board discarded these limitations, transforming terminal trackage rights from a limited remedy into an unconstrained policy tool. The Board granted terminal trackage rights to Metra over three Union Pacific rail lines in Illinois and Wisconsin. Doing so was not necessary to allow Metra to use these lines; for decades, Metra commuter trains operated on these lines under a written contract between the two railroads. And while that contract expired in mid-2025, Metra's trains have kept running without interruption—Union Pacific has no desire to interrupt commuter rail service, and it has committed to allowing Metra to keep using its lines while the parties work towards a long-term agreement to govern their relationship.

Metra instead sought terminal trackage rights to override the parties' private commercial negotiations—in particular, because it does not want to pay the market-rate compensation that Union Pacific seeks for access to its valuable property. In indulging that effort, the Board made three key errors, erasing any meaningful constraints on the agency's power to grant terminal trackage rights to other railroads.

Appellate Case: 25-2919    Page: 11    Date Filed: 01/07/2026 Entry ID: 5594823

*First*, terminal trackage rights must be "in the public interest." 49 U.S.C. § 11102(a). Despite its seeming breadth, this language actually codifies a more concrete and demanding test: an applicant must show this drastic relief is needed to remedy inadequate rail service. The agency so held for decades, and Congress ratified those decisions by borrowing the existing statutory language, explicitly endorsing the agency's interpretation of it, and reenacting that language without change. Courts have held that the inadequate-service showing is mandatory—including the Seventh Circuit, which applied this test last year to invalidate Board regulations that failed to require this showing for a related form of forced access to rail facilities under the same statutory standard.

The agency gave short shrift to the inadequate-service requirement. In the passenger context, this inquiry necessarily focuses on the terms on which the host railroad is willing to grant the passenger railroad access to its lines. But the Board never conducted that analysis. Instead, the Board essentially concluded that Metra is receiving inadequate service—despite its uninterrupted operations—because Union Pacific will not concede that Metra holds an *absolute* right to use its lines. By deeming Union Pacific's service "inadequate" simply because Union Pacific insists on

Appellate Case: 25-2919    Page: 12    Date Filed: 01/07/2026 Entry ID: 5594823

negotiating terms with Metra—without ever evaluating the reasonableness of those terms—the Board effectively gave Metra and every other commuter railroad in the country squatters' rights over all freight rail lines they currently use. That is not Congress's design.

*Second*, even when otherwise permissible, terminal trackage rights can be granted only as to "terminal facilities, including main-line tracks for a reasonable distance outside of [the] terminal." 49 U.S.C. § 11102(a). Here, though, the Board merely paid lip service to this significant limitation. It assumed the "terminal" at issue is the downtown Chicago freight switching terminal. But the Board deemed the terminal's boundaries irrelevant because, in the agency's view, a "reasonable distance" includes whatever track Metra happens to use already, extending dozens of miles from Chicago into the surrounding area and even into Wisconsin—two or three times as far as any prior grant of terminal trackage rights. This ruling ignores statutory text and structure, contradicts the agency's own precedent, and removes any limit on the extent of the Board's power to conscript one railroad's property to serve another.

*Third*, where the Board grants terminal trackage rights, "compensation shall be paid or adequately secured *before*" those rights can be

Appellate Case: 25-2919    Page: 13    Date Filed: 01/07/2026 Entry ID: 5594823

used.  49 U.S.C. § 11102(a) (emphasis added).  After all, granting such rights is a "condemnation," *id.*, and the Fifth Amendment requires compensation no later than when a taking occurs.  Likewise, before the rights can take effect, the agency must set at least some terms to govern; such terms are practically needed to both govern the two railroads' relations and fix compensation (because the terms dictate what is being compensated).

Here, though, the agency refused to discharge these tasks, telling the parties to go work it out amongst themselves while simultaneously granting the rights and making them effectively immediately.  And it said that, if the railroads cannot agree, it will set compensation at some future date.  None of that comports with the Constitution, the statute, or the agency's duties to act and explain itself reasonably.

For each of these reasons, the Board's decision granting terminal trackage rights should be vacated.

Appellate Case: 25-2919    Page: 14    Date Filed: 01/07/2026 Entry ID: 5594823

# JURISDICTIONAL STATEMENT

The Board's jurisdiction was invoked under 49 U.S.C. §§ 10501(c)(3)(B) and 11102(a).  *See* Add. 5; App. 664.

The courts of appeals have jurisdiction to review the Board's "final orders … made reviewable by" 28 U.S.C. § 2321.  *See* 28 U.S.C. § 2342(5).  In turn, § 2321(a) provides that "a proceeding to enjoin or suspend, in whole or in part," an "order of the … Board shall be brought in the court of appeals as provided by and in the manner prescribed in" the Hobbs Act.  The order under review is final because it marked the consummation of the Board's decisionmaking process on whether Metra is entitled to trackage rights and it immediately altered the parties' rights and duties.  *See Union Pac. R.R. v. STB*, 358 F.3d 31, 34 (D.C. Cir. 2004).  Venue is proper because this is "the judicial circuit in which the petitioner … has its principal office," 28 U.S.C. § 2343, in Omaha, Nebraska.  Union Pacific timely sought review on September 29, 2025, within 60 days of the Board's September 3, 2025 order.  *See id.* § 2344.

6

## STATEMENT OF THE ISSUES

1. Whether the Board erred by giving Metra terminal trackage rights without any showing of inadequate service.

   *Most apposite authorities*:

   - *Grand Trunk Corp. v. STB*,
     143 F.4th 741 (7th Cir. 2025)

   - *Cent. States Enters., Inc. v. ICC*,
     780 F.2d 664 (7th Cir. 1985)

   - H.R. Rep. No. 96-1430, at 116–17 (1980),
     *as reprinted in* 1980 U.S.C.C.A.N. 3978, 4148–49

2. Whether the Board erred by giving Metra terminal trackage rights spanning the entirety of Metra's commuter operations.

   *Most apposite authorities*:

   - 49 U.S.C. § 11102(a)

   - *Rio Grande Indus., Inc.—Purchase & Related Trackage Rights*, No. FD 31505, 1989 WL 246814, at *9 (I.C.C. Nov. 13, 1989)

3. Whether the Board erred by granting Metra immediate trackage rights without setting compensation or any conditions of use.

   *Most apposite authorities*:

   - 49 U.S.C. § 11102(a)

   - *Knick v. Twp. of Scott*, 588 U.S. 180 (2019)

Appellate Case: 25-2919    Page: 16    Date Filed: 01/07/2026 Entry ID: 5594823

## STATEMENT OF THE CASE

### A.    Legal background.

In 1920, Congress first empowered the Interstate Commerce Commission to grant terminal trackage rights if certain conditions were met. The ICC could "require the use of any … terminal facilities, including main-line track or tracks for a reasonable distance outside of such terminal, of any carrier, by another carrier," provided the agency found such use "to be in the public interest and to be practicable." *See* Transportation Act of 1920, ch. 91, § 405, 41 Stat. 456, 479–80. "The intent of Congress in enacting [this provision] was to provide a method of avoiding … unnecessary expense in duplicating existing terminal facilities by a railroad entitled to serve a particular territory." *Spokane, Portland & Seattle Ry.—Control—Peninsula Terminal Co.*, 334 I.C.C. 419, 435 (1969).

From the early 1920s onwards, the ICC consistently "determined that the 'public interest' did not necessitate shared use of terminal facilities [if] the shipper failed to demonstrate the incumbent carrier's rail service was inadequate." *Grand Trunk Corp. v. STB*, 143 F.4th 741, 749–50 (7th Cir. 2025) (collecting and discussing cases).

In 1980, Congress passed the Staggers Rail Act, which added a new subsection confirming the agency's ability to mandate a different kind of

8

forced-sharing arrangement: reciprocal-switching agreements.[1]  Both the terminal-trackage and reciprocal-switching provisions "provide[d] that the Commission 'may' order relief in the form of a joint use or switching agreement where it is 'practicable and in the public interest.'"  *Cent. States Enters., Inc. v. ICC*, 780 F.2d 664, 668 (7th Cir. 1985).

In readopting this standard in the Staggers Act, Congress made clear it was codifying the specific test the ICC had developed in decades of decisions.  Congress "adopted that portion of the Senate bill which provided that the practicable and public interest standard to be considered by the Commission 'is to be the same standard the Commission has applied in considering whether to order the joint use of terminal facilities.'"  *Id.* at 677 (cleaned up) (quoting H.R. Rep. No. 96-1430, at 116–17, *as reprinted in* 1980 U.S.C.C.A.N. 3978, 4148–49).  That is, the "legislative[ly] mandated standard" for terminal trackage rights or reciprocal switching

---

[1]  A reciprocal-switching agreement "require[s] a rail carrier that has a monopoly over a certain rail line to compete with another carrier for particular rail traffic."  *Grand Trunk*, 143 F.4th at 743.  In essence, the incumbent carrier must hand off the traffic to a competitor for the "line haul"—the long-distance shipment to the destination—when it otherwise would handle that part of the shipment itself.

Appellate Case: 25-2919     Page: 18     Date Filed: 01/07/2026   Entry ID: 5594823

requires "some actual necessity or compelling reason," meaning the available service is "inadequate." *Id.* at 669, 679–80 & n.19.

In 1995, Congress passed the ICC Termination Act, abolishing the ICC and transferring its rail-regulatory functions to the newly created Surface Transportation Board. This Act also recodified various Interstate Commerce Act provisions, including the terminal-trackage and reciprocal-switching statutes. Those provisions are now codified at 49 U.S.C. § 11102(a) and (c).

Today, the terminal-trackage provision says the Board "may require" one railroad's "terminal facilities, including main-line tracks for a reasonable distance outside of a terminal … to be used by another rail carrier," provided "the Board finds that use to be practicable and in the public interest without substantially impairing the ability of the [incumbent] rail carrier … to handle its own business." 49 U.S.C. § 11102(a). If the Board grants terminal trackage rights, the two railroads initially "are responsible for establishing the conditions and compensation for use of the facilities." *Id.* If they "cannot agree, the Board may establish conditions and compensation for use of the facilities under the principle controlling compensation in condemnation proceedings." *Id.* "The

compensation shall be paid or adequately secured before a rail carrier may begin to use" terminal trackage rights. *Id.*

## B. Factual background.

Union Pacific is one of the largest North American railroads, operating more than 32,500 route miles in 23 states. This case is about three of Union Pacific's lines in Illinois and Wisconsin. Each line originates at the Ogilvie Transportation Center in downtown Chicago. The North Line runs to Kenosha, Wisconsin; the Northwest Line to Harvard and McHenry, Illinois; and the West Line to Elburn, Illinois. *See* Add. 17–18 & n.35; App. 676–77. The West Line is Union Pacific's main freight line into the Chicago area and continues on to Omaha, Nebraska, making it one of the busiest rail lines in the United States. All three lines—the tracks and underlying land—are Union Pacific's private property.

Metra's commuter trains have operated over these three lines for decades. For many years, Union Pacific (or its predecessor) operated this commuter service on Metra's behalf under a written Purchase of Service Agreement, or PSA. The PSA spelled out the mutually agreed terms on which Union Pacific would operate Metra service on Union Pacific property. Though the trains were Metra-branded, Union Pacific crews ran

11

the trains and sold the tickets. Metra paid Union Pacific a fee for these services. *See* Add. 2; App. 661.

But Union Pacific is a freight railroad. Indeed, these three lines were the only place on its entire network where Union Pacific operated passenger service. In 2019, as their contract allowed, Union Pacific notified Metra that it intended to stop providing commuter service on these lines. *Id.* It encouraged Metra to negotiate a resolution transitioning commuter operations to Metra or an independent contractor.

Metra responded that Union Pacific had perpetual statutory and contractual duties to provide commuter service. Union Pacific therefore secured a declaratory judgment that it has no "common-carrier obligation" to provide passenger service and is "not bound by any contractual promise to keep providing rail services to Metra for the indefinite future." *Union Pac. R.R. v. RTA*, 74 F.4th 884, 887, 889 (7th Cir. 2023).

The parties thus began working to transfer commuter rail operations to Metra. The goal was for commuter service to continue, but with Metra now providing that service directly. The parties substantially completed the operational transition in May 2025. Add. 3; App. 662. But they still needed an agreement to govern their new relationship.

12

The parties have so far been unable to negotiate a successor agreement to replace the PSA, with compensation being the main sticking point. Mediation through the Board proved unsuccessful, and Metra refused to arbitrate. *See* Add. 3, 28 n.61; App. 662, 687. During this time, the parties repeatedly extended the PSA on an interim basis, most recently through June 30, 2025. Add. 3; App. 662.

**C. Proceedings below.**

1. In March 2025, Metra commenced the proceedings below by applying to the Board for terminal trackage rights over Union Pacific's three lines under 49 U.S.C. § 11102. At the same time, Metra sued Union Pacific in district court, asserting various contractual and antitrust claims (which it has since dropped).

As the agency and court proceedings progressed, the PSA's June 30 expiration loomed. No one wanted a Metra service interruption, and terms were needed to govern Metra's continued operations after the PSA expired. Thus, in early June, Union Pacific issued the Condition of Entry (COE): a set of default contractual terms to allow continued Metra operations during the dispute. The COE provided Metra would accept its

13

terms by operating on Union Pacific's lines after midnight on June 30. *See* Add. 3; App. 662.

Metra sought emergency injunctive relief from both the Board and the district court to bar the COE's enforcement, but it failed in both forums. *See* Add. 4; App. 663; *Commuter Rail Div. v. Union Pac. R.R.*, No. 1:25-cv-2439, 2025 WL 1787514 (N.D. Ill. June 27, 2025). When July 1 arrived, Metra kept operating on Union Pacific's lines as usual. It continued to do so through July and August without interruption.

2. On September 3, with Metra still operating as usual on Union Pacific's lines, the Board granted Metra's terminal trackage rights application with immediate effect. The Board decided four substantial issues.

*First*, the Board held that it had jurisdiction over Metra's application. *See* Add. 11; App. 670. This holding, though flawed, is not at issue here.

*Second*, the Board granted terminal trackage rights over the entirety of the three Union Pacific lines, each extending between 50 and 65 miles from its downtown-Chicago origin. *See* Add. 18 n.35; App. 677. As noted, the statute applies to "terminal facilities, including main-line tracks for a reasonable distance outside of a terminal." 49 U.S.C. §

11102(a). Union Pacific argued, and the Board assumed, that the relevant "terminal facility" is "the Chicago Freight Terminal (or CFT)"—"the downtown freight switching terminal" in Chicago, as historically understood in the rail industry. Add. 16; App. 675.

But the agency then concluded that "a 'reasonable distance' outside the CFT is the endpoint of Metra's existing commuter rail service over each UP Line," such that Metra can secure terminal trackage rights over all three lines, from end to end. *See* Add. 16–17, 19; App. 675–76, 678. That was so, the agency said, because "this case involves a defined commuter rail system that has been in operation for decades," and "a narrower cut-off point would undermine the public interest served by granting terminal trackage rights in this case." Add. 20; App. 679. Thus, the Board concluded, it "need not decide whether a more expansive definition of terminal area would be appropriate." Add. 16; App. 675.

*Third*, the Board decided that "there is a compelling reason to award Metra terminal trackage rights" because "Metra provides a vital public service." Add. 27; App. 686. In so holding, the Board rejected Union Pacific's reliance on cases holding that a trackage-rights applicant must show inadequate service. *See* Add. 27–28; App. 686–87.

15

Union Pacific explained that Metra could not show any service inadequacy because Union Pacific was willing to keep hosting Metra trains—the parties just disputed the proper terms and compensation for that service. Add. 28; App. 687. The Board said this "characterization" was "critically undermined by [Union Pacific's] continued insistence that Metra does not have a statutory right to seek access to operate over the UP Lines to provide commuter rail service in the Chicago area." *Id.* In the Board's view, "while UP has stated that it does not intend to deny Metra access to the UP Lines, it also has repeatedly stated that it is under no obligation to allow Metra to continue to do so." Add. 29; App. 688. The agency went on: "If Metra's heavily trafficked public commuter rail service is subject to unreviewable terms and pricing set unilaterally by UP and can disappear on a whim, that is not adequate service." Add. 29–30; App. 688–89.

The agency also said that granting Metra's application was "most consistent with Congress's clearly expressed intent" (in legislative history) "that 'a local transportation authority's request would virtually always satisfy the public interest standard.'" Add. 30; App. 689 (quoting H.R. Conf. Rep. No. 104-422, at 184 (1985)). The Board thus found that

16

"granting Metra's requested trackage rights meets the inadequate service standard … to the extent such a showing is even necessary in these circumstances." *Id.* The agency did not evaluate the specific terms on which Union Pacific was willing to grant Metra continued access (under the COE or in the parties' negotiations).

*Fourth*, the Board made those rights effective immediately—even as it declined to set any terms or compensation to govern Metra's exercise of trackage rights, even on an interim basis. The agency acknowledged that, under the statute, "compensation must be paid or adequately secured before a rail carrier may begin to use the facilities of another rail carrier under this section." Add. 30; App. 689 (quoting 49 U.S.C. § 11102(a)). But the Board relied on agency precedent declaring that "the Board's pledge to set compensation" at some future time "serves as 'adequate security' under § 11102(a)." Add. 31; App. 690. The Board also said compensation "is 'adequately secured' as a practical matter" because Metra "is a governmental entity and thus may be presumed to be 'financially responsible.'" Add. 31–32; App. 690–91 (cleaned up).

On that basis—and even though both "parties have expressed support for a Board order establishing compensation to be paid on an interim

17

basis"—the agency declined to adopt such a mechanism: because "the substantive terms of the parties' competing proposals [were] not easily reconcilable … the Board will not adopt either of the parties' written interim proposals." Add. 32; App. 691. The Board did not evaluate either of those proposals or explain why it could not choose between them or adopt its own interim compensation scheme. Rather, the agency said simply that it "expects Metra to continue to compensate UP for its use of the UP Lines." *Id.* "If the parties cannot reach agreement, and the Board is required to set interim terms and conditions governing Metra's access, there will be an accounting and reconciliation when final terms are set." *Id.*

The Board similarly declined to adopt any non-compensation terms, either interim or final: "Because § 11102(a) provides that '[t]he rail carriers are responsible for establishing compensation and conditions for the use of terminal facilities' in the first instance, the Board will not address any [such] issues … at this time." Add. 33; App. 692. Rather: "The Board expects and encourages Metra and UP to undertake a concerted, good faith effort to reach agreement …. If the parties cannot reach an

Appellate Case: 25-2919    Page: 27    Date Filed: 01/07/2026 Entry ID: 5594823

agreement, the Board will establish the compensation and conditions of use in accordance with the statute." *Id.*

The agency thus gave Metra an immediate federal statutory right to operate over Union Pacific's lines without any enforceable obligation to compensate Union Pacific in any specific amount, and without any governing terms.

3. Given the sudden vacuum created by the Board's decision, Union Pacific asked Metra to agree on interim indemnity terms drawn from Metra's own prior proposals. When Metra refused, Union Pacific moved the Board to impose those terms on an interim basis or to stay its decision. It also moved this Court to stay the Board's decision pending review. The Board temporarily granted Union Pacific's request for interim indemnity terms and then—after a delay caused by the government shutdown—confirmed that those terms would govern until final terms are adopted. During that delay, this Court held Union Pacific's stay motion in abeyance (as Union Pacific had suggested). After the shutdown ended and the Board readopted those terms, this Court denied Union Pacific's motion without addressing the merits and resumed the briefing schedule.

19

## SUMMARY OF ARGUMENT

I.     The Board erred by giving Metra terminal trackage rights without a showing of inadequate service.

A.     Statutory history shows—and precedent confirms—that when Congress used the seemingly broad term "public interest" in § 11102(a), it codified the agency's longstanding test for terminal trackage rights. That test requires the applicant to show that this extraordinary relief is necessary to remedy inadequate service.  In the passenger context, service is not inadequate if the freight railroad is willing to give the passenger railroad access to its lines on reasonable terms.

B.     The Board never considered the reasonableness of the terms on which Union Pacific is willing to allow Metra continued access.  Instead, it focused mainly on the broad public benefits of Metra's commuter operations.  But that has nothing to do with service inadequacy—and again, Union Pacific has not disrupted or threatened to interrupt Metra's operations.

The Board also said that, to the extent inadequate service matters, Metra had made such a showing because Union Pacific refused to concede (i) that Metra is entitled to *statutory* trackage rights or (ii) that Union

Appellate Case: 25-2919     Page: 29     Date Filed: 01/07/2026 Entry ID: 5594823

Pacific will never exclude Metra under any circumstances. The agency thus held that Metra was receiving inadequate service essentially because Union Pacific would not acknowledge that Metra holds an absolute right to use its private property. This turns the statutory standard upside down. And the Board failed to evaluate the terms on which Union Pacific *is* willing to continue access.

The agency also leaned heavily on a statement in the legislative history that a local transportation authority's application would virtually always satisfy the public-interest standard. But that snippet does not override the statutory history and precedent showing what the public-interest standard actually requires. In any event, the very same legislative history material confirms that Congress retained the established standard requiring inadequate service.

II. Even if Metra were entitled to terminal trackage rights, the Board erred by granting Metra the right to use the entirety of all three Union Pacific lines at issue, extending dozens of miles from downtown Chicago.

A. The statute applies only to "terminal facilities, including main-line tracks for a reasonable distance outside of a terminal." 49

21

U.S.C. § 11102(a). The terminal itself is thus the focus. And the agency has long recognized (and accepted here) that "terminal facilities" subject to the statute are those facilities and track that assist in the performance of the functions of a terminal. In turn, a "reasonable" distance is one that is necessary to reach such facilities—no more.

B.     The agency ignored these standards entirely, granting Metra unprecedented trackage rights over main-line track based largely on the same factors the agency emphasized in the public-interest analysis. In so doing, the Board read the term "terminal facilities" out of the statute, arrogating to itself the power to grant trackage rights over *any* distance, based on whatever factors it prefers to consider. But the statute cannot be read to allow that, and the agency did not rationally explain its reasoning.

III.     Even if Metra were entitled to terminal trackage rights, the Board acted unlawfully and unreasonably by granting those rights with immediate effect while refusing to set conditions or compensation for the exercise of those rights, even on an interim basis.

A.     The statute is best read to require the Board to set (at least interim) compensation and other terms *before* granting terminal

22

trackage rights. The statute explicitly requires setting compensation before trackage rights take effect. And because trackage rights are a constitutional taking, the Fifth Amendment independently requires the same result. In holding otherwise, the Board relied on a line of agency and court precedent that effectively reads this timing requirement out of the statute with zero analysis. Likewise, at least some operational terms must be set in advance, since compensation cannot be set without knowing what is being compensated.

B. At a minimum, the Board acted arbitrarily and capriciously by granting Metra *immediate* trackage rights without setting any terms or compensation. The Board never explained why this extraordinary step was necessary. It said only that (i) the parties' proposed interim terms were very different and (ii) the parties should negotiate before the Board steps in to set terms. But none of that explains why Metra's trackage rights supposedly needed to take effect immediately.

## ARGUMENT

The Administrative Procedure Act governs judicial review under the Hobbs Act. *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987). Thus, the Court "shall . . . hold unlawful and set aside agency

23

action" that is (as relevant) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). The Court "must exercise independent judgment in determining the meaning of statutory provisions." *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024).

## I. The Board erred by giving Metra terminal trackage rights without a showing of inadequate service.

The Board's most basic error was intervening in a private commercial dispute "to ensure the provision of adequate rail service," Add. 30a, even though rail service has undisputedly continued without interruption—and even though the Board never evaluated the terms on which Union Pacific is willing to continue that service. The Board thus failed to make the proper threshold finding required by the statute: that terminal trackage rights are necessary to remedy inadequate service.

### A. Granting terminal trackage rights requires a threshold showing of inadequate service.

The Board can grant terminal trackage rights only if it finds that doing so is "in the public interest." 49 U.S.C. § 11102(a). In a vacuum, this may look like the sort of open-ended language that gives an agency

24

broad discretion. "Statutory language, however, cannot be construed in a vacuum." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (cleaned up). Here, statutory history and precedent show that Congress used this language to capture a specific, demanding test: a trackage-rights applicant must show that this relief is necessary to remedy inadequate service.

1. Granting terminal trackage rights is an "extraordinary remedy." *See W. Fuels Serv. Corp. v. BNSF Ry.*, No. NOR 41987, 1997 WL 416961, at *6 (STB served July 28, 1997). It involves an indefinite, government-authorized occupation of private property for a third party's business. Thus, as the statute itself recognizes, this remedy effects a "condemnation," 49 U.S.C. § 11102(a)—a constitutional taking. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021). Such a provision should be construed in light of the "strong policy of respecting traditional property rights." *See United States v. Rodgers*, 461 U.S. 677, 716 n.5 (1983).

Consistent with these weighty interests, the ICC applied a demanding threshold test: before the agency could grant terminal trackage rights, it "would have to find that there was some actual necessity or

Appellate Case: 25-2919     Page: 34     Date Filed: 01/07/2026 Entry ID: 5594823

compelling reason" to do so. *See Grand Trunk Corp.*, 143 F.4th at 748–49 (cleaned up) (collecting and discussing cases). Under this standard, the "'public interest' did not necessitate shared use of terminal facilities [if] the [applicant] failed to demonstrate the incumbent carrier's rail service was inadequate." *Id.* at 749–50 (collecting cases). In other words, "prescrib[ing] joint use of terminal facilities" required "*a finding that the existing service was inadequate.*" *Id.* at 750 (emphasis added).

Congress then ratified this test, in three ways. First, it reused the same language in the adjacent reciprocal-switching provision, now codified at § 11102(c). *Supra* p. 9; *see George v. McDonough*, 596 U.S. 740, 746 (2022) (when Congress reused a specific term with "a long regulatory history in this very context," it codified and adopted that "prior agency practice"). Second, Congress was explicit about its goal in doing so: the "public interest standard" for reciprocal switching "is to be the same standard the Commission has applied in considering whether to order the joint use of terminal facilities"—the standard requiring inadequate service. H.R. Rep. No. 96-1430, at 116–17 (cleaned up); *see also United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 134 (1978) ("When a Congress that re-enacts a statute voices its approval of an administrative

or other interpretation thereof, Congress is treated as having adopted that interpretation."). Third, Congress in 1995 reenacted both provisions without changing the relevant language. *See* ICC Termination Act, Pub. L. No. 104-88, § 102(a), 109 Stat. 803, 831 (1995); *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 722 (2018) ("Congress is presumed … to adopt [an administrative or judicial interpretation] when it re-enacts a statute without change" (cleaned up)).

Thus, as two other circuits have recognized, the "legislative[ly] mandated standard" for terminal trackage rights *or* reciprocal switching requires "some actual necessity or compelling reason," meaning the existing service must be "inadequate." *Cent. States*, 780 F.2d at 669, 679–80 & n.19; *see also Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1502 (D.C. Cir. 1988) (the agency's "discretion should be exercised and constrained in like manner under both provisions" by the "actual necessity or compelling reason" test). Under the statute, then, "a finding of inadequate service function[s] as a prerequisite to regulatory intervention." *Grand Trunk*, 143 F.4th at 752.

This is a significant constraint. Indeed, the Seventh Circuit recently applied this rule to invalidate the Board's reciprocal-switching

27

regulations. *See id.* at 756. The agency adopted rules allowing it to mandate reciprocal switching whenever an incumbent freight railroad's service to shippers dropped below any of three "performance standards." *Id.* at 754. Those metrics, however, did "not correspond with a finding that an incumbent rail carrier's service is inadequate." *Id.* Because the rules thus "permit[ted] the Board to impose a reciprocal switching agreement in the absence of a finding of inadequate service," they "exceed[ed] the Board's statutory authority." *Id.* at 752.

In so holding, the Seventh Circuit rejected the Board's alternative reading of the statute as "requir[ing] not a threshold finding of inadequate service … but instead a balancing of the respective interests of the affected carriers, shippers, and public at large." *Id.* at 751. Given "the legislatively mandated standard that emerged from the ICC's pre-1980 administrative precedent … a construction of the statute that merely considers … whether the existing rail service is inadequate, but does not require such a finding, rests on legal infirmity." *Id.* at 751–52 (cleaned up).

2. In turn, to entertain Metra's application, the Board needed to make a threshold finding of inadequate service. In the freight context,

28

the inadequate-service inquiry generally considers the level of service provided to one or more shippers—parties seeking to have cargo transported by rail to or from their facilities (factories, warehouses, and the like). *See Mfrs. Ass'n of York v. Penn. R.R.,* 73 I.C.C. 40, 49–50 (1922). For example, a freight railroad that constantly fails to make scheduled deliveries or pickups may be providing inadequate service.

In the current context, the analysis differs. Here, a freight railroad is not picking up or dropping off cargo at a shipper's facility for transport; it is giving a passenger railroad access to its lines so the passenger railroad can use them to carry its own passengers, with stops along the way. In this context, then, "adequate service" is best understood to address the adequacy of the passenger railroad's *access* to the freight railroad's lines. If the passenger railroad has access to the lines on reasonable terms, it is not receiving "inadequate service," and terminal trackage rights are not available.

Thus, in this context, the "inadequate service" inquiry focuses on the terms on which the freight railroad that owns the lines is willing to allow access. To be sure, no precedent spells this out; the agency has not applied the statute in this context before. But no other approach makes

29

sense: the service the host railroad provides in this scenario is access to its lines, so adequate access is adequate service. Indeed, the Board accepted as much below—in the agency's view, this dispute "is about access." Add. 28; App. 687; *see also* Add. 17, 19–20 & n.39; App. 676, 678–79.

Here, then, the Board needed to find that Union Pacific was not willing to grant Metra access on reasonable terms. As explained next, it did not do so.

## B. The Board's public-interest reasoning lacks merit.

In finding the statutory standard satisfied, the Board reached three conclusions. None is sound.

*First*, the Board said that "Metra provides a vital public service" and "there is a strong public interest in having this service continue." Add. 27; App. 686. This analysis is defective because it eschews the inadequate-service standard altogether. Indeed, this is the same error that doomed the Board's reciprocal-switching rule in *Grand Trunk*. The agency said it need not make "a threshold finding of inadequate service" because the statute's "'in the public interest' requirement" simply calls for "a balancing of the respective interests of the affected carriers,

30

shippers, and public at large." *See* 143 F.4th at 751. The Seventh Circuit rejected that view. *See id.* at 752. The same is true here. The Board cannot look to "the public interest" in the abstract; "a finding of inadequate service" is "a prerequisite to regulatory intervention." *Id.*

*Second*, the Board said that, "to the extent such a showing is even necessary in these circumstances," granting Metra's application was necessary to remedy inadequate service. Add. 30; App. 689. This reasoning does not satisfy the statute.

Union Pacific undisputedly "has not refused access and is willing to provide Metra with access to the UP Lines through a private commercial agreement." Add. 26; App. 685; *see also* Add. 23, 27–28; App. 682, 686–87. On that basis, Union Pacific argued Metra had not shown any service inadequacy because this dispute is not about *whether* Metra will have access, but simply the *terms* on which it enjoy access, including the compensation it will pay. Add. 27; App. 686. The Board rejected this argument, declaring that Union Pacific's "characterization of the dispute is critically undermined by its continued insistence that Metra does not have a *statutory right* to seek access to operate over the UP Lines." Add. 28; App. 687 (emphasis added).

31

That does not follow. Union Pacific's position is that Metra cannot show inadequate service because Union Pacific is willing to continue access on commercially reasonable terms, by contract. If Union Pacific is right, then Metra cannot show a substantive entitlement to forced access because it *already has access* on reasonable terms. The Board's analysis, by contrast, turns the statutory test upside down: so long as a freight railroad disputes that a passenger railroad is entitled to relief under § 11102(a), the Board's logic would deem access disputed and service inadequate. *Id.*; *see also* Add. 29; App. 688 (emphasizing that, "while UP has stated that it does not intend to deny Metra access to the UP Lines, it also has repeatedly stated that it is under no obligation to allow Metra to continue to do so"). That makes no sense.

The Board also emphasized that the Condition of Entry—the set of temporary terms that Union Pacific issued to allow Metra's continued access after the prior contract expired—"permit[s] UP to remove Metra from the UP Lines if Metra does not comply with the terms of the COE." Add. 28; App. 687. Because the "terms of the COE allow UP to deny Metra access," the Board said, Metra's service could "disappear on a whim." Add. 29–30; App. 688–89. In the Board's view, "that is not

adequate service" because "the public interest requires greater certainty."  Add. 30; App. 689.

This view is another version of the same error.  The Board focused narrowly on Union Pacific's refusal to concede that Metra holds an absolute, unconditioned right to access its private property.  In the Board's view, Metra is receiving inadequate service—even though its trains have kept running without interruption and Union Pacific has committed not to exclude it—just because Union Pacific's stop-gap access terms contemplate *some* circumstances in which access might be cut off (namely, if Metra fails to comply with those terms).  Thus, instead of asking whether Metra's current, uninterrupted access is "inadequate," *Grand Trunk*, 143 F.4th at 751–52, the Board asked simply whether it is possible that Metra could ever lose that access.  The former, however, is the inquiry mandated by the statute.

And because of this misplaced focus, the Board never considered the actual terms on which Union Pacific *is* willing to continue access.  If Union Pacific's terms are commercially reasonable—which it provided evidence to show, and which the Board never disputed—then Metra's service does not become inadequate just because Union Pacific reserves the

33

right to exclude Metra if it *fails to comply* with those reasonable terms. *See* App. 300. The Board deemed Metra's access inadequate even though it never considered the terms on which Union Pacific will voluntarily continue that access. That oversight is fatal.

The Board also said repeatedly that, on Union Pacific's view, "Metra would have no right to refuse unreasonable terms and conditions and no recourse if UP decided to deny access altogether." Add. 29; App. 688; *see also* Add. 28; App. 687 (asserting that Metra would lose "access to Board intervention"); Add. 29–30; App. 688–89 (similar). As just explained, however, the Board never considered whether Union Pacific's terms are unreasonable, and thus did not address whether Metra's refusal to accept them was reasonable. In any event, the Board's conclusion does not follow. If Union Pacific excluded Metra for failing to accept *unreasonable* terms, Metra would not be receiving adequate service and would be free to seek relief from the Board under § 11102(a). But again, Union Pacific has not excluded Metra or threatened to do so, much less on grounds the agency evaluated and deemed unreasonable.

*Third* and finally, the agency said granting Metra relief is "most consistent with Congress's clearly expressed intent"—meaning a snippet

34

of legislative history saying—"that 'a local transportation authority's request would virtually always satisfy the public interest standard.'" Add. 30; App. 689 (quoting H.R. Conf. Rep. No. 104-422, at 184, 1995 U.S.C.C.A.N. 850, 869 (1995)).  But the Board did not try to reconcile this unexplained assertion with the inadequate service standard that Congress unambiguously ratified, and which the agency itself assumed would apply.

Regardless, when read in context, this language in the legislative history lends little support to the Board's decision.  This passage says that "local transportation authorities" can "invoke the remedies of [§ 11102] with respect to both freight and passenger transportation uses of railroad facilities, *based on the existing public interest standard*." H.R. Conf. Rep. No. 104-422, at 184 (emphasis added).  "It is the Conference's intent that, *subject to the foregoing limitations* … a local transportation authority's request would virtually always satisfy the public interest standard." *Id.* (emphasis added).  Since the report disclaimed any intention to alter "the existing public interest standard"—which had required inadequate service for decades—this passage suggests a local

35

transportation authority will "virtually always" be entitled to trackage rights *if* it can first show inadequate service.

For similar reasons, the Board failed to distinguish *Grand Trunk*. *See* Add. 27–28 n.58; App. 686–87. Though the agency stopped short of holding that Metra need not show inadequate service, the Board claimed *Grand Trunk* was inapt because the Seventh Circuit "did not consider … Congress's subsequent enactment of § 10501(c)(3)(B) and its impact on the public interest standard." *Id.* But that statute just says the Board "has jurisdiction under section[] 11102 … over transportation provided by a local governmental authority" if certain conditions are met. 49 U.S.C. § 10501(c)(3)(B). It says nothing about the substantive standards governing trackage-rights applications by such entities. And as just explained, the legislative history for the 1995 law that added this jurisdictional language confirms that Congress retained "the existing public interest standard." H.R. Conf. Rep. No. 104-422, at 184. Section 10501(c)(3)(B) thus provides no basis to depart from that standard.

\* \* \*

Together, the Board's errors radically transform the statutory scheme. The Board's reasoning seemingly allows any existing *or aspiring*

36

commuter railroad to force its way onto a freight railroad's lines. The key point for the Board, to which it returned over and over, is that Metra "provides a vital public service." Add. 27; App. 686. But the same can be said of any commuter service, even one that does not yet exist. And as just explained, the Board deemed Union Pacific's service inadequate—even though Union Pacific has not lifted a finger to interrupt Metra traffic after the parties' prior contract expired—simply because Union Pacific does not concede that Metra has an unlimited right to use its private property forever. So either a freight railroad voluntarily surrenders its rights or the Board will take those rights away.

And even if the Board's reasoning were limited to *existing* passenger carriers, upholding its decision would effectively turn § 11102(a) into a guarantee of squatters' rights—deterring freight railroads from hosting passenger service at all. Under the Board's decision, that Metra uses Union Pacific's lines to carry commuters is reason enough for regulatory intervention; the Board must "ensure" that the service never stops. *See* Add. 30; App. 689. But again, nothing in the combination of § 11102(a) and § 10501(c)(3) suggests that Congress intended to adopt such a scheme. And in the Board's view, a freight railroad could avoid

37

*permanently* hosting passenger service only by refusing to accept it in the first place. That, too, is inconsistent with Congress's design.

## II. The Board erred by giving Metra terminal trackage rights spanning the entirety of Metra's commuter operations.

When the statutory standards are met, the Board may grant the applicant the right to use another railroad's "terminal facilities, including main-line tracks for a reasonable distance outside of a terminal." 49 U.S.C. § 11102(a). Here, the Board granted Metra trackage rights over "the entirety of the UP Lines up to the last Metra station," each spanning dozens of miles. Add. 21; App. 680. The agency reasoned that Metra's operations are necessarily within a "reasonable distance" of a terminal, *whatever* area the terminal might encompass, essentially because no other approach would give Metra the relief it seeks. That is unlawful, arbitrary, and capricious—even accepting the agency's reading of the key statutory terms.

### A. Terminal trackage rights extend only to terminal facilities.

The Board's power under § 11102(a) extends only to "terminal facilities." 49 U.S.C. § 11102(a). Though such facilities "includ[e] main-line tracks for a reasonable distance" beyond the terminal, *id.*, the "terminal" itself remains the central focus. The "tracks for a reasonable distance"

38

are merely ancillary—and a distance is "reasonable" only to the extent that main-line track assists in the functions of the terminal itself, *e.g.*, by providing necessary access.

The statute does not define "terminal," but "[t]he agency has long understood the concept of a terminal area in functional terms: as a commercially cohesive area in which two or more railroads engage in the local collection, classification, and distribution of rail shipments" for transport to and from other destinations. *See* Add. 14; App. 673. Essentially, a terminal is a railroad hub, often found in or near a city. *See* Add. 14 & n.28; App. 673; *cf. Golden Cat Div. of Ralston Purina Co.*, No. 41550, 1996 WL 197602, at *5 (S.T.B. served Apr. 25, 1996) (switches and tracks at a shipper's industrial facility "in a rural, unincorporated area" were not terminal facilities). The authorities often use "terminal" and "terminal area" interchangeably.

The statute's focus on the terminal constrains what constitutes "main-line tracks for a reasonable distance outside" the terminal. 49 U.S.C. § 11102(a). *First*, a reasonable distance includes only those main-line tracks that can properly be viewed as "terminal facilities." After all, the object of the statutory directive is not track, but "terminal facilities":

Appellate Case: 25-2919     Page: 48     Date Filed: 01/07/2026 Entry ID: 5594823

"The Board may require terminal facilities … to be used by another rail carrier." 49 U.S.C. § 11102(a). The statute specifies that such facilities can "includ[e] main-line tracks." *Id.* "In both lay and legal usage, 'include' generally signifies that what follows is a subset of what comes before." *City of Providence v. Barr*, 954 F.3d 23, 40 (1st Cir. 2020) (citing authorities). Thus, the "main-line tracks" covered by the statute must *be* "terminal facilities." *See Golden Cat*, 1996 WL 197602, at \*5 ("As a threshold issue, before we impose relief … we must find that the facilities [at issue] are terminal facilities.").

In this way, the text both gives the agency flexibility and constrains its power. The "including" clause ensures that trackage rights can reach not just yards, depots, or track *within* the terminal, but also "main-line track" beyond the strict boundaries of the terminal itself. But the statute reaches only such main-line track as actually constitutes "terminal facilities"—that is, main-line track within a reasonable distance that "assists in the performance of the functions of a terminal." *Rio Grande Indus., Inc.—Purchase & Related Trackage Rights*, No. FD 31505, 1989 WL 246814, at \*9 (I.C.C. Nov. 13, 1989) (quoting *CSX Corp.—Control—Chessie and Seaboard*, 363 I.C.C. 518, 585 (1980)); *see also* Add. 14; App. 673

40

(reciting and not questioning this definition). And the function of main-line track just outside the terminal is to provide access to facilities within the terminal.

*Second*, and consistent with the statute's language, Congress adopted this provision to avoid "unnecessary expense in duplicating existing terminal facilities." *Spokane*, 334 I.C.C. at 435. If remedying inadequate service requires that an additional railroad be able to reach a terminal area, it would be inefficient to require the additional railroad to build its own terminal facilities alongside the existing ones. That rationale applies both to (i) facilities within the terminal itself and (ii) main-line track just outside the terminal that is necessary to reach it or use its facilities. It does not apply to more distant main-line track that is not necessary to access or use the terminal. *Cf. Chi. & Alton R.R. v. Toledo, Peoria & W. Ry.*, 146 I.C.C. 171, 179 (1928) (a reasonable distance will "depend primarily upon the extent of the terminal area to be served and the complexity of access to it").

Statutory text, structure, and purpose thus confirm that § 11102(a) reaches only (i) those rail facilities that are part of a terminal itself—the cohesive area where multiple railroads interchange or organize traffic—

41

and (ii) track just beyond the terminal but part of its functions, which generally means track necessary to access or use the terminal. No other facilities qualify as "terminal facilities" eligible for terminal trackage rights. It is thus unsurprising that previous grants of terminal trackage rights have generally included less than 15 miles of main-line track (in one case, around 22 miles). *See* Add. 19 & n.36; App. 678.

## B. The Board ignored the statutory test, instead working backward from its desired result.

The Board's analysis bears no resemblance to the statutory test just described. To start, the Board said it would assume that "the terminal area in this proceeding" is "the Chicago Freight Terminal (or CFT)," *i.e.*, "the downtown [Chicago] freight switching terminal." Add. 16; App. 675. The Board did "not decide" whether this definition or "a more expansive definition" is correct because it decided "that Metra's system either falls within the CFT or consists of mainline track for a reasonable distance outside of the terminal." *Id.*

On the latter point, the Board concluded that "a 'reasonable distance' outside the CFT is the endpoint of Metra's existing commuter rail service over each UP Line," admittedly covering distances "longer than those found reasonable in past cases." Add. 19–20; App. 678–79. In fact,

42

the Board granted Metra "terminal" trackage rights extending between 40 and 60 miles on each line—and almost 50 miles *beyond* the Board's assumed terminal area. *See* Add. 16 n.30, 18–19 n.35; App. 675, 677–78.

The Board said this conclusion about "reasonable distance" rested on "several factors":

a) "this case involves a defined commuter rail system that has been in operation for decades";

b) "a narrower cut-off point would undermine the public interest served by granting terminal trackage rights in this case";

c) Union Pacific's freight operations have not "been hindered in the past" and would not "be impeded going forward";

d) "all three UP Lines have yards located at their endpoints that assist in the performance of important functions";

e) The lines "are all subject to centralized monitoring and coordination";

f) Two of the lines are "lightly used" for freight, and Metra invested in infrastructure for the third line.

Add. 20; App. 679.

This is the tail wagging the dog. The Board was supposed to (1) ascertain the relevant terminal and then (2), on that basis, identify the distance of adjacent main-line track, within a reasonable distance, that is part of the terminal's functioning. Instead, the agency assumed a

43

definition of the terminal, "not decid[ing]" whether other definitions are correct, *see* Add. 16; App. 675, and then set it aside entirely, treating the "reasonable distance" determination as an independent inquiry with no relation to the terminal itself.

And none of the Board's "several factors" bear on the statutory test—whether Union Pacific's lines extending dozens of miles from downtown Chicago are "terminal facilities." Although the Board said that a terminal facility "assists in the performance of the functions of a terminal," Add. 14; App. 673 (cleaned up), it nowhere explained how these factors relate to that standard. The closest it came was to assert, without elaboration, that all three Union Pacific lines "have yards located at their endpoints that assist in the performance of important functions." Add. 20; App. 679. But it did not claim those yards play any role in *the Chicago terminal's* functioning—just that they have "important functions," period. If you look far enough down any main-line track, you will always find a yard that meets this test. So the Board's grab-bag of "factors" serves to erase any limits on what distance can be "reasonable."

In short, while the statute contemplates an inside-out inquiry— starting from the terminal and then determining what surrounding

44

main-line track is part of the terminal facilities—the Board inverted the analysis. It started from the outside ("the endpoint of Metra's existing commuter rail service" on each line) and worked its way inwards, without regard for any functional link between the lines at issue and the terminal that is supposed to anchor the analysis. *See* Add. 19–20; App. 678–79.

By treating the terminal as a functionally meaningless subset of an otherwise "reasonable distance" of track, the Board gave no effect to the key statutory terms: "terminal facilities" and "terminal." If the Board could grant trackage rights over any distance it considered generally "reasonable," the statute would not need to speak in terms of terminals and terminal facilities at all. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (emphasizing that court are "especially unwilling" to tolerate surplusage "when the term occupies so pivotal a place in the statutory scheme").

This atextual analysis betrays the agency's atextual aims. Metra does not want or need access to the terminal *qua* terminal. It already has that. *See* Add. 17; App. 676. What Metra wants is access to the suburbs along Union Pacific's lines so it can use them for commuter operations. And that was the decisive point for the agency: "Without access

45

to the UP Lines, Metra would not be able to provide commuter service to the passengers in those communities, forcing those passengers to find alternative means of transportation." Add. 19–20 n.39; App. 678–79. The Board thus rejected any "reading of the statute" that "*would render a grant of access to UP's terminal facilities nearly meaningless for Metra's purposes*." *Id.* (emphasis added). That is: "Adopting a narrower cut-off point would undermine the public interest served by granting terminal trackage rights in this case." Add. 20; App. 679. To call this reasoning results-oriented would be an understatement.

The rest of the agency's discussion on this topic boils down to the idea that passenger rail is different. Unlike in the freight context, the Board said, a "commuter rail system is only as useful as its proximity to the places its customers live." *See* Add. 17; App. 676. That is true as far as it goes. But it has nothing to do with whether all such track counts as "terminal facilities" under the statute.

That § 11102(a) uses the term "reasonable" does not avoid these problems. *Contra* Add. 19 & n.37; App. 678. While "the word 'reasonable'" may generally be "an open-ended term that confers discretion," *id.*, the statute applies only to "terminal facilities," of which "main-line tracks

46

for a reasonable distance" must be a subset. Likewise, a "reasonable" distance is one that maintains the core functional relationship between the track and the terminal. This context cabins the agency's power, as explained above. *See supra* § II.A.

Nor can the agency evade § 11102(a)'s textual "limitation[s]" by pointing to the supposedly "foundational precepts that the statute is 'highly remedial' and the term 'terminal facilities' should be liberally, not narrowly, construed." Add. 18; App. 677. Whatever interpretive principles the agency adopted in decades past, *see id.*, they do not control this Court's "independent judgment in determining the meaning of statutory provisions." *See Loper Bright*, 603 U.S. at 394. And the Supreme Court has made clear that "it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *PBGC v. LTV Corp.*, 496 U.S. 633, 647 (1990); *see also BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1539 (2021) ("Whatever the reason for a legislative compromise, we have no right to place our thumbs on one side of the scale or the other."). Anyway, as explained above, the agency did not so much construe the term "terminal facilities" as ignore it.

47

At bottom, the Board wanted to give Metra a federal right to use Union Pacific's lines. Section 11102(a) was the only tool at hand, so the agency hammered and stretched until it seemed to fit. But the statutory text is not so malleable. And it is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). That is true especially when the agency's rewrite removes essentially all limits on its authority. Shorn of any functional link to the actual terminal, the Board's approach contains no limiting principle. That is how the Board ended up granting Metra "terminal trackage rights" extending dozens of miles beyond the assumed terminal area—much further than the agency has ever granted any applicant before.

Thus, even if the Court holds that Metra made the requisite threshold showing for terminal trackage rights, it should vacate and remand for the Board to conduct the "terminal facilities" analysis under the correct legal standards.

Appellate Case: 25-2919    Page: 57    Date Filed: 01/07/2026 Entry ID: 5594823

### III. The Board erred by granting Metra immediate trackage rights without setting compensation or any conditions of use.

Even if Metra were entitled to terminal trackage rights, the Board acted unlawfully and unreasonably by granting those rights with immediate effect—and without setting conditions or compensation for the exercise of those rights, even on an interim basis.

#### A. The Board lacks authority to order immediate access without terms or compensation.

1. When the Board orders trackage rights, the two railroads initially "are responsible for establishing the conditions and compensation." 49 U.S.C. § 11102(a). If they "cannot agree," the Board may do so, applying "the principle[s] controlling compensation in condemnation proceedings"—and "compensation shall be paid or adequately secured before" the trackage rights are used. *Id.*

This language is best read to require setting terms—both compensation and other conditions of use—before access can begin. The statute says explicitly that compensation must be "paid or adequately secured" in advance. *Id.* As noted, granting trackage rights is a Fifth Amendment taking, and the "Fifth Amendment right to full compensation arises at the time of the taking." *Knick v. Twp. of Scott*, 588 U.S. 180, 190 (2019).

Thus, the statute requires—and must be read to ensure—compensation no later than when the taking begins.

Under the statute, other conditions, like operational terms or indemnity, must be set in advance too before the trackage rights can be exercised. Section 11102(a) describes a sequential process. The first sentence requires the Board to decide whether the statutory criteria for trackage rights are met. The second sentence makes the railroads "responsible for establishing the conditions *and* compensation." 49 U.S.C. § 11102(a) (emphasis added). And if the railroads cannot do so, "the Board may establish conditions *and* compensation"—which must "be paid or adequately secured *before*" trackage rights are exercised. *See id.* (emphasis added). The statute thus reflects that conditions and compensation are a package deal, to be addressed by the railroads or the Board "before" the rights take effect.

Indeed, at least some conditions *must* be set together with (or before) compensation so the amount of compensation can be determined. After all, the other terms dictate what the host railroad is being compensated for. Without knowing what requirements have been forced on Union Pacific through the access order, setting compensation is impossible.

Appellate Case: 25-2919    Page: 59    Date Filed: 01/07/2026 Entry ID: 5594823

For example, just compensation for hosting one passenger train per day will be far lower than just compensation for hosting forty trains.

Following the statutory process thus requires fixing both terms and compensation before trackage rights take effect. To be sure, *final* terms are not required in advance; as both parties explained below, it is sensible to set interim terms while indefinite terms are negotiated or litigated, which has taken years in prior proceedings. But setting some terms at the outset—including compensation—is legally required.

2. The Board held that it need not set compensation or any other terms before granting immediate access. Ignoring older precedent that required at least some terms to set before use, the Board instead relied on more recent agency precedent holding that "the Board's pledge to set compensation" at some future time "serves as 'adequate security' under § 11102(a)." Add. 31; App. 690. That precedent in turn relies on a single sentence from a forty-year-old per curiam decision with zero relevant analysis. *See S. Pac. Transp. Co. v. ICC*, 736 F.2d 708, 723 (D.C. Cir. 1984) (per curiam).

The Board is mistaken. The statutory phrase "paid or adequately secured before [use]" cannot be read to require merely that the agency

51

"pledge" to address compensation *after* use has begun—something it would have to do anyway.  If Congress were satisfied with the prospect of further agency proceedings to address compensation later, it would not have mandated payment or security "before" use begins.  The Board simply reads this language out of the statute, violating the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." *Liu v. SEC*, 591 U.S. 71, 89 (2020) (cleaned up).

The Board's reading also raises constitutional problems.  The Fifth Amendment requires "full compensation … at the time of the taking, regardless of post-taking remedies that may be available." *Knick*, 588 U.S. at 190.  Under *Knick*, a "procedure that will eventually result in just compensation"—what the Board "pledged" here—is not enough.  588 U.S. at 190–91.  Constitutional avoidance thus tips the scales even further from the Board's reading. *See Union Pac. R.R. v. DHS*, 738 F.3d 885, 892–93 (8th Cir. 2013).

The Board also said compensation "is 'adequately secured' as a practical matter" because Metra "is a governmental entity and thus may be presumed to be 'financially responsible.'"  Add. 31–32; App. 690–91.

52

Whatever the wisdom of such a presumption—and setting aside Metra's well-publicized financial troubles[2]—this assertion does not satisfy either the statutory text or the Fifth Amendment's mandate. The point is not whether Metra can eventually pay. Metra must pay up front.

Finally, the Board suggested not only that it could decline to set interim terms, but that it *cannot* set them. Because "the parties are responsible in the first instance for establishing the conditions and compensation," the Board said, it "would be inappropriate for the Board to prejudge the parties' interim proposals, which have not been subject to the statutorily-required negotiating process." Add. 32 n.65; App. 691. But even if that were true, nothing compelled the Board to make Metra's trackage rights effective before the parties could negotiate. In any event, nothing in the statute bars the agency from setting *interim* terms while the railroads negotiate long-term "conditions and compensation"—and the statute unambiguously requires setting compensation in advance.

The Board violated the statute by granting immediate trackage rights without fixing any conditions or compensation.

---

[2] Metra, *Fiscal Cliff Still Looms*, https://tinyurl.com/metdxnhw (last visited Jan. 1, 2026) (warning of "projected $160 million deficit" for 2026) .

53

## B. Forcing one railroad onto another railroad's tracks without setting terms is arbitrary and capricious.

Even if the Board had authority to grant Metra immediate trackage rights without setting interim terms, doing so was arbitrary and capricious. Agency action must be "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (cleaned up). The Board's decision is neither.

Running a railroad is a serious, complex business—especially when it involves a freight railroad hosting passenger service. These operations involve many issues that require clear rules for everyone involved, including scheduling, priority, dispatching, maintenance requirements, and liability and indemnity provisions. Both parties agreed that interim terms are needed, and each party proposed such terms. Yet the Board punted. Because "the parties' competing proposals are not easily reconcilable," the Board said, it would adopt *no* interim terms. Add. 32; App. 691. Even so, the Board ordered that Metra's trackage rights were effective immediately, Add. 34; App. 693—meaning Metra's trains are operating *right now* without clear terms.

The Board's choice is unreasonable and unjustified. The agency routinely addresses disputed terms and conditions, weighing competing

proposals and making decisions. *See, e.g., New Eng. Cent. R.R.—Trackage Rights Order—Pan Am S. LLC*, No. FD 35842, 2017 WL 5639660 (S.T.B. served Oct. 31, 2017) (establishing modified terms for existing trackage rights based on parties' competing positions on topics like compensation, insurance, and indemnification and liability). It could have done the same here. That the parties disagree is not grounds for refusing to decide.

And if the Board felt the parties *must* have a chance to negotiate interim terms, it could have delayed its order's effective date to allow negotiation. No urgency foreclosed such a delay. At the time of the Board's decision, the PSA had expired over two months prior, and Metra's trains were running without issue under the governing COE. There was no reason the Board's order had to take effect on September 3—certainly no reason disclosed in the decision.

The Board's preference for party negotiations does not justify refusing to adopt any interim terms *while ordering immediate access*. Rejecting interim terms *and* ordering immediate trackage rights—without meaningful explanation—was arbitrary and capricious.

55

## CONCLUSION

For these reasons, the Court should vacate the Board's September 3 trackage-rights order.

January 2, 2026

Respectfully submitted,

/s/ *Raymond A. Atkins*
Raymond A. Atkins
Allison C. Davis
Tobias S. Loss-Eaton
Stephen S. Laudone
Brooke B. Boyd
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
ratkins@sidley.com
(202) 736-8427

*Counsel for Petitioner*

56

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,845 words (as determined by the Microsoft Word word-processing system used to prepare it), excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.     This brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type-style requirements because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

3.     This brief complies with Circuit Rule 28A(h)(2) because the brief and addendum have been scanned for viruses and are virus-free.

/s/ *Raymond A. Atkins*
Raymond A. Atkins

# CERTIFICATE OF SERVICE

I certify that, on January 2, 2026: (1) this brief was filed with the Clerk of the Court through the appellate CM/ECF system, which will send notice to all registered counsel of record, (2) I caused 10 copies of this brief and the accompanying addendum to be sent to the Clerk of the Court by third-party commercial carrier for delivery within 3 days; and (3) I caused one copy of this brief and the accompanying addendum to be served on Respondents' counsel of record at the addresses below by third-party commercial carrier for delivery within 3 days:

Carolyn J. Chachkin
  ATTORNEY
Annika Sanders Cooper
  CHIEF COUNSEL
Scott M. Zimmerman
  ACTING DEPUTY CHIEF COUNSEL
Adam M. Kress
  ASSOCIATE COUNSEL–LITIGATION
SURFACE TRANSPORTATION BOARD
395 E Street, S.W.
Washington, DC 20423-0001
(202) 919-6195

*Counsel for Respondent Surface Transportation Board*

Robert B. Nicholson
Robert J. Wiggers
  ATTORNEYS
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Avenue
Washington, DC 20530
(202) 514-2489

*Counsel for Respondent United States of America*

Paul W. Hughes
Andrew A. Lyons-Berg
Mary H. Schnoor
Emmett Witkovsky-Eldred
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, DC 20001
(202) 756-8000

*Counsel for Intervenor-Respondent
the Commuter Rail Division of the
Regional Transportation Author-
ity, d/b/a Metra*


/s/ *Raymond A. Atkins*
Raymond A. Atkins