No. 25-2919

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

UNION PACIFIC RAILROAD COMPANY, *Petitioner*,

v.

SURFACE TRANSPORTATION BOARD and
UNITED STATES OF AMERICA, *Respondents*;

and

COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION
AUTHORITY, d/b/a METRA, *Intervenor for Respondents*.

ON PETITION FOR REVIEW OF AN ORDER OF
THE SURFACE TRANSPORTATION BOARD

## RESPONDENTS' JOINT BRIEF

ROBERT B. NICHOLSON
ROBERT J. WIGGERS
Attorneys
Antitrust Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC  20530

ANIKA S. COOPER
Chief Counsel

SCOTT M. ZIMMERMAN
Acting Deputy Chief Counsel

ADAM M. KRESS
Associate Counsel – Litigation

CAROLYN J. CHACHKIN
Attorney
Surface Transportation Board
395 E Street SW
Washington, DC  20423
(202) 919-6195

February 24, 2026

## SUMMARY OF THE CASE

This case is about Respondent Surface Transportation Board's efforts to prevent Petitioner Union Pacific from forcing Intervenor Metra, the local Chicago-area commuter railroad, to pay more than just compensation for the use of Union Pacific's rail lines under implicit threat of barring Metra (and its tens of thousands of daily commuters) from the lines entirely.

Metra sought a statutory remedy at the Board—one that Congress explicitly preserved to allow qualifying local government authorities to share freight railroads' critical rail infrastructure for public-transportation purposes. 49 U.S.C. § 11102(a); § 10501(c)(3)(B). The Board granted Metra's application to use Union Pacific's lines, in a thorough, fact-intensive decision amply supported by the record, statute, and precedent.

Respondents do not oppose oral argument of 20 minutes per side.

**TABLE OF CONTENTS**

SUMMARY OF THE CASE ............................................................... i

TABLE OF AUTHORITIES .......................................................... iv

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT ............................................... 5

STATEMENT OF THE ISSUES .................................................... 6

STATEMENT OF THE CASE ........................................................ 7

I.   Statutory Framework ............................................................. 7

II.  This Case ................................................................................ 11

    A.   The Parties' Dispute .................................................. 11

    B.   The Board Proceeding and *Decision* ..................... 12

SUMMARY OF THE ARGUMENT ............................................ 16

ARGUMENT .................................................................................. 21

I.   The Board Reasonably Found that Metra's Request for Terminal Trackage Rights Is "In the Public Interest" ........................... 22

    A.   Union Pacific's purported "statutory test" for assessing inadequate service in the passenger-rail context is forfeited and contravenes § 11102(a). ......................................... 23

    B.   The Board's assessment of the "public interest" was thorough and proper. .................................................... 32

II.  The Board Properly Found the Entirety of the Lines To Be "Terminal Facilities, Including Main-Line Tracks For a Reasonable Distance Outside of a Terminal" ...................... 35

    A.   Union Pacific's restrictive interpretation of "main-line tracks for a reasonable distance" is forfeited and flawed. ...................... 36

ii

  B. The Board rationally found that the endpoints of the Lines, as used by Metra, are a "reasonable distance" outside of the terminal under § 11102(a). ........................................................... 44

III. The Board Followed the Plain Statutory Language and Longstanding Precedent Regarding Conditions and Compensation ....................................................................... 47

  A. The Board properly deferred its resolution of disputed conditions and ensured that compensation was "adequately secured" before Metra's use. ......................................................... 47

  B. Union Pacific's reading of Section 11102(a)'s "conditions and compensation" language is contrary to the plain statutory text and longstanding precedent.................................................. 49

CONCLUSION ............................................................................. 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Dole,*
927 F.2d 771 (4th Cir. 1991)............................................6, 19, 39

*Bettor Racing, Inc. v. Nat'l Indian Gaming Comm'n,*
812 F.3d 648 (8th Cir. 2016) ....................................................21

*BNSF Ry. Co. v. STB,*
453 F.3d 473 (D.C. Cir. 2006) ..........................................25, 38

*City of Providence v. Barr,*
954 F.3d 23 (1st Cir. 2020)......................................................39

*Davis v. Mich. Dep't of Treasury,*
489 U.S. 803 (1989) ................................................................25

*Dep't of Homeland Sec. v. MacLean,*
574 U.S. 383 (2015) ................................................................53

*Grand Trunk Corp. v. STB,*
143 F.4th 741 (7th Cir. 2025)............................6, 10, 16, 22, 24-25, 30-32

*Knick vs. Township of Scott,*
588 U.S. 180 (2019)................................................................50

*Liu v. SEC,*
591 U.S. 71 (2020)..................................................................49

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ..........................................................22, 44

*Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of Interior,*
95 F.4th 573 (8th Cir. 2024)..............................................21-22

*McChesney v. Fed. Election Comm'n,*
900 F.3d 578 (8th Cir. 2018).....................................................5

*Michigan v. EPA,*
576 U.S. 743 (2015)................................................................22

*Mo., Kan. & Tex. R.R. Co. of Tex. v. Tex. & New Orleans*
    *R.R. Co.*, 172 F.2d 768 (5th Cir. 1949) .............................................7, 39-40

*New York v. Dep't of Justice,*
    951 F.3d 84 (2d Cir. 2020) ...................................................... 39

*Parker Drilling Mgmt. Servs., Ltd. v. Newton,*
    587 U.S. 601 (2019) ...................................................... 49

*Pulsifer v. United States,*
    601 U.S. 124 (2024) ...................................................... 28

*Republic of Sudan v. Harrison,*
    587 U.S. 1 (2019) ...................................................... 28

*S. Pac. Transp. Co. v. ICC,*
    736 F.2d 708 (D.C. Cir. 1984)................. 6, 8, 10, 16, 19-20, 42-43, 48, 51

*Fla. E. Coast Ry. Co. v. United States,*
    256 F. Supp. 986 (M.D. Fla. 1966) ....................................9, 51

*Sierra Club v. EPA,*
    252 F.3d 943 (8th Cir. 2001) ...................................................... 22

*Union Pac. R.R. Co. v. Reg'l Transp. Auth.*, No. 19-C7957,
    2021 WL 4318106 (N.D. Ill. Sept. 23, 2021) ............................. 11

*Union Pac. R.R. Co. v. Reg'l Transp. Auth.,*
    74 F.4th 884 (7th Cir. 2023)...................................................... 11

*United States v. L.A. Tucker Truck Lines, Inc.,*
    344 U.S. 33 (1952) ...................................................... 25

*Wis. Cent. Ltd. v. STB,*
    122 F.4th 1009 (7th Cir. 2024) .................................................. 44

*Zimmer Radio of Mid-Missouri, Inc. v. Fed. Commc'ns*
    *Comm'n*, 145 F.4th 828 (8th Cir. 2025)............................. 22, 32

# Agency Decisions[*]

*Chi. & Alton R.R. Co. v. Toledo, Peoria & W. Ry. Co.,*
146 I.C.C. 171 (1928) ........................................................... 43, 44

*Golden Cat Div. of Ralston Purina Co. v. St. Louis S.W. Ry. Co.,*
1996 WL 197602 (STB served Apr. 25, 1996) ...........................41

*Missouri-Kansas-Texas R.R. Co. v. Kan. City Term. Ry. Co.,*
104 I.C.C. 203 (1925) ........................................................ 41, 51

*Missouri-Kansas-Texas R.R. Co. v. Kan. City Term. Ry. Co.,*
198 I.C.C. 4 (1933) ..................................................................51

*Rio Grande Indus., Inc.—Purchase & Related Trackage Rts.—*
*Soo Line R.R.,* 1989 WL 246814
(ICC served Nov. 15, 1989) ................................... 6, 7-8, 19, 38, 40-42, 44

*Seaboard Air Line R.R. Co.—Use of Term. Facilities of*
*Fla. E. Coast Ry. Co.,* 327 I.C.C. 1 (1965) ....................... 9, 41, 51

*Spokane, Portland & Seattle Ry.—Control—Peninsula*
*Term. Co.,* 348 I.C.C. 109 (1975) ...................................8, 41, 43

*Union Pac. Corp.—Control—S. Pac. Rail Corp.,*
1 S.T.B. 233 (1996)................................................... 10, 42-43, 53

*Union Pac. Corp.—Control—Mo. Pac. Corp.,*
366 I.C.C. 459 (1982).............................................................. 44

# Statutes

5 U.S.C. § 706(2)......................................................................21

28 U.S.C. § 2321(a) ................................................................. 5

---

[*] Agency decisions are generally available on Lexis and Westlaw, and Board decisions after November 1, 1996, are also available at www.stb.gov.

28 U.S.C. § 2342 ........................................................................ 5

28 U.S.C. § 2344 ........................................................................ 5

49 U.S.C. § 10102(6)............................................................... 8, 40

49 U.S.C. § 10501 ................................................................ 7, 9, 29

49 U.S.C. § 10501(c)(2) ............................................................... 9

49 U.S.C. § 10501(c)(3)(B) ............................... i, 1, 5, 9, 25, 29-30

49 U.S.C. § 11102(a)............................................................*passim*

ICC Termination Act (ICCTA),
Pub. L. No. 104-88, 109 Stat. 803 (1995)...................... 7, 9, 29

Transportation Act of 1920,
Ch. 91, 41 Stat. 456 (1920) .................................... 8, 26, 40, 42

## Congressional Materials

H.R. Conf. Rep. 104-422 (1995),
*reprinted in* 1995 U.S.C.C.A.N. 850 .......................... 2, 6, 9, 10, 15, 29-30

Hearings on H.R. 4378 before the House Committee on
Interstate and Foreign Commerce, Vol. 2 (1919) ................... 43

## Other Authorities

CSX Railroad Dictionary, *available at*
https://www.csx.com/index.cfm/about-us/company-
overview/railroad-dictionary/?i=M ...................................... 40

**INTRODUCTION**

For over four decades, Metra has provided daily commuter-rail service to tens of thousands of Chicago-area workers and residents over three rail lines owned by Union Pacific (the Lines).  Until recently, Union Pacific operated the commuter trains on Metra's behalf under a contract.  But that contract expired, and (at Union Pacific's behest) a court determined that Union Pacific had no obligation to continue providing that service.  Despite years of negotiations, Metra and Union Pacific have been unable to reach a new agreement for Metra to operate its trains over the Lines itself.

Left without Union Pacific's provision of either service or secure contractual access, Metra requested that the Board grant it the right to use the Lines under 49 U.S.C. § 11102(a).  That provision authorizes the Board to allow one carrier, including a qualifying commuter-rail carrier, to use another carrier's "terminal facilities, including main-line tracks for a reasonable distance outside of a terminal," after finding that the use is in the public interest and practicable, without substantially impairing the owning carrier's operations.  Indeed, in 1995, Congress expressly preserved the Board's authority to grant this remedy to certain local transportation authorities (49 U.S.C. § 10501(c)(3)(B)) and stated its intent that such

entities' requests "would virtually always satisfy the public interest standard" (H.R. Conf. Rep. 104-422, at 184 (1995)).

It is common ground that the Chicago Freight Terminal, located in and around downtown Chicago, is a terminal. In an extensive decision (*Decision*), the Board granted Metra's request to use the facilities within that terminal, as well as Union Pacific's main-line track outside of it, so that Metra could reach the suburban passenger stations located on the Lines. The Board found that granting the trackage rights was in the public interest, noting the importance of this long-established and relied-upon commuter-rail service and the fact that no other rail carrier, including Union Pacific, has an obligation to provide this service. It also found that trackage rights would be practicable and would not impair Union Pacific's own operations; indeed, Union Pacific has never argued otherwise. The Board's findings—made pursuant to statutory language that confers discretion and implicates the agency's unique, century-long experience and expertise—are amply supported by the record and relevant precedent and well within its statutory authority.

On appeal, Union Pacific advances three arguments, which either ignore or distort the text of § 11102(a). Union Pacific contends that for a passenger-rail operator to show that trackage rights are in the public

interest, it must prove that the conditions and compensation for access presently on offer by the owning carrier are "commercially unreasonable." But the statute speaks directly to the sequencing of the grant inquiry and the establishment of conditions and compensation. It provides that, *after the Board grants trackage rights*, the rail carriers negotiate for those terms among themselves. And it authorizes the Board to establish those terms, with compensation being set in accordance with condemnation principles, if the rail carriers cannot agree. Union Pacific makes no effort to reconcile its interpretation (basing a trackage-rights grant on a finding that one party's conditions and compensation are "commercially unreasonable") with the plain text and sequence of the statute.

Union Pacific also argues that the Board may only grant trackage rights over "main-line track" that itself "qualifies" as "terminal facilities" (as that term is commonly understood). This interpretation would not only undermine Congressional intent by rendering § 11102(a) a nullity to commuter operators like Metra that provide service between a city and its suburbs, but it also ignores that, in common industry usage for over a century, "terminal facilities" and "main-line track" have fundamentally different purposes and meanings. Thus, the best reading of § 11102(a) is

that it authorizes the Board to grant trackage rights over terminal facilities **and** main-line track within a reasonable distance of those facilities.

Finally, Union Pacific contends that payment and contested conditions must be established by the Board before trackage rights commence. But § 11102 expressly provides that only *compensation* (and not conditions) "shall be paid *or adequately secured*" before any granted rights may be used. And longstanding judicial and agency precedent holds that compensation is adequately secured when the Board pledges to set it and require that it be paid with retroactive effect. Moreover, the Board further assured that compensation is adequately secured here by finding that Metra is financially responsible and capable of paying and by admonishing Metra to continue paying (which it has).

Overall, Union Pacific's atextual statutory-interpretation arguments—many of which were never raised before the agency—in no way undermine a reasonable and thorough Board decision falling squarely within the agency's discretion and authority. The Court should deny the petition for review.

## JURISDICTIONAL STATEMENT

The Board has authority to grant terminal trackage rights under 49 U.S.C. § 11102(a) to local government authorities meeting certain jurisdictional requirements, *see* 49 U.S.C. § 10501(c)(3)(B), which, the Board found, Metra satisfied here.  Add. 4-11; App. 663-70.  Union Pacific acknowledges, and does not contest, the Board's assertion of jurisdiction (Br. 6, 14), thus forfeiting any objection.  *See McChesney v. Fed. Election Comm'n*, 900 F.3d 578, 587 n.3 (8th Cir. 2018).

Under the Hobbs Act, this Court has jurisdiction to review all final orders of the Board for which a petition for review is filed within 60 days.  28 U.S.C. §§ 2321(a), 2342 & 2344.  The *Decision* issued on September 3, 2025.  Union Pacific, which is headquartered in Nebraska, timely sought review in this Court on September 29, 2025.

## STATEMENT OF THE ISSUES

I.  Whether the Board reasonably found that Metra's requested terminal trackage rights are "in the public interest" under § 11102(a).

- 49 U.S.C. § 11102(a)

- H.R. Conf. Rep. 104-422, at 167, 184 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 850, at 852, 869

- *Grand Trunk Corp. v. STB*, 143 F.4th 741 (7th Cir. 2025)

II.  Whether the Board properly found that the entirety of the Lines, as used by Metra, constitute "terminal facilities, including main-line tracks for a reasonable distance outside of a terminal" under § 11102(a).

- 49 U.S.C. § 11102(a)

- *Adams v. Dole*, 927 F.2d 771, 777 (4th Cir. 1991)

- *S. Pac. Transp. Co. v. ICC*, 736 F.2d 708 (D.C. Cir. 1984)

- *Rio Grande Indus., Inc.—Purchase & Related Trackage Rts.—Soo Line R.R.*, 1989 WL 246814 (ICC served Nov. 15, 1989)

III.  Whether the Board's decision to defer establishment of the conditions of use and compensation accorded with § 11102(a) and longstanding precedent.

- 49 U.S.C. § 11102(a)

- *S. Pac. Transp. Co. v. ICC*, 736 F.2d 708 (D.C. Cir. 1984)

# STATEMENT OF THE CASE

## I.    Statutory Framework

The Board, like its predecessor the Interstate Commerce Commission (ICC),[1] has exclusive jurisdiction over the use of "trackage rights" on the interstate rail network.  *See* 49 U.S.C. §§ 10501; 11102(a), 11323(a)(6), 11324(c).  Trackage rights are arrangements whereby one railroad operates over another railroad's track for a fee.  Although most trackage rights stem from voluntary agreements between carriers, the Board may grant a rail carrier trackage rights to use another carrier's "terminal facilities, including main-line tracks for a reasonable distance outside of a terminal," over the owning carrier's objection.  49 U.S.C. § 11102(a).

In industry parlance, a rail carrier's "main line" is its "road."  The main line is commonly described "in contrast to" a carrier's "terminal facilities," which refer to property such as the "freight or classification yards or team tracks" that the rail carrier uses for the assembly and disassembly of trains.  *See Mo., Kan. & Tex. R.R. Co. of Tex. v. Tex. & New Orleans R.R. Co.*, 172 F.2d 768, 769 (5th Cir. 1949); *Rio Grande Indus., Inc.—Purchase & Related Trackage Rts.—Soo Line R.R.* (*RGI/Soo*), 1989 WL 246814, at *10

---

[1]  In the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (ICCTA), Congress abolished the ICC and transferred its remaining rail regulatory functions to the Board.

(ICC served Nov. 15, 1989); *also compare* 49 U.S.C. § 10102(6)(b) *with* § 10102(6)(c).  And a "terminal" or "terminal area"—"as opposed to main-line track"—is the "cohesive commercial area immediately served by [terminal] facilities."  *RGI/Soo*, 1989 WL 246814, at *10.

The language of § 11102 has remained essentially unchanged since its predecessor was added to the Interstate Commerce Act in 1920.[2]  Its main purpose is to avoid "unnecessarily duplicated" lines—particularly in congested urban areas, where many terminals are located—by facilitating the less wasteful joint use of existing infrastructure.  *See S. Pac. Transp. Co. v. ICC*, 736 F.2d 708, 723 (D.C. Cir. 1984) (per curiam); *Spokane, Portland & Seattle Ry.—Control—Peninsula Term. Co.*, 348 I.C.C. 109, 142-43 (1975) (citing 1919 legislative history)).

When the terminal-trackage-rights provision was enacted in 1920, the agency's authority encompassed, and most railroads provided, both freight and passenger rail transportation.  *See, e.g.*, 41 Stat. at 474.  But even as Congress allowed rail carriers to discontinue their less-profitable passenger-rail obligations, it retained the agency's authority to grant terminal trackage rights to ensure the sharing of infrastructure for

---

[2] *See* Transp. Act of 1920, Ch. 91, 41 Stat. 456, 479-80 (1920).

passenger-rail purposes. In 1995, Congress in ICCTA amended § 10501 specifically to preserve the Board's authority to award trackage rights under § 11102(a) to local governmental entities (like Metra) that provide public transportation, despite otherwise ending the Board's jurisdiction over such services. *See* 49 U.S.C. § 10501(c)(3)(B) ("The Board has jurisdiction under section[] 11102 . . . over transportation provided by a local governmental authority" if it is found to meet certain pre-ICCTA jurisdictional requirements.); 49 U.S.C. § 10501(c)(2); *see also* H.R. Conf. Rep. 104-422, at 167, 184, *as reprinted in* 1995 U.S.C.C.A.N. 850, at 852, 869.

To award trackage rights under § 11102(a), the Board must find that the requested use is "practicable," is "in the public interest," and will not substantially "impair" the owning rail carrier's ability to handle its own business. 49 U.S.C. § 11102(a). The agency makes the public interest finding based on the facts of each case, taking into account all affected interests, including those of the involved parties, other carriers, shippers, and the general public. *See Seaboard Air Line R.R. Co.—Use of Term. Facilities of Fla. E. Coast Ry. Co.*, 327 I.C.C. 1, 8 (1965), *aff'd Fla. E. Coast Ry. Co. v. United States*, 256 F. Supp. 986, 989-90 (M.D. Fla. 1966). Where the rail carrier seeking trackage rights is a competing freight carrier, the "public interest" component has been interpreted to require a showing

that the service of the carrier owning the track (*i.e.*, the incumbent) was inadequate.  *See Grand Trunk Corp. v. STB*, 143 F.4th 741, 749-51 (7th Cir. 2025).  Regardless of what standard applies in the passenger-rail context, Congress intended that "a local transportation authority's request would virtually always satisfy the public interest standard."  H.R. Conf. Rep. No. 104-422, at 184.

If the Board grants terminal trackage rights under § 11102(a), the statute leaves it to the rail carriers in the first instance to establish the conditions and compensation for use of the facilities.  49 U.S.C. § 11102(a).  But, "if the rail carriers cannot agree," Congress authorized the Board to establish to those terms, with compensation to be set "under the principle controlling compensation in condemnation proceedings."  *Id.*  Any such compensation must be paid or "adequately secured" before a rail carrier begins to use the facilities.  *Id.*  It has long been held that compensation may be adequately secured by the agency's pledge to set appropriate compensation under condemnation principles if the carriers cannot agree.  *See S. Pac. Transp. Co.*, 736 F.2d at 723-24; *see also Union Pac. Corp.—Control—S. Pac. Rail Corp.*, 1 S.T.B. 233, 449 n.215 (1996).

## II.   This Case

### A.   The Parties' Dispute

Metra, the country's largest regional passenger rail system by size and fourth largest by ridership, serves the greater Chicago area in northeastern Illinois and southeastern Wisconsin.  App. 13.  Its system has 243 stations over 11 lines, which radiate outward from downtown Chicago to serve over 100 communities.  *Id.*; App. 101-03.  The Lines at issue here, which have been used for passenger service since their inception over 170 years ago, account for about 39 percent of Metra's total yearly ridership (approximately 13 million passenger trips per year).  App. 13-15; App. 101-03; App. 268.

For over four decades, Union Pacific (and its predecessor) operated passenger trains for Metra (and its predecessor), using Metra-supplied cars, under a "Purchase of Services Agreement" (PSA).  App. 10.  Dissatisfied with this arrangement, Union Pacific sued Metra in 2019 and obtained a ruling that Union Pacific has no duty to continue providing this service.  *See Union Pac. R.R. Co. v. Reg'l Transp. Auth.*, No. 19-C7957, 2021 WL 4318106 (N.D. Ill. Sept. 23, 2021), *aff'd*, 74 F.4th 884 (7th Cir. 2023).

Since that time, under a series of short-term PSA extensions, the parties have attempted to negotiate successor arrangements for Metra to operate its own passenger trains over the Lines.  App. 10; App. 17-18.

## B.     The Board Proceeding and *Decision*

After an impasse in those negotiations, Metra applied to the Board for terminal trackage rights on March 7, 2025.  App. 18.  Union Pacific opposed.  App. 45; App. 324.

The latest PSA extension expired on June 30, 2025.[3]  Rather than agreeing to another extension, however, Union Pacific presented Metra with a unilateral document termed "Condition of Entry" (COE) purporting to govern Metra's use of the Lines beginning July 1, 2025.  *See* App. 269; App. 290-304.  Metra objected to the COE on multiple grounds, including the more than 100% increase in fees despite Union Pacific no longer providing service, and informed Union Pacific that it will continue operating on the Lines while refusing to consent to the COE's terms.  App. 269; *see also* Add. 3; App. 662.  Since then, Metra has operated its own commuter trains on the Lines, while continuing to pay Union Pacific under the terms of the PSA that governed when Union Pacific conducted those

---

[3]  Metra assumed sole responsibility for operating commuter-rail service on the Lines in May 2025.  *See* App. 52; App. 106; App. 319.

operations.  *See* Metra Mot. to Hold in Abeyance, *Union Pacific v. STB*, No. 25-2919, Doc. #5585380, at 11 (filed Dec. 5, 2025).

On September 3, 2025, the Board issued its *Decision* granting Metra's application for terminal trackage rights.  Add. 1, Add. 4-30; App. 660, App. 663-89.  Because both parties acknowledged that the Chicago Freight Terminal (CFT) qualifies as a "terminal" under § 11102(a), and that at least the portions of the Lines located within the CFT qualify as "terminal facilities" under § 11102(a), the Board construed the terminal area as the CFT.  Add. 14-16; App. 673-75 (citing App. 337).  The Board then found that the portions of the Lines located outside the CFT (ranging between 29 and 48 miles long) constitute main-line tracks within "a reasonable distance" of the terminal under § 11102(a).  Add. 16-21; App. 675-80.

In its reasonable-distance determination, the Board emphasized that the utility of Metra's commuter-rail system would be "severely diminished" without the trackage rights extending to cover all Metra stations on the Lines.  It also found that Metra's use is "defined" and decades-old (not "new and untested"), that the Lines are all centrally monitored and coordinated with freight operations, and that the Lines are either lightly used for freight or have been upgraded, in part through Metra's substantial investments, to efficiently accommodate both commuter and freight traffic.  Add. 17-20,

Add. 27; App. 676-79, App. 686.  In addition, the Board extensively assessed and rejected Union Pacific's narrower interpretations of the "terminal facilities," which would have cut off the use of most of Metra's system and "would render a grant of access [to the terminal] . . . nearly meaningless for Metra's purposes."  Add. 17-21 & n.39; App. 676-80 & n.39.

The Board also found that Metra's trackage-rights use of the Lines is "in the public interest" under § 11102(a).  Add. 22-30; App. 681-89. Specifically, the agency found "a compelling reason to award Metra terminal trackage rights[,]" because Metra "provides a vital public service," relied on by many commuters and communities, and "even a temporary cessation of service would have wide-ranging and harmful economic and social impacts."  Add. 27; App. 686.

Although the Board questioned whether inadequate service must be found under § 11102(a) in the commuter-rail context (*see* Add. 27-28 n.58, Add. 30; App. 686-87 n.58, App. 689), it nevertheless found that Metra had made that showing.  The Board explained that because Union Pacific neither provides nor is obligated to provide Metra's "critically important service," *there is no service from Union Pacific*—adequate or otherwise. Add. 29; App. 688.  Compounding this service insecurity, Union Pacific took the position that it had no legal obligation to allow Metra's continued

access to the Lines after expiration of the PSA and unilaterally imposed the COE, under which Union Pacific dictates the price and terms of Metra's future access and can remove Metra for non-compliance. Add. 28-29; App. 687-88. The Board thus concluded that granting Metra terminal trackage rights was warranted to ensure continued, adequate service to Chicago-area commuters. The Board also observed that it is "most consistent with Congress's clearly expressed intent that 'a local transportation authority's request would virtually always satisfy the public interest standard[.]'" Add. 30; App. 689 (quoting H.R. Conf. Rep. No. 104-422, at 184).

Per § 11102(a), Board also found that granting Metra trackage rights over the Lines would be practicable and would not substantially impair Union Pacific's ability to handle its own business. Add. 21-22; App. 680-81. Union Pacific did not (and still does not) argue otherwise. *Id.*

When the *Decision* granted Metra's application under § 11102(a), it did not establish the terms or compensation for Metra's use of the line. Rather, pursuant to the statute, the Board required the parties "to undertake a concerted, good faith effort to reach agreement[.]" Add. 33; App. 692 (citing 49 U.S.C. § 11102(a)). The Board also pledged to "set appropriate [compensation] terms under condemnation principles with

retroactive effect" if the parties cannot agree. Add. 31; App. 690 (citing *S. Pac. Transp.*, 736 F.2d at 723); *see also* Add. 33; App. 692.

Union Pacific timely petitioned for this Court's review. While this appeal has been pending, Union Pacific requested, and the Board promptly imposed (with a short delay caused by a federal government shutdown), interim liability and indemnity terms. App. 721-24; App. 729-32.

## SUMMARY OF THE ARGUMENT

Unable to undermine the Board's sound and well-supported analysis using the record and agency precedent, Union Pacific instead advances a series of tenuous new interpretations of § 11102(a). None holds water.

I.     The Board properly found Metra's trackage rights request to be in the public interest, in light of all the facts and even after applying the inadequate-service standard articulated in *Grand Trunk*. Union Pacific apparently recognizes that, under *Grand Trunk* and the cases cited therein, its "service" is nonexistent. Indeed it fought (and won) a four-year legal battle against Metra to establish its right never again to provide passenger-rail service on the Lines. Therefore, Union Pacific attempts to invent a new, passenger-rail-specific "statutory test" for inadequate service never presented to the agency. It now claims that the Board, instead of needing to find the incumbent's *service* inadequate, must find the incumbent's

*conditions of access* (essentially, the compensation) to be "commercially unreasonable." Br. 29-36. This reading of the statute is untenable, lacking any support in the statutory text, legislative history, or precedent.

Indeed, it would turn § 11102(a) on its head, undermining both the process and purpose that Congress intended. Union Pacific's interpretation would require the Board to analyze "conditions and compensation" (of only one party) when assessing whether to grant trackage rights, rather than following the text's procedure of first finding the grant criteria met and then giving both parties an opportunity to establish such terms themselves. It would deprive an applicant that would otherwise qualify for terminal trackage rights of its statutory right to have the Board set compensation under the standard established by Congress ("condemnation" principles), by requiring the Board to defer to the incumbent's offered payment terms under a "commercially reasonable" standard nowhere found in the statute. It would also establish a different statutory rule for passenger-rail applicants than for freight-rail applicants, unsupported by any statutory language or precedent. And it would undermine Congress's clearly stated intent that local transportation authorities can seek "access to or use of railroad facilities and infrastructure" and will "virtually always satisfy" the public interest when they do so.

Other than misreading the statute, Union Pacific offers nothing to overturn the Board's determination that granting Metra trackage rights was in the public interest. As the Board found, those rights secure a critical transportation service that thousands of people depend on to commute to and from Chicago and its suburbs every day, over Lines that Metra has spent over $1 billion to improve. Add. 27-30; App. 686-89. It was well within the Board's discretion to set terminal trackage rights under these circumstances, where the statute's jurisdictional requirements had been met and where Union Pacific did not allege impracticability or any impairment to its own operations.

II. The Board also properly found that the Lines, in their entirety, are "terminal facilities, including main-line tracks for a reasonable distance outside of a terminal" under Section 11102(a). Before the agency, Union Pacific argued that "very little" of the Lines qualify "as 'terminal facilities' *or* 'main-line tracks for a reasonable distance outside of a terminal.'" App. 321 (emphasis added). It conceded only that the portions of the Lines within the Chicago Freight Terminal are eligible for access. App. 337. Now that the Board has rationally found, based on the specific facts and circumstances, that the portions of the Lines that lie outside CFT constitute main-line tracks within a reasonable distance of the CFT, Union Pacific

urges a new statutory interpretation not advanced before the Board: that the "main-line tracks" subject to a Section-11102(a) grant must independently "constitute" or "qualify" as "terminal facilities" themselves. But that new interpretation is not properly before the Court because Union Pacific did not present it to the Board. Moreover, it is inconsistent with those terms' common meaning, the statute's text and history, and longstanding agency precedent—including the cases cited by Union Pacific.

As long recognized by the industry, Congress, and the agency, "main-line tracks" and "terminal facilities" have diametrically opposite meanings and purposes. A rail carrier's main line is its road, as "opposed to" terminal facilities, which are the yards and associated tracks the rail carrier uses to build and break-down trains and to collect and deliver freight or passengers. *RGI/Soo*, 1989 WL 246814, at \*10. Because of this inconsistency in the common meaning of these words, the "including" phrase defines and expands the scope of the statute's remedy; it does not (and cannot) merely provide examples. *See, e.g.*, *Adams v. Dole*, 927 F.2d 771, 777 (4th Cir. 1991). Moreover, established precedent directly contradicts Union Pacific's claim that, to qualify under § 11102(a), main-line track must itself "assist in" or be "part of" "the functions of a terminal." *See, e.g.*, *S. Pac. Transp. Co.*, 736 F.2d at 723 (approving agency's

construction that "did not require . . . that [track] segments be used for terminal purposes"). Accordingly, the phrase "a reasonable distance outside of a terminal" cannot be read to mean "just outside the terminal" (whatever that may mean), as Union Pacific contends (Br. 41-42).

Under the proper statutory analysis, the Board's "reasonable distance" findings are rational, well supported, and consistent with the statute's text and history, as well as Congress's intent. The agency detailed many record facts—none of which Union Pacific refutes—that support the reasonableness of including the entirety of the Lines within a grant of access to Metra, rather than arbitrarily truncating the segments on which Metra and the Chicago public have long relied for terminal access and use. Particularly in light of the Board's statutory discretion to extend trackage rights a "reasonable distance outside of a terminal," the agency plainly acted within its authority under the APA.

III. Finally, the Board abided by the plain statutory text and established agency precedent in deferring its setting of disputed conditions of use and compensation. As instructed by § 11102(a)'s second sentence, the Board made "the rail carriers [] responsible" in the first instance for establishing such conditions. As contemplated in § 11102(a)'s third sentence, the Board pledged that, "if the rail carriers cannot agree," it will

exercise its discretion to "establish conditions and compensation for use . . . under the principle controlling compensation in condemnation proceedings." And in accordance with § 11102(a)'s fourth sentence, the Board ensured that compensation to Union Pacific is "adequately secured"—not only by pledging to set compensation later if necessary, with retroactive reimbursement to Union Pacific for any shortfall, but also by finding that Metra is able to pay and is expected to continue paying Union Pacific until final compensation is set by the Board or parties.

Union Pacific's only response—that § 11102(a) should be read to compel immediate compensation and establishment of "at least some" conditions of use—requires mangling and misreading the clear statutory text and precedent. It is Union Pacific's approach, not the Board's, that is contrary to the statute and Fifth Amendment takings precedent.

## ARGUMENT

Under the Administrative Procedure Act, reviewing courts set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Bettor Racing, Inc. v. Nat'l Indian Gaming Comm'n*, 812 F.3d 648, 651 (8th Cir. 2016) (citing 5 U.S.C. § 706(2)(A)). This standard of review is "limited" and gives agency decisions "a high degree of deference." *Mandan, Hidatsa & Arikara Nation v. U.S.*

*Dep't of Interior*, 95 F.4th 573, 579-80 (8th Cir. 2024) (quoting *Sierra Club v. EPA*, 252 F.3d 943, 947 (8th Cir. 2001)).  While courts "must exercise independent judgment in determining the meaning of statutory provisions[,]" when statutes use terms like "reasonable," it "leaves agencies with flexibility" and "a degree of discretion."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95 (2024) (quoting *Michigan* v. *EPA*, 576 U.S. 743, 752 (2015)); *see also Zimmer Radio of Mid-Missouri, Inc. v. Fed. Commc'ns Comm'n*, 145 F.4th 828, 844 (8th Cir. 2025) (recognizing, post-*Loper Bright*, that a "'public[-]interest' standard . . . provides significant discretion to [an agency]").  The court's role then is to ensure that the agency has acted within "the boundaries of the delegated authority."  *Id.*

## I.   The Board Reasonably Found that Metra's Request for Terminal Trackage Rights Is "In the Public Interest"

On appeal, Union Pacific's only "public interest" argument is that the Board erroneously granted terminal trackage rights "without a showing of inadequate service."  Br. 24.  But as Union Pacific itself recognizes (Br. 31-35), the Board plainly *did* find that Metra established inadequate service under the standard articulated in *Grand Trunk*—*i.e.*, that the incumbent carrier's rail service to the public is inadequate—because the incumbent in this case (Union Pacific) does not provide, and has no obligation to provide, rail service to Metra passengers.  Add. 27-30 & n.58; App. 686-89 & n.58

(emphasizing that "[Union Pacific] has no obligation to provide passenger rail service to the thousands of people who rely every day on Metra's service . . . it secured a declaration from a federal court confirming as much").

Faced with the fact that any "inadequate service by the incumbent" requirement does nothing for Union Pacific since it provides *no* passenger service (inadequate or otherwise), Union Pacific's entire position on appeal (Br. 24-36) boils down to a new argument that in the passenger-rail context there is a special "statutory test" for inadequate service. Br. 29-30, 32. Union Pacific's claim is both forfeited and untenable, lacking any support in the statute, legislative history, or precedent. The Board's comprehensive and fact-specific public interest determination applied the correct standard and is entitled to deference.

**A.      Union Pacific's purported "statutory test" for assessing inadequate service in the passenger-rail context is forfeited and contravenes § 11102(a).**

Under Union Pacific's new "statutory test," a passenger-rail carrier applying for terminal trackage rights must demonstrate that an incumbent carrier's proposed terms of access are "commercially unreasonable," as a predicate to showing inadequate service, and thus as a predicate to showing that the rights are "in the public interest." Br. 29-30, 32-34. But a "commercially unreasonable" standard appears nowhere in the Interstate

Commerce Act, let alone in § 11102(a), which contains a different, "condemnation" standard that Union Pacific is transparently trying to evade here.

1.     Union Pacific's strained new reading was never presented to the Board.  Before the agency, Union Pacific's entire "inadequate service" argument consisted of five sentences in a supplemental-authority letter filed after issuance of *Grand Trunk*, in which it claimed simply that inadequate service could not be shown because Union Pacific was (presently) willing to allow Metra to continue using the Lines pursuant to the COE.  App. 625.  Contrary to its suggestions here (Br. 29-34, 36), Union Pacific never claimed that the *statute* requires the Board, as a predicate to a grant of rights, to find "commercially unreasonable" the "actual terms" and compensation that Union Pacific is presently "willing" to offer Metra for access to the Lines.  To the contrary, Union Pacific argued repeatedly that Board "involvement" regarding the parties' "dispute about money" is "inappropriate" and that questions about the COE are best addressed by the courts.  *See* App. 321; App. 350; App. 625 n.1.  And to the extent Union Pacific submitted any "evidence" of the "commercial reasonableness" of the compensation it seeks (Br. 33), it was only to argue that Union Pacific is not engaging in anticompetitive conduct, as part of a distinct claim that Union

Pacific has abandoned on appeal. App. 345-47. Union Pacific has accordingly forfeited its new statutory interpretation. *See BNSF Ry. Co. v. STB*, 453 F.3d 473, 479 (D.C. Cir. 2006) ("A reviewing court generally will not consider an argument that was not raised before the agency 'at the time appropriate under its practice.'") (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)).

2. Even if considered, Union Pacific's argument is plainly wrong because it is inconsistent with the statute's text. When read "in [its] context" and "together" with other sentences in the provision, *see Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989), the "public interest" criterion of § 11102(a) cannot possibly require the Board to find "commercially unreasonable terms of access"—when considering the adequacy of the incumbent's service or otherwise.[4] *Contra* Br. 29-30. Section 11102(a) describes separate and sequential processes: The first

_____

[4] As the Board explained, it is questionable whether the statute even requires an "inadequate service" showing by a local commuter-rail applicant under § 11102(a), because *Grand Trunk*'s holding was based on freight-rail precedent and legislative history from the 1980s and earlier, and the Seventh Circuit "did not consider or have need to consider, Congress's subsequent enactment of § 10501(c)(3)(B) and its impact on the public interest standard under § 11102(a) for qualifying local governmental authorities." Add. 27-28 n.58; Add. 30; App. 686-87 n.58; App. 689 (quoting *Grand Trunk*, 143 F.4th 741 (7th Cir. 2025)).

sentence of § 11102(a) delineates the criteria for determining *whether* to grant trackage-rights use. The second and third sentences govern the setting of the *terms* of such use, *if* granted. Specifically, Congress provided that the "rail carriers are responsible" for establishing terms and compensation in the first instance, and authorized the Board to set terms, including payment "under the principle controlling compensation in condemnation proceedings[,]" "if the rail carriers cannot agree." 49 U.S.C. § 11102(a). Thus, *after* the Board decides to grant the rights, the tenant and incumbent carriers *jointly* negotiate the terms to govern those rights, knowing that the Board's authority to set compensation under "condemnation" (takings) principles provides a backstop in case of an impasse.[5]

Union Pacific's argument is entirely atextual (Br. 28-30): it makes no effort to engage with the structure of § 11102(a) or explain how the statute supports its new "test." Union Pacific's reading smuggles a "conditions and compensation" assessment (from § 11102(a)'s second and third sentences)

---

[5] This procedure has been a hallmark of the statutory language since its inception in 1920. *See* Transp. Act of 1920, 41 Stat. at 479-80 (describing, first, the necessary findings for a grant of use, and second, the ICC's authority to "fix" "terms" and "compensation" on condemnation principles "in the event of a failure [of the carriers] to agree").

into the grant determination (of § 11102(a)'s first sentence), rather than

treating them as separate, sequential inquiries, as in the text.  This would

have the effect of imposing a new burden (apparently on passenger-carrier

applicants only, Br. 29) at the grant inquiry.  It also requires the Board's

immediate review of the incumbent carrier's proposed "conditions and

compensation," which would short-circuit the "responsibility" of the "rail

carriers" (plural) to establish such terms and would ignore the conditional

language permitting Board involvement only "if the rail carriers cannot

agree."  49 U.S.C. § 11102(a).  Finally, as Union Pacific notably is *not*

arguing that "commercially reasonable" is synonymous with "established

under condemnation principles,"[6] its interpretation would effectively read

out of the statute the clause authorizing the Board to set compensation in

---

[6]  Before the agency, Union Pacific's filings differentiated the compensation
it seeks under the COE (which it called an "access fee") from compensation
set under "condemnation principles" (which is typically calculated using the
agency's longstanding *SSW* Methodology, *see* Add. 11 n.21; App. 670 n.21).
*See, e.g.*, App. 371, 374 (Union Pacific's expert, before discussing the access
fee, clarifying: "I have not been asked to provide an opinion on the
appropriate compensation under condemnation principles at this time.");
App. 606 (contrasting the capacity-focused methodology underlying its
"access fee" with the Board's "*SSW* Framework," which "Union Pacific has
never agreed . . . should be used"); *see also* App. 351; App. 589; App. 596.
And in stating the grounds for its fee's "commercial reasonableness," Union
Pacific does not describe any direct nexus to "condemnation principles" or
the Board's *SSW* Methodology.  *See, e.g.*, App. 345-46; App. 374-76.

accordance with condemnation principles. *Contra Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (rejecting a reading that "would negate one of . . . [the] provisions in the very paragraph" being interpreted); *Republic of Sudan v. Harrison*, 587 U.S. 1, 12 (2019) (noting that courts "are hesitant to adopt an interpretation . . . which renders superfluous another portion of that same law.") (internal quotation omitted)).

Thus, under Union Pacific's reading, a passenger carrier would lose its statutory right to have the Board set terms and compensation in accordance with condemnation principles, as part of a post-grant process, if it fails to prove that the incumbent carrier's proffered terms of access are not "commercially reasonable"—a term nowhere used, let alone defined, in the Board's governing statute.  Indeed, Union Pacific does not even explain to the Court what it means by "commercial reasonableness," or the extent to which that standard approximates the compensation Metra would pay were it not a captive passenger-rail provider with no legal right to access the infrastructure on which it has long depended.[7]

---

[7] Union Pacific is also unclear what "actual terms" it expected the Board to assess (Br. 33), given that no long-term conditions for ongoing use were before the Board.  Rather, the only evidence of terms was: (1) a set of "interim" terms submitted by Union Pacific; (2) the COE, which Union Pacific calls a "temporary" or "stop-gap" measure; and (3) witness

3.    Union Pacific's "commercially unreasonable access terms" test likewise finds no support in the relevant legislative history.  When ICCTA authorized the Board to grant terminal trackage rights to local commuter-rail operators, the House Conference Report made clear its "intent that, subject to the foregoing limitations . . . , a local transportation authority's request would virtually always satisfy the public interest standard."  H.R. Conf. Rep. No. 104-422, at 184.

Union Pacific argues that the phrase "subject to the foregoing limitations" must refer to and incorporate "the existing public interest standard" in the Conference Report's preceding sentence.  Br. 8-10, 26-27, 35.  But this would render the quoted sentence meaningless, effectively reading it to say: Local transportation authorities virtually always satisfy the public interest standard when they satisfy the public interest standard.

The only reasonable reading of the Conference Report is that "subject to the foregoing limitations" refers to "satisfying the jurisdictional requirements of section 10501," which are referenced in the prior sentence and were the subject of another, related ICCTA statutory amendment.  *See* H.R. Conf. Rep. No. 104-422, at 167 (referencing new § 10501(c)(3)(B)).

---

submissions regarding the access fee offered in these two "temporary" documents.  *See* Br. 32-33; App. 609; *also compare* App. 284 & App. 293; *with* App. 370 & App. 380.

This interpretation achieves Congress's intent to preserve a Section-11102(a) remedy for local government authorities (*id.* at 167, 184), while reasonably limiting the "virtually always satisfy" language to only those entities that qualify under Congress's jurisdictional requirements in § 10501(c)(3)(B).[8]

4.      Finally, Union Pacific's new "statutory test"—which it would apply only to passenger-carrier applicants under § 11102(a)—has no basis in agency precedent, as Union Pacific readily concedes.  Br. 29.  Where a proposed tenant is a freight railroad, any "inadequate service" inquiry has always focused on the service that the *incumbent* freight railroad provides to shippers (*i.e.*, the end-users of rail service).  Br. 28-29; *see also Grand Trunk Corp.*, 143 F.4th at 749-50 (collecting cases).

Union Pacific's apparent rationale for its new passenger-rail-specific test is that "the service the [incumbent] railroad provides in this [passenger-rail] scenario is access to its lines, so adequate access is adequate service."  Br. 30.  This rationale is factually incorrect, as some

---

[8]  The need to satisfy the jurisdictional requirements of § 10501(c)(3)(B) (based on the ICC's already limited jurisdiction over passenger-rail service in 1995), along with § 11102(a)'s practicability and impairment criteria, drastically undercuts Union Pacific's claim that "seemingly . . . any existing *or aspiring* commuter railroad" could "force its way onto a freight railroad's lines" under the Board's *Decision* here.  *Contra* Br. 36-38.

incumbent carriers do provide passenger-rail service, in addition to access, *see, e.g.*, App. 205. But, more importantly, it elides the key problem the Board highlighted: that, in the passenger-rail context (unlike in the freight-rail context), the incumbent carrier has *no common-carrier obligation* to provide passenger-rail service, so there is no back-up or alternative if the incumbent decides (like Union Pacific here) to terminate that service. Add. 29; App. 688.[9] Tellingly, despite its heavy reliance on *Grand Trunk*, (*e.g.*, Br. 8-9, 25-28), Union Pacific urges an inadequate-service "test" that is very different from the one applied in every ICC case relied on by *Grand Trunk*. *Cf.* 143 F.4th at 749-50 (assessing the incumbent's service to the relevant "public"). That is because, under that inquiry, Union Pacific knows that its service is nonexistent.

Thus, even if the statute's public-interest inquiry requires a showing of inadequate service in the commuter-rail context, which Respondents do

---

[9] Thus, contrary to Union Pacific's claim (Br. 30), the Board did not "accept" Union Pacific's asserted service/access equivalency when it stated that this dispute "is about access[,]" as opposed to just money. *Id.* (quoting Add. 28; App. 687). As the Board explained, "access" is relevant here because Union Pacific had insisted *both* that it has *no legal obligation to provide rail service* to Chicago-area commuters *and* that it could deny Metra access. Add. 28-30; App. 687-89. In other words, the insecurity of Metra's access *compounded*—but was *not* the principal basis for—the inadequacy of Union Pacific's service.

not concede here, the best reading is that service inadequacy turns on the *service* that the *incumbent carrier* provides to the end-users, regardless of the tenant's identity.  That is the standard the Board appropriately applied here.  Add. 27-30; App. 686-89.

## B.    The Board's assessment of the "public interest" was thorough and proper.

The Board's public interest analysis reasonably found Metra's use to be in the public interest, after thoroughly reviewing the unique facts here and addressing all arguments that Union Pacific properly presented.  Add. 22-30; App. 681-89.  *See Zimmer Radio*, 145 F.4th at 844 ("[A] 'public[-] interest' standard . . . provides significant discretion to [an agency].").  In addition to finding inadequate service "under the standard articulated in *Grand Trunk*," the Board also deemed Metra's request to be "otherwise in the public interest under 49 U.S.C. § 11102(a)."  Add. 27-30; App. 686-89. It broadly observed that "Metra provides a vital public service"—relied on by thousands of commuters and dozens of communities—that "supports economic development and job growth, reduces traffic congestion, and helps protect the environment."  Add. 27-29; App. 686-88.  "[E]ven a temporary cessation of service would have wide-ranging and harmful economic and social impacts."  Add. 27; App. 686.  The Board explained that its conclusion is "consistent with Congress's clearly expressed intent"

that requests by local transportation authorities would "virtually always satisfy" § 11102(a)'s public interest standard. Add. 30; App. 689.[10] And it rejected Union Pacific's claim that its service is adequate simply because Union Pacific has purported to unilaterally impose the COE and has not (yet) excluded Metra from the Lines. Add. 27-29; App. 686-88.

The Board's findings do not, *contra* Br. 32-33, fault Union Pacific for refusing to "concede that Metra holds an absolute, unconditioned right to access [Union Pacific's] private property." They simply recognize that Union Pacific's mere provision of "access" (at present) is *not enough* to establish "adequate" *service*, where Union Pacific itself provides *no* service to commuters and has no obligation to do so. Add. 29-30; App. 688-89. Moreover, the Board clearly recognized that Metra's use cannot be "unconditioned" but stressed that under the statute, *both* carriers are initially responsible for establishing any conditions. Add. 30-33; App. 689-692.

---

[10] In addition, the Board noted Union Pacific's own acknowledgement (regarding an argument now abandoned on appeal) that, unlike in the freight-rail context, Union Pacific and Metra do not compete in the same market, so Union Pacific is not losing any business to Metra. Add. 23-24; App. 682-83.

Nor are the Board-authorized trackage rights here akin to "squatters' rights." *Contra* Br. 37. As noted above, Congress intended to provide a way for certain qualifying commuter railroads to serve passengers reliably, by sharing the infrastructure of carriers that were otherwise relieved of their passenger-service obligations. *Contra* Br. 29-34. Because a terminal-trackage-rights grant requires satisfaction of many statutory criteria, including that the rights be practicable and not substantially impair the owning carrier's ability to handle its own business, Union Pacific's claim that "any existing *or aspiring* commuter railroad" could readily secure it (Br. 36-37) is entirely implausible. *See also supra* p.30 n.8. And the statutory scheme hardly permits "free-loading" by the tenant: it has long required both carriers' involvement in establishing the conditions and compensation for use, with Board oversight only as needed, and assurance of Constitutional just compensation to the host. 49 U.S.C. § 11102(a).

At base, Union Pacific appears primarily to fault the Board for not assessing the "reasonableness" of one term: compensation. But as explained further below, *infra* pp. 47-53, the Board properly declined, in accordance with the statute's clear text, to address compensation at this stage of the proceeding. More to the point, if Union Pacific were genuinely "committed" to hosting Metra and only interested in a Board determination

of the adequacy of its access fee, it could have *joined* Metra's trackage-rights request, rather than opposing it, and requested that the Board set terms and compensation as Congress provided in § 11102(a).  In reality, Union Pacific is seeking to avoid even the possibility of a compensation determination under § 11102(a)'s condemnation standard.  *See supra* p.27 n.6.

## II.    The Board Properly Found the Entirety of the Lines To Be "Terminal Facilities, Including Main-Line Tracks For a Reasonable Distance Outside of a Terminal"

The Board also acted well within its authority in concluding that the Lines, in their entirety, qualify for terminal trackage rights under § 11102(a).  Before the agency, Union Pacific conceded that portions of the Lines are eligible for terminal access under § 11102(a) because they are located within the relevant terminal, the Chicago Freight Terminal.  App. 337.  And because the Board accepted the CFT as the terminal, the only remaining issue was whether the portions of the Lines *outside* the CFT are "main-line tracks for a reasonable distance outside of a terminal."  *See* Add. 16-21; App. 675-80.

Exercising its discretion to assess "reasonableness" on each case's specific facts, the Board found no basis for truncating the Lines, on which Metra and the Chicago public have long relied for terminal access and use.

Add. 18-20 & n.34; App. 677-79 & n.34. To the contrary, the Board found numerous facts supporting the reasonableness of including the entirety of the Lines within a grant of access to Metra. Add. 17-20; App. 676-79. It also found that preserving Metra's full access to the Lines is consistent with Congress's intent to make terminal trackage rights available to support local commuter-rail operations. Add. 18; App. 677.

Keen to manufacture a "constrain[t]" on the agency's obvious discretion under § 11102(a) in establishing the geographic scope of trackage rights, Br. 40, Union Pacific newly proposes an untenable construction of the phrase "main-line tracks for a reasonable distance outside of a terminal." The Court should reject this forfeited claim and affirm the Board's well-supported exercise of its authority and expertise.

## A. Union Pacific's restrictive interpretation of "main-line tracks for a reasonable distance" is forfeited and flawed.

On appeal, Union Pacific newly asserts that the trackage subject to a Section-11102(a) grant includes "only those main-line tracks that can properly be viewed as" or "actually constitute" "terminal facilities" *themselves*. Br. 39-40. Focusing without context on the statute's use of the word "including"—which, Union Pacific notes, can signify that "what follows is a subset of what comes before"—Union Pacific argues that the

"main-line tracks" referenced in § 11102(a) "must *be* 'terminal facilities[,]'" as that term is commonly understood.  Br. 40.  According to Union Pacific, the only main-line track eligible for a grant of rights under § 11102(a) is that which "assists in" or "plays a role in" "the functions" (*i.e.*, purposes) of a terminal, such that it is "part of a terminal itself" or "track just beyond the terminal but part of its functions[.]"  Br. 40-42, 44.  In Union Pacific's telling, when Congress expressly gave the Board power to grant access to main-line tracks for a "reasonable distance outside of a terminal," what it really meant was "just beyond the terminal" *and* also "part of its functions."  Br. 40-42.  There is no support for Union Pacific's new construction.

1.     As an initial matter, Union Pacific's new reading of "main-line tracks for a reasonable distance outside of a terminal" was never presented to the Board.  To the contrary, Union Pacific's arguments before the agency treated "main-line tracks . . . outside of a terminal" as separate from, and in addition to—*not* as a subset of—what are commonly considered terminal facilities (*i.e.*, facilities *within* a terminal).  For example, Union Pacific claimed that "very little of the trackage that Metra seeks to access qualifies as 'terminal facilities' *or* 'main-line tracks for a reasonable distance outside of a terminal.'"  App. 321 (emphasis added).  Similarly, Union Pacific referenced "the statutory requirement limiting access to terminal facilities

*or* 'main line track' a reasonable distance outside the terminal." App. 598 (emphasis added). It also argued that, in *RGI/Soo*: "Not only was [] half of the line <u>not</u> within the terminal," . . . "'nor [did] it appear to be main line track for a reasonable distance outside a terminal area.'" App. 336 (quoting 1989 WL 246814, at *11).[11]

As such, Union Pacific has forfeited its new statutory interpretation. *See BNSF Ry. Co.*, 453 F.3d at 479. Even if considered, however, Union Pacific's interpretation should be rejected.

2.     Contrary to Union Pacific's assertions (Br. 42), § 11102(a)'s remedial authority extends to certain "main-line tracks" that are not themselves part of a freight terminal or its functions. Although Union Pacific purports to examine the "text, structure, and purpose" of the statute (Br. 41), its entire analysis rests on a single word ("including") and misquotations of the *Decision* and agency precedent (Br. 40-41). This

_____

[11] Union Pacific's remaining arguments regarding "terminal facilities" were limited and similarly inconsistent with its new theory of statutory interpretation. *See, e.g.*, App. 337-40 (contending that *no* part of the Lines beyond the terminal—"just outside" or otherwise—can qualify because Metra customers may use routes in other suburbs to access the terminal, and because prior freight precedent found 15-22 miles outside the terminal to be "a reasonable distance outside," but not more).

attempt to read out of the statute the Board's discretion to grant trackage rights over main-line tracks outside of the terminal is plainly incorrect.

Union Pacific reasons that, because the word "including" can "signif[y] that what follows is a subset of what comes before," "the 'main-line tracks' covered by the statute must *be* terminal facilities" to qualify for a trackage-rights grant.  Br. 40 (quoting *City of Providence v. Barr*, 954 F.3d 23, 40 (1st Cir. 2020)).  However, an "including" phrase can do "more than merely provide examples"; it can also introduce "definitional terms" and thereby mean "and," "in addition to," or "*by which we mean to include*[.]"  *Adams v. Dole*, 927 F.2d 771, 777 (4th Cir. 1991); *see also New York v. Dep't of Justice*, 951 F.3d 84, 102 (2d Cir. 2020) ("Depending on context, the word 'including' can be either illustrative or enlarging.").  That is what Congress did here.  The clear "inconsistency between" "terminal facilities" and "main-line tracks"—as those terms are used in industry parlance, statutory text, and agency precedent—shows that § 11102(a)'s "including main-line tracks" phrase is "not meant to be illustrative, but rather, definitional."  *Adams*, 927 F.2d at 777.

In the long-used and common speech of railroad work, a carrier's "main-line tracks," or "road," are generally distinguished from the "yards," "team tracks," or "terminals" it uses to make-up and break-down trains.

*E.g.*, *Mo., Kan. & Tex. R.R. Co.*, 172 F.2d at 769 (defining various "terminal facilities" as being "in contrast to the main line"); CSX Railroad Dictionary, *available at* https://www.csx.com/index.cfm/about-us/company-overview/railroad-dictionary/?i=M (last visited Feb. 24, 2026) (defining "main line" as "[t]hat part of the railway, exclusive of switch tracks, branches, yards, and terminals").  Put simply, a carrier's main line is its "road," and its "terminal facilities" are where it assembles and services trains and/or collects and distributes freight or passengers.

This distinction between "terminal facilities" and "main-line track" is apparent in other sections of the statute and in court and agency decisions. Beginning with the Transportation Act of 1920, the statutory text has distinguished between a carrier's "road" (used for "operating" its trains) and other necessary track, like "terminals, and terminal facilities[.]"  41 Stat. at 475 (separating "road" from other facilities with the words "and also"); *see also* 49 U.S.C. § 10102(6)(b) & (c) (listing "road" in a different subsection than other facilities).

Moreover, as the *RGI/Soo* decision relied upon by Union Pacific made clear:  "A 'terminal area' (*as opposed to main line track*) must contain and *cannot extend significantly beyond* recognized *terminal facilities*, such as freight or classification yards or team tracks, and a

cohesive commercial area immediately served by those facilities."
*RGI/Soo*, 1989 WL 246814, at *10 (emphasis added). If a "terminal area"
cannot extend much beyond "terminal facilities," and if a terminal area is,
by definition, *not* "main-line track," then "main-line tracks" (especially
those "outside of a terminal") cannot be the same as "terminal facilities."

A century of precedent confirms that "main-line tracks" are distinct
from, and *not* a subset of, "terminal facilities." *See, e.g.*, *Golden Cat Div. of
Ralston Purina Co. v. St. Louis S.W. Ry. Co.*, 1996 WL 197602, at *5 (STB
served Apr. 25, 1996) (also describing "terminal facilities" as within a
"'terminal area' (as opposed to main-line track)"); *Spokane, Portland, &
Seattle R.R. Co.*, 348 I.C.C. at 141 (discussing agency decisions granting
"use of terminal facilities *and* main line tracks *adjacent thereto* under"
Section 11102(a)'s predecessors) (emphasis added); *Seaboard Air Line
R.R.*, 327 I.C.C. at 3 (concluding that "[i]t is not required that the terminal
facilities *and* the tracks for a reasonable distance outside of such terminal
be owned by the same carrier") (emphasis added); *Missouri-Kansas-Texas
R.R. Co. v. Kan. City Term. Ry. Co.*, 104 I.C.C. 203, 228 (1925) (holding
that terminal-trackage-rights relief need not include both "a terminal use"
and "an outside main-line use"). Indeed, the agency has long held that it
"interpret[s]" both "terminal facilities" and "reasonable distance outside of

a terminal" "liberally," a construction that would make no sense under Union Pacific's interpretation. *RGI/Soo*, 1989 WL 246814, at *9.

In light of the fundamental dissimilarity between "main-line tracks" and "terminal facilities," court and agency decisions have never read the statute to require that the subject trackage be used for, or part of, terminal functions.[12] *Contra* Br. 40-42, 44. In *Southern Pacific Transportation Company vs. ICC*, the D.C. Circuit explicitly rejected the owning carrier's claim that "the [statutory] term 'terminal facilities' is limited in meaning to trackage that is . . . used for terminal purposes." 736 F.2d at 723. Citing the statute's "highly remedial" nature and broad language expanding use outside the terminal, the court explained that the agency has applied the statute to "'bridge the gap' between [a carrier's] line and the terminal. *It did not require . . . that the segments be used for terminal purposes.*" *Id.* (emphasis added); *see also Union Pac. Corp.—Control—S. Pac. Rail Corp.*, 1 S.T.B. at 446-49 (granting "bridge the gap" terminal trackage rights and concluding that "[t]he precise use to be made of these segments . . . is not

---

[12] Consistent with the statutory text, the agency has long required that the subject facilities and trackage be within or adjacent to a terminal area. 49 U.S.C. § 11102(a) ("including main-line tracks for a reasonable distance outside of a terminal"); 41 Stat. 456, 479-80 ("including main-line track or tracks for a reasonable distance outside of such terminal").

crucial"); *Chi. & Alton R.R. Co. v. Toledo, Peoria & W. Ry. Co.*, 146 I.C.C. 171, 178-79 (1928) (granting use of a 12-mile main-line segment, even though "it is apparent that the [tenant carrier] is not using and does not propose to use it as a terminal facility").

This makes sense given the purpose of § 11102(a) and its predecessors: to avoid the unnecessary duplication of track and facilities within crowded (often urban) terminal areas. *See S. Pac. Transp.*, 736 F.2d at 723; *Spokane, Portland & Seattle Ry.*, 348 I.C.C. at 141-43 (citing Hearings on H.R. 4378 before the House Committee on Interstate and Foreign Commerce, Vol. 2, at 2319 (1919), and holding that nothing in the statute's purpose limits relief to carriers already "entitled to serve" the area, *contra* Br. 8)). Whether the trackage and facilities are used for train assembly, deliveries, or simply to reach or traverse the terminal area within a reasonable distance, requiring their shared use avoids the need for additional infrastructure (and added congestion and complexity) in areas where this would be extremely costly or infeasible.

In sum, the statute is clearly best read as authorizing the Board to grant the use of facilities within a terminal *and* main-line tracks for a reasonable distance outside of it, with the question of what constitutes a "reasonable distance" to be determined by the agency based on the specific

facts and circumstances of each case.  *See RGI/Soo*, 1989 WL 246814, at

*9-10.  The only real dispute here, then, is whether the Board abused its

discretion in this particular, fact-bound case.  It did not.

> **B.    The Board rationally found that the endpoints of the Lines, as used by Metra, are a "reasonable distance" outside of the terminal under § 11102(a).**

Applying the correct statutory analysis (*contra* Br. 44), the Board

properly found that all extra-terminal portions of the Lines are within a

reasonable distance of the Chicago Freight Terminal.  As the Board

explained, "reasonable distance" "is to be determined in light of the facts in

each case."  Add. 19; App. 678 (citing *RGI/Soo*, 1989 WL 246814, at *10).

The Board has "discretion to consider all pertinent facts and circumstances"

in light of the specific purpose of the trackage-rights request.  Add. 19-20;

App. 678-79 (citing *Loper Bright Enters.*, 603 U.S. at 394-95; *Wis. Cent.

Ltd. v. STB*, 122 F.4th 1009, 1011 (7th Cir. 2024); *Union Pac. Corp.—

Control—Mo. Pac. Corp.*, 366 I.C.C. 459, 574-75 (1982); *Chi. & Alton R.R.*,

146 I.C.C. at 179).

The Board concluded that, as a commuter-rail carrier, Metra needs

the entirety of the Lines to serve its purpose of providing access to the

terminal from many different surrounding communities.  Add. 17-20; App.

676-79.  It found that Metra's ability to access and use the Chicago terminal

area would be of "severely diminished" utility if it could only pick up and deliver passengers within 10-15 miles of the city and could no longer reach two-thirds of the communities it has long served. Add. 20; App. 679. Foreclosing access to the full extent of its customers would also directly contravene Congress's intent to make terminal trackage rights available to local commuter-rail entities. Add. 18-20; App. 677-79.

Union Pacific does not challenge these sound factual findings, instead claiming (1) that they are irrelevant because the Board has no power to grant trackage rights on any track that is not either within a terminal or "just beyond the terminal but part of its functions" and (2) that the "dozens" of miles awarded in this case are more than the 15-22 miles awarded in past cases. Br. 4, 38, 41-45, 48. Union Pacific's first claim fails for the reasons given above.[13] As for its latter argument, in considering all pertinent facts and circumstances, the Board is not limited to examining only the "physical distance[s]" found "reasonable" in some freight-rail cases. Add. 18-19; App. 677-78. Here, the Board found many other

_____

[13] Indeed, Union Pacific makes no effort to explain why the 15- and 22-mile main-line segments at issue in the cases cited favorably in its brief (Br. 42) qualify as "just beyond" a terminal, while the "dozens" of miles used here by Metra do not (Br. 38, 44, 48).

relevant circumstances that make it "reasonable" to include the entirety of the Lines.  Add. 20-21; App. 679-80.

First, unlike in prior freight cases, Metra's use of the Lines is "defined" and decades-old, not "new and untested[.]"  Add. 20; App. 679. In addition, the Board noted that Metra uses yards at the endpoints of all three Lines to serve "important functions" related to its terminal use, like car storage, maintenance, and fueling.  Add. 20 & n.41; App. 679 & n.41.

The Board also found numerous facts supporting the continued feasibility of dual freight-and-commuter use of the Lines.  These included: (1) Union Pacific's failure to claim any point beyond which its ability to conduct freight operations has been (or will be) hindered; (2) the Lines' "centralized monitoring and coordination[,]" which ensures that both "freight and passenger traffic moves efficiently throughout the greater Chicago region"; and (3) the fact that two of the Lines are only "lightly used" for freight, while the third has been upgraded with an additional "main" track, thus "mitigat[ing] the likelihood that Metra's operations" in the area will be problematic.  Add. 17-20; App. 676-79.  In sum, the Board reasonably found that nothing in the record or precedent supported "adopting cut-off points within Metra's service area[,]" particularly where doing so would "severely diminish" the utility of Metra's system and

undermine "the public-interest considerations involved[.]"  Add. 20-21; App. 679-80.  This conclusion was well within the Board's discretion and authority and should be affirmed.

## III.   The Board Followed the Plain Statutory Language and Longstanding Precedent Regarding Conditions and Compensation

Finally, Union Pacific improperly faults the Board's decision to defer resolution of disputed conditions and compensation for Metra's use of the Lines.  In particular, Union Pacific claims that, under § 11102(a), compensation must be paid "up front," and "at least some" conditions of use must be established, "before access can begin."  Br. 22-23; Br. 49-53.  However, the statute is clear, and the Board clearly complied with it.  Union Pacific's reading of § 11102(a) would radically rewrite the statute, agency precedent, and Fifth Amendment takings law.

### A.   The Board properly deferred its resolution of disputed conditions and ensured that compensation was "adequately secured" before Metra's use.

Section 11102(a) provides that:

The *rail carriers* are responsible for establishing the conditions and compensation for use of the facilities.  However, *if the rail carriers cannot agree*, the Board *may* establish conditions and compensation for use of the facilities under the principle controlling compensation in condemnation proceedings.  The compensation shall be paid *or adequately secured* before a rail carrier may begin to use the facilities of another rail carrier under this section.

49 U.S.C. § 11102(a) (emphasis added).

In accordance with this language and well-established agency precedent, the Board required Union Pacific and Metra first to negotiate and establish terms privately. Add. 30; App. 689. Recognizing that the parties disputed only compensation and "certain" conditions of use, the Board declined initially to set any terms (interim or ongoing) and stated that it would resolve disputed terms "if the parties cannot reach an agreement." Add. 32-33, App. 691-92 & n.65.

The Board also recognized Union Pacific's right to compensation under takings principles and did several things to ensure it was adequately secured prior to Metra's use under § 11102(a). The Board: (1) pledged to set compensation "under condemnation principles with retroactive effect" if the parties cannot agree, in accordance with the statute and *S. Pac. Transp.*, 736 F.2d at 723; (2) found compensation to be "'adequately secured' as a practical matter" based on record evidence and Metra's status as a government entity presumed to be "financially responsible" under agency regulations; (3) admonished Metra "to continue to compensate" Union Pacific; and (4) stated that "Union Pacific will be reimbursed retroactively (from [the expiration of the last PSA]) if the interim amount paid by Metra is less than the final amount set." Add. 30-33; App. 689-92.

Since the *Decision*, Metra has continued to pay Union Pacific under the PSA terms in place when Union Pacific was operating Metra's trains. Metra Mot. to Hold in Abeyance, Doc. #5585380, at 11. The Board has also promptly set specific "critical" interim terms at Union Pacific's request, as it assured the parties it would. Add. 32 n.65; App. 691 n.65; App. 721-24; App. 729-32. The agency proceeding remains open, and the Board retains jurisdiction to resolve any terms that remain disputed following the parties' negotiations. *See infra* p.51 n.14, p.53 n.16.

**B.      Union Pacific's reading of Section 11102(a)'s "conditions and compensation" language is contrary to the plain statutory text and longstanding precedent.**

1.      Union Pacific urges the Court to read the final sentence of § 11102(a) to require that compensation "shall be paid"—rather than (as the statute says) "shall be paid *or adequately secured*"—before trackage-rights use can commence. *See* Br. 52-53 (claiming that, under the "statutory text and the Fifth Amendment's mandate," "Metra must pay up front" or "at the time of the taking"). Union Pacific's interpretation reads a key phrase ("or adequately secured") entirely out of the statutory text, violating the "cardinal principle" that "courts must give effect, if possible, to every clause and word of a statute." *See Liu v. SEC*, 591 U.S. 71, 89 (2020) (quoting *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U. S. 601, 611 (2019)).

Union Pacific similarly omits pertinent text when quoting *Knick vs. Township of Scott* (a case it did not cite before the agency) to suggest that "the Fifth Amendment requires 'full compensation . . . at the time of the taking[.]'" Br. 52 (quoting 588 U.S. 180, 190 (2019)). *Knick* actually says the opposite. *Knick* holds that "[t]he Fifth Amendment *right* to full compensation *arises* at the time of the taking" and that the owner is ultimately entitled to "compensation *as if it had been* paid contemporaneously with the taking." 588 U.S. at 190 (emphasis added, citations omitted). Contrary to Union Pacific's contentions (Br. 53), "[t]hat does not mean that the government must provide compensation in advance of a taking[,]" "[s]o long as the property owner has some way to obtain compensation after the fact[.]" 588 U.S. at 185; *see also id.* at 202 (government may proceed "in the absence of contemporaneous compensation").

The Board thus met the statutory and constitutional standard by pledging that if Union Pacific is found to be under-compensated, Metra (which was found to be financially capable and is presumed under Board regulations to be financially responsible) will be required to make Union Pacific whole. Add. 30-32; App. 689-91.

2.     Simply puzzling is Union Pacific's attack (Br. 51-52) on the

Board's reliance on *Southern Pacific Transportation Company v. ICC*, in

which the D.C. Circuit held that compensation is adequately secured under

the statute by the agency's pledge subsequently to set compensation in

accordance with the statute.  736 F.2d at 723.  Union Pacific complains that

the per curiam decision, which was decided by a panel that included Judges

Bork, Mikva, and Wright, is forty years old (Br. 51)—as if there is some sort

of statute of limitations on precedent (regarding a provision of law that has

not substantively changed in over 100 years).  And the claimed "zero

relevant analysis" (Br. 51) reflects the obvious conformity of the agency's

action to the requirements of the statute.  Indeed, *Southern Pacific* has not

been questioned by any other Circuit, has been applied faithfully by the

agency since 1984, and is plainly consistent with the Fifth Amendment

takings law cited by Union Pacific and discussed above.[14]

---

[14]  It is also consistent with older agency precedent in cases of ongoing
tenant use, where the agency has declined to set compensation immediately
but maintained jurisdiction to do so in the event of disagreement.  *See, e.g.*,
*Seaboard Air Line R.R.*, 327 I.C.C. at 8-9, *aff'd Fla. E. Coast Ry. Co.*, 256 F.
Supp. at 988-89; *Missouri-Kansas-Texas R.R. Co.*, 104 I.C.C. at 228-29,
231; *Missouri-Kansas-Texas R.R. Co. v. Kan. City Term. Ry. Co.*, 198 I.C.C.
4, 5 (1933).

3.    Finally, Union Pacific argues that the statute is "best read" to "require" setting "at least some" conditions of use (and not only compensation) "before access can begin."  Br. 22-23; Br. 49-51 (claiming that "conditions and compensation are a package deal, to be addressed . . . 'before' the rights take effect").  But because Union Pacific never argued this statutory interpretation until *after* the Board issued its *Decision*, it is waived.  The argument is also moot because the Board promptly set the only interim conditions that have been requested by Union Pacific post-*Decision*, pertaining to indemnity and liability.  App. 721-24.[15]

Moreover, Union Pacific's new argument is contrary to the plain language of § 11102(a).  While the third sentence of the statute states that the Board "may" establish both conditions and compensation for use of the facilities, the fourth sentence states (without any mention of conditions) that "[c]ompensation shall be paid or adequately secured before a rail carrier may begin to use the facilities[.]"  49 U.S.C. § 11102(a).  Union

_____

[15] Also, contrary to Union Pacific's suggestion (Br. 50-51), many other conditions of use *had* been established (by agreement of the parties) at the time of the *Decision*, thus meeting any supposed "requirement" as a practical matter.  *See* Add. 32 n.65, App. 691 n.65 (noting that only "certain" conditions are still in dispute); *see also* Add. 26 n.53, App. 685 n.53 (noting that Metra agrees to maintain Union Pacific's dispatching authority and advance approval of schedules, among other things).

Pacific may not simply expand by fiat an express directive relating only to "compensation" to somehow reach "conditions" as well. The interpretive canon that "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another" applies "with particular force" where, as here, a broader phrase ("conditions and compensation") is used "repeatedly" and "in close proximity" to a narrower term ("compensation" standing alone). *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015). Section 11102(a) clearly delineates which tasks are permissive and which are mandatory, and when (and by whom) such tasks must be completed.[16] Add. 30-33; App. 689-92.

Thus, the Board's faithful adherence to the statute and precedent regarding conditions and compensation is *anything but* "arbitrary and capricious." *Contra* Br. 54.

---

[16] The agency has, as a practical matter, observed that negotiations regarding conditions of use should precede new trackage-rights operations, or allowed the parties a period of time to negotiate conditions of use before the effectiveness of a new grant. But it has never held or suggested that the *statute bars* access unless conditions are set in advance—and certainly not in cases of long-established ongoing use. *See, e.g.*, *Union Pac. Corp.— Control & Merger—S. Pac. Rail Corp.*, 1 S.T.B. at 425, 449 (giving the rail carriers ten days to negotiate and submit conditions for new trackage-rights use, yet holding that the rights become effective within 30 days regardless).

## CONCLUSION

The Court should deny the petition for review.

Respectfully submitted,


ROBERT B. NICHOLSON            ANIKA S. COOPER
ROBERT J. WIGGERS             Chief Counsel
Attorneys
Antitrust Division            SCOTT M. ZIMMERMAN
U.S. Department of Justice    Acting Deputy Chief Counsel
950 Pennsylvania Avenue NW
Washington, DC  20530         ADAM M. KRESS
                              Associate Counsel – Litigation

                              /s/ Carolyn J. Chachkin
                              CAROLYN J. CHACHKIN
                              Attorney
                              Surface Transportation Board
                              395 E Street SW
                              Washington, DC 20423
                              (202) 919-6195
                              carolyn.chachkin@stb.gov

February 24, 2026

## CERTIFICATE OF COMPLIANCE

I, Carolyn J. Chachkin, hereby certify the following:

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 11,628 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, using the Microsoft 365 version of Microsoft Word, in 14-point Georgia font.

3.    This brief complies with 8th Cir. R. 28A(h)(2) because it has been scanned for viruses and has been determined to be virus-free.


 /s/ Carolyn J. Chachkin

Carolyn J. Chachkin
Office of the General Counsel
Surface Transportation Board


February 24, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2026, I electronically filed the foregoing Respondents' Joint Brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system and that the participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Carolyn J. Chachkin
Carolyn J. Chachkin
Office of the General Counsel
Surface Transportation Board