No. 25-2919

---

*In the*

# United States Court of Appeals

*for the*

# Eighth Circuit

---

UNION PACIFIC RAILROAD COMPANY,
*Petitioner*,

– v. –

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA
*Respondents*,

COMMUTER RAIL DIVISION OF THE REGIONAL TRANSPORTATION AUTHORITY
D/B/A METRA,
*Intervenor*.

---

*On Petition for Review from
the Surface Transportation Board*

---

## RESPONSE BRIEF OF INTERVENOR
## COMMUTER RAIL DIVISION OF THE
## REGIONAL TRANSPORTATION AUTHORITY

---

AARON D. VAN OORT
  *Faegre Drinker*
   *Biddle & Reath LLP*
  *2200 Wells Fargo Center*
  *90 South Seventh Street*
  *Minneapolis, MN 55402-3901*
  *(612) 766-7000*

PAUL W. HUGHES
ANDREW A. LYONS-BERG
MARY H. SCHNOOR
EMMETT WITKOVSKY-ELDRED
  *McDermott Will & Schulte LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Commuter Rail Division of the
Regional Transportation Authority d / b / a Metra*

## SUMMARY OF THE CASE

The U.S. rail network converges inexorably on Chicago—the "Player with Railroads and the Nation's freight handler"[1]—creating an unrivaled density of rail traffic and tracks. In such a place, when one rail carrier owns the only available tracks, the public interest may require allowing another carrier to use them. The alternative is placing the second carrier (and the public) at the mercy of the first, and monopolists are not known for mercy.

The Surface Transportation Board (STB) may award terminal trackage rights when "in the public interest." 49 U.S.C. § 11102(a). Here, three lines owned by Union Pacific Railroad Company (UP) have carried commuters for more than 150 years. After UP abandoned that service itself, Metra—Chicago's commuter rail agency—began operating the trains. The STB reasonably found that the public interest supported granting Metra a statutory *right* to use the lines, rather than leaving Metra to UP's mercy. Granting Metra the rights to use the lines' full length also was reasonable: Anything less would have stranded thousands. With Metra's right to use the lines resolved, the STB secured compensation for UP and, consistent with the statute, left the parties to negotiate final terms.

This Court should deny the petition for review. Metra and the STB will split argument time; 20 minutes per side will suffice.

---

[1]     *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 651 (D.C. Cir. 2011) (quoting "*Chicago*," Carl Sandburg (1916)).

# CORPORATE DISCLOSURE

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1A, Intervenor the Commuter Rail Division of the Regional Transportation Authority d/b/a Metra, a municipal corporation, states that it is established under the Regional Transportation Authority Act (70 ILCS 3615/3B.01), has no parent corporation, and no publicly held corporation owns more than 10% of its stock.

# TABLE OF CONTENTS

Summary of the Case ...................................................................... i

Corporate Disclosure ..................................................................... ii

Table of Authorities ...................................................................... v

Introduction .................................................................................. 1

Statement of the Issues................................................................. 4

Statement of the Case ................................................................... 5

    A.   Legal background .............................................................. 5

    B.   Factual background .......................................................... 8

        1.   Metra's commuter rail service.................................. 8

        2.   The UP Lines .......................................................... 10

        3.   UP's exit from commuter service........................... 11

    C.   Surface Transportation Board proceedings ................. 12

Summary of Argument.................................................................. 16

Standard of Review ...................................................................... 18

Argument ...................................................................................... 19

I.    The STB reasonably found that granting terminal trackage rights serves the public interest. .......................................... 19

    A.   Congress granted broad policymaking discretion to the STB through the public interest standard. ........................... 20

    B.   The STB's public interest finding reasonably exercised its expert judgment........................................................... 22

    C.   The STB's decision is not constrained by a service inadequacy standard here; even if it were, the STB reasonably determined that service was inadequate. ................. 26

        1.   The STB did not need to apply a service inadequacy standard associated with the introduction of competing freight service..................................... 27

        2.   The STB reasonably determined that UP's non-negotiated access conditions were inadequate. ..................... 37

II.   The STB reasonably included the entirety of the UP Lines within its remedy. ................................................................ 43

    A.    The STB properly concluded that the UP Lines extend a
         reasonable distance outside of the terminal. ................................43

    B.    UP's position conflicts with the statute and misconstrues
         the STB's reasoned analysis. .........................................................45

III.  The STB properly applied the statutory remedy. ...............................49

    A.    The statute does not require final terms before use. ...................50

    B.    The STB reasonably declined to set interim terms. .....................53

IV.  Should the Court disagree, remand is proper. ....................................54

Conclusion .....................................................................................................54

# TABLE OF AUTHORITIES

**Cases**

*Bragdon v. Abbott,*
  524 U.S. 624 (1998) ................................................. 35

*Brown v. Gardner,*
  513 U.S. 115 (1994) ............................................. 28, 34

*Bruesewitz v. Wyeth LLC,*
  562 U.S. 223 (2011) ................................................. 33

*C.I.R. v. Glenshaw Glass Co.,*
  348 U.S. 426 (1955) ................................................. 34

*Campos-Chaves v. Garland,*
  602 U.S. 447 (2024) ................................................. 50

*Cent. S.D. Co-op. Grazing Dist. v. Sec'y of U.S. Dep't of Agric.,*
  266 F.3d 889 (8th Cir. 2001) .................................... 27

*Chicago, M. & St. P. Ry. Co. v. Solan,*
  169 U.S. 133 (1898) ................................................... 2

*City of Lincoln v. STB,*
  414 F.3d 858 (8th Cir. 2007) .................................... 18

*City of St. Louis v. Dep't of Transp.,*
  936 F.2d 1528 (8th Cir. 1991) .................................. 22

*Digital Realty Tr., Inc. v. Somers,*
  583 U.S. 149 (2018) ................................................. 46

*Est. of Cowart v. Nicklos Drilling Co.,*
  505 U.S. 469 (1992) ............................................. 28, 33

*FCC v. WNCN Listeners Guild,*
  450 U.S. 582 (1981) ................................................. 21

*Food Mktg. Inst. v. Argus Leader Media,*
  588 U.S. 427 (2019) ................................................. 35

*Garland v. Ming Dai,*
  593 U.S. 357 (2021) ................................................. 42

*Grand Trunk Corp. v. Surface Transp. Bd.,*
  143 F.4th 741 (7th Cir. 2025) ........................... 28, 36, 37

**Cases—continued**

*Hous. Auth. of City of Omaha, Neb. v. U.S. Hous. Auth.*,
  468 F.2d 1 (8th Cir. 1972) ........................................................ 25

*Iowa v. Wright*,
  154 F.4th 918 (8th Cir. 2025) ................................................. 35

*Jama v. ICE*,
  543 U.S. 335 (2005) .................................................................. 29

*Knick v. Twp. of Scott*,
  588 U.S. 180 (2019) ............................................................ 18, 51

*Learning Resources, Inc. v. Trump*,
  __ S. Ct. ___, 2026 WL 477534 (U.S. Feb. 20, 2026) ............... 34

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ......................................... 18, 21, 22, 44, 49

*Michigan v. EPA*,
  576 U.S. 743 (2015) .................................................................. 21

*Middlewest Motor Freight Bureau v. United States*,
  433 F.2d 212 (8th Cir. 1970) ................................................... 38

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co.*,
  463 U.S. 29 (1983) .................................................................... 18

*N.Y. State Pub. Serv. Comm'n v. FERC*,
  104 F.4th 886 (D.C. Cir. 2024) ............................................... 38

*Nat'l B'casting Co. v. United States*,
  319 U.S. 190 (1943) .................................................................. 20

*Northshore Mining Co. v. Sec'y of Lab.*,
  46 F.4th 718 (8th Cir. 2022) ................................................... 25

*Ohio v. EPA*,
  603 U.S. 279 (2024) .................................................................. 53

*Otter Tail Power Co. v. Surface Transp. Bd.*,
  484 F.3d 959 (8th Cir. 2007) .............................................. 27, 46

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*,
  651 F.3d 857 (8th Cir. 2011) ................................................... 25

*PennEast Pipeline Co. v. New Jersey*,
  594 U.S. 482 (2021) ............................................................ 35, 52

## Cases—continued

*Romag Fasteners, Inc. v. Fossil, Inc.*,
  590 U.S. 212 (2020) ........................................................52

*Rotkiske v. Klemm*,
  589 U.S. 8 (2019) ............................................................39

*S. Pac. Transp. Co. v. ICC*,
  736 F.2d 708 (D.C. Cir. 1984) ......................................4, 50

*SAS Inst., Inc. v. Iancu*,
  584 U.S. 357 (2018) ........................................................52

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
  605 U.S. 168 (2025) ............................................4, 18, 22

*Tex. Dep't of Housing v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) ........................................................29

*Union Pac. R.R. Co. v. Reg'l Transp. Auth.*,
  74 F.4th 884 (7th Cir. 2023) ........................................1, 11

*United States v. Bean*,
  537 U.S. 71 (2002) ..........................................................20

*United States v. Lachowski*,
  405 F.3d 696 (8th Cir. 2005) ..........................................20

*United States v. Mathison*,
  518 F.3d 935 (8th Cir. 2008) ..........................................27

*Wilson v. Commodity Futures Trading Comm'n*,
  322 F.3d 555 (8th Cir. 2003) ..........................................44

*Zimmer Radio of Mid-Missouri, Inc. v. F.C.C.*,
  145 F.4th 828 (8th Cir. 2025) ......................................4, 21

## Agency decisions

*Chicago & Alton Railroad v. Toledo, Peoria & Western Ry.*,
  146 I.C.C. 171 (1928) ......................................................48

*Chicago & N.W. Ry. v. Ann Arbor R.R.*,
  263 I.C.C. 287 (1945) ................................................21, 30

*CSX Corp.—Control—Chessie Sys., Inc.*,
  363 I.C.C. 518 (1980) ......................................................49

**Agency decisions—continued**

*Del. & Hudson Ry. Co. v. Consol Ry.,*
367 I.C.C. 718 (1983).....................................................22, 30

*Erie R.R. Acquis., Etc.,*
275 I.C.C. 679 (1950).........................................................47

*Golden Cat Div. of Ralston Purina Co. v. St. Louis Sw. Ry.,*
1996 WL 197602 (STB served Apr. 17, 1996)........................47

*Hastings Com. Club v. Chicago, Milwaukee & St. Paul Ry.,*
69 I.C.C. 489 (1922)........................................................5, 30

*Jamestown Chamber of Com. v. Jamestown, Westfield & N.W. R.R.,*
195 I.C.C. 289 (1933)..........................................................39

*Lehigh Valley R.R. Trackage Rights,*
312 I.C.C. 389 (1961) ...................................... 31, 32, 39, 40

*Mfrs. Ass'n of York v. Penn. R.R.,*
73 I.C.C. 40 (1922).........................................................6, 31

*Port Arthur Chamber of Com. v. Texarkana & Fort Smith Ry.,*
136 I.C.C. 597 (1928).....................................................22, 30

*Rio Grande Indus., Inc.—Purchase & Related Trackage Rights,*
1989 WL 246814 (I.C.C. Nov. 13, 1989)............................4, 44

*Seaboard Air Line R. Co.—Use of Terminal Facilities,*
327 I.C.C. 1 (1966) .................................. 4, 6, 21, 24, 30, 31, 32

*Spokane, Portland & Seattle Ry.—Control—Peninsula Terminal Co.,*
348 I.C.C. 109 (1975)...........................................................30

**Statutes**

70 ILCS 3615/1.02(a)(ii) ...............................................8, 26

5 U.S.C.
§ 706(2)(A)......................................................................22
§ 706(2)(E)..................................................................22, 42

49 U.S.C.
§ 10501(c)(2)(A)............................................................7, 24
§ 10501(c)(3)(B)........................................ 2, 4, 7, 24, 33, 42
§ 11102(a) .......2, 4, 6, 12, 15–17, 20, 25, 30, 35–38, 40, 42, 43, 46, 50–53
§ 11102(c) ...................................................... 22, 34, 35, 36

**Statutes—continued**

Pub. L. No. 85-625, 72 Stat. 568 (1958) ....................................................7, 24

ICC Termination Act,
    Pub. L. No. 104-88, 109 Stat. 803 (1995) ................... 7, 24, 25, 32, 34, 36

Transportation Act of 1920
    Pub. L. No. 66-152, ch. 91, 41 Stat. 456 (1920) ........................................5

**Congressional materials**

141 Cong. Rec. H15600-02 (1995)....................................................................26

H.R. Conf. Rep. 104-422 (1995) ............................................... 4, 8, 14, 25, 33

H.R. Rep. 104-311 (1995) ........................................................ 7, 8, 25, 26, 33

H.R. Rep. 96-1430 (1980) ..............................................................................36

**Other authorities**

2B *Sutherland Statutory Construction* § 49:8 (7th ed.) ...............................33

Black's Law Dictionary (12th ed. 2024) .......................................................20

Henry Campbell Black, *A Law Dictionary* (2d ed. 1910)......................20, 50

William Eskridge, *Interpreting Law* (2016)..................................................29

# INTRODUCTION

Metra provides commuter rail service over three rail lines owned by UP (the UP Lines), which are part of the U.S. interstate rail network. Passenger service has existed on the UP Lines since before the Civil War. Dozens of communities were built in reliance on them. They remain vital to the Chicago region's economy and well-being—tens of thousands of commuters rely on them every day.

Beginning in 1975, UP and its predecessor operated commuter trains on the UP Lines as a contractor pursuant to an agreement with Metra. Over time, Metra invested more than $1.25 billion in taxpayer funds to improve the UP Lines and stations. In 2019, UP decided to discontinue its operation of commuter service. It obtained a judgment declaring it had "unfettered authority" to do so. *Union Pac. R.R. Co. v. Reg'l Transp. Auth.*, 74 F.4th 884, 887 (7th Cir. 2023). Metra assumed responsibility for the commuter operations in 2025. During that transition, the parties tried but failed to negotiate a new agreement. On June 30, 2025, the existing agreement expired.

At that point, UP asserted it was willing to allow Metra to continue to operate its commuter service on the UP Lines—but only on terms dictated by UP, which included materially increased compensation. UP maintained it could alter or revoke its non-negotiated access terms at will. Thus in its view, UP could decide tomorrow to double the price, scale back passenger

trips, or end commuter service altogether—and Metra would have no recourse. UP can do so, it maintains, notwithstanding the interests of the public or billions of dollars of Metra's taxpayer-funded improvements.

But as a railroad subject to STB jurisdiction—a railroad that has benefited handsomely from government land-grants and easements—UP has "important duties to the public" under longstanding law. *E.g.*, *Chicago, M. & St. P. Ry. Co. v. Solan*, 169 U.S. 133, 135 (1898). UP's stance that it alone may decide whether and under what conditions Metra's commuter rail service may continue does not satisfy those duties, as the STB recognized.

Congress anticipated these circumstances. Even while generally removing commuter rail from STB jurisdiction in 1995, Congress directed that "transportation provided by a local governmental authority" may have a right to use another carrier's facilities. 49 U.S.C. § 10501(c)(3)(B). Specifically, the STB may "require terminal facilities, including main-line tracks for a reasonable distance outside of a terminal, owned by a rail carrier … to be used by another rail carrier if the Board finds that use to be practicable and in the public interest without substantially impairing the ability" of the track owner "to handle its own business." 49 U.S.C. § 11102(a).

Metra satisfies the statutory criteria. The STB agreed, recognizing that Metra provides a "vital public service." Add.27, App.686. The agency found that the public interest requires granting Metra the *right* to continue

serving the communities that depend on it, rather than making that future service contingent on UP's changing interests. And, as the STB explained, the *entirety* of the UP Lines are a "reasonable distance" outside the terminal; anything less would leave thousands of commuters stranded.

The STB's decision is a reasonable exercise of statutory discretion—which UP does not challenge directly. Instead, UP lodges three attacks, each built on atextual statutory constructions that lack support in precedent.

*First*, UP tries to limit the public interest inquiry to a framework applied only in agency precedents involving *private freight* carriers seeking to use the tracks of *direct competitors*. But Metra is a *public transportation* provider and does not compete with UP (which abandoned commuter service). UP concedes that no precedent supports its position. Br.29.

*Second*, the Board adopted UP's own definition of the "terminal" involved and reasonably explained why the main-line portions of the UP Lines outside the terminal are "a reasonable distance" from it. Contrary to UP's proposed test, which reads this language out of the statute, the STB appropriately granted terminal trackage rights to the entire UP Lines.

*Third,* the STB followed the statutorily mandated sequence in finding that UP's compensation was "adequately secured," while deferring establishing interim conditions and requiring the parties to negotiate final terms.

The Court should deny the petition for review.

## STATEMENT OF THE ISSUES

1. Whether the STB acted within its statutory discretion in finding that granting Metra terminal trackage rights is in the public interest.

*Most apposite authorities*:

- 49 U.S.C. §§ 11102(a), 10501(c)(3)(B)
- H.R. Conf. Rep. 104-422
- *Seaboard Air Line R. Co.—Use of Terminal Facilities*, 327 I.C.C. 1 (1966)
- *Zimmer Radio of Mid-Missouri, Inc. v. Fed. Commc'ns Comm'n*, 145 F.4th 828 (8th Cir. 2025)

2. Whether the STB acted within its statutory discretion in granting trackage rights over the entirety of the UP Lines.

*Most apposite authorities:*

- 49 U.S.C. § 11102(a)
- *Rio Grande Indus., Inc.—Purchase & Related Trackage Rts.— Soo Line R.R.*, 1989 WL 246814 (I.C.C. Nov. 15, 1989)
- *Seven County Infrastructure Coalition v. Eagle County, Colo.*, 605 U.S. 168 (2025)

3. Whether the STB properly charged UP and Metra with establishing compensation and conditions in the first instance, while ensuring UP's compensation is "adequately secured."

*Most apposite authorities:*

- 49 U.S.C. § 11102(a)
- *S. Pac. Transp. Co. v. ICC,* 736 F.2d 708 (D.C. Cir. 1984)

## STATEMENT OF THE CASE

### A.    Legal background

The STB, which succeeded the Interstate Commerce Commission (ICC), is the nation's economic regulator of railroads. Congress in 1920 gave the ICC the "power to require the use of … terminal facilities, including main-line track or tracks for a reasonable distance outside of such terminal, of any carrier, by another carrier or other carriers." Transportation Act of 1920, Pub. L. No. 66-152, ch. 91, § 405, 41 Stat. 456, 479-480.

As the ICC remarked after the law's passage, "[t]he object of the statute was to make more flexible the use of existing terminal facilities, … an extension of the general principle that in many instances, and from the very nature of the business of a common carrier, the interest of the public imposes important qualifications on the manner of use of the property employed in the carrier service." *Hastings Com. Club v. Chicago, Milwaukee & St. Paul Ry.*, 69 I.C.C. 489, 493 (1922), *rev'd on other grounds*, 107 I.C.C. 208 (1926).[2]

Then as now, the statute tasked the agency with determining whether granting a right of use would "be in the public interest and [] be practicable, without substantially impairing the ability of a carrier owning or entitled to

---

[2]    Decisions of the ICC are published in the Interstate Commerce Commission Reports, which are accessible via https://catalog.hathitrust.org/Record/003916145.

the enjoyment of terminal facilities to handle its own business." 41 Stat. at 479-480; *see* 49 U.S.C. § 11102(a). The agency immediately recognized this standard as broad. "In determining what is 'in the public interest' in a given case," the agency stated, "we must take into consideration not only the interests of the particular shippers located at or near the terminal involved but also the interests of the carriers and of the general public." *Mfrs. Ass'n of York v. Penn. R.R.*, 73 I.C.C. 40, 49 (1922); *see also, e.g., Seaboard Air Line R.R. Co.—Use of Terminal Facilities*, 327 I.C.C. 1, 8 (1966) ("In determining what is 'in the public interest' we have considered, as required, the interests of the residents of the city of Miami, the interests of the shippers using the service involved, the interests of the carriers, and the interests of the public in general.").

Prior terminal trackage rights cases have involved attempts by one freight railroad to use an "incumbent" freight railroad's terminal facilities to compete for the same pool of customers (*i.e.*, shippers). Wary of requiring one freight carrier to host a rival aiming to poach business, the ICC and STB have considered that zero-sum dynamic when assessing the public interest. *See, e.g. York*, 73 I.C.C. at 50 (weighing the "considerable" "loss to [the incumbent carrier]" against "the gain to" the prospective tenant). Until

this case the agency had not addressed whether a local governmental authority should be granted use of a private freight carrier's track to provide public transportation service that the freight carrier does not provide.

Still, Congress anticipated that this situation might arise and provided for it. In 1995, Congress passed the ICC Termination Act (ICCTA) (Pub. L. No. 104-88, 109 Stat. 803), which further deregulated the rail industry and created the STB. ICCTA introduced two relevant changes. First, Congress generally eliminated the STB's oversight over "public transportation provided by a local government authority" (49 U.S.C. § 10501(c)(2)(A)) and eliminated former code sections 10908 & 10909, which had empowered the ICC to prevent or delay the discontinuation of certain passenger rail transportation. *See* Pub. L. 85-625, § 5, 72 Stat. 568, 571-572 (1958).

Second, Congress expressly provided for the STB's "jurisdiction under section 11102" (the section pertaining to terminal trackage rights) "over transportation provided by a local governmental authority," if the local governmental authority would have been subject to ICC jurisdiction immediately prior to ICCTA's effective date. *Id.* § 10501(c)(3)(B).

The House committee report explained that "commuter rail or other mass transportation authority embodies the public policy decision of the State to devote resources to the known benefits of commuter rail and other mass transportation services." H.R. Rep. 104-311, at 104. Thus, "[w]here the

applicant for relief under [the terminal trackage rights] provision is a public mass transportation authority," the "public interest standard would virtually always be satisfied." *Id.*; *see* H.R. Conf. Rep. 104-422, at 184 (1995) (same).

**B.  Factual background**

**1.  Metra's commuter rail service**

Metra operates the largest U.S. commuter rail system by size and fourth-largest by ridership. Metra consists of two governmental entities: the Commuter Rail Division of the Regional Transportation Authority (CRD) and the Northeast Illinois Regional Commuter Railroad Corporation (NIRCRC). App.13. The "Metra" service mark brands all CRD passenger rail services. *Id.* Metra is a unit of local government created by the Illinois legislature to provide for Chicago's commuter rail service.

Metra was formed to avoid a catastrophic collapse in regional passenger service caused by economic failure in the freight rail industry, with the conviction that public transportation is "essential to the public health, safety and welfare" and to "economic well-being, maintenance of full employment, conservation … and reduction of traffic congestion." 70 ILCS 3615/1.02(a)(ii).

Metra's commuter service operates on a hub-and-spoke system connecting downtown Chicago with points in northeast Illinois and southeast Wisconsin:



App.14.

Metra owns and operates some of its lines; others are owned by private freight railroads. App.13. Commuter service on privately owned lines is operated by Metra or the freight railroad under contract with Metra. *Id.*

### 2. The UP Lines

UP is among the nation's largest freight carriers. It owns the three lines at issue here: the UP-North line, which terminates in Kenosha, Wisconsin; the UP-Northwest Line, which terminates in Harvard, Illinois, with a branch to McHenry, Illinois; and the UP-West Line, which terminates in Elburn, Illinois. App.15. All three lines originate in downtown Chicago. *Id.* The UP-North and UP-Northwest lines predominantly handle Metra's commuter service. App.515. The UP-West line is a busy artery handling both freight and commuter trains, where Metra has funded a third mainline track to alleviate congestion. *Id.*

The UP Lines have provided passenger service since before the Civil War. App.15-16. Dozens of Chicago-area communities were planned and developed around them. App.106.

Tens of thousands of riders use the UP Lines daily. They account for 39% of Metra's total ridership (App.103), which equates to approximately 13 million passenger trips annually (App.52).

Pursuant to "fixed facilities agreements" (FFAs), Metra and its predecessor funded capital improvements to the UP Lines totaling over $1 billion.

App.17. Since 2017 alone, Metra has invested more than $235 million into the UP Lines. App.559. That total is twice UP's capital investment in right-of-way projects on the UP Lines, and *all* the capital invested in stations. App.560.

### 3. UP's exit from commuter service

In 1975, with commuter service operated by UP's predecessor on the brink of collapse, Metra's predecessor intervened. App.206-207. For nearly fifty years, UP (or its predecessor) operated the service under a purchase of service agreement (the PSA) with Metra (or its predecessor). App.16.

In 2019, UP informed Metra that it would discontinue its operation of the commuter service. App.17. UP obtained a judgment declaring it had "unfettered authority" to discontinue its operation of the service with no requirement for approval by the STB. *Union Pac. R.R.*, 74 F.4th at 887.

Metra, therefore, assumed direct responsibility for commuter service operations on the UP Lines. App.17-18. By May 16, 2025, Metra had taken control of operations, at which point almost all the operating personnel previously employed by UP had transitioned to Metra's payroll. App.52.

Metra sought unsuccessfully to negotiate an agreement with UP to succeed the PSA, which expired on June 30, 2025. App.52-53.

Shortly after transitioning its Metra-related personnel to Metra—and after the STB proceeding commenced—UP sought to impose a non-negotiated "Condition of Entry" (COE) to govern Metra's access to the UP Lines following the PSA's expiration. App.269; App.619; *see also* App.290-302. The COE would have materially transformed Metra's position by, *inter alia*, doubling the compensation owed to UP and shifting UP's accident liability onto Metra. App.269; App.501-502; App.572-577. The COE stated it provides only a "non-exclusive, revocable limited license" for Metra to operate its service on the UP Lines and that UP "shall have the right to terminate" if Metra "breach[es] … the terms of this COE." App.292-300. UP has stated that the COE "reflects the only terms on which Union Pacific is willing to allow" Metra to use the UP Lines and "Metra ha[s] no right to use [the UP Lines] *except* as Union Pacific agrees." Complaint, Dkt. No. 1 ¶¶ 9, 88, *Union Pac. R.R. v. Commuter Rail Div.*, No. 1:25-cv-10785 (N.D. Ill. Sep. 8, 2025).

## C. Surface Transportation Board proceedings

With the PSA expiration looming and no replacement agreement forthcoming, Metra applied to the STB for statutory terminal trackage rights under Section 11102(a). App.7. UP opposed Metra's application on the merits (App.37; App.315) and moved to dismiss on jurisdictional grounds (App.210). While Metra's application was pending, UP issued the

non-negotiated COE, which it asserted was not subject to agency review. App.269; App.619; *see also* App.290-302.

The STB granted Metra's application. App.660. The STB noted that UP did not dispute "that Metra's use of the UP Lines for commuter services has been and would remain practicable within the meaning of the statute" (Add.21, App.680) or that Metra's use "would not substantially impair UP's ability to handle its own [freight] business" (Add.22, App.681).

Turning to the public interest, the STB rejected UP's argument that trackage rights turn on the presence of anticompetitive behavior by the incumbent carrier, an argument UP has since abandoned. The Board explained that here Metra is "seeking to continue to provide a different service—in and to an entirely different market involving different consumers (passengers, not shippers) and different products (commuter rail, not freight rail, service)—after UP elected to discontinue that service." Add.24, App.683.

The STB then explained why, considering all relevant facts, granting Metra a right to use the tracks to provide commuter service serves the public interest: "[D]ozens of communities were planned and built along the UP Lines" in reliance on having commuter service. Add.27, App.686. More than 13 million passenger trips are taken on the lines each year. *Id.* The com-

muter service "supports economic development and job growth, reduces traffic congestion, and helps protect the environment." Add.29, App.688. Even a "temporary cessation of service would have wide-ranging and harmful economic and social impacts." Add.27, App.686. And more than "$1 billion in public funds" had been invested in the UP Lines to support that service. *Id.*

Thus, the STB found "that there is a strong public interest in having this service continue." Add.27, App.686. The STB noted that its finding was consistent with legislative history stating that public transportation systems "virtually always" satisfy the public interest. Add.30, App.689 (quoting H.R. Conf. Rep. 104-422, at 184 (1995)).

Addressing the contention that trackage rights could be granted only if UP's service was inadequate, the STB explained that this standard does not apply, but that even if service inadequacy were a prerequisite, commuter service on the UP Lines is inadequate. UP had "elected to discontinue [commuter rail] service" (Add.24, App.683) and had "secured a declaration from a federal court confirming" it had no obligation to provide it (Add.29, App.688). In its place, UP proposed "access" under the COE. Absent a grant of usage rights, however, the commuter service would be "subject to unreviewable terms and pricing set unilaterally by UP and can disappear on a whim." Add.29-30, App.688-689. "Under these circumstances," the STB concluded, "the public interest requires greater certainty and granting Metra

14

terminal trackage rights is warranted to ensure the provision of adequate rail service to the public." Add.30, App.689.

The STB further found that the UP Lines in their entirety are eligible to be included within Metra's trackage rights as "terminal facilities, including main-line tracks for a reasonable distance outside of a terminal." 49 U.S.C. § 11102(a); Add.13-21, App.672-680. The STB accepted as the terminal the "Chicago Freight Terminal" (CFT), which both parties acknowledged qualified as a terminal area under any definition the agency might apply. Add.16, App.675. It found that some points on the UP Lines were within the CFT and that the points outside the CFT were a "reasonable distance" from the terminal because, without them, Metra could not serve its customers. Add.19, App.678.

Finally, the STB made Metra's terminal trackage rights effective immediately, and, consistent with the statute, declined to set interim terms. Add.33, App.692. The STB did not leave UP uncompensated, however, stating it "expects Metra to continue to compensate UP for its use of the UP Lines to avoid any interim impairment to UP's financial interests." Add.32, App.691. It further found UP's compensation "adequately secured" because the agency "pledge[d]" to set final compensation if necessary (Add.31 & n.64, App.690 & n.64) and there is "no real doubt" concerning Metra's ability to compensate UP for its use of the UP Lines (Add.31-32, App.690-691). The

agency directed the parties to "undertake a concerted, good faith effort to reach agreement on terms and compensation" for Metra's use and, if the parties were unable to agree, provided for either party to request the Board to establish conditions and compensation, as provided in § 11102(a). Add.32-33 & n.65, App.691-692 & n.65.

UP petitioned for review of the terminal trackage rights decision. It also sought a stay, which this Court denied.

The STB proceeding remains ongoing. After terminal trackage rights were granted, UP sought an interim condition regarding indemnity and liability issues (App.694), which the STB granted. App.721; App.729. On December 1, 2025, citing an impasse in the parties' negotiations, Metra asked the STB to initiate proceedings to set final conditions and compensation.

## SUMMARY OF ARGUMENT

The Court should deny the petition for review.

**I.** The STB properly found that terminal trackage rights are in the "public interest." 49 U.S.C. § 11102(a). The public interest standard calls for a fact-specific, policy-laden balancing, and the STB reasonably exercised its discretion in determining that the public interest favors certainty in ensuring the provision of Metra's "vital public service." Add.27, App.686.

The statute does not require the STB to make a service inadequacy finding in cases involving transportation by a local governmental authority

that does not compete with the incumbent freight carrier for customers. Regardless, the STB made a reasonable service inadequacy finding, and neither the statute nor the facts required the STB to base its analysis solely on terms UP is presently demanding—but may alter or rescind at any time.

**II.** The STB reasonably determined that the UP Lines are "terminal facilities, including main-line tracks for a reasonable distance outside of a terminal." 49 U.S.C. § 11102(a). Accepting UP's proposed terminal, the STB determined that "the entirety of the UP Lines to the last Metra station" were eligible for trackage rights under the statute and precedent. Add.21, App.680. In doing so, it reached the well-reasoned conclusion that granting trackage rights for the entirety of the UP Lines was reasonable, and that cutting them short—and stranding tens of thousands of passengers—would not be. That is all the STB needed to do.

**III.** The STB did not need to set interim or final terms before Metra's terminal trackage rights became effective. The statute permits use to begin if compensation is "adequately secured." 49 U.S.C. § 11102(a). Here, the STB reasonably concluded it was, based on the evidence and decades of precedent. That approach raises no concerns under the Takings Clause—in the very case UP cites, the Supreme Court made clear that "government … regulation *may* … proceed in the absence of contemporaneous compensation[,]

[g]iven the availability of post-taking compensation." *Knick v. Twp. of Scott*, 588 U.S. 180, 202 (2019) (emphasis added).

## STANDARD OF REVIEW

This Court reviews the STB's decisions under the deferential "arbitrary or capricious" standard of review. *City of Lincoln v. STB*, 414 F.3d 858, 860 (8th Cir. 2007); *see* Br.23-24. "Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 180 (2025). Findings of fact may be set aside only where they are "unsupported by substantial evidence" (*City of Lincoln*, 414 F.3d at 860), and the decision must be upheld if the agency has "examine[d] the relevant data and has articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choices made" (*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted)). To resolve any questions of law that arise, the Court must apply the "traditional tools of statutory construction" to determine the "best reading of the statute." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-401 (2024).

**ARGUMENT**

## I. THE STB REASONABLY FOUND THAT GRANTING TERMINAL TRACKAGE RIGHTS SERVES THE PUBLIC INTEREST.

The STB reasonably found that preserving the continuity of Metra service on the UP Lines is in the public interest. Metra's service is economically critical and supported by decades of taxpayer investment. Contrary to UP's principal argument on appeal, the STB was not required to analyze the question of public interest as if Metra were a second private freight carrier trying to use UP's tracks to compete with UP for freight business. Nor would that inquiry, if applicable, be based solely on whether UP is presently demanding "commercially reasonable" terms—a test UP admits has no support in agency precedent.

Here, considering that Metra is a public entity providing a public transportation service that UP has exited and refuses to provide, the STB reached the obvious and reasonable conclusion, expressly provided for under the governing statute, that preserving Metra's service is in the public interest. The Court should defer to the STB's expert exercise of policy judgment.

**A.** **Congress granted broad policymaking discretion to the STB through the public interest standard.**

This Court, like the STB did, "must start, as always, with the plain text." *United States v. Lachowski*, 405 F.3d 696, 699 (8th Cir. 2005). Congress provided that "[t]he Board may require terminal facilities, including main-line tracks for a reasonable distance outside of a terminal, owned by a rail carrier providing transportation subject to the jurisdiction of the Board under this part, to be used by another rail carrier if the Board finds that use to be practicable *and in the public interest* without substantially impairing the ability of the rail carrier owning the facilities … to handle its own business." 49 U.S.C. § 11102(a) (emphasis added).

The text affords the STB broad policymaking discretion to award terminal trackage rights, the exercise of which the Court reviews deferentially.

From 1920 to today, the term "public interest" has meant "[s]omething in which the public as a whole has a stake"—an "interest that justifies government regulation." *Public Interest*, Black's Law Dictionary (12th ed. 2024); *cf. Public*, Henry Campbell Black, *A Law Dictionary* 964 (2d ed. 1910) ("Public welfare. The prosperity, well-being, or convenience of the public at large, or of a whole community.").

A statutory "public interest" standard is thus "expansive" (*Nat'l B'casting Co. v. United States,* 319 U.S. 190, 219 (1943)) and "calls for an inherently policy-based decision best left in the hands of an agency" (*United*

*States v. Bean,* 537 U.S. 71, 77 (2002)). That is, "[t]he 'public-interest' standard … provides significant discretion" to the agency. *Zimmer Radio of Mid-Missouri, Inc. v. FCC*, 145 F.4th 828, 844 (8th Cir. 2025) (alterations incorporated). It "is 'a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy.'" *Id.* (quoting *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 593 (1981)).

After all, agency authority "to regulate" is often conveyed by use of "a term or phrase that 'leaves agencies with flexibility.'" *Loper Bright*, 603 U.S. at 395 (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)). The term "public interest" is one such term. *Zimmer Radio*, 145 F.4th at 845. An agency, therefore, may "implement its view of the public-interest standard … so long as that view is based on consideration of permissible factors and is otherwise reasonable." *Id.* at 844 (quoting *WNCN Listeners Guild*, 450 U.S. at 594).

The STB and the ICC have long recognized the broad discretion Congress provided. The ICC explained that "[i]n determining what is 'in the public interest' we have considered, as required, the interests of the residents of the [surrounding community], the interests of the shippers using the service involved, the interests of the carriers, and the interests of the public in general." *Seaboard Air Line*, 327 I.C.C. at 8; *see also, e.g., Chicago & N.W. Ry. v. Ann Arbor R.R.*, 263 I.C.C. 287, 296 (1945) (public interest

standard satisfied based solely on lack of impairment to incumbent); *Port Arthur Chamber of Com. v. Texarkana & Fort Smith Ry.*, 136 I.C.C. 597, 599 (1928) (public interest satisfied where "the present situation hampers" public development and trackage rights "would result in a freer and greater flow of traffic through that port"); *cf. Del. & Hudson Ry. Co. v. Consol Ry.*, 367 I.C.C. 718, 723 (1983) (under Section 11102(c), evaluating the public interest by weighing "[a]ny detriment incurred" by an incumbent against "the substantial benefits to the public from the proposed operation").

### B. The STB's public interest finding reasonably exercised its expert judgment.

When, as here, Congress has granted policymaking discretion to an expert agency, courts review the agency's exercise of judgment deferentially. Though "courts decide legal questions by applying their own judgment," Congress has "mandate[d] that judicial review of agency policymaking and factfinding be deferential." *Loper Bright*, 603 U.S. at 392; *see* 5 U.S.C. § 706(2)(A), (E). Under this "deferential" standard, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 180.

Such deference is warranted as to the agency's expert application of the public interest standard. *See City of St. Louis v. Dep't of Transp.*, 936

F.2d 1528, 1535 (8th Cir. 1991) (Agency action pursuant to "the public-interest standard, when based on a rational weighing of competing policies, is not to be set aside by the Court of Appeals."). The STB's thoroughly explained public interest finding satisfies this deferential review.

**1.** As the STB explained, here, there is "compelling reason to award Metra terminal trackage rights." Add.27, App.686.

Namely, "Metra provides a vital public service over the UP Lines." Add.27, App.686. Its services are essential for tens of thousands of daily riders, who collectively take "more than 13 million passenger trips" annually. They "support economic development and job growth; help connect the entire metropolitan Chicago region; reduce traffic congestion; reduce road and parking costs; protect the environment and public health; provide households with access to and from work, school, and essential appointments; create and facilitate housing opportunities; and provide an otherwise unavailable transportation option for low-income individuals and families." Add.27 n.55, App.686 n.55. The public has invested "more than $1 billion in public funds in the UP Lines to improve UP's infrastructure," reflecting the public's own judgment of what serves its interest. Add.27, App.686.

Metra's continued service on the UP Lines is vital, and loss of this service, even temporarily, would devastate the region. Recognizing the in-

terest in having Metra's service "continue," the STB had no trouble concluding that terminal trackage rights are necessary. Add.27, App.686; *see Seaboard Air Line*, 327 I.C.C. at 7 ("Obviously, long-continued prior service demonstrates a public need for maintaining operations."). More, the STB explained that "the record demonstrates that Board intervention is warranted to ensure that result." Add.27, App.686. That is—because UP had refused to allow Metra any right to access the UP Lines except "at UP's sole discretion"—the Board found the "future of commuter rail service over the three UP Lines" was uncertain and needed protection. Add.28, App.687.

**2.** Though no public commuter transit system has invoked Section 11102(a) before, the STB's public interest analysis in this context is in complete accord with ICCTA's design. ICCTA eliminated the STB's general jurisdiction over "public transportation provided by a local government authority." 49 U.S.C. § 10501(c)(2)(A). And it repealed provisions that had authorized the ICC to prevent or delay discontinuation of passenger rail services. *See* Pub. L. 85-625, § 5, 72 Stat. 571-572. Counterbalancing these changes, Congress affirmatively ensured that terminal trackage rights would continue to be available for qualified and existing ICC-jurisdictional public transportation systems. *See* 49 U.S.C. § 10501(c)(3)(B).

ICCTA's history is uncommonly clear about how to assess the public interest under Section 11102(a) with respect to public transportation agencies. Were there any ambiguity about the application of the statutory public interest standard, the legislative history resolves it. *See, e.g.*, *Northshore Mining Co. v. Sec'y of Lab.*, 46 F.4th 718, 730 (8th Cir. 2022) ("If the language of the statute is ambiguous, the court may examine legislative history and other authorities to determine legislative intent.") (quotation marks and ellipsis omitted); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857, 865-866 (8th Cir. 2011) (extensively analyzing legislative history of ICCTA in particular).

Both the ICCTA House and Conference reports state that "[w]here the applicant for relief … is a public mass transportation agency," the "public interest standard would *virtually always* be satisfied." H.R. Rep. 104-311, at 104 (emphasis added); H.R. Conf. Rep. 104-422, at 184 ("[A] local transportation authority's request would virtually always satisfy the public interest standard."); *see e.g.*, *Hous. Auth. of City of Omaha, Neb. v. U.S. Hous. Auth.*, 468 F.2d 1, 6 n.7 (8th Cir. 1972) (among types of legislative history, "committee reports represent the most persuasive indicia of congressional intent.").

That is for good reason: Terminal trackage rights for public transportation agencies are "virtually always" in the public interest because "the

commuter rail or other mass transportation authority embodies the public policy decision of the State to devote resources to the known benefits of commuter rail." H.R. Rep. 104-311, at 104; *accord* 141 Cong. Rec. H15600-02, 1995 WL 759690 (Rep. Shuster) (metropolitan commuter railroads are "owned and operated for the public interest"). Where a State has invested in public transportation, it has already made a public interest judgment upon which the STB can confidently rely.

Just so here. The Illinois legislature determined that public transportation services are "essential to the public health, safety and welfare" and to "economic well-being [and] maintenance of full employment," creating Metra to effect those purposes. 70 ILCS 3615/1.02(a)(ii). Taxpayers have invested more than $1.25 billion into improving the UP Lines to secure that public benefit. *See* App.17. The STB's public interest finding was supported and eminently reasonable.

**C.    The STB's decision is not constrained by a service inadequacy standard here; even if it were, the STB reasonably determined that service was inadequate.**

UP asserts that the statute's broad public interest standard should be constrained by a "specific, demanding" service inadequacy "test" (Br.25) that has been applied when one freight carrier seeks usage rights over the tracks of an incumbent competitor. UP further proposes that in the context

of commuter service, the measure of inadequate service is whether the present terms UP has unilaterally demanded are "commercially reasonable," a made-for-purpose standard which UP admits is supported by "no precedent." Br.29.

Neither argument provides a basis for vacating the Board's decision.[3]

1. **The STB did not need to apply a service inadequacy standard associated with the introduction of competing freight service.**

UP admits that "in a vacuum"—that is, reading the text on its face—the statute employs "open-ended language that gives the agency broad discretion" in assessing the public interest. Br.24-25; *accord supra* 20-26

---

[3] UP's service inadequacy position also fails for a threshold reason: This Court will not "consider arguments a party failed to raise before the agency" (*Cent. S.D. Co-op. Grazing Dist. v. Sec'y of U.S. Dep't of Agric.*, 266 F.3d 889, 901 (8th Cir. 2001)), but UP never asked the STB to make a service inadequacy determination. In its case-in-chief, UP relied on the position that Metra must show anticompetitive conduct on UP's part, which the STB rejected. Add.24-25, App.683-684. UP first mentioned service inadequacy in a post-evidence notice of supplemental authority (App.624), but that delayed presentation is "fatally late." *Otter Tail Power Co. v. Surface Transp. Bd.*, 484 F.3d 959, 963 (8th Cir. 2007); *cf. United States v. Mathison*, 518 F.3d 935, 942 (8th Cir. 2008) ("[P]arties may not raise new arguments in Rule 28(j) letters."). Additionally, UP faults the STB for not basing its public interest determination on the supposed "actual terms on which [UP] *is* willing to continue access." Br.33 (emphasis in original). But UP never argued that test before the STB, nor presented any such terms. UP did not submit the COE or any other set of "actual terms" in evidence, other than proposed *interim* terms (App. 350) to apply only *after* an award of trackage rights.

Unsatisfied with the statutory language, UP argues that beneath the plain text lurks "a specific, demanding test" (Br.25) not expressed in words but ascertainable through UP's parsing of the statute's reenactment history. According to UP, this history compels the STB to adjudicate a commuter rail system's application to use the lines of a freight carrier for a non-competing public passenger service via precedent addressing only freight carriers' requests to use a competing freight carrier's tracks to move freight. *See* Br.25-26 (citing *Grand Trunk Corp. v. Surface Transp. Bd.*, 143 F.4th 741, 748-749 (7th Cir. 2025)).

That argument is wrong several times over.

**a.** *First*, fundamentally, UP cannot use the reenactment canon to override the plain statutory text. That is, "[w]here the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction." *Brown v. Gardner*, 513 U.S. 115, 121 (1994); *accord, e.g.*, *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 478 (1992) (An "administrative interpretation followed by congressional reenactment cannot overcome the plain language of a statute."). The Court need do no more than read plain statutory text to reject UP's argument: As demonstrated above (*supra* 20-22), the phrase "in the public interest" grants broad discretion to the agency—it does not compel any rigid, one-size-fits-all test.

**b.** *Second*, and critically, prior to the reenactments UP highlights (and since), the ICC had *never* addressed a situation in which a commuter carrier was seeking access rights to a line owned by a freight carrier. UP flatly concedes this point: "To be sure, no precedent spells this out; the agency *has not applied the statute in this context before*." Br.29 (emphasis added).

This means there was nothing for Congress to ratify. A fundamental "requirement[] for congressional ratification" is a "consensus" of authority "so broad and unquestioned that we must presume Congress knew of and endorsed it" through reenactment. *Jama v. ICE*, 543 U.S. 335, 349 (2005) (rejecting reenactment canon where consensus was lacking); *see Tex. Dep't of Housing v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536 (2015) (requiring "a uniform interpretation" for reenactment canon) (quotation marks omitted); William Eskridge, *Interpreting Law* 421-422 (2016) ("The [reenactment] rule is inapplicable when there is no settled standard Congress could have known.").

No such consensus exists here. *No* ICC case in front of Congress involved an application like Metra's. Rather, every authority addressed the different context of one freight carrier seeking to access the lines of an incumbent with whom the applicant directly competes. Whatever ICC decisions may have said about how the public interest should be analyzed in

that context, they said nothing about how it should be analyzed in the quite different context of a commuter carrier use.

Moreover, while *some* ICC decisions emphasized inadequate service in assessing whether there was an "actual necessity or a compelling reason" for trackage rights, others did not. *See, e.g., Del. & Hudson Ry. Co.,* 367 I.C.C. at 723; *Seaboard Air Line*, 327 I.C.C. at 8; *Chicago & N.W. Ry.*, 263 I.C.C. at 287; *Port Arthur Chamber of Com.*, 136 I.C.C. at 599. In *Spokane, Portland & Seattle Ry.—Control—Peninsula Terminal Co.*, the ICC flatly rejected the notion that "the public interest should be so narrowly construed," explaining the standard is "'more flexible'" because "'the interest of the public imposes important qualifications on the manner of use of the property employed in the carrier service.'" 348 I.C.C. 109, 140 & n.20 (1975) (quoting *Hastings*, 69 I.C.C. at 493).

The service inadequacy standard UP invokes simply reflects how the ICC exercised its discretion to assess the public interest in a particular context—one where the agency had to weigh whether it was justified in requiring an incumbent freight carrier to host a rival, and thereby share its shipping customers with its direct competitor. No such question is presented by a local governmental authority's application under § 11102(a) to secure trackage rights for commuter service. The distinction is critical.

For example, in *Manufacturers Ass'n of York*, an early trackage rights case, the ICC framed the public interest inquiry broadly: "we must take into consideration not only the interests of the particular shippers located at or near the terminal involved but also the interests of the carriers and of the general public." 73 I.C.C. at 49. But "in this case," *i.e. York*, the ICC found troubling the "practical effect [of] requiring a division between [the incumbent and tenant] carriers of traffic naturally tributary to the [incumbent]." *Id.* at 49-50. Before "depriving the [incumbent] carrier … of an important volume of the traffic along its line," the ICC examined whether shippers were "inadequately served" by the incumbent. *Id. See also, e.g., Lehigh Valley R.R. Trackage Rights*, 312 I.C.C. 389 (1961) (assessing whether the incumbent carrier "provide[s] … []adequate service to the shipping public" or whether "the public interest requires additional competition.").

In *Seaboard Air Line*, different circumstances compelled a different analysis placing considerably less emphasis on service inadequacy. *See* 327 I.C.C. at 7-9. There, two freight carriers, Seaboard and East Coast, long jointly served the port of Miami using publicly owned tracks. *Id.* at 3. Then the city built a new port, which connected to tracks owned by East Coast but not Seaboard. *Id.* at 4. Seaboard, seeking terminal trackage rights to reach the new port, specifically said it would "not serve shippers intermediate to the new facility" but wanted "only to continue a longtime service." *Id.*

31

at 7. Thus, terminal trackage rights inflicted no competitive harm on East Coast. In that context, the ICC's analysis barely discussed service adequacy, instead broadly balancing "the interests of the residents of the city of Miami, the interests of the shippers using the service involved, the interests of the carriers, and the interests of the public in general." *Id.* at 8.

Here, the service inadequacy inquiry makes no sense. Metra and UP do not compete for customers. UP *discontinued* Metra's commuter service, which is why Metra sought terminal trackage rights in the first place. UP faces no risk of Metra diluting its market share. Without any need to weigh the pros and cons of "additional competition" (*Lehigh Valley*, 312 I.C.C. at 392), the service inadequacy standard has no logical application.

**c.** *Third*, legislative history disproves UP's ratification argument.

UP notes that in 1995, Congress "reenacted both provisions"—terminal trackage rights and reciprocal switching—as part of ICCTA "without changing the relevant language." Br.27. UP argues that in that reenactment, Congress silently incorporated into the public interest standard the service inadequacy inquiry appearing in past ICC cases involving two freight carriers. The actual legislative history tells a different story. With ICCTA, Congress eliminated the ICC's jurisdiction over public transportation authorities in general, but Congress specifically protected their eligibil-

ity for terminal trackage rights (49 U.S.C. § 10501(c)(3)(B))—and the un-contradicted legislative history is that Congress intended a local authority's terminal trackage rights application to "virtually always" satisfy the public interest standard. H.R. Conf. Rep. 104-422, at 184; H.R. Rep. 104-311, at 104; *see supra* at 24-26.

For UP's ratification argument to work, Congress must have intended to silently adopt a "specific, demanding" service inadequacy test for the stat-utory public interest standard (Br.25) and apply it to local governmental authorities seeking terminal trackage rights *in the very same statute* for which the Conference Report expressly states its "intent that … a local transportation authority's request *would virtually always satisfy* the public interest standard." H.R. Conf. Rep. 104-422, at 184 (emphasis added); *see also* H.R. Rep. 104-311, at 104 (similar). That is not a plausible construction.

Consideration of that legislative history is appropriate. Because the reenactment canon is itself merely a "presum[ption]" about what the legis-lature "intended" (*Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 243 (2011)), UP, in making its reenactment argument, has opened the door to that presump-tion being "rebutted by conflicting legislative history." 2B *Sutherland Stat-utory Construction* § 49:8 (7th ed.). *See Estate of Cowart*, 505 U.S. at 478 (rejecting ratification where "the legislative history … indicate[s] an intent

to overturn" the allegedly ratified construction); *Brown*, 513 U.S. at 121 (rejecting ratification argument where "there is no … evidence" in "the record of congressional discussion" or otherwise "to suggest that Congress was even aware of the [agency's] interpretive position."); *Learning Resources, Inc. v. Trump*, __ S. Ct. ___, 2026 WL 477534, at \*12 n.5 (U.S. Feb. 20, 2026) (consulting legislative history in rejecting reenactment argument); *cf. C.I.R. v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955) ("Re-enactment—particularly without the slightest affirmative indication that Congress ever had the [relevant administrative interpretation] before it—is an unreliable indicium at best.").

In other words, *UP* has asked the Court to look past the plain statutory text and investigate congressional intent. The Court need not engage in that inquiry where the statutory text is clear. But if it does, the best evidence of that intent, like the text itself, refutes UP's position.

**d.** Apart from ICCTA, UP says, Congress "reused the same language [from the terminal trackage rights provision] in the adjacent reciprocal-switching provision, now codified at § 11102(c)." Br.26. That is not quite correct. Although both provisions include the words "public interest," the surrounding language in the reciprocal switching provision is different. *See* 49 U.S.C. § 11102(c)(1) (requiring a finding that granting the remedy is "practicable and in the public interest, *or where such agreements are necessary to*

34

*provide competitive rail service*") (emphasis added). *See Iowa v. Wright*, 154 F.4th 918, 944 (8th Cir. 2025) (discussing the meaningful-variation canon).

In any event, UP's argument that the reciprocal switching provision (now Section 11102(c)) modified the meaning of the pre-existing terminal trackage rights provision (now Section 11102(a)) gets the canon backwards: While "repetition of [authoritatively construed] language in a new statute indicates … intent to incorporate [those] interpretations" into the *new* statute (*Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)), it does not go back in time and insert those interpretations into the original, un-amended statute. On the contrary, while "Congress's use of similar language in other statutes after" the relevant interpretation was issued "might (or might not) tell us what later Congresses understood *those other* statutes to mean, it tells us nothing about Congress's understanding of the language it enacted in" the *original* statute. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (emphasis added).

UP also points to the Conference Report for the Staggers Act, which, in enacting that provision, stated that "[t]he standard 'practicable and in the public interest' [governing reciprocal switching] is the same standard the Commission has applied in considering whether to order the joint use of

terminal facilities." H.R. Rep. 96-1430, at 116 (1980); *see* Br.26.[4] But this fails for the same reason—whatever Congress intended in enacting the Staggers Act says nothing about its earlier enactment of what is now Section 11102(a). Nor, most importantly here, does it tell us what Congress intended in making the Section 11102(a) remedy available to qualifying local governmental authorities when it passed ICCTA.

**e.** The Seventh Circuit's *Grand Trunk* decision, on which UP principally relies, is readily distinguishable. That case arose in a separate context—it involved a rule directed to "competitor [freight] rail carrier[s]" (143 F.4th at 745), rather than a public transportation provider seeking terminal trackage rights. It provides no guidance on how the public interest standard applies in that latter context (which holds a unique place in the statutory scheme, pages 29-32, *supra*).

*Grand Trunk* also involved the STB's reciprocal switching power under Section 11102(c), not the terminal trackage provision under Section 11102(a). As discussed above (pages 34-35, *supra*), UP's ratification arguments relying on the Staggers Act's introduction of that code section—upon

---

[4] UP misquotes the report. The report did *not* say prescriptively that the reciprocal switching standard "is to be" the same that the Commission had previously applied. Br.26. It states, descriptively, that the text of the new reciprocal switching provision "is the same standard" that already existed in the statute for terminal trackage rights. H.R. Rep. 96-1430, at 116.

which the Seventh Circuit also relied (*Grand Trunk*, 143 F.4th at 748-749)—have no bearing on the meaning of the preexisting Section 11102(a), and especially how it applies to commuter rail carriers. The Court should not expand *Grand Trunk* to the very different context presented here.

> **2.     The STB reasonably determined that UP's non-negotiated access conditions were inadequate.**

Straying even further from statutory text, UP asserts the STB should have to judge the public interest based solely on whether Metra "has access to the lines on reasonable terms" because whether there is "'adequate service'"—itself the wrong test, *see supra*—"is best understood to address the adequacy of the passenger railroad's *access* to the freight railroad's lines." Br.29 (emphasis in the original). In other words, because UP says it will allow Metra access to the UP Lines (for now) on terms UP (unilaterally) deems reasonable, UP contends that the STB *cannot* find trackage rights to be in the public interest.

The STB's exercise of discretion is reviewed only for its reasonableness, however, and the STB—considering all the evidence before it—reasonably concluded that UP's proposed non-negotiated, access-only service was inadequate.

**1.** To begin, UP's proposed test is inconsistent with the structure of Section 11102(a). It asks the STB, *before* awarding trackage rights, to decide if the incumbent carrier's proposed conditions and compensation for access

are reasonable. The statute provides otherwise: *After* the STB awards terminal trackage rights, "[t]he rail carriers are responsible for establishing the conditions and compensation for use of the facilities." 49 U.S.C. § 11102(a). If they "cannot agree," the STB decides the governing terms. *Id.*

UP's approach subverts the statute by adding a step never contemplated by Congress, upending the balance Congress struck. Congress's plan encourages bilateral negotiation, and, if negotiation fails, allows both parties to present their proposed terms on equal footing, with the STB as final arbiter, including of compensation based on "condemnation principles." 49 U.S.C. § 11102(a). UP's approach asks the STB to first adjudicate *only* the incumbent's non-negotiated terms, in the place of terms agreed by the parties or established by the STB. *Id.*

Congress could have imposed a different statutory plan that turns on whether the incumbent carrier's private conduct is within a zone of reasonableness; such an inquiry was the core of rate regulation under the Interstate Commerce Act itself, as well as other statutes. *See, e.g.*, *Middlewest Motor Freight Bureau v. United States*, 433 F.2d 212, 221 (8th Cir. 1970) ("[T]he carrier has the right to fix its own rates at any level it sees fit, so long as it … is, upon challenge, able to show that its rates are just and reasonable."); *N.Y. State Pub. Serv. Comm'n v. FERC*, 104 F.4th 886, 891 (D.C. Cir. 2024) (Under Federal Power Act, "so long as a utility's rates fit within

the zone of reasonableness, FERC is obligated to approve them."). Congress did not do so for terminal trackage rights, which compels rejection of UP's proposed test. *See, e.g.*, *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision.").

**2.** As to its test, UP concedes that "no precedent spells this out; the agency has not applied the statute in this context before." Br.29. That is reason enough to reject extension of the service inadequacy inquiry to the current context—not reason to adopt service inadequacy here for the first time, only to immediately replace it with a new test that UP has made up from whole cloth.

The service inadequacy inquiry traditionally asks whether "shippers"—freight railroad customers—"are so inadequately served at the present time as to warrant [the agency], from the standpoint of the public interest, to require the [incumbent freight carrier] to inaugurate additional terminal facilities and share them with [another rail carrier]." *Jamestown Chamber of Com. v. Jamestown, Westfield & N.W. R.R.*, 195 I.C.C. 289, 292 (1933). Put differently, can the incumbent "provide [adequate] service between the desired points … to the shipping public," or does "the public interest require additional competition[?]" *Lehigh Valley*, 312 I.C.C. at 392.

Applying the service inadequacy standard to the context of commuter service would mean asking whether *passengers*—the relevant "public"—are adequately served absent terminal trackage rights. Congress is not as concerned with whether *Metra* gets a fair deal as whether the public Metra *serves* (its passengers) receive adequate passenger service. The relevant "service" is not Metra's "access to [the incumbent carrier's] lines." *Cf.* Br.29. It is, just as with freight shipping of goods, whether passengers can reliably get to and from "desired points." *Lehigh Valley*, 312 I.C.C. at 392.

For that question, the STB must do more than ask whether UP is presently offering (what it unilaterally considers) reasonable terms. Rather, the statute requires the STB to make a "find[ing]" regarding the "public interest" (49 U.S.C. § 11102(a)), with no constraint on the facts it may consider.

**3.** While questioning its applicability (Add.27 n.58, App.686 n.58; Add.30, App.689), the STB applied the service inadequacy standard to make a reasonable and thoroughly explained public interest finding based on all the evidence before it. It agreed that Metra must be able to "provide [its] service to the public on transparent, reasonable, and bilateral terms and with the certainty required, as Congress understood, to run a railroad." Add.26, App.685. It further found "there is a strong public interest in having

[Metra's] service continue, and … the record demonstrates that Board intervention is warranted to ensure that result." Add.27, App.686.

The STB agreed that Metra had demonstrated intolerable uncertainty in its ability to deliver commuter service on the UP Lines: absent terminal trackage rights, "[t]he future of commuter rail service over the three UP Lines would be dictated by UP …. Metra would have no right to refuse unreasonable terms and conditions and no recourse if UP decided to deny access altogether." Add.28-29, App.687-688. The STB found that subjecting this "heavily trafficked public commuter rail service … to unreviewable terms and pricing set unilaterally by UP," diminishing a longstanding public service into one which UP can make "disappear on a whim," is "not adequate service." Add.29-30, App.688-689. Rather, "the public interest requires greater certainty." Add.30, App.689.

That conclusion is reasonable. The public is not adequately served by commuter rail service that (UP says) has no durable legal right to exist and is thus a permanent target for service and pricing changes or unilateral cancellation by UP—particularly given Metra's massive, long-lived public investment in the UP Lines to make them useable for commuter service.

**4.** UP faults the STB for emphasizing Metra's "'vital public service'" (Br.30 (quoting Add.27, App.686)), which UP says "eschews the inadequate-service standard altogether" (*id.*). That is wrong. The STB explained why

the conditional access UP promised constituted inadequate service. UP might disagree with the STB's expert determination, but that is insufficient to overturn the "public interest" "find[ings]" made by the agency here. 49 U.S.C. § 11102(a); *see*, *e.g., Garland v. Ming Dai*, 593 U.S. 357, 367 (2021) ("Courts deferentially review the agency's fact determinations"); 5 U.S.C. § 706(2)(E).

UP also says the STB's analysis "turns the statutory test upside down" by compelling an inadequate service finding whenever "a freight railroad disputes that a passenger railroad is entitled to relief under § 11102(a)." Br.32. But the STB's analysis did not turn on UP's position in the litigation below, it focused on UP's *actions*—specifically, its "continued and repeated insistence that it has the unilateral right to set the terms and conditions under which Metra can access the UP Lines, including the ability to deny Metra access altogether," in combination with UP's lack of "obligation to provide passenger rail service" itself on those lines. Add.30, App.689.

Finally, UP argues that now "any existing or aspiring commuter railroad [can] force its way onto a freight railroad's lines," "effectively turn[ing] § 11102(a) into a guarantee of squatter's rights." Br.36-37. This policy argument is both irrelevant to the statutory inquiry and unfounded. Congress imposed strict jurisdictional limitations on the STB's authority to consider trackage rights applications by local governmental authorities (49 U.S.C.

§ 10501(c)(3)(B))—which, as Metra showed below, few commuter systems could satisfy (App.282 & n.12)—along with requirements that terminal trackage rights be "practicable" and not impair the incumbent's ability to "handle its own business" (49 U.S.C. § 11102(a)). In the context of Metra's service, those latter standards were never in dispute. As the STB observed, "passenger rail service has operated over the UP Lines for more than 100 years, long before UP acquired them." Add.30 n.63, App.689 n.63.

## II. THE STB REASONABLY INCLUDED THE ENTIRETY OF THE UP LINES WITHIN ITS REMEDY.

Applying the plain statutory text, the STB reasonably exercised its statutory discretion to define the "terminal" at issue and conclude that the trackage rights should include the UP Lines in their entirety.

### A. The STB properly concluded that the UP Lines extend a reasonable distance outside of the terminal.

Trackage rights can be awarded for the use of "terminal facilities, including main-line tracks for a reasonable distance outside of a terminal." 49 U.S.C. § 11102(a). UP argued—and the Board accepted—that the terminal area is the Chicago Freight Terminal (CFT). Add.16, App.675. The only dispute is whether the STB reasonably concluded that the portions of the UP Lines outside the CFT are "main-line tracks for a reasonable distance outside of the terminal." 49 U.S.C. § 11102(a). It did.

**1.** The statute sets a discretionary, fact-specific standard. As the STB recognized, "the question of reasonable distance 'is to be determined in light of the facts in each case.'" Add.19, App.678 (quoting *Rio Grande Indus., Inc.—Purchase & Related Trackage Rights*, 1989 WL 246814, at *10 (I.C.C. Nov. 13, 1989)). The word "reasonable" is best read to "leave[] [the] agenc[y] with flexibility." *Loper Bright*, 603 U.S. at 395. Where, as here, "the issue involves the agency's specialized knowledge and Congress has vested the agency with discretion in a technical area," "courts should recognize the agency's presumed competence and expertise, and uphold the agency's conclusion if it is rationally based." *Wilson v. Commodity Futures Trading Comm'n,* 322 F.3d 555, 559 (8th Cir. 2003).

Undertaking the fact-specific statutory analysis, the STB found the entirety of the UP Lines are a "reasonable distance" outside the CFT. It focused on "several factors" in support of that conclusion:

> (1) Metra's system is "a defined commuter rail system that has been in operation for decades," not a "new and untested service;"

> (2) a shorter distance "would undermine the public interest" by "foreclos[ing] access to downtown Chicago for thousands of residents;"

> (3) the distance would not "impede[]" "UP's ability to conduct its freight operations;"

> (4) the endpoints are not "distant ends of main-line track" but have "yards located at" these points "that assist in the performance of important functions;"

(5) the UP Lines are "subject to centralized monitoring and coordination … which work to help ensure that freight and passenger traffic moves efficiently;" and

(6) "congestion" is unlikely because two tracks are "at most lightly used by UP" and Metra "invested in the construction of a 'third main'" on the other.

Add.19-20, App.678-679.

All these factors address the statute's "reasonable distance" standard. They explain why the distance of the entire UP Lines is "reasonable," either because it is not too long (*e.g.*, because Metra's service is longstanding and has proved to be compatible with UP's operations) or because any shorter distance would be unworkable (*i.e.*, by preventing thousands of Chicago-area residents from using Metra's service). The agency reasonably applied its expertise and discretion.

The STB also reasonably rejected UP's argument that the distance was unreasonable because it is greater than prior terminal trackage rights awards involving freight service. Add.18-19, App.677-678. As the agency explained, none of UP's examples involved a commuter rail system or suggested that physical distance, alone, determines reasonableness. *Id.*

## B. UP's position conflicts with the statute and misconstrues the STB's reasoned analysis.

**1.** UP's position appears to be that *before* determining whether main line tracks are a reasonable distance from the terminal, the STB first must determine that those track sections are "terminal facilities" *independently*

45

of their distance from the terminal. Br.40 ("Thus, the 'main-line tracks' covered by the statute must *be* 'terminal facilities.'").[5]

But that is not what the statute says. Instead, the statute expressly *defines* "terminal facilities" to *"includ[e]* main-line tracks for a reasonable distance outside of a terminal." 49 U.S.C. § 11102(a) (emphasis added). In other words, the statute brings main-line tracks within the definition of "terminal facilities" so long as they are a reasonable distance from the terminal, even if the ordinary meaning of "terminal facilities" would not include main-line tracks. *Cf., e.g.*, *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from a term's ordinary meaning."). UP's position conflicts with the statutory text and, therefore, is incorrect.

**2.** The remainder of UP's argument misconstrues the STB's reasoned analysis in support of its determination. UP objects that the STB merely "assumed" the relevant terminal and then "treat[ed] the 'reasonable distance' determination as an independent inquiry with no relation to the terminal itself." Br.43-44. But the STB *did* "ascertain the relevant terminal" and "identify the distance of adjacent main-line track, within a reasonable distance, that is part of the terminal's functioning." *Id.*; *see* Add.14-16,

---

[5]   UP again advances an argument it failed to make to the STB. App.329-340. The argument is thus waived. *Otter Tail Power Co.*, 484 F.3d at 963).

App.673-675 (defining the terminal); Add.16-21, App.675-680 (explaining why the entire UP Lines satisfy the reasonable distance standard).

*First*, the STB did not just "assume" the terminal. Br.43. The STB expressly defined the terminal, reasonably selecting the definition UP proposed: "The Board will construe the terminal area in this proceeding as the Chicago Freight Terminal (or CFT). Both parties acknowledge that the CFT qualifies as a terminal area under any definition the Board may apply." Add.16, App.675. The STB determined that it "need not" reach either of Metra's *larger* proposed terminal areas (*id.*), which is not the same as leaving the terminal undefined.

*Second*, the STB reasonably found the UP Lines "assist[] in the performance of the functions of a terminal" (*Golden Cat Div. of Ralston Purina Co. v. St. Louis Sw. Ry.,* 1996 WL 197602 at *5 (STB served Apr. 17, 1996)), as they are "necessary for the convenience of passengers" and their "prompt transportation" (*Erie R.R. Acquis., Etc.*, 275 I.C.C. 679, 687 (1950)). *See* Add.14 n.28, App.673 n.28. That is, the STB applied the longstanding and expansive definition of terminal facilities, which includes facilities supporting passenger transportation, and reasonably found it satisfied here. Add.14-15; App.673-674. As the STB put it: "[a] commuter rail system is only as useful as its proximity to the places its customers live." Add.17,

App.676. The UP Lines outside the terminal assist the passenger rail activity within it. For a passenger from Harvard, Illinois—the UP-Northwest Line's endpoint—the passenger transport function of the terminal depends on the train reaching that passenger. The same is true for thousands of commuters along all three lines.

Nor is UP justified in its accusations of the "tail wagging the dog" (*id.* at 43); or the STB pursuing "atextual aims" (*id.* at 45) through "results-oriented" reasoning (*id.* at 46); or "hammer[ing] and stretch[ing]" the statute (*id.* at 48). The STB defined the terminal as the CFT, as UP proposed, and then rationally explained why the UP Lines outside the CFT are a "reasonable distance" from the terminal—exactly as the statute commands.

**3.** UP's ultimate objection is that the STB adopted a different (but more straightforward) application of the statutory language to the mainline tracks outside the terminal than what UP would have preferred: UP asserts that "terminal facilities" outside the terminal are "generally" limited to *only* "track necessary to access or use the terminal." Br.42.

But the statute does not contain any such limitation, and the STB rightly rejected UP's position. Add.17-18, App.676-677. No case draws this line, and some refute it. *See, e.g.,* Add.17, App.676 (citing *Chicago & Alton Railroad v. Toledo, Peoria & Western Railway*, 146 I.C.C. 171, 179 (1928)). As the Board explained, application of the terminal facilities statute to a

hub-and-spoke commuter rail system demands a different and case-specific analysis. Add.17, App.676. Whether Metra might have *some* other way to access the CFT is irrelevant to whether the UP Lines support the terminal's passenger transportation function. They, in fact, do support that function, as "many thousands of commuters … rely each day on Metra's service specifically over the UP Lines." Add.17, App.676.

**4.** Lastly, UP resists the principle that "the term [terminal facilities] should be liberally construed" given the "remedial … nature" of the provision. *CSX Corp.—Control—Chessie Sys., Inc.*, 363 I.C.C. 518, 585 (1980), *aff'd* 857 F.2d 1487 (D.C. Cir. 1988). Though UP suggests *Loper Bright* has changed the analysis (Br.47), the Supreme Court agreed that the "longstanding practice of the government—like any other interpretive aid— can inform a court's determination of what the law is." 603 U.S. at 386. UP offers no cogent argument for abandoning the agency's long-held view on construing terminal facilities remedially.

## III. THE STB PROPERLY APPLIED THE STATUTORY REMEDY.

UP asserts the STB's decision was unlawful or arbitrary and capricious for failing to set terms before Metra's terminal trackage rights took effect. Not so. The agency followed the statutorily mandated sequence by reasonably determining that UP's compensation was adequately secured

and holding UP and Metra responsible for establishing compensation and conditions in the first instance.

## A. The statute does not require final terms before use.

UP is wrong to assert that the statute "require[s] setting terms—both compensation and other conditions of use—before access can begin." Br.49.

**1.** As to compensation, the text plainly states that "compensation shall be paid *or adequately secured* before" use begins. 49 U.S.C. § 11102(a) (emphasis added). Compensation does *not* need to be set and paid before use—the statute provides for an alternative, which the STB selected here. *See Campos-Chaves v. Garland*, 602 U.S. 447, 457 (2024) ("The word 'or' is almost always disjunctive.").

The ordinary meaning of "secure" at enactment was "to assure of payment, performance, or indemnity." *Secure*, Henry Campbell Black, *A Law Dictionary* 1066 (2d ed. 1910). The STB reasonably determined that UP was adequately "assure[d] of payment." *Id.*; *see* Add.30-32, App.689-691.

*First*, following decades of precedent, the STB found its "pledge" to set final compensation is adequate security. Add.31 & n.64, App.690 & n.64. *See also S. Pac. Transp. Co. v. ICC,* 736 F.2d 708, 723 (D.C. Cir. 1984) (per curiam) (pledge to set compensation "fulfills the requirement of the term 'adequate security'"). Contrary to UP, this approach does not read the word

"before" out of the statute because the STB ultimately "would have to [address compensation] anyway." *Cf.* Br.51. The statutory sequence is honored: compensation has been "adequately secured" by providing the incumbent assurance of payment before use begins.

*Second*, the STB determined that UP's payment was "adequately secured" because Metra, as a governmental entity, is "presumed to be financially responsible," and Metra testified that it could afford any payment ultimately required. Add.31-32, App.690-691. In response, UP bluntly asserts that "Metra must pay up front." Br.53. But the statute requires otherwise: Compensation can be "paid *or* adequately secured." 49 U.S.C. § 11102(a) (emphasis added).

Nor, contrary to UP's suggestion, does this sequencing "raise[] constitutional problems." Br.52 (citing *Knick v. Twp. of Scott*, 588 U.S. 180, 190 (2019)). *Knick* held that "[t]he Fifth Amendment *right to* full compensation arises at the time of the taking," meaning that a takings plaintiff need not exhaust state procedures before suing in federal court. 588 U.S. at 190-191 (emphasis added). The Court made clear that this right "*does not* as a practical matter mean that government action or regulation may not proceed in the absence of contemporaneous compensation[,] [g]iven the availability of post-taking compensation." 588 U.S. at 190, 202 (emphases added); *see also*

*PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 487-488 (2021) ("Eminent domain … can be exercised … simply by taking possession up front, with compensation to follow").

**2.** Even more strained is UP's assertion that "conditions, like operational terms or indemnity, must be set in advance too." Br.50. The statute says the opposite. While the parties must negotiate both "conditions *and* compensation," and, "if the rail carriers cannot agree, the Board may establish conditions *and* compensation," only "[t]he *compensation* shall be paid or adequately secured before" use begins. 49 U.S.C. § 11102(a) (emphases added). Congress knew how to encompass both conditions and compensation within a provision—it did so twice in the preceding two sentences. "[I]f Congress had wanted" to make both conditions and compensation prerequisites to entry, "it knew exactly how to do so—it could have simply borrowed from the [sentence] next door." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018); *accord Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020) ("[W]e are doubly careful to avoid" "read[ing] into statutes words that aren't there … when Congress has (as here) included the term in question elsewhere in the very same statutory provision.").

The same is true of UP's argument that "at least some conditions … *must* be set together with (or before) compensation." *Cf.* Br.50. This argu-

ment—that some conditions must be set prior to use to allow for a compensation calculation—mistakenly presumes that compensation must be "paid" rather than "adequately secured" in advance. 49 U.S.C. § 11102(a).[6]

### B. The STB reasonably declined to set interim terms.

UP also argues that allowing use pursuant to trackage rights without setting conditions and compensation was arbitrary and capricious, because "[r]unning a railroad … require[s] clear rules for everyone involved." Br.54. The STB accounted for such concerns. Its decision was "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024).

The STB declined to prejudge the two sides' competing proposals for interim conditions, because they had not been "subject to the statutorily-required negotiating process." Add.32 n.65, App.691 n.65. At the same time, the STB accounted for UP's specific concerns regarding indemnity for accident liability, which UP asserted was a "critical interim term." *Id.* The STB said it "d[id] not anticipate serious disagreement" on this point, but assured both parties that it would provide "guidance" upon request. *Id.* The STB then followed through: When UP requested that the agency set interim conditions on indemnity and liability (on the same day UP filed this petition), the STB promptly did just that. App.721; App.729.

---

[6]   Moreover, once again, this argument is waived by UP's failure to timely present it to the STB. *Otter Tail Power Co.*, 484 F.3d at 963.

UP has not identified any actual dislocation in Metra's operations or its own resulting from the STB's determination to require the parties to establish conditions and compensation for Metra's trackage rights bilaterally in the first instance consistent with the statute. The STB cannot have acted arbitrarily and capriciously by obeying the law. UP argues that the STB "could have delayed its order's effective date to allow negotiation." Br.55. But the statute neither provides for nor requires such delay. In contrast, the agency saw an urgent need to grant Metra's application "to ensure the provision of adequate rail service to the public" and reasonably gave its order immediate effect. Add.30, App.689.

## IV. SHOULD THE COURT DISAGREE, REMAND IS PROPER.

The Court should deny UP's petition for review. If the Court were to disagree, the proper remedy would be to vacate the STB's order and remand for re-determination of Metra's terminal trackage rights application, not to direct that the application be denied. UP's arguments are that the STB misread the statute and applied incorrect standards in granting Metra's application. If the STB erred, it should be permitted to determine the correct result (including whether to adopt the alternative terminal area definitions proposed by Metra), under whatever standards this Court may apply.

## CONCLUSION

The Court should deny the petition for review.

Dated: February 24, 2026                Respectfully submitted,

                                         /s/ Paul W. Hughes
                                         PAUL W. HUGHES
                                         ANDREW A. LYONS-BERG
                                         MARY H. SCHNOOR
                                         EMMETT WITKOVSKY-ELDRED
                                           McDermott Will & Schulte LLP
                                           500 North Capitol Street NW
                                           Washington, DC 20001
                                           (202) 756-8000

                                         AARON D. VAN OORT
                                           Faegre Drinker Biddle & Reath LLP
                                           2200 Wells Fargo Center
                                           90 South Seventh Street
                                           Minneapolis, MN 55402-3901
                                           (612) 766-7000


            Counsel for Intervenor Commuter Rail Division
        of the Regional Transportation Authority d/b/a Metra

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7) because it contains 11,701 words, excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 MSO and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

(iii) complies with Circuit Rule 28A(h)(2) because the brief has been scanned for viruses and is virus-free.

Dated: February 24, 2026                    */s/ Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2026, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: February 24, 2026                    */s/ Paul W. Hughes*